IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TESCO CORPORATION | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO. H-08-2531 |
| | § | |
| v. | § | |
| | § | |
| WEATHERFORD INTERNATIONAL, INC.; | § | JURY TRIAL DEMANDED |
| NATIONAL OILWELL VARCO, L.P.; | § | |
| OFFSHORE ENERGY SERVICES, INC.; and | § | |
| FRANK'S CASING CREW AND RENTAL | § | |
| TOOLS, INC. | § | |
| | § | |
| Defendants. | § | |

**DEFENDANT NATIONAL OILWELL VARCO, L.P.'S
MOTION FOR PARTIAL SUMMARY JUDGMENT OF
PATENT INVALIDITY FOR INDEFINITENESS PURSUANT TO 35 U.S.C. § 112, ¶ 2**

TABLE OF CONTENTS

TABLE OF CONTENTS………………………………………………………………………i

TABLE OF AUTHORITIES………………………………………………………………...ii

I.      SUMMARY OF ARGUMENT…………………………….......…………………….1

II.     STATEMENT OF MATERIAL FACTS ……………………………………....…..1

III.    AUTHORITIES……………………………………………………………………...4

        A.      Summary Judgment Standard, F.R.C.P.56……………………………………..4

        B.      Indefiniteness Under 35 U.S.C. §112, ¶2………………………………………4

        C.      In the Alternative, Claim Construction is a Matter of Law………………………5

IV.     ARGUMENT…………………………………………………………………………6

        A.      The Claimed Connection to A "Top Drive" Is Ambiguous According to Tesco's
                Own Designated Expert Witnesses……………………………………………6

        B.      A Person Of the Ordinary Skill In The Art Cannot Unambiguously Define a "Pipe
                Engaging Apparatus"………………………………………………………10

                1.      Tesco's Experts Cannot Agree Upon An Unambiguous Definition……..10

                2.      The "main body" and the "pipe gripping mechanism" of the "pipe
                        engaging apparatus" are indistinguishable………………………………15

                3.      Tesco's Experts Cannot Determine Whether Tesco's U.S. Patent No.
                        6,311,792 to Scott & Nikiforuk Includes A "Pipe Engaging Apparatus".17

V.      CONCLUSION………………………………………………………………………18

# TABLE OF AUTHORITIES

## CASES:

*Avia Group Int'l Inc. v. L.A. Gear California, Inc.*,
853 F.2d 1557, 1561 (Fed. Cir. 1988)…………………………………………………………...4
*Halliburton Energy Servs., Inc. v. M-I, LLC*,
456 F. Supp.2d 811, 825 (E.D. Tex. 2006)…………………………………………………...4
*Exxon Research & Eng'g Co. v. United States*,
265 F.2d 1371, 1375 (Fed. Cir. 2001)……………………………………………………4,5
*Miles Labs., Inc. v. Shandon, Inc.*,
997 F.2d 870, 875 (Fed. Cir. 1993)…………………………………………………………...4
*Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*,
359 F.3d 1367, 1371 (Fed. Cir. 2004)……………………………………………………4,5
*Monsanto Co. v. Scruggs,*
459 F.3d 1328, 1336-37 (Fed.Cir.2006)………………………………………………………...5
*Personalized Media Communications, LLC v. International Trade Comm'n,*
161 F.3d 696, 705, 48 USPQ2d 1880, 1888 (Fed.Cir.1998)…………………………………5
*Datamize, L.L.C. v. Plumtree Software, Inc.*,
417 F.3d 1342, 1347 (Fed. Cir. 2005)……………………………………………………5
*Halliburton Energy Servs., Inc. v. M-I, LLC*,
514 F.3d 1244, 1249 (Fed. Cir. 2008)……………………………………………….........5
*Honeywell Int'l, Inc. v. Int'l Trade Comm'n*,
341 F.3d 1332, 1338 (Fed. Cir. 2003)……………………………………………………5
*Cytologix Corp. v. Ventana Med. Systems, Inc.*,
424 F.3d 1168, 1172 (Fed. Cir. 2005)……………………………………………………...5,6

## STATUTES:

35 U.S.C. § 112, ¶ 2……………………………………………………………………………1,4
35 U.S.C. § 282 ………………………………………………………………………………4

## I.      SUMMARY OF ARGUMENT

NOV moves for partial summary judgment of patent invalidity Tesco's asserted claims contain the elements "pipe engaging apparatus" or "pipe engaging apparatus … having a main body … and a pipe gripping mechanism."   These elements are indefinite as a matter of law pursuant to 35 U.S.C. § 112, ¶ 2.   Since even Tesco's own designated expert witnesses cannot identify precisely what constitutes a "pipe engaging apparatus," "main body," or a "pipe gripping mechanism," a person of ordinary skill in the art could not do so either.

## II.      STATEMENT OF MATERIAL FACTS

Plaintiff Tesco Corporation (Tesco) asserts that Defendants Weatherford International, Inc. (Weatherford); National Oilwell Varco, L.P. (NOV); Offshore Energy Services, Inc. (OES); and Frank's Casing Crew and Rental Tools, Inc. (Frank's) infringe U.S. Patent 7,140,443 ('443 Patent) and U.S. Patent 7,377,324 ('324 Patent) (hereinafter collectively the patents-in-suit). (Appendix 1 – 14 and 15 – 27)

During the claim construction phase of this litigation, the parties' principle dispute was the location of the pivotal connection of the link arms.   On January 5, 2010, the Court issued its *Markman* (Dkt # 176-1) ruling.   The court did not construe the term "pipe engaging apparatus." At the time the parties agreed that this term did not need interpretation since "pivotal connection" was being construed.

The description of the patents-in-suit describes link arms mounted to a support surface, which "can, for example, be [1] a portion of a top drive or [2] a pipe-engaging apparatus or [3] another surface connected in some way to move with the top drive" ('443 Patent, Col. 3, ll. 21-23).   The Court found that the 1st example and certain portions of the 3rd example listed above have been disclaimed.   Dkt#176-1:

"embodiments in which the support surface is a portion of the top drive have now    been disclaimed." (p. 13);

"What Tesco did disavow, however, is any surface that can fairly described as part of the top drive. Therefore, the language of the claims themselves need not as a matter of law be construed to exclude coverage of an intermediate surface, provided that this intermediate surface forms no part of and is not supported by the top drive itself." (p. 14) (emphasis added);

"Tesco's statements clearly disclaim any embodiment which the link arms are connected to any part of the top drive itself" (p. 19).

The Court acknowledged that "Tesco's patents do not cover *all* the intermediate surfaces described above" (Dkt#176-1, p. 13) and "that some such surfaces would not be covered" (Dkt#176-1, p. 19).  However, the Court did not clarify what "intermediate surfaces" are beyond the scope of the claims.  Therefore the principle conflict recognized by the Court during *Markman* remains unresolved:

"the issue of dispute between the parties appears to be **whether Tesco's patent will cover those embodiments of the device in which the link arms are mounted on some surface positioned below the top drive, but not part of the main body** of the pipe-handling device such that the link arms can be said to be 'directly on the device.'"

Dkt#176-1, p. 12.  (emphasis added).

During recent depositions of plaintiff's experts, attempts to discover the meaning of terms such as "top drive" and "main body" of the "pipe engaging apparatus" have been futile.  As shown below, Tesco's own expert witnesses on infringement and validity, Gary Wooley, Ph.D. (Wooley) and Tommy Warren (Warren), respectively, do not agree with each other regarding the meaning of these claim terms to a **p**erson **o**f **o**rdinary **s**kill **i**n **t**he **a**rt (POOSITA).  Their motivation is clear.  Wooley proposes a broad meaning in order to support a patent infringement claim, while Warren presents a narrow meaning to try to preserve patent validity.

2

The meaning of these terms, and the meets and bounds of their scope, cannot be determined based upon the claim language, the figures, or the written description.

### III.   AUTHORITIES

**A.     Summary Judgment Standard, F.R.C.P. 56**

Summary judgment is just as appropriate in a patent case as in any other case, where the summary judgment evidence establishes that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *Avia Group Int'l Inc. v. L.A. Gear California, Inc.*, 853 F.2d 1557, 1561 (Fed. Cir. 1988).  Thus if the summary judgment evidence establishes that one or more elements of the asserted patent claims are indefinite, NOV is entitled to summary judgment for non-infringement.  *Halliburton Energy Servs., Inc. v. M-I, LLC*, 456 F. Supp.2d 811, 825 (E.D. Tex. 2006) (granting summary judgment after finding that the patent was invalid because the claims were indefinite).

**B.     Indefiniteness Under 35 U.S.C. § 112, ¶ 2**

Under 35 U.S.C. § 112, ¶ 2, "[t]he specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."   In other words, the standard is "whether the claims at issue are sufficiently precise to permit a potential competitor to determine whether or not he is infringing."  *Exxon Research & Eng'g Co. v. United States*, 265 F.2d 1371, 1375 (Fed. Cir. 2001) (internal quotation omitted).  Determination of claim indefiniteness is a question of law drawn from the Court's duty as construer of patent claims. *Id.* at 1376.

Whether a patent complies with § 112, ¶ 2 is a question of law.  *Miles Labs., Inc. v. Shandon, Inc.*, 997 F.2d 870, 875 (Fed. Cir. 1993); *Bancorp Servs., L.L.C. v. Hartford Life Ins. Co.*, 359 F.3d 1367, 1371 (Fed. Cir. 2004).  Because 35 U.S.C. § 282 gives a patent "a statutory presumption of validity," a challenger bears the burden of proving "by clear and convincing

evidence" that a patent is invalid. *Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1336-37 (Fed.Cir.2006).

Where the bounds of the claims are indeterminable, the claims are invalid under 35 U.S.C. § 112, ¶ 2, as indefinite. *Personalized Media Communications, LLC v. International Trade Comm'n*, 161 F.3d 696, 705, 48 USPQ2d 1880, 1888 (Fed.Cir.1998).   To determine whether a claim is indefinite, "a court must determine whether those skilled in the art would understand what is claimed when the claim is read in light of the specification." *Bancorp*, 359 F.3d at 1371.  "If a claim is insolubly ambiguous, and no narrowing construction can properly be adopted, we have held the claim indefinite." *Exxon*, 265 F.2d at 1375.

Under 35 U.S.C. § 112, ¶2, claims must be sufficiently definite to notify the public of the boundaries of patentee's right to exclude.  *Halliburton Energy Servs., Inc. v. M-I, LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008); *Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1338 (Fed. Cir. 2003) (35 U.S.C. § 112, ¶2 "focuses on whether the claims, as interpreted in view of the written description, adequately perform their function of notifying the public of the [scope of the] patentee's right to exclude.").  "Otherwise, competitors cannot avoid infringement, defeating the public notice function of patent claims." *Halliburton*, 514 F.3d at 1249.  Equivocal language undermines the notice function of the claims because rather than giving notice of the scope to competitors, the inventor may exploit the language to encompass a particular product.  *Id.* at 1254–55.

## C.    In the Alternative, Claim Construction is a Matter of Law

In *Cytologix Corp. v. Ventana Med. Systems, Inc.*, the parties agreed, against the wishes of the court, to proceed to trial without a *Markman* hearing and to allow the court to construe the claims at issue after the close of evidence.  424 F.3d 1168, 1172 (Fed. Cir. 2005).  The Federal

Circuit held that the district court in *Cytologix* improperly allowed the parties to present expert witnesses to testify before the jury on issues relating to claim construction and also improperly allowed the counsel to argue conflicting claim constructions to the jury. *Cytologix*, 424 F.3d at 1172 ("This was improper, and the district court should have refused to allow such testimony despite the agreement of the parties."). The Federal Circuit does not allow jurors to hear experts testifying about claim construction issues because of the high risk of confusing the jury. *Id.* ("The risk of confusing the jury is high when experts opine on claim construction before the jury even when, as here, the district court makes it clear to the jury that the district court's claim constructions control.").

## IV.   ARGUMENT

### A.   The Claimed Connection to A "Top Drive" Is Ambiguous According To Tesco's Own Expert Witnesses

Each of the asserted claims of the patents-in-suit require a "pipe engaging apparatus" for connection to a "top drive." However, the precise boundary of a top drive cannot be determined based upon Tesco's designated expert witnesses—Wooley and Warren. Wooley defines the "top drive" as the motor, housing and the output shaft or quill:

> Q:   Okay.  2.3, you put this little yellow balloon out here that says "top drive", that has a little arrow.  That's the top drive you're referring to?
>
> A:   … And with respect to claim 13 that you were just asking about, the connection – connection to a top drive, in my opinion, refers to the main shaft or the quill at the bottom of the moving component I have labeled as top drive in figure 2.3.

Appendix p.29, Wooley Dep., p. 30, ll. 9-20.  (emphasis added).

> Q:   Okay.  I'll circle it for you here.  And I've labeled it "top drive" and I'll put my initial there so nobody gets confused.  That's the top drive that I've labeled "top drive" with initials RMB, and put a blue circle around; is that correct?
>
> A:   Yes.

6

Q:     And is that the same type of top drive that is used in claim 13 where it references "a top drive"?

A:     Well, I think I've answered that.  Let's go back to claim 13.  <u>Claim 13 refers to a top drive in terms of, "A drive connection to a top drive," in quotes</u>.  And in my opinion, that is a connection to the drive shaft at the bottom of the moving part that's shown in 2.3, and I have labeled as top drive, and you've also labeled it as top drive.  <u>And the drive shaft at the bottom of that or the quill is the connection that's referred to in claim 13</u>.



Appendix p. 29, Wooley Dep., p. 32, ll. 2-20.  (emphasis added).

The top drive from Wooley's expert report, and as referenced above, is reproduced here to illustrate the boundaries according to Wooley's definition.

**Warren disagreed with Wooley's definition of "top drive**":

Appendix p. 42, Warren Dep., p. 9, ll. 6-14 (emphasis added):

Q:     Did you disagree with anything Mr. Wooley said?

A:     I probably would disagree – and I didn't study for looking at this, but <u>I probably disagree with the definition he gave for a top drive</u>.  I would have said that a different way.  <u>I consider a top drive to probably be more *inclusive* than what I think he said</u>, if I remember correctly.

Warren thinks a "top drive" is an ever changing, moving target that depends upon the application and decisions regarding hardware or subs used.  This is very unclear:

7

Q:      Well, when – how do you determine when you connect something to the top drive, when it becomes part of the top drive?

A:      If you are drilling, for example, with drill pipe with a top drive, and then you decide that you would like to pick up a casing engaging apparatus and use it with the top drive, those components that remain on the top drive from when you were drilling with drill pipe are part of the top drive.

Appendix p. 46, Warren Dep., p. 166, ll. 10-17;

Q:      And who makes the determination of whether or not a crossover sub stays with the top drive or not?

Q:      Wouldn't the rig owner make that determination?

A:      The rig owner could make that determination.

Q:      I mean, the rig owner of every top drive decides what he's going to connect to the top drive main shaft, correct?

A:      The rig owner may decide, but the components that stay with the top drive are part of the top drive.

Q:      Right.  But the rig owner might decide one day he's going to put two IBOP's connected to the top drive, and then tomorrow, Thursday, decide he's only going to use one, correct?

A:      He could decide that.

Q:      And he could decide tomorrow that he's going to put a crossover sub there, where there wasn't one today?

A:      He could decide that.

Q:      And he could decide tomorrow that he's going to put a saver sub connected to the top drive, correct?

A:      He could decide to put a saver sub there.  Normally, the saver sub would be something that would be on the top drive.

> Q:    And depending on how they're drilling and what where they're drilling and what they're doing that day, the drilling operator will decide what he wants connected to the top drive, correct?
>
> A:    That's the normal, yes.
>
> Q:    So, when does a crossover sub become part of the top drive, and when is it not part of the top drive?
>
> A:    If the crossover sub is put on the top drive and stays there day in, day out, primarily as a saver sub, it would be part of the top drive.

Appendix p. 44, Warren Dep., p. p. 160, l. 3 - p161, l. 13;

> Q:    Mr. Warren, let's go back to Exhibit 836, please.  If I have a piece of dumb pipe connected to a top drive main shaft, and I have something connected below it, how do you determine if that piece of dumb pipe is part of the top drive or part of the device connected there below?
>
> A:    If that piece of pipe is normally something that stays on the top drive as you routinely drill, it's probably part of the top drive.

Appendix p. 46, Warren Dep., p. 168, ll. 9-16;

> Q:    And what if you have a piece of pipe that functions both as a saver sub and a crossover?
>
> A:    <u>If that piece of pipe functions as a saver sub and it stays there, it might be considered part of the top drive.  I</u> --
>
> Q:    <u>So you can't determine?</u>
>
> A:    <u>I don't know that I can determine that that particular sub in the hypothetical case that you've given me is part of the top drive or not.</u>  You might – if it is part of the top – if it's a saver sub that stays on the top drive, and that's typically what we call a saver sub to be, it stays there over many connections, then that would be part of the top drive.
>
> Q:    So it depends on how long it stays there?
>
> A:    If it stays there routinely as part of the top drive, then it's part of the top drive.  If it stays there – I mean, that didn't make much sense; but if it stays there with the other top drive components routinely, then it's part of the top drive.

Appendix p. 46, Warren Dep., p. 169, l. 20 – p. 170, l. 15.  (emphasis added).  Thus, according to

Warren, the top drive consists of whatever components that the drilling contractor chooses on

any given day to drill with drill pipe.  This determination is made sometime prior to connecting a "pipe engaging apparatus" or other sub-assembly that is not "routinely" used to drill with drill pipe.

     Thus, Tesco's own experts disagree as to the scope and meaning of the "top drive" as claimed by the patents-in-suit.  Wooley's and Warren's respective positions are illustrated below:

**FIGURE 1:**

**B.**    **A Person Of the Ordinary Skill In The Art Cannot Unambiguously Define a "Pipe Engaging Apparatus"**

    **1.**    **Tesco's Experts Cannot Agree Upon An Unambiguous Definition**

The term "pipe engaging apparatus" as claimed in Tesco's '324 and '443 Patents is insolubly ambiguous.  Tesco's designated expert witnesses cannot agree with each other, much less provide an unambiguous definition of a "pipe engaging apparatus."

Wooley was asked several times to define a pipe engaging apparatus.  He initially defined "pipe engaging apparatus" by simply rearranging the words —"an apparatus that can engage pipe."  Appendix p. 30, Wooley Dep., p. 58, l. 21 – p. 59, l. 3.  Wooley then testified that there are two components to the pipe engaging apparatus—the "main body" and the "pipe-gripping mechanism."  Appendix p. 31, Wooley Dep. p. 62, ll. 10–18.  Unfortunately, Wooley could not offer any reasonable meaning of these two terms.   Like his definition of "pipe engaging apparatus", Wooley only offered a circular definition of "pipe-gripping mechanism" by merely rearranging the words:

> Q:    Okay.  Well, in your opinion, what is a <u>pipe-gripping mechanism</u>?
>
> A:    I think the words are fairly self-explanatory.
>
> Q:    Well, please help me understand.
>
> A:    It's a <u>mechanism</u> for <u>gripping pipe</u>.

Appendix p. 30, Wooley Dep., p. 60, l. 25 – p. 61, l. 5 (emphasis supplied).

To understand the other component of the "pipe engaging apparatus" – the "main body" – Wooley offered only an exclusory interpretation of the term:

> Q:    Okay.   What about the other component of the pipe-engaging apparatus which claim 13 refers to as a main body.  <u>What is a main body</u>?
>
> A:    That's the rest of the pipe-engaging apparatus. That's not the pipe-gripping mechanism.
>
> Q:    Anything that's not the part that grips the pipe?
>
> A:    Yes.
>
> Q:    How do we know what that part is?
>
> A:    I think it's pretty easy.  <u>If it's not the pipe-gripping mechanism, it's the main body.</u>

Appendix p. 61, Wooley Dep., p. 64, l. 19 – p. 65, l. 4.  (emphasis added).  Not satisfied with the

11

broadness of the answer, Wooley was asked to differentiate between the pipe gripping mechanism and main body. Again his answer was ambiguous:

> Q:   Okay.  What differentiates the gripping mechanism from the main body?
>
> A:   As you indicated, you can probably identify the gripping mechanism; and everything else is the main body.

Appendix p. 61, Wooley Dep., p. 65, ll. 12–15.  (emphasis added).

**Amazingly, according to Wooley, the "main body" of the "pipe engaging apparatus" is *wherever* the link arms are connected**.  This is a blatant attempt to find infringement under all possible circumstances, in complete contradiction of this Court's claims construction:

> Q:   There's no disclosure in the patent or suggestion that a sub mounted set of link arms located between the pipe engaging apparatus and the top drive is part of the main body, is there?
>
> A:   That defines the main body.  The patent describes the place where the pivotal connection of the link arms occurs is on the main body.  So, where that pivotal connection of the link arms is is the main body.
>
> Q:   Okay.  So your opinion is that *wherever* the pivotal connection is below the top drive, that must be the main body?
>
> Q:   Correct?
>
> A:   That is one of the descriptions of the main body in the patent.
>
> Q:   Is that – is that your opinion?
>
> A:   What I just said was my opinion, yes.
>
> Q:   Well, all right.  And what I've said is:  Is it your opinion that at *any place* located below the top drive that the link arms are connected, that those link  arms are connected to a main body?
>
> A:   That is the description in the patent.
>
> Q:   And is it your belief that the main body would then include a sub mounted below the top drive and above the pipe-engaging apparatus?
>
> A:   Yes.

Appendix p. 37 - 38, p. 269, l. 6 – p. 270, l. 10.  (emphasis added).

Wooley opined a POOSITA would understand all of the components under the top drive depicted in Figure 1 above are part of the main body – not the top drive:

Appendix p. 38, Wooley Dep., p. 319, l. 25 – p.

> Q:    So that crossover sub is going to be part of the main body –
>
> A:    Yes.
>
> Q:    -- of the pipe-engaging apparatus?
>
> A:    Like the other components in here, it will just be incorporated into the main body.  The patent defines the main body as the location where the  -- the pivotal connection with the link arms is located.

Appendix p. 39, Wooley Dep., p. 323, l. 6-13.  (emphasis added).

> Q:    So whenever I connect something in series to what we call the current CRT-350, that all becomes part of the pipe-engaging apparatus?
>
> A:    Correct.  But **where the link arms are attached *is* the main body**, as defined by the patent.
>
> Q:    So, wherever the link arms are connected, that's the main body?
>
> A:    Well, the main – the patent claim describes the link arms as being pivotally – pivotally connected to the main body.  So, if you just move that up and incorporate a couple of new components in here, the main body is just a little longer than it was before.
>
> Q:    So, the only way for there to be infringement is if the link arms are connected to the main body?
>
> A:    No.  I think you stated it backwards.  The link arms are pivotally connected to the main body.
>
> Q:    Okay.
>
> A:    So that defines the location of the main body.

Appendix p. 39, Wooley Dep., p. 324, l. 8 – p. 325, l. 4.  (emphasis added).

On the other hand, Tesco's other expert, Warren testified that a "main body" in the context of the patents-in-suit must include a "housing that has something inside of it":

> Q:    Okay.  So a main body has to include a housing?

13

A:     A main body includes a housing.

Q:     And what do you mean by housing?

A:     A housing is a structure that encloses or covers other parts.

Q:     And if there's no other parts inside of, let's just say a mandrel, I think that's another fancy word for pipe, it can't be a main body?

Q:     Okay.  Would a dumb piece of pipe, just a mandrel or a piece of pipe, cylindrical, has an opening through it, would that be considered a main body?

A:     I would not consider that a main body in the context of this patent.

Q:     Okay.  What if you put link arms on it, would that change whether or not it's a housing?  A dumb piece of pipe,  put some ears on the side of it and hung link arms off of it, would it become a housing then?

A:     Would a dumb piece of pipe?

Q:     Yeah.

A:     It depends on whatever – what else was there, but a dumb piece of pipe would not be a housing.

Appendix p. 43, Warren Dep., p. 135, l. 17 – p. 136, l. 17.  Thus, according to Warren, a "main body" of the pipe engaging apparatus cannot be a sub with nothing in it unless that very same sub is connected to a housing which has something, e.g., an actuator, inside of it.  As illustrated above, these various components are connected in series in the rig.  Given the testimony of Tesco's experts, a POOSITA cannot possibly distinguish which parts constitute a "main body", when a sub or section of pipe becomes part of the "main body", and when a sub or section of pipe becomes part of the top drive.  Such inconsistency renders this claim language insolubly ambiguous and indefinite.

2.      The "main body" and the "pipe gripping mechanism" of the "pipe engaging apparatus" are indistinguishable

Using the figures in the patents-in-suit, Wooley was asked at what point he would distinguish between the "main body," or "pipe gripping mechanism" of the "pipe engaging apparatus":

Q:      So, would it be safe if I drew a horizontal line right there at that red point, that the pipe-gripping mechanism is everything below that?

A:      No.  That wouldn't be safe.  I mean, there are other pieces around this thing.  You would have to look at the machine drawing to see where you might want to draw that line to separate the pipe-gripping mechanism from everything else. I mean, all this stuff is hooked together.  You're going to sort of arbitrarily draw the line somewhere; but if you've got a machine drawing that's got all of the components, you could probably do that.

Q:      Well, I'm asking you your opinion of where you would draw the line?

A:      That's what I'm saying, you could probably do it if you had a machine drawing with all of the various components shown.  Here you've got the basic elements, and we've been through those; but this obviously doesn't show everything.

Appendix p. 32, Wooley Dep., p. 78, l. 17 – p. 79, l. 9.  (emphasis added).

Q:      And I am trying to differentiate the components of the pipe-engaging apparatus, which I believe your opinion is has got two parts; a main body, and a pipe-gripping mechanism?

A:      Correct.

Q:      And I'm trying to figure out where you draw the line between the pipe-gripping mechanism and the main body?

A:      And I think I've answered that.  It's not a bright line.  They are all hooked to each other.  All of the components are hooked to each other; but with a machine drawing, you could probably do a pretty good job of saying it's everything in this area.

Q:      So, only with a machine drawing could you carve out and make a definitive line to distinguish the two?

A:      To get a good answer to your question, yes.

15

Appendix p. 32, Wooley Dep., p. 79, l. 25 – p. 80, l. 16.  (emphasis added).

> Q:   Okay.  Well, would it be safe for me to draw a line right here to say the pipe-gripping mechanism is everything below a horizontal line here; and everything above is the main body?
>
> A.   I'd have to look at a more specific drawing to make that -- to draw that line exactly.
>
> Q:   But you can't draw it –
>
> A:   I mean, this is just a conceptual embodiment of the claim language.
>
> Q:   But you can't draw it based on the disclosure of the patent?
>
> A:   Sure.  You could pick a spot, but, I mean, you're -- you're trying to identify a bright line where one might call it.  **And different people of ordinary skill might draw it at a different point because it's not -- it's not a bright line in terms of where -- all these pieces are connected together. It's not a bright line as to where one might call the end of the pipe-gripping mechanism** and -- because it's all connected to everything above it.
>
> Q:   So because all these components are connected --
>
> A:   There's some of them that are clearly the pipe-gripping mechanism; but as you move your way up, the line becomes less clear.  Because you include the adapter and the strap and all of the gripping mechanism and the housing and the packer and the stabbers.  But then you get to like the hydraulic lines we talked about, and you get to other components that are, where it's bolted up together.  Do you include the bolts?  **It's just not real clear where – where one might draw that.**

Appendix p. 32, Wooley Dep., p. 88, l. 17 – p. 89, ll. 2-23.  (emphasis added).

> Q:   Well, is there any way to tell what these components are right here, if they are part of the main body or the -- between my two fingers here, is there a way to determine between those two components if they're a part of the pipe-gripping mechanism or the main body?
>
> A:   I would include the actuator for the pipe-gripping mechanism.  Now, what else one might include, I'd have to **-- I don't know if it's labeled sufficiently in here to – to draw that bright line**.

Appendix p. 33, Wooley Dep., p. 89, l. 24 – p. 89, l. 7.  (emphasis added).

16

> Q:     Okay.  Forget how it functions.  I'm still trying to get back to my ultimate question of:  How do I know, or <u>where do I draw the line or draw a circle around where the pipe-gripping mechanism is</u> --
>
> A:     <u>I don't think the</u> --
>
> Q:     -- <u>and the main body</u>?
>
> A:     <u>I don't think that's easy to do precisely</u>.
>
> Q:     Okay.

Appendix p. 34, Wooley Dep., p. 93, l. 2-9.

Thus, Wooley clearly states that he cannot, from the description in the patents-in-suit, distinguish the main body from the pipe gripping mechanism.

### 3.     Tesco's Experts Cannot Determine Whether Tesco's U.S Patent No. 6,311,792 to Scott & Nikiforuk Includes A "Pipe Engaging Apparatus"



The patents-in-suit describe an example of a *pipe engaging apparatus* including the system disclosed in U.S. Patent No. 6,311,792 to Scott et al. ('792 Patent, Appendix p.50-58).  *See, e.g.,* Appendix p. 1 - 14, '443 Patent, Col. 1, ll. 19-21 ("Some engaging apparatus for casing pipe are described in U.S. Pat. No. 6,311,792…").  Figure 1 of the '792 Patent is reproduced to the right and includes: (14) "quill adapter" for "threaded connection to a top drive" (Col. 4, l. 1); (12) "housing"; (26) "annular ram" "drive means"; (20) "slips"; and (16) "slip bowl."

Tesco's expert on infringement, Wooley, testified that figure 1 of the '792 patent does **<u>NOT</u>** include a "pipe engaging apparatus"; a "pipe gripping mechanism"; *or* a "main body" as

used in the claims of the patents in suit.  *See* Appendix at p. 35 - 36, Wooley Dep. at p. 108, ll. 9-12; p. 109, ll. 8-10; p. 110, ll. 6-9; p. 110, ll. 17-20; p. 112, l. 10 – p. 113, l. 8 ; p.113, ll. 9-16.

However, Tesco's expert on validity, Warren, testified that the '792 patent **DOES** include a "pipe engaging apparatus"; a "pipe gripping mechanism"; *and* a "main body" as used in the claims of the patents in suit.  *See* Appendix at p. 48, Warren Dep. at p. 202, l. 5 – p. 203, l. 2.

## V.    CONCLUSION

Without a clear definition of the parts of the pipe engaging apparatus, NOV has no notice of what Tesco claims their invention to be.  "I'll know it when I see it" definitions of their experts do not put competitors on notice of the exact bounds of a patentee's claims – particularly when they contradict each other.  Likewise, circular definitions and exclusionary definitions do nothing to inform potential infringers of the patentee's position.  A POOSITA should be able to discern a definition from the patent.  Tesco's own experts cannot discern the "main body" from the "pipe gripping mechanism" in the patents they have been retained to give opinions about. Therefore, this Court should find claims 13, 18, 25, 43, and 55 of the '433 Patent and claims 1, 4, 12, 14, 17, and 27 of the '324 Patent invalid because the key terms are indefinite.

The patents merely give suggestions as to what <u>may</u> be included in the pipe engaging apparatus.  At best, it can be deduced that something called a main body and something else called a pipe gripping mechanism make up a pipe engaging apparatus.  However, how the parts embody the pipe engaging apparatus cannot be ascertained from the specification.  Tesco itself has problems defining the pipe gripping mechanism and the main body.

The '443 and '324 patents fail to limit the scope of the invention.  Similar to the patent at issue in *Halliburton*, the '443 and '324 patents do not delineate what parts are included in a pipe engaging apparatus beyond an undefined main body and an unidentified pipe gripping

18

mechanism.  Properties of the pipe engaging mechanism are described by functions rather than components.  This is no different than listing only some of the ingredients to a recipe.  A competitor cannot possibly know if its pipe engaging mechanism reads on the '443 or '324 patents.

Tesco could have clearly avoided this ambiguity by listing the components required for a pipe engaging apparatus.  Tesco's indefinite definition of a pipe engaging apparatus allows Tesco to make up whatever meaning it wants to help them in a lawsuit.  This is, of course, what they are doing in the case at bar.

Based on the foregoing, NOV respectfully requests that the Court grant its Motion for Summary Judgment and find U.S. Patents 7,140,443 and 7,377,324 indefinite.

Respectfully Submitted,

*/s/ ROBERT M. BOWICK*_____
John W. Raley, III.
Robert M. Bowick
Raley & Bowick, LLP
1800 Augusta Dr., Suite 300
Houston, Texas 77057
Email: rbowick@raleybowick.com
John W. Raley, III
Texas Bar No. 16488400
Email: jraley@raleybowick.com
Tel:  (713) 820-8045
Fax:  (713) 429-8045

**ATTORNEYS FOR DEFENDANTS /
COUNTER PLAINTIFFS
NATIONALOILWELL VARCO, L.P.**

## CERTIFICATE OF SERVICE

Pursuant to LR5.3 of the Local Rules for the United States District Court for the Southern District of Texas, I certify that a true and correct copy of the foregoing instrument has been served on July 23, 2010, on all counsel of record who have consented to electronic notification via CM/ECF through the United States District Court for the Southern District of Texas listed below:

Glenn A. Ballard, Jr.
Texas Bar No. 01650200
John F. Luman, III
Texas Bar No. 00794199
Andrew W. Zeve
Texas Bar No. 24042209
BRACEWELL & GUILIANI, LLP
711 Louisiana St., Suite 2300
Houston, Texas 77002
Tel:  (713) 221-2300
Fax:  (713) 221-1212
Email: glenn.ballard@bgllp.com
        john.luman@bgllp.com
        andrew.zeve@bgllp.com
**ATTORNEYS FOR PLAINTIFF / COUNTER DEFENDANT TESCO CORPORATION**

Paul E. Krieger
Lucas T. Elliot
Thomas R. Davis
MORGAN, LEWIS & BOCKIUS, LLP
1000 Louisiana St., Suite 4200
Houston, Texas 77002
Tel:  (713) 890-5000
Fax:  (713) 890-5001
Email: pkrieger@morganlewis.com
lelliot@morganlewis.com
tdavis@morganlewis.com
**ATTORNEYS FOR DEFENDANT WEATHERFORD INTERNATIONAL, INC.**

C. James Bushman
Loren G. Helmreich
BROWNING BUSHMAN, P.C.
5718 Westheimer, Suite 1800
Houston, Texas 77057
Tel:  (713) 266-5593
Fax:  (713) 266-5169
Email:  jbushman@browningbushman.com
lhelmreich@browningbushman.com
ATTORNEYS FOR DEFENDANT OFFSHORE ENERGY SERVICES, INC.

and

Lester Hewitt
Sarah Ring
David Clonts
AKIN, GUMP, STRAUSS, HAUER & FELD, LLP
1111 Louisiana 44th Floor
Houston, TX, 77002
Tel:  (713) 220-5800
Email:  lhewitt@akingump.com
sring@akingump.com
dclonts@akingump.com
ATTORNEYS FOR DEFENDANT FRANK'S CASING CREWAND RENTAL
TOOLS, INC.

 /s/ Robert M. Bowick _____
Robert M. Bowick