UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TESCO CORPORATION, | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 08-cv-2531 |
| | § | |
| WEATHERFORD INTERNATIONAL | § | |
| INC., NATIONAL OILWELL VARCO, | § | |
| L.P., OFFSHORE ENERGY SERVICES, | § | |
| INC., and FRANK'S CASING CREW & | § | |
| RENTAL TOOLS, INC., | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM AND ORDER

Pending before the Court are the Motion to Stay the Case Until Issuance of Reexamination Certificates (Doc. No. 195) ("Motion to Stay") and the Motion to Admit Reexamination Records into Evidence at Trial (Doc. No. 196) ("Motion to Admit"), both filed by Defendant Frank's Casing Crew & Rental Tools, Inc. ("Frank's"). Both Motions have been fully briefed. Also pending are the Motion for Partial Summary Judgment Limiting Liability Due to Plaintiff Tesco's Failure to Mark Pursuant to § 287(A) of the Patent Act (Doc. No. 202) ("Motion for Partial Summary Judgment") and the Motion for Summary Judgment of Patent Invalidity for Tesco's Admission of Prior Public Use of the Claimed Invention (Doc. No. 225) ("Motion for Summary Judgment") of Defendant National Oilwell Varco, L.P. ("NOV").

Having considered the parties' filings, all responses and replies thereto, and the applicable law, the Court finds that the Motion to Stay should be denied, the Motion to

Admit should be denied, the Motion for Partial Summary Judgment should be granted in part and denied in part, and the Motion for Summary Judgment should be denied.

## I.    BACKGROUND[1]

### A.    Motions to Stay and to Admit

Plaintiff Tesco Corporation ("Tesco") filed a complaint in this court on August 19, 2008, against Defendants Weatherford International, Inc. ("Weatherford"), NOV, Offshore Energy Services, Inc. ("OES") and Frank's.  The claims in the case arise from Defendants' alleged infringement of two Tesco patents concerning a casing running tool or casing drive system used to pick up, rotate, and "run" casing in oil wells.

Tesco was granted United States Patent No. 7,140,443 (the "'443 Patent"), entitled "Pipe Handling Device, Method, and System," in November 2006, and United States Patent No. 7,377,324 (the "'324 Patent") (collectively, the "Tesco Patents"), with the same title, in May 2008.[2] Tesco asserts that various casing running tools of each Defendant have infringed seven claims of the '443 Patent, and six claims of the '324 Patent. (Doc. No. 194.) Tesco also asserts that Defendants knew of the Tesco Patents and willfully disregarded them.

In October 2008, Weatherford, but not NOV, OES, or Frank's, filed a request for *inter partes* re-examination of the '443 Patent with the United States Patent and Trademark Office ("PTO"). (Doc. No. 54, at 1.) A few weeks later, Weatherford, again acting alone, filed a request for *inter partes* re-examination of the '324 Patent with PTO. (Doc. No. 60, at 1.) PTO granted both re-examination requests. In January and February 2009, PTO issued its first Office Actions in the two re-examinations, rejecting fifty-eight

---

[1] Except where noted, the facts presented in this section are not disputed by the parties.

[2] The '324 Patent is a continuation of the same application that resulted in the '443 patent.

of the seventy claims in the '443 Patent (Doc. No. 54, at 1) and thirty-three of the thirty-four claims in the '324 Patent (Doc. No. 60, at 2).

On the same day it requested re-examination of the '443 Patent, Defendants together filed a Motion to Stay Proceeding Pending Re-examination of the Patent-in-Suit[3] ("First Motion to Stay") (Doc. No. 34) with this Court. The Court denied the First Motion to Stay in February 2009. (Doc. No. 61.)

In January 2010, PTO issued an Action Closing Prosecution ("ACP") in each of the re-examinations of the Tesco Patents. (Doc. No. 195, at 3.) Of the seven claims in the '443 Patent asserted against the Defendants, PTO rejected five and confirmed two. (*Id.*, at 5.)   Of the six claims in the '324 Patent asserted against the Defendants, PTO rejected five and confirmed one.   (*Id.*)   All the confirmed claims include a "channel key" limitation that is absent from all of the rejected claims. (*Id.*, at 3.)  In March, 2010, PTO vacated the ACP regarding the re-examination of the '324 Patent at Tesco's request as a result of incorrect cross-references within the document. (*See* Doc. No. 215-1 at 4-6; Doc. No. 220-1 at 2.) PTO has not yet issued a corrected ACP regarding the re-examination of the '324 Patent, and PTO has not issued a Right of Appeal Notice[4] regarding either of the Tesco Patents.

Since PTO released the ACPs, this action has made significant progress towards trial.  This Court issued its *Markman* order in January 2010 (Doc. No. 176).  The deadline

---

[3] At the time of that filing, this action concerned only the '443 Patent. (*See* Original Complaint, Doc. No. 1, ¶¶ 10-18.) The complaint was later revised to assert claims of the '324 Patent as well. (*See* Second Amended Complaint, Doc. No. 64, ¶¶ 10-30.)

[4] A Right of Appeal Notice is the final Office Action in the re-examination process, and would allow either Tesco (as the patent holder) or Weatherford (as the requester) to appeal to the Board of Patent Appeals and Interferences ("BPAI"). The result of the BPAI proceeding, if any, could then be appealed to the Federal Circuit under 28 U.S.C. 1295(4)(a).

for expert reports passed in May 2010. Discovery is now closed, dispositive motions have been filed, and the case is set for trial on October 25, 2010.

The Motion to Stay and Motion to Admit currently before the court were filed by Frank's after the ACPs were issued. Although filed as two separate docket entries, these documents are identical and each requests the same three forms of relief. First, Frank's requests that the Court stay this case until the *inter partes* reexamination procedures at PTO are completed. Second, if the Court denies a stay, Frank's requests that the Court confirm now that it will admit the entire contents of the PTO's reexamination record into evidence at trial. Finally, if both of the other requests are denied, Frank's requests that the Court certify these issues for immediate interlocutory appeal.  The Court will address these three requests in turn. The Court will then turn to the Motion for Partial Summary Judgment filed by NOV.

### B.    Motions for Summary Judgment

In its pleadings, Tesco asserts that NOV's CRT-350 tool infringed upon its '443 and '324 Patents. According to Tesco, NOV's CRT-350 Casing Running Tool has directly, indirectly, contributorily, and/or by inducement, infringed upon claims of both its patents. As of the date that its Motion was filed, NOV had sold a total of eighty-nine (89) accused CRT-350 devices. Prior to the date that Tesco filed its suit under the '443 Patent, August 19, 2008, NOV had received purchase orders for eighty-six (86) accused CRT-350 devices from customers including co-defendants Weatherford, Frank's, and OES.

On March 2, 2010, during the reexamination of Tesco's patents, Tesco filed an Information Disclosure Statement ("IDS") with the PTO identifying relevant prior art.

Within this IDS, Tesco attached an October 11, 2002 email communication, along with several photographs, and referred to this disclosure as "E-mail communication re: Photographs of Public Use of Prior Art System: October 11, 2002."

## II.    MOTION TO STAY

Frank's moves to stay the case until completion of the re-examination process at PTO, arguing that substantially all of the claims in the Tesco Patents were held invalid by PTO in its first Office Actions and now by the ACPs, and that therefore the case will be simplified by final rejection of many of the claims in the Tesco Patents asserted against Defendants. Furthermore, Frank's argues that the three confirmed claims asserted against Defendants should have been rejected because the "channel key" feature common to those claims was disclosed in a late-filed prior art brochure that the PTO examiner did not properly consider.  Finally, Frank's argues that, even if this Court were to hold a trial and enter judgment on a jury verdict, the Federal Circuit would stay execution of that judgment until PTO and BPAI had completed their re-examination, and then vacate any portion of the judgment that was inconsistent with the result of the PTO and BPAI proceedings.

Tesco responds that the re-examination process in PTO is not yet complete, much less any appeal to BPAI, and that a stay would therefore last several years during which Defendants could continue to infringe the Tesco Patents.  Tesco argues that money damages would not provide adequate compensation because continuing infringement threatens to erode Tesco's market share and reputation in the industry.  Furthermore, Tesco argues that this case is destined for trial because the three "channel key" claims were confirmed as patentable in the ACPs, and therefore would still be litigated even if this case were resumed several years later.

### A.       Race to Trial

As a threshold matter, the Court must consider Frank's contention that "[Tesco's] race to trial is futile" because the Federal Circuit would stay enforcement of this Court's judgment until the re-examination was complete, and then vacate the judgment where it conflicts with the findings of validity from PTO and BPAI. (Doc. No. 195, at 6-7.) If this contention were correct, a stay would be warranted without further inquiry.

Frank's argues that the Federal Circuit has recently established a policy of awaiting results from re-examination appeals, which it then favors over related district court judgments. In *In re Translogic Tech., Inc.*, the Federal Circuit affirmed BPAI's rejection of all claims in an *ex partes* re-examination of a patent, despite a prior judgment in district court upholding the patent. 504 F.3d 1249, 1251 (Fed. Cir. 2007). During the entire re-examination proceeding and subsequent appeal, the patent infringement case had proceeded in parallel in district court. *Id.* Two years prior to the BPAI decision, a jury upheld the patent as valid. *Id.* A few weeks before the BPAI decision was released, a second jury held the defendant liable for $86.5 million in damages. *Id.* The district court entered a permanent injunction, which the Federal Circuit stayed on interlocutory appeal. *Id.* The Federal Circuit then consolidated the interlocutory appeal and the later appeal from the final judgment and assigned the appeal from BPAI to the same panel. *Id.* Finally, that panel affirmed the result from BPAI in a precedential opinion. *Id.* In an unpublished opinion released the same day, the panel relied on its holding in the BPAI appeal to vacate the district court judgment and remand the case for dismissal. *Translogic Tech, Inc. v. Hitachi, Ltd.*, 250 Fed. App'x 988, 988 (Fed. Cir. 2007). This result, Frank's contends, demonstrates that the Federal Circuit will also vacate any judgment

upholding the Tesco Patents once the panel "ultimately finds [them] unpatentable in reexamination." (Doc. No. 195, at 7.)

Notably, however, the Federal Circuit has not announced a policy calling for stays of all litigation appeals proceeding in parallel with re-examination proceedings, or universally elevating re-examination results over district court judgments. Nor can this Court conclude that the Federal Circuit intended such a reading of *Translogic*, for two reasons.

First, the timelines in *Translogic* are unusual, and materially different from those in the case before this Court. *Translogic* involved a BPAI decision which was issued only weeks after the jury trial, and prior to the entry of the district court judgment. In essence, the BPAI appeal and the appeal from the district court arrived at the circuit simultaneously. By contrast, the trial in this Court is set for October, but the re-examination process at PTO has not concluded and the subsequent appeal to BPAI could easily take years. *Translogic* does not indicate that the Federal Circuit would be willing to delay an appeal for any significant length of time in order to consider a related BPAI appeal, and Frank's cites no authority supporting such a conclusion.

Second, the policy advanced by Frank's would nullify Congressional intent. Federal patent law requires an *inter partes* re-examination to terminate when a final decision upholding or invalidating the same patent is entered in a related civil action. 35 U.S.C. § 317(b). Were the Federal Circuit to universally stay litigation appeals, and thus avoid entering any final judgments until related re-examinations were complete, this Section would be rendered a nullity.

Therefore, the Court holds that *Translogic* does not mandate a stay under the circumstances of this case, and turns instead to the prevailing law governing stays in patent cases.

**B.      Legal Standard**

The decision to stay a patent case pending reexamination is entirely in the Court's discretion. *See Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1426-27 (Fed. Cir. 1988) ("Courts have inherent power to manage their dockets and stay proceedings, . . . including the authority to order a stay pending conclusion of a PTO reexamination." (internal citation omitted)); *Soverain Software LLC v. Amazon. com, Inc.,* 356 F. Supp. 2d 660, 662 (E.D.Tex. 2005). Management of the court's docket requires "the exercise of judgment, which must weigh competing interests and maintain an even balance." *Landis v. North American Co.,* 299 U.S. 248, 254-55 (1936). In determining whether to grant a stay, courts consider several factors: (1) prejudice or tactical disadvantage to the non-moving party; (2) whether a stay will simplify the issues in question; and (3) whether discovery is complete and a trial date has been set. *Soverain Software,* 356 F.Supp.2d at 662; *Premier Intern. Associates LLC v. Hewlett-Packard Co.*, 554 F.Supp.2d 717, 724 (E.D. Tex. 2008). As noted by the Federal Circuit, reexamination may result in the elimination of most of the issues remaining in the pending litigation. *Gould v. Control Laser Corp.,* 705 F.2d 1340 (Fed.Cir.1983), *cert. denied* 464 U.S. 935 (1983). In addition, the PTO reexamination is less costly than a court proceeding. *See, e.g.*, *Canady v. Erbe Elektromedizin v. GmbH*, 271 F.Supp.2d 64, 68 (D.D.C. 2002) (denying a motion to lift a stay).

**C.      Analysis**

### 1.     Prejudice to non-movant

Where the parties are direct competitors, a stay would likely prejudice the non-movant. *See, e.g.*, *Cooper Techs. Co. v. Thomas & Betts Corp.*, No. 2:06-cv-242, 2008 WL 906315, at *1 (E.D. Tex. Mar. 31, 2008), *02 Micro Int'l v. Beyond Innovation Tech. Co.*, C.A. No. 2:04-cv-32 (TJW), 2008 WL 4809093, at *1 (E.D. Tex. Oct. 29, 2008); *but see Reebok Intern. Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1557 (Fed. Cir. 1994) (upholding a denial of a preliminary injunction and noting that lost sales alone are not sufficient for a preliminary injunction where the plaintiff did not demonstrate harm to reputation); *cf. eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 393 (2006) (vacating the court's decisions below and rejecting the district court's categorical denial of a permanent injunction based on the plaintiff's lack of commercial activity on the patent).

In the instant case, Tesco and the Defendants are direct competitors. As a result, a stay would prejudice Tesco's rights to exclusive use of technology on which it holds a valid patent. The potential prejudice to Tesco is exacerbated by the lengthy and uncertain amount of time required to complete the re-examination process through an appeal to BPAI. *See* Robert Greene Sterne, Jon E. Wright, and Lori A. Gordon, *Reexamination Practice with Concurrent District Court Litigation or Section 337 USITC Investigations*, 10 SEDONA CONF. J. 115, 121 (Fall 2009) (noting that the BPAI's current backlog of 22 months is "growing with little relief in sight" because new appeals are being filed faster than BPAI is disposing of pending cases).

Frank's seeks to evade this conclusion, arguing that the validity of the Tesco Patents is questionable because PTO's first Office Actions and ACPs rejected many of the claims therein. If Tesco's patents are invalid, Frank's reasons, Tesco would not be

prejudiced by losing the opportunity to enforce them.  However, the same Office Actions on which Frank's relies also confirmed three of the claims asserted against Defendants. Therefore, to the extent that the Court considers the first Office Actions or the ACPs as evidence of the likely invalidity of some of Tesco's patent claims, the Court must also consider them as evidence of the likely *validity* of the other claims, and thus of likely prejudice to Tesco.

Frank's further argues that the three "channel key" claims should have been rejected by PTO as well, but that the PTO examiner failed to properly consider a 2002 prior art brochure that Tesco filed late in the re-examination process. (*e.g.*, Doc. No. 212, at 4.) Frank's asserts that these claims will therefore be rejected in Weatherford's appeal to BPAI, thus leaving Tesco with no valid claims. The Court declines to speculate as to the result of the BPAI appeals process.  However, the Court notes that PTO has already dismissed a petition by Weatherford asserting the same argument regarding the 2002 brochure.[5]

Therefore, the Court finds that Tesco would be prejudiced by imposition of a stay. As a result, this factor weighs strongly against a stay.

### 2.    Simplification of issues

When a case relies in large part upon the validity of a patent's claims, a stay may be appropriate to avoid duplicative or contradictory rulings as to the patent's validity. *See Weatherford International, Inc. v. Casetech International, Inc.*, No. Civ. A. 03-5383, 2006 WL 581270, at *1 (S.D. Tex. Mar. 8, 2006) (Ellison, J.) (granting a conditionally

---

[5] Decision Dismissing Petition, *Inter Partes* Reexamination Proceeding Control No. 95/000,407, mailed May 4, 2010, *available at* http://portal.uspto.gov/external/portal/pair (enter the displayed verification code and click "Continue" button; then enter "95/000,407" and click "Search"; then click the "Image File Wrapper" tab; then scroll down and click the "Reexam Petition Decision – Dismissed" hyperlink listed by the date 05-04-2010).

unopposed motion to stay proceedings, but declining to impose the plaintiffs' conditions); *see also Premier Intern. Associates LLC v. Hewlett-Packard Co.*, 554 F.Supp.2d 717, 725 (E.D. Tex. 2008) (granting a stay because the parties had modified their claims several times and the PTO rejected all the claims in both patents, suggesting that there is significant uncertainty surrounding the claims). In addition, the estoppel effects of an *inter partes* examination can serve to streamline ongoing litigation. *See, e.g.*, *EchoStar Technologies Corp. v. Tivo*, No. 5:05 cv 81 DF, 2006 WL 2501494, at \*3 (E.D. Tex. July 14, 2006) (granting a stay and placing great weight on the estoppel effects on the third-party requester in an *inter partes* reexamination proceeding). However, where there are several defendants who are not party to the reexamination proceeding, they are not bound by estoppel effects of the reexamination and estoppel does not produce the same simplification of issues. *See* 35 U.S.C. § 315(c) (estopping only the third-party requester from asserting the invalidity of any claim finally determined to be valid and patentable on any ground that the requester raised or could have raised during the *inter partes* examination); *Stormedia Texas, LLC v. CompUSA, Inc.*, No. 2:07-cv-025, 2008 WL 2885814, at \*1 (E.D. Tex. July 23, 2008) (holding that the presence of defendants not party to the re-examination "serves to counteract any simplifying effects of the *inter partes* reexamination proceeding"). The speculative nature of which claims will survive reexamination can also reduce the weight of this factor. *See, e.g.*, *Cooper Technologies Co. v. Thomas & Betts Corp.*, 2008 WL 906315, at \*1.

Frank's argues that rejection of some or all of the claims in the Tesco Patents would necessarily simplify the issues at trial because the Court and the jury need not address any such claims. Tesco responds that the parties and the Court can only speculate

11

about which claims which will ultimately be rejected or confirmed, but that the issues before the Court will only be simplified to a limited degree because PTO has confirmed some of the patent claims asserted against Defendants.

While the Court agrees that the list of claims which will emerge unscathed from the re-examination process is speculative,[6] the PTO's confirmation of three of the asserted claims in the ACPs indicates that part of this action would likely proceed even after the re-examination process is complete. Furthermore, the issues surrounding any claims confirmed by PTO will remain unchanged, as only Weatherford is estopped from asserting here any of the defenses advanced in the reexamination. *See* 35 U.S.C. § 315(c). As a result, the simplification of issues in this case would be limited. However, the PTO's rejection of ten of the thirteen asserted claims in its most recent Office Actions indicates that at least some of the issues confronting the Court in this action would be eliminated if the case were stayed pending the re-examination. Therefore, this factor weighs slightly in favor of a stay.

### 3.    Stage of the proceedings

In deciding whether to stay a patent case, courts examine whether discovery has been completed in the current or related cases and the length of the litigation between the two parties. *See, e.g.*, *Power Integrations Inc. v. Fairchild Semiconductor Int'l Inc.*, Civ.

---

[6] The parties cite various statistics regarding PTO's likelihood of rejecting all asserted claims or amending, limiting, or rejecting some of the claims.  However, the statistics cited by both parties reflect only the likelihood of rejections or cancellation of claims during the entire process, rather than the chance that the results of a first Office Action or an ACP will be altered at a later stage.  In other words, neither party has provided competent evidence from which the Court can estimate the probability that the claims currently rejected or confirmed by the PTO will ultimately be rejected or confirmed by the BPAI.

Furthermore, the Court notes that PTO added and removed items on the list of confirmed claims in the '443 Patent between the first Office Action and the ACP. (*Compare* Doc. No. 195-2, at 3 (confirming claims 4, 18 43-50, 60, and 70); *with* Doc. No. 195-4, at 4 (confirming claims 18, 26, 38, 43-50, and 60).) Similar changes could occur before the final Office Action, or as a result of appeal to BPAI. Although the Court agrees with Frank's that the result is more certain at this stage than when this inquiry was undertaken immediately after PTO's grant of re-examination, the final result remains speculative.

No. 08-309-JJF-LPS, 2008 WL 5335400, at  *2 (D. Del. Dec. 19, 2008) (denying a  stay because, even though discovery was in early stages and the trial date had not yet been set, discovery from a related case was complete and the parties had been litigating infringement and validity issues relating to some of the claims at issue the current litigation for four years); *Network Appliance Inc. v. Sun Microsystems Inc.*, No. C-07-06053 EDL, 2008 WL 4821318, at **1-2 (N.D. Cal. Nov. 3, 2008) (denying a stay because, *inter alia*, the court had construed some of the claim terms of the patent and discovery had advanced, and noting the possibility of undue delay because of the length of the patent reexamination process).

Franks argues that a stay will eliminate the expense of trial preparation in the event that all claims in the Tesco Patents are rejected.  However, this case is very advanced. The instant case has been in progress for two years, and related litigation for four years.  The Court has already issued its *Markman* order.  Discovery has closed and the deadlines for expert reports and dispositive motions have passed. The case is scheduled for trial in less than three months.  Returning to it in several years, after a BPAI appeal is completed, will not serve justice because memories may fade, records may be lost, and more discovery may be required or need to be redone. Therefore, this factor weighs strongly against a stay.

### D.    Balance of Factors

Because two factors weigh strongly against a stay, but only one weighs slightly in favor, the Court concludes that the Motion to Stay should be denied.

## III.   MOTION TO ADMIT

Having denied Frank's' Motion to Stay the case, the Court must now consider Frank's' request in the alternative to admit the PTO's re-examination record into

evidence. Stated differently, Frank's seeks the Court's commitment to deny any motion *in limine* and overrule any future objection regarding the admissibility of any portion of the PTO's re-examination record.

Such an advance commitment is inappropriate for several reasons. First, although the trial will arrive more quickly than the results of the re-examination at PTO, it is still three months away. The re-examination at PTO will continue, and the contents of the record are continually expanding. In other words, neither Frank's nor the Court is certain what documents will be in the PTO record at the time that trial commences or when the evidence will be used.  Second, at this preliminary stage, the Court cannot conclusively predetermine the context in which the evidence will be offered, or the purpose for which it will be used. Frank's has offered at least three possible uses for this evidence: validity, willfulness of infringement, and inequitable conduct.  This only further highlights the fact that different portions of the re-examination record may be freely admissible, admissible for some of the named purposes but not others (because documents may be more probative on certain issues than others), or not admissible for any purpose. The broad ruling which Frank's seeks could not accommodate such nuances, which is precisely why this Court concludes that such a ruling would be inappropriate at this early stage.

For these reasons, among others, this Court prefers to rule on evidentiary matters as they arise at trial. Therefore, the Court denies the Motion to Admit as premature. However, this denial does not prejudice Frank's' right to assert its arguments at a later time in response to a motion *in limine* or an objection, should Frank's choose to offer some or all of the PTO's re-examination record as evidence at trial.

14

## IV.     REQUEST TO CERTIFY INTERLOCUTORY APPEAL

Having denied the two main requests in the Motions, the Court must now consider Frank's' request to certify the issues for an interlocutory appeal.

### A.     Legal Standard

The final judgment rule states that "a party is entitled to a single appeal, to be deferred until final judgment has been entered." *Digital Equipment Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 868 (1994); *see also Henry v. Lake Charles American Press, LLC*, 566 F.3d 164, 171 (5th Cir. 2009) (noting that "as a general rule, parties must litigate all issues in the trial court before appealing any one issue"). Nonetheless, a district judge may certify an order for interlocutory appeal when it (1) involves a controlling question of law (2) as to which there is substantial ground for difference of opinion and (3) an immediate appeal from the order may materially advance the ultimate termination of the litigation. 28 U.S.C. § 1292(b). Unless all three criteria are satisfied, a district court may not and should not certify its order for immediate appeal. *Ahrenholz v. Bd. of Trs. of the U. of Ill.*, 219 F.3d 674, 676 (7th Cir. 2000). In some cases, courts have reasoned that Section 1292(b) appeals are appropriate under only "exceptional" circumstances or in "big" cases. *Clark-Dietz and Associates-Engineers v. Basica Constr. Co.*, 702 F.2d 67, 69 (5th Cir. 1983). However, in other cases, courts have employed a more flexible approach to Section 1292(b) appeals. *See Hadjipateras v. Pacifica, S.A.*, 290 F.2d 697, 702-03 (5th Cir. 1961) (finding that Section 1292 gave the appellate machinery "a considerable amount of flexibility" so that "disadvantages of piecemeal and final judgment appeals might both be avoided").  However, regardless of which approach is adopted, the decision to permit interlocutory appeal is firmly within the district court's

discretion. *Cheney v. U.S. Dist. Court for Dist. of Columbia*, 542 U.S. 367, 405 n.9 (2004).

### B.    Analysis

#### 1.    Controlling question of law

"Although the resolution of an issue need not necessarily terminate an action in order to be 'controlling,' it is clear that a question of law is 'controlling' if reversal of the [order] would terminate the action." *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 921 F.2d 21, 24 (2d Cir. 1990) (citing cases); *see also Johnson v. Burken*, 930 F.2d 1202, 1206 (7th Cir. 1991) (finding that a question of law can be controlling if it determines the outcome or "even the future course of the litigation"). "On the other hand, an issue is not seen as controlling if its resolution on appeal would have little or no effect on subsequent proceedings." *Ryan v. Flowserve Corp.*, 444 F. Supp. 2d 718, 723 (N.D. Tex. 2006) (citing authority). Whether an issue of law is controlling generally hinges upon its potential to have some impact on the course of the litigation. *Id.*

Although it is a close question, the Court finds that its denial of the Motion to Stay does involve a controlling question of law.  Reversal of the Court's decision to deny a stay would not result in termination of this action, nor would it likely determine the outcome of the litigation.  However, a stay would clearly have an effect on the future course of the litigation, in that the trial would be delayed, likely by years, and the measures of possible damages would be altered accordingly.

However, the Court finds that its denial of the Motion to Admit does not involve a controlling question of law. The Court has simply deferred ruling on the admissibility of

the re-examination records until such time as the content of the evidence is fixed and the context in which it is offered is clear. The denial of the Motion at this time will have no effect on the future course of the litigation because Frank's arguments will be considered at or before trial, if they are relevant at that time.

### 2. Substantial ground for difference of opinion

Courts have varied in their approach to the question of whether there is substantial grounds for difference of opinion on a particular issue. Nonetheless, they have generally found that there is a substantial ground for difference of opinion when "a trial court rules in a manner which appears contrary to the rulings of all Courts of Appeals which have reached the issue, if the circuits are in dispute on the question and the Court of Appeals of the circuit has not spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented." *Ryan*, 444 F. Supp. 2d at 723-24. First and foremost, there must be a discernible *opinion* triggering the requisite disagreement. *Id.* But, simply because a court is the first to rule on a question or counsel disagrees on applicable precedent does not qualify the issue as one over which there is substantial disagreement. *Id.* (citing 4 AM. JUR. 2D APPELLATE REVIEW § 128 (2005)). The level of uncertainty required to find a substantial ground for difference of opinion should be adjusted to meet the importance of the question in the context of the specific case. WRIGHT, MILLER & COOPER, FED. PRACTICE & PROCEDURE: JURISDICTION 2D § 3930. However, distinctions must be drawn between disagreements on questions of law, and questions that turn on the facts. "There is indeed no reason to suppose that interlocutory appeals are to be certified for the purpose of inflicting upon courts of appeals an unaccustomed and ill-suited role as factfinders." *Id.*

The Court finds no substantial ground for difference of opinion on its denial of the Motion to Stay. As discussed in part II, *supra*, well-settled law establishes that the decision to stay a case is within the Court's discretion under its inherent power to manage its own docket. Furthermore, the Court's evaluation of the factors weighing for or against a stay relied primarily on findings of fact that are inappropriate matters for interlocutory appeal. Finally, the Court is not aware of any conflict between its reasoning and any ruling of a Court of Appeals, nor is it a question of first impression or a question of foreign law.

The Court also finds no substantial ground for difference of opinion on its denial of the Motion to Admit.  In this Order, the Court denies the Motion to Admit without prejudice, and the Court will consider Frank's arguments and the Federal Rules of Evidence at the proper time.  Therefore, there is not yet a discernible opinion which would trigger the requisite disagreement.  Furthermore, as with the Motion to Stay, the Court's inherent power to manage its docket, and thus its discretion to make decisions regarding admissibility of evidence at the appropriate time, is a matter of well-established law.

### 3.    Materially advancing the ultimate termination of the litigation

The requirement that an appeal should materially advance the ultimate termination of the litigation is closely tied to the requirement that the order involve a controlling question of law. WRIGHT, MILLER & COOPER, FED. PRACTICE & PROCEDURE: JURISDICTION 2D § 3930. A key concern consistently underlying Section 1292(b) decisions is whether permitting an interlocutory appeal will speed up the litigation. *Ahrenholz*, 219 F.3d at 676.

The Court finds that an appeal of its denial of the Motion to Stay would not materially advance  the ultimate termination of the litigation.  As the Court has noted above, the instant case is scheduled for trial in October, less than three months away.  By contrast, the re-examination process at PTO and the appeal of that re-examination at BPAI could take years to complete.  Because PTO's most recent Office Actions confirm three patent claims asserted against the Defendants, the Court finds that litigation would be likely even if the case were stayed pending the result of the re-examination.  Therefore, even if the Federal Circuit were to reverse this Court's ruling and stay the case, the ultimate termination of the litigation would not be advanced, but instead substantially delayed.

The Court also finds that appeal of its denial of the Motion to Admit would not materially advance the ultimate termination of the litigation. At best, a reversal of the Court's decision would have no effect on the trial date. More likely, an interlocutory appeal of either Motion would result in a delay of the trial, regardless of outcome, because the appeals process itself would take longer than the time remaining before trial.

### C. Conclusion

Because the Court finds that its denial of the Motion to Stay fails to meet two of the three elements required for certification, the Court will not certify this issue for interlocutory appeal. Similarly, because the Court finds that its denial of the Motion to Admit fails to meet all three of the elements required for certification, the Court will not certify this issue for interlocutory appeal.

## V.    MOTION FOR PARTIAL SUMMARY JUDGMENT

In its Motion for Partial Summary Judgment, NOV argues that, because of Tesco's failure to mark its patents under 35 U.S.C. § 287(a), it is precluded from recovering damages for infringement that occurred before Tesco gave notice of infringement through filing this suit. More specifically, NOV seeks an award of summary judgment as to three issues: 1) products sold by NOV prior to the notice date are not subject to direct liability or damages; 2) further use or sale of such products do not give rise to damages or liability; and 3) injunctive relief is unavailable for the products sold by NOV prior to the notice date. [7]

Tesco has asserted that NOV has infringed upon Tesco's '443 and '324 Patent by NOV's manufacture, use, offer for sale, sale, and importation of CRT-350 tools. Tesco alleges that NOV directly infringed under 35 U.S.C. § 271(a) and indirectly infringed under 35 U.S.C. §§ 271(b) & (c). As stated above, NOV had, as of the date of its Motion, sold a total of eighty-nine of its allegedly infringing CRT-350 devices to the other named Defendants in this suit. NOV further alleges that, prior to the date of the filing of the suit, August 19, 2008, NOV had sold eighty-six accused CRT-350 devices. It is as to its liability for these eighty-six devices that NOV now seeks summary judgment. It appears, therefore, that NOV concedes that three of the eighty-nine accused CRT-350s were sold after the notice date, and the Court will not discuss these three devices in this Order.

### A.      Legal Standard

---

[7] In its initial response, Tesco argues that NOV's Motion is premature in light of the remaining discovery period, and that it should be denied on this basis alone. However, after examining the briefing on this matter, the Court concludes that NOV's Motion largely presents issues of law, which may be resolved by this Court at any point in this litigation. Moreover, in light of both the number of briefs submitted by the parties on this matter, and the length of time over which this briefing spanned, this Court is willing to conclude that Tesco suffered no prejudice from the timing of this Motion. Accordingly, the Court will consider it.

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.* Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. F.R.C.P. 56(e)(1); *See, e.g.*, *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996), *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts.'" (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

### B.     Whether Products Sold by NOV Prior to the Notice Date are Subject to Damages Liability for Direct Infringement

NOV first argues that the products sold by NOV prior to the relevant notice date are not subject to liability or damages. 35 U.S.C. § 287(a) provides:

> Patentees . . . may give notice to the public that the [patented article] is patented, either by fixing thereon the word 'patent' or the abbreviation 'pat.', together with the number of the patent . . . . In the event of failure

21

> so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

*See also American Medical Systems, Inc. v. Medical Engineering Corp.*, 6 F.3d 1523, 1538 (Fed. Cir. 1993) (holding that section 287(a) precludes recovery of damages "for infringement from any time prior to compliance with the marking or actual notice requirements of the statute"). Because Tesco has asserted both product and method claims in this suit, the marking requirements of Section 287 are applicable. *Hanson v. Alpin Valley Ski Area, Inc.*, 718 F.2d 1075, 1083 (Fed. Cir. 1983).

### 1.   NOV's notice

The Court first considers when NOV received notice of the infringement. Section 287(a) requires either "constructive notice," which is accomplished by marking, or actual notice of infringement for damages to begin to accrue. *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1345 (Fed. Cir. 2001). Compliance with § 287(a) is a question of fact, and the burden of proving actual or constructive notice lies with the patentee. *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1111 (Fed. Cir. 1996).

Tesco does not appear to dispute that it failed to mark its patents prior to filing its suit. Therefore, neither NOV nor any other Defendant was given constructive notice of infringement. According to NOV, it did not, therefore, receive actual notice of infringement until August 19, 2008 as to the '443 Patent, and March 6, 2009 as to the '324 Patent, or the dates that Tesco respectively filed suit for those patents. Tesco avers in its response that, in order for the date of filing suit to be the relevant date from which

damages begin to accrue, NOV must demonstrate that it received no actual notice of infringement prior to date the suit was filed. (Tesco Resp. Br., Doc. No. 217, at 2.)

"[A]ctual notice under § 287(a) 'requires the affirmative communication of a specific charge of infringement by a specific accused product or device.'" *U.S. Philips Corp. v. Iwasaki Elec. Co. Ltd.*, 505 F.3d 1371, 1375 (Fed. Cir. 2007) (citing *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 187 (Fed. Cir. 1994)). The Federal Circuit has further observed that " 'the actual notice requirement of § 287(a) demands notice of the patentee's identity as well as notice of infringement,'" and " 'an affirmative act on the part of the patentee which informs the defendant of infringement.' " *Id.* (citing *Lans v. Digital Equipment Corp.*, 252 F.3d 1320, 1327-28 (Fed. Cir. 2010)).

Under this standard, therefore, the evidence must reflect some affirmative action or communication on the part of Tesco which served to put NOV on notice of its alleged patent infringement. Logically, then, the party best positioned to present any such evidence is Tesco, who presumably has first-hand knowledge of any such actions it took. The record, however, presents no evidence that Tesco took affirmative steps prior to filing suit to provide NOV with actual notice. Therefore, because Tesco admits that it did not mark its patents under Section 287(a), the Court must conclude that NOV did not receive actual notice of infringement until the dates on which this suit with respect to each patent was filed.

### 2.    Infringing sale of the accused products[8]

---

[8] Tesco objects to the evidence relied upon by NOV to establish the timing of the sales of CRT-350s for purposes of the notice requirement. More specifically, Tesco objects to the Declaration of Richard Verhoef, who testifies to the accuracy of the data in a computer generated spreadsheet on which NOV relies to establish the dates on which the accused CRT 350s were shipped. Tesco argues that Mr. Verhoef's Declaration violates FED. R. CIV. P. 56(e), which states that "[a] supporting or opposing affidavit must be made on personal knowledge." According to Tesco, because Mr. Verhoef admitted that the information in the original spreadsheet was computer generated at someone else's direction, that he did not access the information in the computer system, and that he did not verify the underlying information, he cannot be

The parties do not dispute that infringing sales of accused products made prior to the satisfaction of § 287(a) cannot serve as the subject of any damage recovery. *See Fonar Corp. v. General Electric Co.*, 107 F.3d 1543, 1554-55 (Fed. Cir. 1997) (holding that because the machines in question were not marked, no damages were recoverable before notice was given). For sixty-eight of the accused products, both the purchase order and the delivery of the infringing product occurred before NOV received actual notice. Tesco does offer any legal or  factual evidence that legitimately calls into question NOV's immunity from damages for direct infringement as to these devices. The Court is willing to conclude, then, that NOV cannot be held liable for the sale of these sixty-eight devices.

However, for a total of twenty-one of the accused products, delivery of the products occurred after the suit was filed. As noted above, NOV seeks summary judgment as to eighteen of these remaining twenty-one accused devices. NOV argues that for all eighteen of these products, purchase orders were generated before the date of notice, thereby constituting a "sale" of the products in question for purposes of the notice requirement. In other words, NOV argues that it can only be held directly liable for those

---

said to have personal knowledge of the facts to which he testifies. (Richard Verhoef Dep., Tesco Br. Ex. A, Doc. No. 223, 39:5-40:1, March 30, 2010). NOV responds that Mr. Verhoef does have personal knowledge of the sales data contained in the computer files by virtue of his position as the Product Line Manager of NOV's Handling Tools. According to NOV, it is of no significance that he asked another NOV employee to create the spreadsheet containing certain data maintained in NOV's computer files, because the subject of the spreadsheet falls within the purview of his duties.

The Court appreciates Tesco's position in this matter, and acknowledges that it was less than wise for NOV to chose a declarant to testify to the accuracy of its data who neither generated the spreadsheet data himself nor went back to verify its underlying accuracy. Nonetheless, the Court is willing to infer, from Mr. Verhoef's position, that he had personal knowledge that the company's computer system is maintained accurately, and that the person who generated this spreadsheet did so on the basis of the data contained within it. Moreover, Tesco offers no facts which would lead this Court to question the accuracy of the data provided. As such, the Court finds that Rule 56(e) has been satisfied, and the Court may properly consider the data on the basis of which NOV brings this Motion.

products for which purchase orders were made after August 19, 2008 and March 6, 2009, or the dates that this infringement suit was filed. Tesco, on the other hand, argues that the "sale" of the accused products did not become complete until delivery of the products in question, and that NOV is therefore not entitled to summary judgment for those products that were delivered after the date of notice. Whether NOV is entitled to summary judgment for eighty-six of the accused CRT-350 products (the sixty-eight products for which both delivery and sale occurred before the notice date plus the eighteen for which delivery occurred after the notice date), therefore, turns on the point at which the "sale" has occurred.

The parties present competing case law on this issue. In *Enercon GmbH v. International Trade Com'n*, the Federal Circuit, interpreting 19 U.S.C. § 1337(a)(1)(B), held that the term "sale" as used in that state did not require an immediate delivery of goods in order for the International Trade Commission to assume jurisdiction over the controversy. 151 F.3d 1376, 1383 (Fed. Cir. 1998). Citing *In Re Caveny*, 761 F.2d 671, 676 (Fed. Cir. 1985), the court reasoned that "'it is well settled that a sale is a contract between parties to give and pass rights or property for consideration which the buyer pays or promises to pay the seller for the thing bought or sold.'" *Id*. at 1382. As Tesco points out, the court there specifically noted that the tariff statute was "intended to strengthen the statute's effectiveness in eliminating the problems caused by the importation of goods that infringe U.S. intellectual property rights." *Id.* at 1382-83. In *In Re Caveny*, 761 F.2d 671, 676 (Fed. Cir. 1985), the Federal Circuit examined whether an offer to sell a product to a related company constitutes a sale for purposes of the "on sale bar" in patent law. The court concluded that the "on sale bar" statute, 35, U.S.C. § 102(b), was indeed

implicated by the facts of that case, which involved one company in England making an offer to a related company in the United States. *Id*. at 676-77. Thus, all of these cases strongly suggest that delivery is not necessary for a sale to occur.

However, in *Quality Tubing, Inc. v. Precision Tube Holdings Corp*., 75 F. Supp. 2d 613, 621 (S.D. Tex. 1999), the court, after examining Federal Circuit precedent, concluded that "sale," as used in the patent infringement statute, presupposed not merely an agreement to sell, but performance of that agreement. *Id*. at 620. The court further held that "[t]he negotiation and execution of a contract to sell is not, standing alone, a sale that is an action of infringement under sections 271(a) and (g)," because the applicable case law also required performance. *Id*. at 621. Accordingly, the court went on to hold that, because performance of the contract in that case, or delivery, occurred outside the United States, it did not constitute an infringing sale under the patent statutes. *Id*. Because the Court in *Quality Tubing* was interpreting "sale" as used in patent law specifically, the Court finds its reasoning is particularly persuasive. Similarly, in *Black & Decker v. GSL Engineering, Ltd*., 1996 WL 444587, at *1  (E.D. Va. Jan. 4, 1996), the court, interpreting patent law,  held that the point sale in that case occurred at the time that the infringing products were *delivered* within the United States, or after the issuance of the patents at issue, thereby rendering the sale an infringing activity.

### i.      Delivery constitutes part of sale.

NOV points out that the cases cited by Tesco are not directly on point, because the critical issue that this Court must determine is not the point at which infringement actually occurred, but rather the point before which notice was required pursuant to 35 U.S.C. § 287(a). The language of this statute, however, immunizes from damages only

26

infringing acts that occur prior to notice, and specifically provides that damages may be recovered for "continuing" infringement that occurs after notice is given. Therefore, it is critical for this Court to determine the point or points at which Tesco's patent was (allegedly) actually infringed upon, so that a determination can then be made as to whether this infringement occurred before or after notice. In examining the precedent cited by both parties, the Court is persuaded that the delivery of the accused goods in question constitutes a critical part of the infringing activity of which NOV is accused. Even if, as NOV argues, infringement initially occurred at the point at which the sale contract was made, the case law makes abundantly clear that delivery of goods in question at the very least constitutes *continuing* infringement which subjects NOV to liability. Indeed, in *North American Philips v. American Vending Sales, Inc.*, 35 F.3d 1576 (Fed. Cir. 1994), the Federal Circuit, in defining "the situs of the tort of infringement-by-sale, rejected the test that looks only to the place "where legal title passes rather than the more familiar places of contracting and performance." *Id*. at 1579 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985). The court concluded that selling an infringing article to a buyer in Illinois constituted a tort in Illinois, that is, the place in which the product was to be delivered, though not necessarily only in Illinois. *Id.* Under this precedent, therefore, it is clear that the delivery of an accused product does fall within the scope of an infringing sale as used in Sections 271(a) and 271(g) of the patent statute, even if this is not the only point at which infringement occurred. Accordingly, even if the Court were to accept NOV's argument that a sale occurred upon submission of a purchase order and prior to delivery, this does not mean that the act of the infringing sale was complete at this point, nor does it render the delivery of the

accused goods wholly outside of the scope of the term "sale."[9] Therefore, NOV is not entitled to damages immunity for those eighteen products that were delivered after they received actual notice of the alleged infringement, because their actions with respect to these products constituted post-notice continuing infringement.

In so holding, the Court acknowledges and declines to follow the district court holding in *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 2001 WL 66345, at *3-4 (D. Del. Jan. 4, 2001), suggesting that damages cannot be recovered for sales contracts entered into before notice date, even if delivery occurred thereafter. This holding, it seems, is inconsistent with legal precedent emphasizing the importance of delivery within the tort of infringement by sale. Although, in the process of narrating the course of the litigation, the Federal Circuit noted this holding in the subsequent appeal, *Honeywell Int'l, Inc. v. Hamilton Sunstrand Corp.*, 523 F.3d 1304, 1310 (Fed. Cir. 2008), it was neither revisited nor explicitly sanctioned by the Federal Circuit opinion. Therefore, the conclusion reached by the district court in *Honeywell* is not binding on this Court. The Court concludes that, because NOV had actual notice of the asserted patents at the time eighteen of the accused products were delivered, or at the time that at least a portion of

---

[9] In addition, to say that the point of sale is frozen at the moment that a purchase order is submitted belies logic. Under such a holding, whether NOV was subject to damages for direct infringement would be wholly determined by when its customers acted by submitting a purchase order, rather than by its own actions. Such an argument suggests that NOV's liability would be the product of the whims of its consumers, some of which submitted purchases order before NOV received notice of infringement, and others which submit these orders afterwards. To hold that NOV's liability is governed by the actions of a customer, who may or may not have had any knowledge of the patents in this case, seems to wholly undermine the principles of patent law which seek to hold accountable those who take affirmative steps to infringe upon patents. Furthermore, under NOV's argument, even if its customer were to default or significantly delay payment on its purchase, NOV would nonetheless be considered to have made a sale simply from the fact of a purchase order submission. This result further defies logic, and lends further support to the Court's conclusion that delivery, or the affirmative action on the part of NOV to fulfill the orders of its customers, cannot be irrelevant to NOV's liability.

the alleged infringing sale occurred, they are not entitled to summary judgment as to their direct liability with respect to these products.[10]

### ii. There is insufficient evidence that the purchase orders constitute sales.

Moreover, even if this Court were to hold that delivery was not relevant to determining when an infringing sale occurred, the Court is not persuaded that the purchase orders submitted to NOV prior to the date of notice constitute "sales contracts" that might absolve any subsequent delivery. As Tesco points out, the Court is given little information as to the terms and conditions provided to the purchaser before the purchase orders were submitted, or as to whether the purchase orders were indeed the first communication between the buyer and the seller. In other words, the evidence presented does not conclusively demonstrate whether the purchase orders functioned as offers or as acceptances in NOV's transactions with its customers.

In fact, Tesco presents evidence that strongly suggests that the purchase orders cannot be considered completed sales contracts. Tesco points out that, on NOV's "Worldwide Terms and Conditions of Sale," it states, "[o]rders and other requests, whether oral or written . . . are subject to Seller written acceptance by an authorized representative of Seller." (Tesco Br. Ex. 12, Doc. No. 217, at NOV 0014106-0014107.)

---

[10] NOV argues in its brief that holding it liable for sale contracts that were executed before Tesco's notice would put NOV in the untenable position of either incurring liability for infringement when the products are delivered, or incurring liability for breach of contract, all based upon pre-notice conduct. The Court acknowledges that its holding could indeed result in a difficult situation for NOV or others similarly situated, however such risks are an inherent part of the costs of doing business. That NOV agreed to sell a product prior to being put on notice that such a sale would constitute infringing activity does not mean that they should be permitted to knowingly carry out this infringing activity free from all liability. Moreover, NOV ignores the possibility that it could obtain a license to continue to sell the accused products in order to avoid this conundrum, or refund any payments made by its customers. Moreover, although the Court can not definitely rule on the issue now, it notes the possibility that notice of patent infringement could constitute a valid defense to any breach of contract claim later brought against NOV by its customers for failure to deliver the accused products.

Similarly, section nine of the Terms and Conditions provides: "Seller expressly reserves the right to change, discontinue or modify the design and manufacture of its products without obligation to furnish, retrofit, or install goods previously or subsequently sold." (*Id.* at NOV-0014106.) These provisions at least suggest that the purchase order did not constitute a final sales contract, as the order was still subject to conditions or changes imposed by the seller, or NOV.

In support of its argument that the purchase order did constitute a valid and enforceable contract for the sale of the accused products, NOV points only to the fact that its customer, Express Energy Services Operating, L.P., states in a petition filed in state court that it had a valid and enforceable contract with NOV for the sale of the CRT-350. (NOV Br. Ex. A, Doc. No. 224, ¶ 22.) This fact, however, says nothing of when the contract was formed, nor does it shed light upon the terms and conditions of the purchase orders or the circumstances surrounding their submission. Accordingly, the Court must conclude that there remains a fact issue as to whether the terms of the purchase orders render it a binding contract such that submission of the orders may be considered the point of sale, or whether it constitutes a mere offer to purchase which NOV, the seller, was to later accept.

In accordance with this analysis, the Court finds and holds that NOV is immune from direct infringement liability for the sixty-eight (68) accused products that were both ordered and delivered prior to the date of notice, or the date this suit was filed. However, the Court denies NOV's Motion as to the remaining eighteen (18) products, or those products for which delivery occurred after the date of notice.

### C.      Whether NOV May be Held Liable for Indirect Infringement

Indirect patent infringement is an action that contributes to the infringement of another or actively induces the infringement of another. 35 U.S.C. §§ 271(b) & (c). In its pleadings, Tesco alleges that, even if NOV cannot be held liable for their sale of the accused products, NOV can nonetheless be held indirectly liable for the continuing acts of infringement by the other three defendants. According to Tesco, Weatherford, OES, and Frank's are liable for direct infringement stemming for their continued use of the accused CRT-350s after they received notice of patent from Tesco, and NOV should be liable for inducing such infringement.

NOV contends in its Motion that it cannot be held liable even for indirect infringement of those products that were sold before the notice date. NOV argues that, because it was not on notice of infringement when it processed the purchase orders for these CRT-350s and therefore not liable for their sale, the customers who received those tools are not liable for their continued infringing use even after receiving notice. Absent any direct infringement on the part of these three purchasing Defendants, NOV maintains, it cannot be held indirectly liable for infringement of the accused products sold prior to notice. The Court emphasizes that NOV's argument is inapplicable to those eighteen accused products as to which the Court has already concluded NOV may be held liable for its post-notice sale; at issue are only those sixty-eight products that were clearly sold to purchasers before the notice date.

### 1.     Relevant case law

There can be no liability for indirect infringement without an underlying act of direct infringement. *Aro Mfg. Co. Inc. v. Convertible Top Replacement Co., Inc*, 365 U.S. 336, 341 (1961).  "If a machine was sold under circumstances that did not subject its

seller to damages, then subsequent repair cannot subject it to damages. One is entitled to repair that which is sold free of liability for infringement." *Fonar Corp. v. General Elec. Co.*, 107 F.3d 1543, 1554-55 (Fed. Cir. 1997). The *Fonar* court concluded that, because the goods that were the subject of the inducement claim were not marked, the defendant could continue to service the goods without inducing infringement, because "servicing of the machines is analogous to repair . . . and repair is not infringement." *Id.* at 1555. Notably, the *Fonar* holding is framed in terms of whether the seller's action in servicing the products sold prior to notice constitute indirect infringement, but says nothing of whether the buyer's actions in that case constituted direct infringement.

In *Odetics, Inc. v. Storage Technology Corp.*, 14 F. Supp. 2d 785, 792 (E.D. Va 1998), *aff'd in part, rev'd in part*, 185 F.3d 1259 (Fed. Cir. 1999), the Court interpreted the holding in *Fonar* to stand for the proposition that a "patentee's failure to mark its product precluded not just recovery for past infringement damages, but also an injunction against future repair of products made, sold, and used during the period when there was no marking." The *Odetics* court went on to say that "any product sold prior to the time proper notice is given to the alleged infringer cannot be the subject of any remedy, whether legal or equitable." *Id.*

Courts have also limited the direct liability of buyers of allegedly infringing products that are sold under circumstances that do not subject the seller to liability, that is, sold prior to notice of infringement. In *Devices for Medicine, Inc. v. Boehl*, 822 F.2d 1062, 1066 (Fed. Cir. 1987), the Federal Circuit noted that "having sold the product unmarked, [plaintiff] could hardly maintain entitlement to damages for its use by a purchaser uninformed that such use would violate DFM's method patent." Importantly,

however, the holding in *Boehl* specifically acknowledges that the purchaser in that case was uninformed that its use would violate the patent at issue, and is therefore of little value in assessing the culpability of post-notice continuing use by the three Defendants here.

NOV cites to *Leapfrog Enterprises Inc. v. Fisher-Price, Inc.*, 2005 WL 1331216 (D. Del. June 6, 2005) to support its contention that it cannot be held liable for indirect infringement because there is no direct infringement on the part of the other Defendants in this case. In *Leapfrog*, the court held that products sold to a retailer "under circumstances that did not subject its seller to damages" did not subject the retailer to liability for post-notice direct infringement. *Id.* at *4. The court further concluded that, without any direct liability on the part of the retailer, the seller could not be held liable for indirect infringement. *Id*. In interpreting *Fonar*, the *Leapfrog* court reasoned that the only reason servicing and/or repair was not indirect infringement in *Fonar* was because the underlying use of the product was not direct infringement, due to the fact that the product had been sold under circumstances that did not subject its seller to damages. *Id.* at * 5. Notably, the post-notice infringing act at issue in *Leapfrog* was subsequent sales of the accused product, rather than use.

Tesco responds by citing to *Power Lift, Inc. v. Lang Tools, Inc*., 774 F.2d 478, 481 (Fed. Cir. 1985) in which the Federal Circuit held the defendants liable for infringement although the accused tool was developed and produced before the patent issued, that is, before the defendant knew that the device was being patented. However, neither failure to mark nor notice were at issue in that case, as the plaintiff there

contacted the alleged infringer immediately after issuance of the patent, and it is therefore of limited relevance to the matter now before the Court.

### 2.    Application

None of these cases squarely addresses the question of whether post-notice use by the buyer of a product, which was sold to it before the seller received notice, subjects the buyer to direct infringement liability. While *Leapfrog* comes the closest to addressing this precise issue, it, as stated above, involves only the issue of post-notice sales by the purchaser of a product, rather than post-notice use. Turning then the precise holding in *Fonar*, the Court recognizes that the language used by that court is somewhat ambiguous. Although the *Fonar* court states that servicing of accused products by a seller was analogous to repair, and repair is not infringement, the court fails to fully set out its reasoning as to precisely why repair by the seller in the context of that case was not indirect infringement. More specifically, the *Fonar* court never explicitly addresses whether indirect liability was foreclosed because continued use of the product by the purchaser did not constitute direct infringement. Instead, the language of that opinion is framed only in terms of the servicing actions taken by the seller; purchaser actions are not explicitly mentioned at all. As a result, the scope of its holding is difficult to ascertain.

The *Leapfrog* court, however, appears to supply this missing piece in the *Fonar* court's logic when it states that "the only reason servicing and/or repair was not infringement in *Fonar* was because the underlying use of the product was not infringement." *Leapfrog*, 2005 WL 1331216 at *5.  This holding in *Leapfrog* also appears consistent with the logic of *Aro Mfg. Co*., wherein the Supreme Court stated that "[w]here use infringes, repair does also, for it perpetuates the infringing use." 337 U.S. at

484. The dual holdings of the *Aro Mfg. Co*. cases, therefore, establish that where use of an accused product is infringing, repair of the product is also, and when use it not infringing, then repair is not infringing. *Id*. (stating that when there is direct infringement, then repair constitutes indirect infringement); 365 U.S. at 341 (noting that there can be no indirect infringement without direct infringement). In other words, the culpability attached to repair or servicing of an accused product must be tied to the culpability attached to its use. When *Fonar* is read in light of this relationship between use and repair, therefore, the necessary conclusion that this Court must draw is that *Fonar*'s statement that post-notice repair of the products were innocent must mean that post-notice use of the products was also innocent (because, under *Aro Mfg. Co*, if post-notice use was culpable, so then would be post-notice repair). And because the *Fonar* court linked the innocence of the post-notice repair to the fact that the product was sold by the seller free from liability, the only conclusion that can be drawn from its holding is that post-notice use of a product sold under circumstances that do not subject to the seller to liability does not constitute direct infringement.

Thus, the Court concludes that the only manner in which to logically and consistently apply the binding precedent of *Fonar* is to hold that the continued use of the sixty-eight CRT-350s that were clearly sold prior to notice does not give rise to direct infringement. And without direct infringement, NOV cannot be held liable for indirect infringement as to these products.

Under this holding, then, Tesco's argument that *Fonar*'s holding is inapplicable because NOV engaged not merely in servicing the devices, but also reconfiguration and retrofitting infringing elements of these devices, must also fail. (Tesco Resp, Doc. No.

217, at 20.) As long as *Fonar*'s holding is interpreted to mean there is no direct infringement on the part of the purchasers of the accused product when they are sold to them pre-notice, there can necessarily be no inducement liability, regardless of the type of action taken by the party accused of inducement. Tesco attempts to distinguish this case law though, arguing that the nature of the inducement committed by NOV was distinct from that presented by *Fonar*. However, as explained above, the rationale behind *Fonar* must be that subsequent action taken on a product that was sold free from liability cannot subject a defendant to inducement liability. In any event, even construing the facts in a light most favorable to Tesco and assuming that NOV's actions towards the sold CRT-350 can be characterized as an upgrade, the Court is unwilling to find that the alleged improvements made by NOV to the CRT-350 are so distinguishable from maintenance and repair that the holding in *Fonar* could be applicable.

The Court notes however, that it is somewhat troubled by the result it has reached. In its briefing, Tesco rightfully points out that, in arguing that the other three Defendants should not be held liable for their continuing use after notice, NOV essentially seeks to have the marking statute "trump" the infringement statute. More specifically, NOV's argument, and this Court's holding, appear to directly contravene the language in the marking statute that explicitly states that "damages can be recovered for infringement after notice on proof that the infringer was notified of their infringement and continued to infringe thereafter." 35 U.S.C. § 287(a). It seems to defy logic that the Defendants would be completely absolved of their continued infringing activity after receiving notice of such infringement, simply because the product was sold to them before the seller had such notice. The marking statute clearly allows for post-notice damages for continuing

infringement, which should mean that a defendant's exposure to liability for patent infringement is not pegged only to the initially infringing act. Continuing acts of infringement should carry with them independent consequences, particularly if these acts occur with notice of the infringement. Therefore, the resolution reached by the Court, in essence, allows the Defendants to do an end-run around this continuing infringement language within the marking statute.

Nonetheless, the Court is bound by Federal Circuit precedent and, because it seems that *Fonar* can logically be read in no other way, must accordingly hold that NOV cannot be held liable for indirect infringement of the sixty-eight accused products sold before notice, because there has been no direct infringement as to these products. The Court reiterates, however, that this does not preclude NOV's indirect liability as to the remaining eighteen accused products that were sold after the notice date.

### D.     Whether Tesco is Entitled to Seek Injunctive Relief

NOV further argues that Tesco is not entitled in injunctive relief for any of the products which were sold by NOV prior to the date of notice. This Court has already held that NOV is not entitled to summary judgment as to the eighteen CRT-350s that were delivered by NOV after the notice date. Accordingly, the Court will not preclude injunctive relief as to these products.

As to those sixty-eight products that were clearly sold prior to the notice date, NOV once again relies on the *Odetics* holding that "patentees failure to mark its product precluded not just recovery for past infringement damages, but also an injunction against future repair of products made, sold, and used during the period when there was no marking." 14 F. Supp. 2d at 792. NOV thus argues that Tesco should be precluded from

seeking injunctive relief as to it with respect to those devices that were indisputably sold pre-notice.  NOV further argues that, with an injunction against current and future infringing acts, a patentee could exact payment from the accused product's present or future owner, and thereby do an end-run around the notice statute's preclusions of damages for pre-notice infringement.

However, as Tesco points out, the court in *Odetics* relied heavily on the doctrine of laches and its finding that Plaintiff was unreasonably dilatory in bringing suit to reach its conclusion as to the preclusion of future injunctive relief. Because the Court is not persuaded that the doctrine of laches applies in this case, or that Tesco was unreasonably dilatory in filing this suit, it is unwilling, at this stage, to preclude Tesco from seeking future injunctive relief, even as to those accused devices that were sold before the date of notice. Moreover, to NOV's argument that *Odetics* stands for the proposition that products sold before Section 287 marking acquire an implied license that extends to current and future infringing acts, Tesco correctly responds that *Odetics*' discussion of an implied license occurred in the distinct context of a jury verdict that required payment of damages, which, according to that court, essentially functioned as the purchase of a license. The Court need not, therefore, extend this implied license rationale to the circumstances of this case, in which Tesco has received no payment for the accused infringement. Furthermore, even of Tesco were able, on the basis of an injunction award, to exact payment from the accused products' present owners, this would not undermine the purposes of the marking requirement, and Tesco would still be unable to obtain any relief for pre-notice infringing activities, such as the sale of the accused product from NOV to its customers. Finally, as noted above, precluding all future relief with respect to

these sixty-eight products would, it seems, undermine the language within Section 287(a) that allows relief for post-notice continuing infringement.

The Court therefore declines to hold that Tesco is precluded from seeking injunctive relief as to any of the accused products. This does not mean, however, that the Court would be unwilling to hold, when discovery is complete and a more complete factual record is before it, that injunctive relief would be inappropriate in this case. Accordingly the analysis set forth above, NOV's Motion for Partial Summary Judgment must be granted in part and denied in part.

## VI.   MOTION FOR SUMMARY JUDGMENT

Pursuant to 35 U.S.C. § 102(b), an otherwise valid patent is invalid if "the invention was patented or described in printed publication in this or a foreign country or in public use or on sale in this country, more than a year prior to the date of application for the patent in the United States." 35 U.S.C. § 102(b). NOV argues in its Motion for Summary Judgment that Tesco's patents are invalid because Tesco had admitted to prior public use of the patented invention prior to the critical date, or the date exactly one year prior to the date of application for the patent. NOV avers that Tesco's submission to the PTO within its IDS—namely the email communication as well as the photographs— constitutes an admission that it publicly used the '443 and '324 patented invention as least as early as October 11, 2002, which is thirty days prior to the patents' critical date, November 10, 2002.

In response, Tesco points to a plethora of evidence in the form of sworn deposition testimony that the photographs in question that were submitted to the PTO actually show a private, experimental use of the patented invention. According to Tesco,

because the overwhelming evidence demonstrate that the photographs show a private test of the CDS tool, NOV lacks any factual basis for this Motion.

This Court agrees with Tesco. NOV has failed to conclusively demonstrate that Tesco did in fact make an admission that its patented invention was in public use prior to the critical date. The label given to the email communication and photographs alone is insufficient to meet NOV's burden to invalidate the patents-in-suit. Moreover, Tesco presents a wealth of evidence that the email and photographs actually depict non-public, experimental use. As such, Tesco has, at the very least, created a genuine issue of fact as to whether the photographs in question depict public or private use of the patented invention. Accordingly, NOV's Motion for Summary Judgment must be denied.

## VII.    CONCLUSION

The Motion to Stay (Doc. No. 195) is hereby **DENIED**.  The Motion to Admit (Doc. No. 196) is hereby **DENIED WITHOUT PREJUDICE**.   Frank's request to certify these issues for interlocutory appeal is hereby **DENIED**. NOV's Motion for Partial Summary Judgment (Doc. No. 202) is hereby **GRANTED IN PART AND DENIED IN PART**. NOV's Motion for Summary Judgment (Doc. No. 225) is **DENIED**.

**IT IS SO ORDERED**.

**SIGNED** this 5th day of August, 2010.

_____

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE