UNDER SEAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **TESCO CORPORATION,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. H-08-2531** |
| | § | |
| **WEATHERFORD INTERNATIONAL,** | § | |
| **INC., NATIONAL OILWELL VARCO,** | § | |
| **L.P., OFFSHORE ENERGY SERVICES,** | § | |
| **INC., and FRANK'S CASING CREW &** | § | |
| **RENTAL TOOLS, INC.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

<u>**MEMORANDUM AND ORDER**</u>

Pending before the Court are the following motions:

**Filed by Plaintiff Tesco Corporation ("Tesco"):**

- Motion for Partial Summary Judgment on Defendants' Anticipation Invalidity Defense and Motion to Amend Claim Construction (Doc. No. 279);
- Motion for Partial Summary Judgment of No Inequitable Conduct (Doc. No. 281);
- Motion to Strike the Incomplete Reexamination Files of the Patents-in-Suit as Evidence from Defendants' Motions for Summary Judgment (Doc. No. 338).

**Filed by Defendant Frank's Casing Crew & Rental Tools, Inc. ("Frank's"):**

- Motion for Summary Judgment of No Willful Infringement of U.S. Patent Nos. 7,140,443 and 7,377,324 (Doc. No. 275);
- Motion for Summary Judgment of Invalidity of U.S. Patent Nos. 7,140,443 and 7,377,324 (Doc. No. 284);
- Motion for Partial Summary Judgment of Non-Infringement of Tesco's "Pivotal Connection" Claims by Frank's Sub-Mounted Supertawg and Motion to Amend Claim Construction  (Doc. No. 289);

- Motion for Partial Summary Judgment of Non-Infringement of the "Channel Key" and "Anti-Rotation" Claims in Patent Nos. 7,140,443 and 7,377,324 (Doc. No. 291);
- Motion to Strike Testimony of Tommy Warren (Doc. No. 323).

**Filed by Defendant National Oilwell Varco, L.P. ("NOV"):**

- Motion for Partial Summary Judgment of Non-Infringement Regarding "Channel Key" and "Anti-Rotation" Claims (Doc. No. 283);
- Motion for Partial Summary Judgment of Patent Invalidity for Indefiniteness Pursuant to 35 U.S.C. § 112, ¶ 2 (Doc. No. 293);
- Motion for Partial Summary Judgment of Non-Infringement Regarding "Pivotal Connection" Claims and Motion to Amend Claim Construction (Doc. No. 294);
- Motion for Summary Judgment of Invalidity Due to Obviousness (35 U.S.C. § 103(a)) (Doc. No. 300).

**Filed by Defendant Weatherford International, Inc. ("Weatherford"):**

- Motion for Summary Judgment of No Infringement (Doc. No. 296);
- Motion to Strike the Expert Report and Exclude the Testimony of Gary Wooley and Motion to Supplement Claim Constructions (Doc. No. 299).

Upon considering the Motions, all responses thereto, and the applicable law, the Court finds that Tesco's Motion to Strike Reexamination Files (Doc. No. 338) should be granted in part and denied in part, Weatherford's Motion to Strike the Report and Testimony of Gary Wooley (Doc. No. 299) should be denied, Frank's Motion to Strike the Testimony of Tommy Warren (Doc. No. 323) should be dismissed as moot, Defendants' Motions for Summary Judgment of Non-Infringement of the "Pivotal Connection" Claims (Doc. Nos. 289, 294, 296) should be denied, Defendants' Motions for Summary Judgment of Non-Infringement of the "Channel Key" and "Fitted for Anti-Rotation" Claims (Doc. Nos. 283, 291) should be granted in part and denied in part, NOV's Motion for Summary Judgment of Invalidity Due to Obviousness (Doc. No. 300) should be denied, Tesco's Motion for Summary Judgment on Defendants' Anticipation Defense (Doc. No. 279) should be denied, NOV's Motion for Summary Judgment of

Invalidity Due to Indefiniteness (Doc. No. 293) should be denied, Frank's Motion for Summary Judgment of Invalidity Due to the On-Sale Bar (Doc. No. 284) should be denied, Tesco's Motion for Summary Judgment on Defendants' Inequitable Conduct Defenses (Doc. No. 281) should be granted in part and denied in part, and that Frank's Motion for Summary Judgment of No Willful Infringement (Doc. No. 275) should be granted in part and denied in part. The Court also finds it appropriate to further construe the claim terms as a matter of law, and does so in this order and the accompanying claim construction chart.

## I.    BACKGROUND

Tesco owns U.S. Patent No. 7,140,443 (the "'443 patent") and U.S. Patent No. 7,377,324 (the "'324 patent"). The '324 patent, granted in May 2008, is a continuation of the '443 patent, granted in November 2006. Tesco brought suit against Frank's, NOV, Weatherford, and Offshore Energy Services, Inc. ("OES") for infringement of these patents.

The '443 and '324 patents describe a tool used on a drilling rig. Drilling rigs are used to bore and encase holes in the ground for the purpose of extracting oil. This process involves oilfield tubulars, or pipes, generally segmented into lengths of 30-40 feet. The drilling rig screws the pipe segments together to form a pipe string used to drill or encase the hole in the ground. More specifically, the patents describe an apparatus and method for handling the sections of the pipe or pipe strings that are used for drilling or lining a well bore. This pipe handling device is positioned below a top drive, a device placed in the upper part of a drilling rig which bears the weight of suspended pipe as it is driven into a well bore. Link arms are used to raise segments of a pipe string and place those

segments into a pipe engaging apparatus such that the pipe segment can be rotated and connected with the pipe string being used to line or drill a well bore. Tesco's product is commonly referred to as the casing drilling system ("CDS"). Tesco alleges that products sold by each Defendant infringe on the claims of the '443 and '324 patents. Specifically, Tesco asserts claims 13, 18, 25, 27, 43, 55, and 59 of the '443 patent and claims 1, 4, 12, 14, 17, and 27 of the '324 patent.

In October and November 2008, Weatherford filed requests for *inter partes* re-examination of the patents with the United States Patent and Trademark Office ("PTO"). (Doc. No. 54, at 1; Doc. No. 60, at 1.) PTO granted both re-examination requests. Defendants then moved for a stay of this proceeding pending the conclusion of the reexamination proceedings (Doc. No. 34), which the Court denied in February 2009. (Doc. No. 61.)

In January and February 2009, PTO issued its first Office Actions in the two re-examinations, rejecting fifty-eight of the seventy claims in the '443 Patent (Doc. No. 54, at 1) and thirty-three of the thirty-four claims in the '324 Patent (Doc. No. 60, at 2). In January 2010, PTO issued an Actions Closing Prosecution ("ACP") for each of the re-examinations of the Tesco Patents.[1] (Doc. No. 195, at 3.) Of the seven claims in the '443 Patent asserted against the Defendants, PTO rejected five and confirmed two. (*Id.*, at 5.) Of the six claims in the '324 Patent asserted against the Defendants, PTO rejected five and confirmed one. (*Id.*) All the confirmed claims include a "channel key" limitation that is absent from all of the rejected claims. (*Id.*, at 3.) After the Actions Closing Prosecution were issued in the reexaminations, Frank's filed another Motion to Stay the

---

[1] The Action Closing Prosecution for the '324 patent was temporarily vacated due to incorrect cross-references within the document, but was reissued on August 18, 2010. (*See* Doc. No. 355-1 and -2.)

4

Case Until Issuance of Reexamination Certificates (Doc. No. 195), which the Court denied in August 2010. (Doc. No. 317.)

On January 5, 2010, the Court issued an order construing the claims of the patents-in-suit as a matter of law under *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). (Doc. No. 176 (the "*Markman* Order").) This case is scheduled to go to trial on October 25, 2010.

## II.     MOTIONS TO AMEND CLAIM CONSTRUCTION

All of the moving parties ask the Court to engage in additional claim construction beyond that included in the *Markman* Order. Tesco, Frank's, NOV, and Weatherford all request that the Court construe the terms "main body," "pipe engaging apparatus," and "pipe gripping mechanism." Frank's, NOV, and Weatherford also request that the Court amend its constructions of "link arm mounted by a pivotal connection to move with the top drive," "pivotally connectable," and "pivotally connected / pivotally mounted / pivotal connection."

The Federal Circuit has held that "a district court may engage in claim construction during various phases of litigation, not just in a *Markman* order," and "may engage in rolling claim construction, in which the court revisits and alters its interpretation of the claim terms as its understanding of the technology evolves." *Conoco, Inc. v. Energy & Environmental Intern., L.C.*, 460 F.3d 1349, 1359 (Fed. Cir. 2006). "When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." *O2 Micro Intern. Ltd. v. Beyond Innovation Technology Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). The goal of claim construction is to arrive at the ordinary and customary meaning of a claim term in the eyes of a person of

ordinary skill in the art. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc).

The Court now considers in turn each term for which construction is requested:

**A. "link arm mounted by a pivotal connection to move with the top drive"; "pivotally connectable"; "pivotally connected / pivotally mounted / pivotal connection"**

In the *Markman* Order, the Court construed the term "link arm mounted by a pivotal connection to move with the top drive" to mean "link arm mounted to a surface by a pivotal connection to move with the top drive, but not connected to any part of, or surface supported by, the top drive itself." (Doc. No. 176, at 14.)  In doing so, the Court noted that the parties did not dispute that "Tesco's patents do not cover any embodiments of this device in which the link arms are connected directly to a top drive," nor that Tesco's patents "do cover any embodiments where the link arms are mounted onto the pipe engaging apparatus, even when this connection is achieved through mounting the link arms onto a bracket that is then mounted onto the pipe engaging apparatus." (*Id.* at 12.) With respect to embodiments in which the link arms are connected to "intermediate surfaces," meaning surfaces "positioned below the top drive, but not part of the main body of the pipe-handling device such that the link arms can be said to be 'directly on the device,'" the Court held that "Tesco's patents do not cover *all* of the intermediate surfaces" but that the claims did not exclude all embodiments in which the link arms were not "directly" connected to the pipe engaging apparatus. (*Id.* at 13 (emphasis in original).) A significant portion of the current claim construction disputes stems from the parties' differing interpretations of the Court's construction of this term.

Frank's and NOV ask the Court to add to its construction of this term the phrase "including but not limited to the top drive shaft or quill," so it would be defined as "link arm mounted to a surface by a pivotal connection, but not connected to any part of, or surface supported by, the top drive itself, including but not limited to the top drive shaft or quill." (Doc. No. 289, 294.) Frank's and NOV also seek to add that definition onto the constructions of "pivotally connectable," and "pivotally connected / pivotally mounted / pivotal connection." (*Id.*) Weatherford asks the Court to clarify that "If the link arms are connected to a surface intermediate the top drive and pipe engaging apparatus, which surface is supported by the top drive, then the link arms are not connected to the pipe engaging apparatus." (Doc. No. 299.) Tesco argues that those amendments are unnecessary.

At the outset, the Court finds it necessary, in light of the parties' competing interpretations and in order to avoid confusion, to clarify its intention in construing the term "link arm mounted by a pivotal connection to move with the top drive." The Court now adds the word "directly" into that definition, to read: "link arm mounted to a surface by a pivotal connection to move with the top drive, but not connected to any part of, or surface directly supported by, the top drive itself." In so doing, the Court expresses no view as to whether any, or all, intermediate surfaces (i.e. those between the top drive and the pipe engaging apparatus) on the accused devices are directly supported by the top drive itself.[2] That determination is part of applying the Court's claim construction to the accused devices at issue, which is a question of fact for the jury. *See, e.g.*, *PPG Indus. v.*

---

[2] The Court also emphasizes that link arms connected to surfaces that are directly supported by the top drive itself are excluded from the patents' coverage, notwithstanding Tesco's argument that "ALL surfaces and ALL devices in the entire drill string, including the pipe engaging apparatus, are supported by the top drive."

*Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998) ("after the court has defined the claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact").

Next, the Court declines to adopt the phrase "including but not limited to the top drive shaft or quill." The definition of "link arm mounted by a pivotal connection to move with the top drive," as clarified in this order, sufficiently defines the locations of link arm connections that are excluded from the coverage of the patents-in-suit. Frank's and NOV's proposal asks the Court to partially determine which particular surfaces are supported by the top drive. The Court declines to do so, because such application of the claim constructions to the accused products is a question of fact for the jury. If a jury finds that link arms are connected to a surface that is part of the top drive, it could not reasonably find that the device is within the scope of the patents-in-suit. Therefore, the proposed construction is unnecessary to clarify the meaning of the claim terms.

Finally, the Court finds it appropriate to include Weatherford's proposed sentence in its construction, with the additional word "directly." The new sentence states, "If the link arms are connected to a surface intermediate the top drive and pipe engaging apparatus, which surface is directly supported by the top drive, then the link arms are not connected to the pipe engaging apparatus." The validity of that statement should be clear from the *Markman* Order, as it essentially says, "If the link arms are connected to neither the pipe engaging apparatus nor the top drive, the link arms are not connected to the pipe engaging apparatus." However, in an abundance of caution, the Court now incorporates that sentence into the construction. *See O2 Micro Intern. Ltd.*, 521 F.3d at 1362 ("When

the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it."). Omitting the word "directly" would risk confusing the jury about which pivotal connections are excluded from the patents. The constructions of "pivotally connectable" and "pivotally connected / pivotally mounted / pivotal connection" are thus amended to add the sentence "If the link arms are connected to a surface intermediate the top drive and pipe engaging apparatus, which surface is directly supported by the top drive, then the link arms are not connected to the pipe engaging apparatus."[3]

## B.  "pipe engaging apparatus"

Although at the time of the *Markman* hearing, the parties agreed that this term did not need to be construed, they now all agree that construction is needed. Furthermore, the parties agree to Tesco's proposed definition: "a structure or equipment including a main body with an upper end for drive connection directly or indirectly to a top drive, and a pipe gripping mechanism."[4] This construction finds support in the claim language, which states, for example, "13. A pipe handling system comprising: a pipe engaging apparatus for gripping a pipe joint and having a main body including an upper end for drive connection to a top drive and a pipe gripping mechanism . . . ." (Doc. No. 279, Ex. 1, at 9.) Accordingly, the Court adopts the agreed definition, and construes "pipe engaging apparatus" to mean "a structure or equipment including a main body with an upper end for drive connection directly or indirectly to a top drive, and a pipe gripping mechanism."

---

[3] The Court declines to add to the constructions of these terms the phrase "link arm mounted to a surface by a pivotal connection to move with the top drive, but not connected to any part of, or surface directly supported by, the top drive itself" *without* the "top drive shaft or quill" language. It is not clear that there is a dispute between the parties with regard to that aspect of claim construction, and so such an amendment is unnecessary at this time.

[4] Defendants proposed the definition "an apparatus that grips the pipe which includes a main body and a pipe gripping mechanism, and which can be connected directly or indirectly at its upper end to a top drive," but acknowledge that this is essentially the same as Tesco's definition.

###### C.  "main body"

Despite their agreement regarding "pipe engaging apparatus," the parties vehemently dispute the proper construction of the component parts, "main body" and "pipe gripping mechanism."[5] For "main body," Tesco proposes the definition "a structure including a housing for other parts or components, such as an actuator for the pipe gripping mechanism." Frank's, NOV, and Weatherford all propose the definition "the main portion of the pipe engaging apparatus, which has an upper end for connection directly or indirectly to the top drive, and to which one or more link arms can be connected."[6]

In arguing that "main body" be construed to require "a housing for other parts or components," Tesco points to the specification in the patent, which states:

> Referring to FIG. 2, a pipe handling system is shown including a pipe handling device 10*a* and a pipe engaging apparatus 12*a* including a main body 14*a* and a housing 32 carrying, for example, inwardly directed grapples, which can't be seen in this drawing, formed to engage about the outer surface of a pipe, such as a section of casing 33, to be gripped.

(Doc. No. 279, Ex. 1, at 4:33-40.) Tesco's expert Tommy Warren also testified that "main body" would be understood by people of ordinary skill in the art to include "a housing that may house other parts." (Doc. No. 279, Ex. 22, at 135:11-16.) Defendants argue that nothing in the claim language or the specifications limits what constitutes a "main body."

The Court agrees with Defendants that the claims do not require "main body" to include "a housing for other parts or components, such as an actuator for the pipe

---

[5] Neither of these terms were among the list of disputed terms at the time of the *Markman* hearing and order.

[6] Defendants had previously asked the Court to construe "main body" as "the main portion of the pipe engaging apparatus, which has an upper end for connection directly or indirectly to the top drive, and to which a pipe handling device may be connected."

gripping mechanism." First, the language of the claims themselves in no way suggests that the main body must house anything. Rather, the claim language requires only that the main body 1) be part of the pipe engaging apparatus; and 2) have an upper end for drive connection to a top drive. (Doc. No. 279, Ex. 1, claims 13, 43, and 55; Ex. 2, claim 1.)

Second, the specification does not add such a limitation. Although the specification is "highly relevant to the claim construction" and "the single best guide to the meaning of a disputed term," *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996), it is well established that each feature of the specific embodiment described in the specification does not constitute a limitation on the patent claims. *See, e.g.*, *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1325 (Fed. Cir. 2003) ("courts must take extreme care when ascertaining the proper scope of the claims, lest they simultaneously import into the claims limitations that were unintended by the patentee"); *Ventana Medical Systems, Inc. v. Biogenex Laboratories, Inc.*, 473 F.3d 1173, 1181 (Fed. Cir. 2006) ("Although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments.") (internal citation omitted). Here, there is no suggestion in the language of the specification that the housing is a requirement of the main body. Instead, the specification merely states that the device "is shown" with certain components. Moreover, it is not even clear from the specification that the specific embodiment described includes a main body that *contains* housing. (*See* Doc. No. 279, Ex. 1, at 4:33-40 ("pipe engaging apparatus 12a including a main body 14a *and* a housing 32") (emphasis added).) Neither is Warren's testimony that a person of ordinary skill in the art would interpret "main body" to include a housing sufficient to add this limitation into the

11

claim. That statement, without further elaboration, cannot overcome the intrinsic evidence in the claims and specification that such a limitation is not present. *See Kara Technology Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009) ("A court should discount any expert testimony that is clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent.") (internal citation omitted).

On the other hand, Defendants' proposed definition finds support in the claim and specification language, along with the plain meaning of the term "main body." The claims make explicit that the main body is part of the pipe engaging apparatus. (*See, e.g.*, Doc. No. 279, Ex. 1, claim 13 (referring to "pipe engaging apparatus main body).) The specification makes clear that, although the main body must have an upper end for drive connection to the top drive, that connection can be either direct or indirect. (*Id.* at 3:56-58 ("The pipe engaging apparatus can be connectable, directly or indirectly, at its upper end 18 to a top drive 20.").) The claims set forth that the main body must be connectable to the top drive and that the main body is part of the pipe engaging apparatus. Therefore, the main body may connect either directly or indirectly to the top drive.

Finally, Tesco objects that, essentially, "Defendants' proposed construction is simply 'main body' means 'the main portion of the pipe engaging apparatus.'" (Doc. No. 350, at 4.) Tesco may be correct in that summation, but Defendants' proposed construction also captures the full meaning of "main body" as claimed in the patents. The main body is one of very few components of the pipe engaging apparatus that is specified, and both "main" and "body" are used in their common senses. However,

Defendants have presented no evidence that "main body" should be construed to require that "one or more link arms can be connected," and the Court finds it unnecessary to do so.

Therefore, the Court construes "main body" as "the main portion of the pipe engaging apparatus, which has an upper end for connection directly or indirectly to the top drive."

### D.   "pipe gripping mechanism"

Tesco asks that the Court construe "pipe gripping mechanism" as "a mechanism in which pipe is gripped with some form of gripping force provided by radial movement of an element of the gripper for rotational and axial movement." Defendants ask the Court to construe the term as "a device for gripping pipe which transmits force or motion." Further, the parties disagree as to whether a device must have more than one part to constitute a "mechanism." The parties vigorously dispute this point because it could determine whether the threaded connection used in prior art constitutes a "pipe gripping mechanism" for purposes of anticipation invalidity. *See* Section IV.D.2 below. Tesco, citing *Mark's Standard Handbook for Mechanical Engineers*, argues that a "mechanism" must have "two or more moving parts." Defendants, citing Merriam-Webster Dictionary, argue that "mechanism" essentially means "machine," and that a screw is one of the six "simple machines."

The Court finds, based on the claim and specification language, that the only limitation properly read into the term "pipe gripping mechanism" is "for rotational and axial movement." Claim 55 of the '443 patent and claim 1 of the '324 patent, among others, describe "a pipe gripping mechanism to grip a pipe for rotational and axial

movement." (Doc. No. 279, Ex. 1, 13:5-6, Ex. 2, 8:34-35.) However, there is no support in the claims or specification either for Tesco's proposed limitation "with some form of gripping force provided by radial movement of an element of the gripper," or for Defendants' proposed limitation "which transmits force or motion." The Court finds no evidence, either presented by the parties or found in the patents, that requires such limitations.

The Court also declines to find any further limitations in the word "mechanism," such as Tesco's proposed "two or more moving parts." In the context of the patents, "mechanism" does not appear to place such a limit on the pipe gripping device. Furthermore, it is far from clear from the extrinsic evidence that Tesco's proposed definition is appropriate. Although *Mark's Standard Handbook for Mechanical Engineers* suggests that such a meaning is common in that field, the dictionary Defendants cite suggests that, in common usage, one part can constitute a mechanism. Other dictionaries suggest that either usage is appropriate. *See, e.g.*, American Heritage Dictionary, Second College Edition (1982) (defining "mechanism" as "1a. A machine or mechanical appliance. b. The arrangement of connected parts in a machine. 2. A system of parts that operate or interact like those of a machine. 3. An instrument or process, physical or mental, by which something is done or comes into being . . . .") Absent language in the patent specifying that a pipe gripping mechanism must contain more than one part, the jury is capable of applying the ordinary meaning of the word to the accused devices.[7]

---

[7] At the same time, the Court sees no reason to change the word to "device," as Defendants propose. It is possible that a reasonable jury could interpret "mechanism" to include devices with only one part *or* only devices with more than one part, so substituting the word "device" would needlessly take this decision away from the jury.

The Court thus construes "pipe gripping mechanism" to mean "a mechanism in which pipe is gripped for rotational and axial movement."

The claim constructions in this order are set forth in the claim construction chart at the end of the order.

### III.    Motions to Strike

### A.  Legal Standard

Evidence is admissible only if it is relevant, meaning "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Further, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

Federal Rule of Evidence 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise . . . ." "[T]he trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592 (1993). "A district court should refuse to allow an expert witness to testify if it finds that the witness is not qualified to testify in a particular field or on a given subject." *Wilson v. Woods*, 163 F.3d 935, 937 (5th Cir.

1999); *see also Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1363 (Fed. Cir. 2008) ("it is an abuse of discretion to permit a witness to testify as an expert on the issues of noninfringement or invalidity unless that witness is qualified as an expert in the pertinent art"). However, "Rule 702 does not mandate that an expert be highly qualified in order to testify about a given issue. Differences in expertise bear chiefly on the weight to be assigned to the testimony by the trier of fact, not its admissibility." *Huss v. Gayden*, 571 F.3d 442, 452 (5th Cir. 2009) (citing *Daubert*, 509 U.S. at 596).

### B.  Motion to Strike Reexamination Files

Tesco moves to strike the PTO reexamination files as summary judgment evidence. (Doc. No. 338.) Tesco argues that the files are incomplete and that the presumption of patent validity does not apply in reexaminations. Therefore, Tesco argues, the files are irrelevant, or at the very least more prejudicial than probative. *See* Fed. R. Evid. 403. Frank's argues in response that the reexamination is virtually complete, and that the files are relevant to invalidity, willful infringement, prosecution history estoppel, and inequitable conduct. Further, Frank's points to several cases in which district courts have considered reexamination files, and argues that there is no risk of undue prejudice because only the Court, not the jury, will consider the files as evidence at this stage.

The Court finds that the examiners' rejections and confirmations of claims in the reexamination proceedings are inadmissible for purposes of proving invalidity of the patents at the summary judgment stage. Unlike in reexaminations, those challenging the validity of a patent in litigation must overcome a presumption of validity by proving by clear and convincing evidence that a patent is valid. The conclusions of examiners as to whether a claim should be confirmed or rejected using a completely different standard

have no probative value in this context. The Federal Circuit has held that "the grant by the examiner of a request for reexamination is not probative of unpatentability." *Hoechst Celanese Corp. v. BP Chemicals Ltd.*, 78 F.3d 1575, 1584 (Fed. Cir. 1996). As one district court held, "evidence of incomplete patent reexamination proceedings is not admissible to prove invalidity of a patent, because it has no probative value on that issue." *Transamerica Life Ins. Co. v. Lincoln Nat. Life Ins. Co.*, 597 F. Supp. 2d 897, 907 (N.D. Iowa 2009). Although *Hoechst* and *Transamerica Life Ins. Co.* dealt with mere grants of reexamination rather than rejections of claims in reexamination and Actions Closing Prosecution, there is still no probative value on the issue of invalidity due to the differing standards applied in reexamination and in this litigation.

Furthermore, even if there were some marginal probative value, it is outweighed by the risk of prejudice and confusion due to the improper weight likely to be given to the PTO examiners' conclusions. *See* Fed. R. Evid. 403. Even if instructed that the standards were different and thus that the examiners' conclusions are not dispositive in this case, there is a serious risk that a jury would view the examiners as expert and authoritative. *See, e.g., Callaway Golf Co. v. Acushnet Co.*, 576 F.3d 1331, 1343 (Fed. Cir. 2009) (affirming district court's ruling that little relevance of non-final reexamination redeterminations was outweighed by high risk of jury confusion); *Transamerica Life Ins. Co.*, 597 F. Supp. 2d at 907; *Amphenol T & M Antennas, Inc. v. Centurion Intern., Inc.*, 2002 WL 32373639, at *2 (N.D. Ill. Jan. 17, 2002).  Although the risk of prejudice is less when only the judge will consider the evidence, *see Gulf States Utilities Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. 1981) ("This portion of Rule 403 has no logical application to bench trials."), "[t]he admissibility of summary judgment evidence is

subject to the same rules of admissibility applicable to a trial." *Resolution Trust Corp. v. Starkey*, 41 F.3d 1018, 1024 (5th Cir. 1995); Fed. R. Civ. P. 56(e)(1) ("A supporting or opposing affidavit must . . . set out facts that would be admissible in evidence . . ."); *Charleswater Products, Inc. v. Nevamar Corp.*, 178 F.3d 1310 (Table), 1998 WL 911688, at *2 (Fed. Cir. 1998) (upholding district court's exclusion of summary judgment evidence because it would be inadmissible at trial under Federal Rule of Evidence 403).

The reexamination proceedings are, however, relevant to the issue of willful infringement. *Safoco, Inc. v. Cameron Intern. Corp.*, 2009 WL 2424108, at *20 (S.D. Tex. July 31, 2009). Contrary to Tesco's claim, *In re Seagate* does not require that only pre-litigation events be considered in determining whether there is "an objectively high likelihood that its actions constituted infringement of a valid patent." 497 F.3d 1360, 1371 (Fed. Cir. 2007) (en banc). Rather, *In re Seagate* says merely that pre-litigation conduct by the defendant is irrelevant to the *subjective* inquiry of whether the objective risk "was either known or so obvious that that should have been known to the accused infringer." *Id.* The Federal Circuit and other courts have accordingly considered information from after the commencement of litigation in their willful infringement inquiries. *See, e.g.*, *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1337 (Fed. Cir. 2009); *Pivonka v. Central Garden & Pet Co.*, 2008 WL 486049, at *2 (D. Colo. Feb. 19, 2008).

Finally, information from the reexamination proceedings other than 1) the fact that reexamination was opened, or 2) the conclusions of the examiners—for example, what evidence Tesco presented or what statements Tesco made—is relevant to issues

such as prosecution history estoppel and inequitable conduct. Furthermore, the risk of prejudice is not present when the evidence is not conclusions of examiners, as there is no danger of improperly conflating the different standards. *See* Fed. R. Evid. 403.

Therefore, the Motion to Strike Reexamination Files is granted in part and denied in part.

### C.  Motion to Strike Expert Report and Testimony of Gary Wooley

Weatherford moves to strike the expert report and exclude the testimony of Tesco's expert witness Dr. Gary Wooley. (Doc. No. 299.) In support of its motion, Weatherford argues that Dr. Wooley is not qualified to testify as an expert on the subject matter of this case because, although he has three degrees in engineering, none of his education or experience is related to the design or use of pipe-handling equipment of any kind, much less of the type disclosed in the Patents-in-Suit. (Doc. No. 299, at 10.) Weatherford further argues that Dr. Wooley's opinions are contrary to the Court's claim construction and will thus confuse the jury. In response, Tesco points to Dr. Wooley's "general experience in rig operations and the design and testing of oilfield equipment," arguing that Weatherford's objections "should go to the weight of Dr. Wooley's testimony, not its admissibility." (Doc. No. 331, at 8.)

### a.  Dr. Wooley's Qualifications

The Court agrees with Tesco that Dr. Wooley is qualified under Federal Rule of Evidence 702. Even if he does not have specific experience studying or working with pipe handling devices, his three degrees in engineering and his experience in oil fields sufficiently qualify Dr. Wooley as an expert on the subject matter of this case. Rule 702 does not require the extreme specificity of expertise that Weatherford proposes. Neither

do the cases Weatherford cites in support of its argument. In *Proveris Sci. Corp. v. Innovasystems, Inc.*, the Federal Circuit found no abuse of discretion when the district court limited the testimony relating to aerosol sprays used in drug delivery devices by an engineer whose sole relevant experience was "using plumes to maneuver satellites." 536 F.3d 1256, 1267 (Fed. Cir. 2008). In *Sundance, Inc. v. DeMonte Fabricating Ltd.*, the Federal Circuit did find abuse of discretion where the district court allowed a patent lawyer with no technical expertise in the art to testify on the questions of infringement and validity. 550 F.3d 1356, 1363 (Fed. Cir. 2008). Unlike the experts at issue in *Proveris* and *Sundance*, Dr. Wooley is a trained engineer who has technical experience in the field at issue in the case, oil drilling. "A witness qualified as an expert is not strictly confined to his area of practice but may testify concerning related applications; a lack of specialization does not affect the admissibility of the opinion, but only its weight." *Trenado v. Cooper Tire & Rubber Co.*, 2009 WL 5061775, at *2 (S.D.Tex. Dec. 15, 2009) (citing *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 176-77 (5th Cir.1990), *abrogated on other grounds by Little v. Liquid Air. Corp.*, 37 F.3d 1069 (5th Cir.1996)); *Peteet v. Dow Chemical Co.*, 868 F.2d 1428, 1431 (5th Cir. 1989) ("The fact that Dr. Teitelbaum is not a specialist in any other field goes to the weight of his opinion, not its admissibility."). Therefore, the jury may consider Dr. Wooley's lack of more specific experience with casing running systems in evaluating the weight to give his testimony, but the Court finds Dr. Wooley to be qualified as an expert.

### b.  Risk of Confusion

Weatherford further argues that Dr. Wooley's opinions are contrary to the Court's claim construction and will thus confuse the jury. Weatherford's primary argument is that

Dr. Wooley's expert report indicates that, if the link arms are connected to any intermediate surface between the top drive and the pipe engaging apparatus, then they are connected to the main body of the pipe engaging apparatus. This position, Weatherford contends, contradicts the Court's construction of "link arms mounted by a pivotal connection to move with the top drive." Tesco argues in response that Dr. Wooley's report is in line with the Court's construction, and that Dr. Wooley does acknowledge that there are intermediate surfaces that are "supported by" the top drive, and thus excluded from the patents.

As discussed in Section II above, the application of the Court's claim construction to the accused products is a question of fact for the jury. Therefore, the Court declines to rule on the precise situations in which an intermediate area is a part of the pipe engaging apparatus and those in which it is supported by the top drive. As a result, the testimony of Dr. Wooley, along with defense experts expressing contrary opinions, will assist the jury in determining whether the accused products infringe the patents-in-suit.

Some risk of jury confusion is inevitable in applying the Court's construction of the technical terms at issue in this case. *See CytoLogix Corp. v. Ventana Medical Systems, Inc.*, 424 F.3d 1168, 1172 (Fed. Cir. 2005) ("The risk of confusing the jury is high when experts opine on claim construction before the jury even when . . . the district court makes it clear to the jury that the district court's claim constructions control.") However, it is not sufficiently clear to the Court that Dr. Wooley's report contradicts the claim construction rather than merely presenting one interpretation of how the construction applies to the accused products. Accordingly, the probative value of the report outweighs any risk of prejudice, and the motion to strike is denied. To the extent

that Dr. Wooley's testimony at trial contradicts the claim construction, as amended today, particular statements may be excluded if the Court finds that the risk of prejudice is sufficiently high.

For the time being, however, the motion to strike is denied.

### D.  Motion to Strike Testimony of Tommy Warren

Frank's moves to strike the testimony of Tesco's expert Tommy Warren on the topic of claim construction. (Doc. No. 323.) Specifically, Frank's argues that Tesco failed to timely disclose Mr. Warren as an expert on the topic of claim construction and so cannot now rely on his testimony in its Motion to Amend Claim Construction. Tesco responds that Warren merely testified at his deposition "as a person of ordinary skill in the art," rather than an expert, on claim term meaning. Tesco further argues that Warren did provide opinions in his report with respect to several terms, and that his deposition testimony was only in response to questions from NOV's counsel.

Because the Court is not persuaded by Warren's testimony with regard to proposed claim construction, it need not reach the issue of whether it is outside the scope of his expert report.

### IV.    Motions for Summary Judgment

### A.  Legal Standard for Summary Judgment

A motion for summary judgment requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. *See* FED. R. CIV. P. 56(c)(2). "Summary judgment is appropriate when, drawing all justifiable inferences in the nonmovant's favor, there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Transocean*

*Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, --- F.3d ---, 2010 WL 3257312, at *2 (Fed. Cir. 2010). "[A] dispute about a material fact is genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court may not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  "The court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'"  *Id.* at 151.  Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. Fed. R. Civ. P. 56(e)(1); *see, e.g.*, *Mcintosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir.1996) *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts'") (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

### B.  Motions Regarding "Pivotal Connection" Claims

Frank's, NOV, and Weatherford all move for partial summary judgment that their accused products do not infringe on Tesco's claims regarding the "pivotal connection" component of the patents-in-suit. (Doc. Nos. 289, 294, 296.) As discussed in Section II.A. above, whether the accused products infringe on those claims turns on whether their link arms are connected to the pipe engaging apparatus, the top drive, or an intermediate area. If they are connected to the pipe engaging apparatus, they are covered by the claims. If they are connected to the top drive, they are not covered by the claims. If they are in an

intermediate area, they are only covered by the claims if they are not attached to a surface directly supported by the top drive. (*See* Doc. No. 176, *Markman* Order, at 10-14; Section II above.)

### 1. Legal Standard

35 U.S.C. § 271(a) provides, "Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." Infringement is a question of fact, *Technology Licensing Corp. v. Videotek, Inc.*, 545 F.3d 1316, 1327 (Fed. Cir. 2008), although the underlying claim construction is a question of law. *Markman*, 52 F.3d 967. The patentee has the burden to prove infringement by a preponderance of the evidence. *Technology Licensing Corp.*, 545 F.3d at 1327.

"An infringement issue is properly decided upon summary judgment when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device either literally or under the doctrine of equivalents." *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1339 (Fed. Cir. 2001). To constitute literal infringement, an accused product must have every element and limitation of the patent-in-suit. *Builders Concrete, Inc. v. Bremerton Concrete Products Co.*, 757 F.2d 255, 257 (Fed. Cir. 1985); *Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Intern., Inc.*, 389 F.3d 1370, 1378 (Fed. Cir. 2004). To constitute infringement under the doctrine of equivalents, the differences between elements of the accused product and the patented invention must be "insubstantial to one of ordinary skill in the art." *Wavetronix LLC v. EIS Electronic Integrated Systems*, 573 F.3d 1343, 1360 (Fed. Cir. 2009) (internal

quotation marks omitted). Thus, a patentee "can prove equivalence by showing on a limitation-by-limitation basis that the accused product performs substantially the same function in substantially the same way with substantially the same result as each claim limitation of the patented product." *Id.*

However, "the determination of infringement under the doctrine of equivalents is limited by two primary legal doctrines: (1) prosecution history estoppel and (2) the 'all elements' rule," the application of which are questions of law. *Seachange Intern., Inc. v. C-COR, Inc.*, 413 F.3d 1361, 1378 (Fed. Cir. 2005) (internal citation omitted). Where "a narrowing amendment has been made for a substantial reason relating to patentability," prosecution history estoppel can prevent patentees from claiming infringement by any products that fall "between the original claim limitation and the amended claim limitation." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 344 F.3d 1359, 1367 (Fed. Cir. 2003) (en banc).[8] "[T]he 'all elements rule' provides that the doctrine of equivalents does not apply if applying the doctrine would vitiate an entire claim limitation." *Asyst Technologies, Inc. v. Emtrak, Inc.*, 402 F.3d 1188, 1195 (Fed. Cir. 2005); *see also Searfoss v. Pioneer Consol. Corp.*, 374 F.3d 1142, 1151 (Fed. Cir. 2004) (summary judgment appropriate where finding of infringement under doctrine of equivalents would vitiate a claim requirement). In addition, the "[doctrine of] ensnarement bars a patentee from asserting a scope of equivalency that would

---

[8] A showing that a "narrowing amendment has been made for a substantial reason relating to patentability" creates a presumption that the patentee has surrendered such claims.  The patentee can successfully rebut that presumption by showing 1) that "an alleged equivalent would have been 'unforeseeable at the time of the amendment and thus beyond a fair interpretation of what was surrendered'"; 2) "that 'the rationale underlying the narrowing amendment [bore] no more than a tangential relation to the equivalent in question.'"; or 3) that there exists "'some other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question.'" *Id.* at 1369-70 (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 738, 740, 741 (2002)).

encompass, or 'ensnare,' the prior art." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1322 (Fed. Cir. 2009).

### 2. Frank's

Tesco alleges that Frank's product SuperTAWG infringes on Tesco's claims. The parties agree that the SuperTAWG consists of two components: the Praying Mantis, which contains link arms but no pipe engaging apparatus, and the TAWG, which is a pipe engaging apparatus. However, Frank's views the Praying Mantis and the TAWG separately in its infringement analysis while Tesco insists that the SuperTAWG as a whole is the accused product.

Frank's argues that the Praying Mantis is non-infringing because its sub[9] is connected *above* the TAWG, and because the link arms are solely supported by the top drive, not the pipe engaging apparatus. Tesco argues that the SuperTAWG is the accused product and must be viewed as a whole. Tesco further contends that the sub to which the Praying Mantis and its link arms are connected is part of the main body of the pipe engaging apparatus, and thus covered by the claims.

### 3. Weatherford

Tesco alleges that Weatherford's products TorkDrive 750HD, TorkDrive 500M, Compact External, and Compact External Plus infringe on Tesco's claims. Weatherford argues that the link arms are excluded from the patents' coverage because they are attached to a surface that is supported by the top drive. Specifically, Weatherford argues

---

[9] Frank's describes subs as "typically short lengths of tubular with a female-threaded connection at one end and a male-threaded connection at the other end, and can be used in a variety of ways, such as to house mechanisms or attach components or sensors or a variety of things." (Doc. No. 289, Mot. for Summary Judgment, at 5 (citing Ex. 4, Dep. of Michael Webre).)

that the link arms on its products are connected to the "TorkSub"[10] or mandrel, which are supported by the top drive.  In addition, Weatherford contends that the weight of the link arms is completely supported by the top drive and bypasses the pipe engaging apparatus by remaining on the outside.

Tesco argues that it is not sufficient for the TorkSub and mandrel to be supported by the top drive because *every* surface below the top drive is supported by the top drive, including the pipe engaging apparatus. Further, Tesco, relying on the testimony of Tommy Warren, argues that components are only part of the top drive if they "stay with the top drive day in and day out." Because the accused Weatherford products, including the link arms and the pipe engaging apparatuses, each attaches as a unit to the top drive, Tesco argues that they are part of the pipe engaging apparatus rather than the top drive.

### 4. NOV

Tesco alleges that NOV's product CRT-350 infringes on the claims. NOV argues that the CRT-350's link arms are not connected to the pipe engaging apparatus. Instead, they are connected to the "main shaft," which is a sub or mandrel, via the "swivel." NOV contends that the main shaft is not part of the pipe engaging apparatus and is supported by the top drive itself, so the CRT-350 does not infringe. NOV also argues that the load path of the link arms is supported only by the top drive and not by the pipe engaging apparatus.

Tesco argues in response that the link arms are only connected to the top drive to the extent that the entire CRT-350 device is connected to the top drive, because the CRT-

---

[10] Weatherford states that the TorkSub is "threaded to the top drive output shaft" and "supported and rotated by the top drive," and that it "contains instruments for measuring torque values during casing makeup and breakout operations." (Doc. No. 296, Mot. for Summary Judgment, at 11, 15 (citing Decl. of Karsten Heidecke).)

350 device as a whole attaches to the top drive. Tesco further argues that it is not sufficient for a device to be supported by the top drive because *every* surface below the top drive is supported by the top drive, including the pipe engaging apparatus. Tesco again argues that the load path is irrelevant to whether link arms are attached to the top drive or to surfaces supported by the top drive. Finally, Tesco argues that the main shaft—to which the link arms are connected—is part of the main body of the pipe engaging apparatus.

### 5. Analysis

The Court finds that summary judgment is inappropriate for Defendants' motions regarding non-infringement of the "pivotal connection" claims. At least two major disputes of material fact underlie the parties' competing interpretations of how the Court's claim construction applies to the accused products.

First, genuine issues of material fact exist regarding whether the link arms on the accused products are attached to the pipe engaging apparatus. At the heart of this dispute is the question of whether particular components below the top drive constitute part of the "main body" of the pipe engaging apparatus or not. If they do constitute part of the main body—and thus part of the pipe engaging apparatus—then they are within the scope of the patents-in-suit.

The Court's construction of "main body" in this order clarifies that a main body may connect either *directly or indirectly* to the top drive. Therefore, the fact that a component connects directly to the top drive does not necessarily make it part of the main body of the pipe engaging apparatus. The Court's construction also rejects the notion that the "main body" must include a housing for other parts. However, the Court's

construction does not delineate which components of the accused devices constitute a "main body," as applying the claim construction to the accused devices is a question of fact for the jury.

The parties fundamentally disagree about whether the link arms on the accused products are connected to the pipe engaging apparatuses. Defendants all contend they are not, while Tesco's experts Warren and Dr. Wooley testify that they are. However, the parties' dispute revolves around competing interpretations of the *Markman* Order and does not consider today's amended claim construction—in particular, the Court's construction of the term "main body." Therefore, factual issues remain with regard to this question.

Second, genuine issues of material fact exist regarding whether the link arms are attached either to a surface that is part of the top drive or to a surface that is directly supported by the top drive. In disagreeing with Tesco's overly broad statement that it is not sufficient for a surface to be supported by the top drive because *every* surface is supported by the top drive, the Court today clarified its claim construction to exclude from the claims devices in which link arms are connected to surfaces "directly supported by" the top drive.

In light of this clarification, there remain genuine factual disputes as to whether the surfaces to which the link arms are attached are part of, or "directly supported by" the top drive. The parties clearly disagree on these points, yet the evidence they provide does not address the claim construction as amended today.

Therefore, Defendants are not entitled to summary judgment of non-infringement as to the "pivotal connection" claims.

### C.  Motions Regarding "Channel Key" and "Anti-Rotation" Claims

NOV and Frank's move for partial summary judgment on the ground that their accused products do not include a "channel key" and are not "fitted for anti-rotation." (Doc. Nos. 283, 291.) Three of Tesco's claims (claims 18 and 43 of the '443 patent and claim 4 of the '324 patent) contain the "channel key" limitation and four (claims 25, 27, and 59 of the '443 patent and claim 12 of the '324 patent) contain the "fitted for anti-rotation" limitation. The Court has construed "channel key" to mean "a mechanical projection adapted to fit into a guide slot to prevent rotation," and "fitted for anti-rotation" to mean "'fitted for anti-rotation' using 'a key that fits into a guide slot extending from the top drive.'" Therefore, if the accused products do not contain a "channel key" and are not "fitted for anti-rotation" within the Court's definitions of those terms, they do not infringe the claims that contain those limitations.

### 1.  Legal Standard for Summary Judgment of Non-Infringement

(Discussed in Section IV.B.1. above.)

### 2.  The Accused Devices

NOV's accused product CRT-350 contains two mechanisms to prevent rotation of the device's air swivel: a "torque dolly" and a set of chains or straps. Tesco argues that both mechanisms contain a "channel key" and are "fitted for anti-rotation." NOV argues that the torque dolly is not a "key" because it is not designed to go inside of something. Rather, like eyeglass frames or tongs, the torque dolly arms are designed to receive a guide rail[11] *between* them. NOV argues that the chains and straps do not constitute a "channel key" because they do not protrude out and so are also not "mechanical

---

[11] NOV describes the guide rail as "mounted in the rig's mast" and "guid[ing] in  [the top drive's] vertical movement," "steer[ing] the direction of the top drive," and "prevent[ing] the top drive from rotating." (Doc. No. 283, at 4.) It is also known as a "torque beam" or "torque rail." (*See* Doc. No. 325, at 6.)

projections." NOV further contends that the CRT-350 does not contain any guide slot, citing testimony from Tesco's expert Gary Wooley in which Dr. Wooley states that the torque dolly does not fit into a slot, but rather infringes as equivalent. Regarding the chains / straps, NOV disputes Dr. Wooley's contention that anything they wrapped around constitutes a guide slot. NOV also argues that, even if the CRT-350 did have a channel key and guide slot, the guide slot is not "extending from the top drive."

Frank's argues that its SuperTAWG and FA-1 tools do not contain channel keys—and thus do not infringe these claims—for similar reasons to those described by NOV. Frank's argues that its products contain essentially the same system as NOV's for preventing rotation, wherein the "torque reaction kit" goes around the outside of a single guide rail or dual rails.

Finally, Frank's and NOV argue that their accused products cannot infringe these claims under the doctrine of equivalents because of prosecution history estoppel, the all elements rule, and ensnarement.

Tesco, citing testimony from Dr. Wooley, argues that the torque dolly arms are mechanical projections that fit into a guide slot, such as the sides of an I-beam-shaped torque rail or the back of a square beam. Tesco argues that the chains do project out from the CRT-350. Tesco further argues that the chains must wrap around some sort of slot, or else they would "presumably risk slipping off of the top drive." Tesco also argues that, even if the torque dolly arms do not fit into a guide slot, they still infringe under the doctrine of equivalents by performing the same anti-rotation function. Regarding the "fitted for anti-rotation" limitation, Tesco argues that both the top drive guide rails and the chains literally extend down from the top drive.

Finally, Tesco argues that the doctrine of equivalents should apply because neither prosecution history estoppel, the all elements rule, or ensnarement applies, and the accused products contain substantially the same features as the "channel key" and "fitted for anti-rotation elements."

### 3. Analysis

#### a. Literal Infringement

First, Tesco has failed to carry its burden to prove literal infringement of the "channel key" and "fitted for anti-rotation" claims[12]. The evidence demonstrates that the torque dolly systems used in NOV's and Frank's accused devices do not literally constitute a "channel key" for purposes of that limitation. Although the torque dolly arms may be a "projection," they cannot be said to be "adapted to fit into a guide slot." Rather than fit *into* something that could reasonably be called a *slot*, the torque dolly arms fit *around* guide rails.

Tesco's evidence from Dr. Wooley's testimony to support the argument that the accused devices contain channel keys and guide slots is based only on *hypothetical* iterations of the devices in which the torque reaction arms either fit into an "I-beam" or wrap around the back of a straight beam. Such speculation in insufficient to meet the clear and convincing evidence standard to prove infringement. *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001) ("Under the precedent of this circuit, however, that a device is capable of being modified to operate in an infringing manner is not sufficient, by itself, to support a finding of infringement."). Tesco presents

---

[12] Contrary to Frank's and NOV's claim, the Court did not construe "fitted for anti-rotation" as a means-plus-function term under 35 U.S.C. § 112, ¶ 6. (*See* Doc. No. 176, *Markman* Order, at 21-23, 31-32.) Therefore, the legal standards cited above for literal and equivalent infringement applies to both of these terms.

no evidence that the accused devices actually function in that manner, and the only evidence it provides to suggest that the accused devices could even be *modified* to operate in such an infringing manner is 1) testimony from Frank's expert James Brugman stating, "I suppose it's possible" that a single or double I-beam could be used in that manner; and 2) testimony from Dr. Wooley about torque reaction kits generally, rather than Frank's and NOV's accused devices in particular. *Cf. High Tech Medical Instrumentation, Inc. v. New Image Industries, Inc.*, 49 F.3d 1551, 1556 (Fed. Cir. 1995) ("Of course, if a device is *designed to be altered* or assembled before operation, the manufacturer may be held liable for infringement if the device, as altered or assembled, infringes a valid patent.") (emphasis added). Furthermore, Dr. Wooley acknowledged that the torque beam on the accused devices does not "extend from the top drive" and that there was no literal infringement of the "fitted for anti-rotation" claims. (Doc. No. 283-2, at 72, Wooley Dep. 361:12-21.)

Neither does NOV's chain / strap system literally constitute a "channel key." Tesco presents no evidence that the chains or straps are adapted to fit into a guide slot. Tesco's speculation that the chains or straps must fit into some type of slot or risk slipping is inadequate to raise an issue of fact. Although the Court may not determine the credibility to be given to Dr. Wooley's testimony at this stage, the Court does find that his statement that whatever the chains or straps wrap around constitutes a "guide slot," (*see* Doc. No. 325, Resp. to Mot. for Summary Judgment, at 13), is thoroughly contradicted by any ordinary meaning of the term "guide slot." Tesco provides no evidence that the casing running tool contains any groove or indentation into which the chains fit in order to prevent rotation. As with the torque dolly system, Tesco's

unsupported speculation is insufficient to avoid summary judgment. (*See* Doc. No. 325, Resp. to Mot. for Summary Judgment, at 14 ("[W]ithout at least a depression or groove for them to wrap around and hold against, the chains/straps would presumably risk slipping off the top drive.").)

### b. Doctrine of Equivalents

### i. Prosecution History Estoppel

NOV's and Frank's accused products do not infringe two of the "channel key" claims under the doctrine of equivalents because prosecution history estoppel applies. Under the *Festo* test, there is a presumption that Tesco surrendered any claims equivalent to the "channel key" limitation. *See Festo* 344 F.3d at 1367. Tesco initially submitted an independent claim 11, which did not contain the channel key limitation and was rejected; a dependent claim 14, which contained the channel key limitation and was allowed; and a dependent claim 19, which contains an "elevator control mechanism" limitation, and was allowed. Tesco then combined claim 11 with claim 19 to create the amended claim 11, and combined claim 11 with claim 14 to create the new claim 58. The PTO allowed both of those claims. Claim 58 in the amended application became claim 43 of the '443 patent.

"[T]he rewriting of dependent claims into independent form coupled with the cancellation of the original independent claims creates a presumption of prosecution history estoppel." *Felix v. American Honda Motor Co., Inc.*, 562 F.3d 1167, 1182 (Fed. Cir. 2009) (quoting *Honeywell Intern. Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1134 (Fed. Cir. 2004) (en banc)). The presumption applies in this case because Tesco combined accepted dependent claim 14 (containing the channel key limitation) with rejected independent claim 11, and did not resubmit claim 11 in its original form.

That does not end the inquiry, however, as Tesco may rebut the presumption by showing  1) that "an alleged equivalent would have been 'unforeseeable at the time of the amendment and thus beyond a fair interpretation of what was surrendered'"; 2) "that 'the rationale underlying the narrowing amendment [bore] no more than a tangential relation to the equivalent in question.'"; or 3) that there exists "'some other reason suggesting that the patentee could not reasonably be expected to have described the insubstantial substitute in question.'" *Festo*, 344 F.3d at 1369-70 (quoting *Festo*, 535 U.S. at 738, 740, 741). The patentee bears the burden of making that showing. *Id.* at 1368. Tesco fails to do so. Instead, Tesco argues that it combined rejected claim 11 with accepted claim 14 "out of completeness." However, rather than combining claim 14 with the other new version of claim 11 that Tesco submitted (incorporating the "elevator control mechanism" limitation), the new claim 58 consisted only of the original rejected claim 11 and the channel key limitation of claim 14. *See Felix*, 562 F.3d at 1184 (rejecting argument that applicant amended claim in order to add channel limitation but not gasket limitation where applicant could have added only the channel limitation and instead added both). The fact that Tesco also combined rejected claim 11 with dependent claim 19 does not satisfy Tesco's burden. If that were the case, applicants could avoid prosecution history estoppel any time they used two different dependent claims to separately amend a rejected independent claim.

Finally, Tesco also fails in arguing that the initial rejection of claim 11 did not have to do with the channel key limitation and would have been allowed without that limitation. Although it is true that the channel key limitation is not mentioned in the PTO's initial claim rejections, it is also true that the only difference between claim 11's

initial rejected language and its subsequent accepted language was the channel key limitation of dependent claim 14. *See Festo*, 535 U.S. at 740 ("[W]hen the court is unable to determine the purpose underlying a narrowing amendment—and hence a rationale for limiting the estoppel to the surrender of particular equivalents—the court should presume that the patentee surrendered all subject matter between the broader and the narrower language.") The Federal Circuit has stated:

> [I]t frequently happens that patentees surrender more through amendment than may have been absolutely necessary to avoid particular prior art. In such cases, we have held the patentees to the scope of what they ultimately claim, and we have not allowed them to assert that claims should be interpreted as if they had surrendered only what they had to.

*Norian Corp. v. Stryker Corp.*, 432 F.3d 1356, 1361-62 (Fed. Cir. 2005). Tesco has failed to show that the channel key limitation was merely tangential or to meet either of the other rebuttal prongs under *Festo*. Therefore, Tesco is estopped from claiming infringement of the "channel key" limitation under the doctrine of equivalents for claim 43 of the '443 patent.

Furthermore, "[w]hen multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same claim limitation." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999). Therefore, estoppel also applies to claim 4 of the '324 patent, as it derives from the same initial application. However, Frank's and NOV have not shown that Tesco should be estopped from claiming infringement under the doctrine of equivalents of claim 18 of the '443. Claim 18 is a dependent claim that was submitted separately from what became claim 43, but in the same amended application. Furthermore, the independent claim to which claim 18 refers

was accepted in the same form in the original application, and the amended application merely added a dependent "channel key" version in addition. Therefore, the Court is not convinced at this time that prosecution history estoppel applies to claim 18.

### ii.  All Elements Rule

The Court disagrees with Defendants that applying the doctrine of equivalents to the remaining claims would vitiate the claims entirely. Defendants essentially ask the Court to equate literal infringement with vitiation, and the Federal Circuit has specifically warned against that. *See DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1018 (Fed. Cir. 2006) ("the doctrine [of equivalents] is [not] always foreclosed whenever a claim limitation does not literally read on an element of an accused device; such an interpretation of the "all elements" rule would swallow the doctrine of equivalents entirely"). Instead, "any analysis of infringement under the doctrine of equivalents *necessarily* deals with subject matter that is 'beyond,' 'ignored' by, and not included in the literal scope of a claim." *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1317 (Fed. Cir. 1998) (emphasis in original). Frank's and NOV have not made a sufficient showing that finding infringement under the doctrine of equivalents would vitiate the "channel key" and "fitted for anti-rotation" claims entirely.

### iii.  Ensnarement

Frank's argument that the doctrine of equivalents does not apply because it would ensnare prior art fails. Frank's does not "construct a hypothetical claim that literally covers the accused device." *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1324 (Fed. Cir. 2009). Although not an absolute requirement, constructing such a hypothetical is a "helpful first step" in determining whether such a claim would be

"patentable over prior art." *Id.* at 1325. In its short argument for a finding of ensnarement, Frank's also fails to explain clearly how the evidence shows that the mechanisms in the accused products are made obvious or anticipated by the prior art. Moreover, as discussed in Sections IV.D.1 and 2 below, material issues of fact remain as to whether prior art references render the patents in suit invalid. Therefore, the Court finds that ensnarement does not preclude application of the doctrine of equivalents to the remaining "channel key" claim or to the "fitted for anti-rotation" claims.

### iv.  Equivalency

Issues of material fact remain with regard to the infringement of the remaining "channel key" claim and the "anti-rotation" claims under the doctrine of equivalents. Dr. Wooley testified that the torque beam is "performing exactly the same function in the same way with the same result." (Doc. No. 336, Ex. 35, Wooley Dep., at 361:22-362:3.) Although the Court finds that the devices do not perform their functions in *literally* the same way, a factual dispute remains as to whether they perform them in *substantially* the same way, the standard for equivalency. Dr. Wooley elaborated that the accused devices are equivalent to the channel key in that they "have resistance in a torque reaction against a stiff member." (*See* Doc. No. 330, Resp. to Mot. for Summary Judgment, at 16.) Tesco also cites testimony from NOV employee James Brugman stating that the connection between the top drive and guide rail "transmit[s] . . . torque out of the top drive into the rig structure." (*See id.*, at 25.) A reasonable jury could find that the accused products perform "substantially the same function in substantially the same way with substantially the same result as each claim limitation of the patented product." *Wavetronix*, 573 F.3d at 1360. Frank's and NOV have not produced evidence to remove these factual disputes.

Therefore, summary judgment of no literal infringement is granted to Frank's and NOV with respect to all "channel key" and "fitted for anti-rotation" claims. Summary judgment of no infringement under the doctrine of equivalents is granted to Frank's and NOV with respect to claim 43 of the '443 patent and claim 4 of '324 patent. Summary judgment of no infringement under the doctrine of equivalents is denied with respect to claim 18 of the '443 patent and claims 25, 27, and 59 of the '443 patent and claim 12 of the '324 patent.

### D.  Motions Regarding Invalidity of the Patents-in-Suit

NOV moves for partial summary judgment of invalidity of the patents-in-suit for obviousness (Doc. No. 300) and indefiniteness (Doc. No. 293). Frank's moves for partial summary judgment of invalidity for being on sale more than one year prior to the date of application for the patents. (Doc. No. 284). Tesco moves for partial summary judgment on the defenses that the patents-in-suit are invalid because they were anticipated by prior art (Doc. No. 279) or because Tesco engaged in inequitable conduct (Doc. No. 281).

A patent is presumed to be valid, so a challenging party bears the burden of proving invalidity by clear and convincing evidence. *Hearing Components, Inc. v. Shure Inc.*, 600 F.3d 1357, 1366 (Fed. Cir. 2010); 35 U.S.C. § 282. The Court considers each potential grounds for invalidity in turn.

### 1.  Obviousness

NOV moves for partial summary judgment, arguing that Tesco's patents were obvious based on the prior art. (Doc. No. 300.)

### a.  Legal Standard

35 U.S.C. § 103(a) provides that a patent "may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." To determine whether a patent is invalid due to obviousness, "the court must consider (1) the scope and content of the prior art; (2) the difference between the prior art and the claimed invention; (3) the level of ordinary skill in the art; and (4) any objective evidence of nonobviousness." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, --- F.3d ---, 2010 WL 3257312, at *3 (Fed. Cir. Aug. 18, 2010) (citing *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1, 17-18 (1966)). "Obviousness is a question of law with underlying fact issues." *Id.* Thus, while the ultimate issue of invalidity due to obviousness is a question of law for the Court, the four *Graham* factors are factual questions for the jury. *See Eli Lilly and Co. v. Zenith Goldline Pharmaceuticals, Inc.*, 471 F.3d 1369, 1377 (Fed. Cir. 2006); *Okajima v. Bourdeau*, 261 F.3d 1350, 1354 (Fed. Cir. 2001); *see also Transocean*, 2010 WL 3257312, at *3 ("whether there was a reason to combine certain references" is a question of fact).

### b. Analysis

NOV argues that the background section of the patents-in-suit, along with brochures issued by Tesco in January and April 2002 disclose each component of the patents-in-suit except for the pivotal connection of the link arms to the pipe engaging apparatus rather than to the top drive. Further, NOV argues that the feature of a link arm connected to a pipe engaging apparatus was disclosed by prior art including U.S. Patent No. 6,276,450 to Seneviratne.

Tesco argues that NOV has failed to meet its burden of proving invalidity by clear and convincing evidence. Tesco emphasizes NOV's lack of expert testimony, as obviousness depends on the perspective of a person of ordinary skill in the art. Tesco also objects to the use of reexamination proceedings as evidence of invalidity, as the standards used in that proceeding and in this Court's examination are different.

With regard to the specific prior art claims, Tesco argues that its brochures from 2002 are not prior art because they did not—and could not—"enable one skilled in the art to make and use the apparatus or method." *See Beckman Instruments, Inc. v. LKB Produckter AB*, 892 F.2d 1547, 1551 (Fed. Cir. 1989). Contrary to NOV's contention, Tesco argues, the brochures and the Seneviratne patent do not disclose the elements of the patents-in-suit. Tesco further argues that, even if each component had been disclosed in prior art, NOV has not shown that a person of ordinary skill in the art would have had a motivation to combine the various elements. Tesco specifically contends that the steps of moving the link arms to connect to the pipe engaging apparatus and making them non-rotatable, while very significant in the industry, were not simple or intuitive, and were not invented by others in the industry over the long stretch of time prior to Tesco's patents. Finally, Tesco argues that objective factors weight strongly in favor of non-obviousness.

The Court finds that issues of material fact remain on the underlying questions in the obviousness analysis. Therefore, summary judgment is inappropriate.

First, issues of material fact exist regarding the scope and content of the prior art, and the differences between the prior art and the patents-in-suit. Tesco provides evidence from Tommy Warren's deposition and expert report to support its claims that the prior art does not disclose all of the components of the patents-in-suit. For example, Warren

testified that the April 2002 brochure did not disclose link arms fitted for anti-rotation or pivotally connected to a bracket on the top drive with a channel key. (Doc. No. 334, Tesco's Response to NOV's Mot. for Summary Judgment, at 16-19.) Tesco similarly provides evidence from the Warren Report stating that the Seneviratne patent did not render obvious the claims in Tesco's patent, including the pivotal connection of the link arms to the pipe engaging apparatus. (*Id.* at 20-21.) NOV relies on other portions of the Warren deposition, as well as testimony from other Tesco employees to suggest that aspects of the patents-in-suit were indeed disclosed by prior art. (Doc. No. 300, Mot. for Summary Judgment, at 3-13.) However, NOV's evidence does not show by clear and convincing evidence that the patents are invalid for obviousness. The jury must make factual determinations based on the competing evidence of what the prior art disclosed and how that differs from the patents-in-suit.

Second, issues of material fact exist regarding the fourth *Graham* factor, objective evidence of non-obviousness. The Supreme Court and the Federal Circuit have encouraged looking to such evidence to "compensate" for the risk "that a patented invention might appear to be obvious given the excellent vision accorded by hindsight, but might not have been obvious at the time the invention was made." *Ecolochem, Inc. v. Southern California Edison Co.*, 227 F.3d 1361, 1376 (Fed. Cir. 2000) (citing *Graham*, 383 U.S. at 17-18). "These objective indicia may often be the most probative and cogent evidence of nonobviousness in the record." *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1579 (Fed. Cir. 1997) (internal citation omitted). Tesco primarily argues that non-obviousness should be found because Tesco met an unresolved need in the industry and, upon seeing Tesco's new tool, its competitors created "copycat"

versions that were commercially successful. The merits of this claim are undoubtedly intertwined with the merits of Tesco's infringement claims. If the jury determines that Defendants' tools were indeed "copycat" versions of Tesco's, a reasonable jury could find that the wave of copycatting and ensuing commercial success of the copycat tools are objective evidence weighing in favor of non-obviousness. The validity of those claims is a question of fact for the jury to decide.

Therefore, summary judgment of invalidity due to obviousness is denied.

### 2.  Anticipation

Each Defendant asserts an affirmative defense of invalidity due to anticipation. Tesco moves for partial summary judgment on these defenses. (Doc. No. 279).

### a.  Legal Standard

35 U.S.C. § 102(b) renders a patent, or any claims contained therein, invalid due to anticipation by prior art if "the invention was patented or described in a printed publication in this or a foreign country . . . more than one year prior to the date of the application for patent in the United States." *See Orion IP, LLC v. Hyundai Motor America*, 605 F.3d 967, 974 (Fed. Cir. 2010). Anticipation invalidity requires that a "single prior art reference" 1) qualifies as a "printed publication," meaning it was "disseminated or otherwise made accessible to persons interested and ordinarily skilled in the subject matter to which the advertisement relates prior to the critical date"; and 2) "expressly or inherently disclose[s] each claim limitation" to "enable one of ordinary skill in the art to make the invention without undue experimentation." *Id.* at 974-75. Anticipation is a question of fact. *Id.* at 975.

### b.  Analysis

Defendants argue that each of six separate patents[13] fully anticipates six of the claims of the patents-in-suit. Defendants do not invoke the defense of anticipation invalidity for claims involving "channel key" or "link arms fitted for anti-rotation"—only for claims 13 and 55 of the '443 patent and claims 1, 14, 17, and 27 of the '324 patent. In order to fully anticipate the six claims for which Defendants assert the defense, a single piece of prior art must contain, among other things, 1) a pipe engaging apparatus; 2) a main body; 3) a pipe gripping mechanism; and 4) link arms on or pivotally connected to the pipe engaging apparatus.[14] Defendants rely on the expert report of George Boyadjieff to demonstrate that the prior patents contain each necessary element.[15] Tesco argues that Boyadjieff's statements are conclusory and that Defendants fail to prove that the prior patents contain every necessary element. In particular, the parties disagree as to whether the threaded connection described in prior patents constitutes a "pipe gripping mechanism" with "main bodies."

The Court is unconvinced by Defendants' argument that Tesco's statements in the prosecution specifically excluded threaded devices from the term "pipe gripping mechanisms." Although, in discussing a prior art patent, Tesco stated, "the link arms 63 of Seneviratne are not fitted for anti-rotation relative to the rotational movement applied by the threaded pipe engagement device to a pipe gripped thereby," (Doc. No. 350, Ex. 4,

---

[13] U.S. Patent No. 4,800,968 to Shaw ("Shaw"); U.S. Patent No. 6,276,450 to Seneviratne ("Seneviratne"), which incorporates by reference U.S. Patent No. 4, 449,596 to Boyadjieff ("Boyadjieff"); U.S. Patent No. 3,915,244 to Brown ("Brown"); U.S. Patent No. 5,433,279 to Tessari ("Tessari"); and U.S. Patent No. 6,102,116 to Giovanni ("Giovanni").

[14] At the request of all of the moving parties, the Court in this order construes "pipe engaging apparatus," "main body," and "pipe gripping mechanism" as a matter of law. *See* Section II above.

[15] Defendants also cite as evidence a chart containing check boxes that indicate whether or not prior patents contain certain elements. Boyadjieff acknowledged in his deposition that the chart was prepared by his attorneys with his consultation. (Doc. No. 279, Ex. 23, Dep. of George Boyadjieff, June 8, 2010, at 192:22-24.) As a result, the chart is hearsay and lacks probative value, and is thus incompetent summary judgment evidence. Even if it were proper summary judgment evidence, the chart consists entirely of conclusions and so would not change the Court's calculus.

at 13), Tesco also stated in the same response, "the pipe engagement device of Seneviratne is merely a threaded engagement, and not a gripping mechanism for gripping of the drill string." (Doc. No. 350, Ex. 4, at 10.) Therefore, Tesco explicitly denied in that response that the threaded device constitutes a "pipe gripping mechanism." Accordingly, the prosecution history does not require that threaded devices be specifically excluded— or specifically included—in the term "pipe gripping mechanism."

However, the Court finds that factual issues remain that make summary judgment on the anticipation defenses inappropriate. Boyadjieff's statements in his report, although often brief, are sufficient to raise material issues of fact as to whether Defendants can show by clear and convincing evidence that the patents are invalid. Boyadjieff identifies which component of the prior art constitutes which element in question. It is not necessary in raising a question of fact for Boyadjieff in every instance to elaborate on *why* a component constitutes a "pipe engaging apparatus" or a "main body"—the reason may in some cases be obvious, and thus further explanation would be unhelpful. Furthermore, as discussed in Section II above, the Court declines Tesco's invitation to construe "mechanism," as a matter of law, to require more than one moving part. Tesco fails to present sufficient evidence to show that Defendants have failed to meet their burden as a matter of law. Therefore, based on the evidence currently before the Court, a reasonable jury could find that the threaded device found in prior art constitutes a "pipe gripping mechanism," defined as "a mechanism in which pipe is gripped with some form of gripping force for rotational and axial movement."

Genuine issues of material fact exist with regard to the anticipation invalidity defenses, and so summary judgment is inappropriate. Whether Defendants have shown

by clear and convincing evidence that the patents-in-suit were anticipated by prior art is a question of fact for the jury. Therefore, summary judgment of invalidity based on anticipation is denied.

### 3.  Indefiniteness

NOV moves for summary judgment of invalidity on the grounds that the patent claims are indefinite. (Doc. No. 293.)

### a.  Legal Standard

35 U.S.C. § 112, ¶ 2 requires that the patent "specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." The burden to prove invalidity for indefiniteness "is met where an accused infringer shows by clear and convincing evidence that a skilled artisan could not discern the boundaries of the claim based on the claim language, the specification, and the prosecution history, as well as her knowledge of the relevant art area." *Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244, 1249-50 (Fed. Cir. 2008). "Only claims not amenable to construction or insolubly ambiguous are indefinite." *Id.* at 1250 (internal quotation marks omitted). However, "if the meaning of the claim is discernible, even though the task may be formidable and the conclusion may be one over which reasonable persons will disagree," the claim is "sufficiently clear to avoid invalidity on indefiniteness grounds." *Id.* (internal citation omitted). "[D]etermination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Exxon Research and Engineering Co. v. United States*, 265 F.3d 1371, 1376 (Fed. Cir. 2001)

(internal citation omitted) (rejecting argument that "that indefiniteness depends on underlying questions of fact").

### b. Analysis

The Court finds that NOV has not proven by clear and convincing evidence that the phrases "main body," "pipe gripping mechanism," and "pipe engaging apparatus" are indefinite under 35 U.S.C. § 112, ¶ 2. NOV primarily relies on what it describes as conflicting definitions of the terms "main body," "pipe gripping mechanism," and "pipe engaging apparatus" from two Tesco experts, Gary Wooley and Tommy Warren. One source of the indefiniteness claim is the Court's refusal to decide at the claim construction stage the question of whether the pivotal connections on the accused products infringe the patents-in-suit. As discussed above, rather than construing the terms in a manner that decides whether particular components of the accused devices are part of the pipe engaging apparatus or supported by the top drive, the Court finds that those are questions properly before the jury in applying the claim construction to the facts to determine whether infringement has occurred. The fact that the application of the claims, as construed by the Court in the *Markman* Order and this order, to the accused products is a difficult and heavily-disputed question that the jury will be asked to decide does not mean that the patent claims are indefinite.

The Court today construes the terms in question, and finds that they are "amenable to construction" and not "insolubly ambiguous." *Halliburton*, 514 F.3d at 1250. It is apparent that the parties' experts disagree as to precisely what constitutes the main body, pipe gripping mechanism, and pipe engaging apparatus on the accused products. However, NOV has not met its burden to show that this is more than reasonable

persons disagreeing and that "a skilled artisan could not discern the boundaries of the claim." *Id.* at 1249.

Accordingly, summary judgment of invalidity for indefiniteness is denied.

### 4.  On-Sale Bar

Frank's moves for summary judgment of invalidity on the grounds that the patented product was offered for sale more than a year prior to the patent application. (Doc. No. 284.)

### a.  Legal Standard

35 U.S.C. § 102(b) provides that a person is not entitled to a patent if "the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." "[T]he on-sale bar applies when two conditions are satisfied before the critical date," meaning one year prior to the date the patentee applied for the patent. *Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 67 (1998). "First, the product must be the subject of a commercial offer for sale." *Id.* Whether a commercial offer was made is a question of contract law, and requires that the offering party "inten[d] to be bound." *Linear Technology Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1050 (Fed. Cir. 2001). "Only an offer which rises to the level of a commercial offer for sale, one which the other party could make into a binding contract by simple acceptance (assuming consideration), constitutes an offer for sale under § 102(b)." *Group One, Ltd. v. Hallmark Cards, Inc.*, 254 F.3d 1041, 1048 (Fed. Cir. 2001). "Second, the invention must be ready for patenting." *Pfaff*, 525 U.S. at 67. "That condition may be satisfied in at least two ways: by proof of reduction to practice before the critical date; or by proof that

prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." *Id.* at 67-68. "A determination that a product was placed on sale prior to the critical date is a conclusion of law based on underlying findings of fact." *Minnesota Min. & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1301 (Fed. Cir. 2002).

### b.  Analysis

Frank's bases its argument on a February 1, 2002 contract between Tesco and Conoco ("Conoco Contract") in which Tesco agreed to provide three oil drilling rigs to Conoco. It is undisputed that the Conoco Contract does not explicitly name the case running tool with link tilt described in the patents-in-suit, and that the tool did not yet exist at the time of the contract. However, the first rig that Tesco provided under the Conoco Contract (known as the Alpha Rig), in November 2002, contained the link tilt system. Frank's agrees for purposes of this motion that the critical date is November 8, 2002. Frank's argues that the Conoco Contract constitutes an offer to sell the link tilt system because Tesco intended to provide that system to Conoco. Tesco argues in response that it intended with the Conoco Contract to provide an older version of Tesco's casing system—the "Casing Clamp"—rather than the casing running tool with link tilt, and that it did not even conceive of the link tilt system until several months after the contract was signed.

The Court finds that Frank's has not proven by clear and convincing evidence that Tesco offered the subject of the patents-in-suit for sale prior to the critical date. The fact that the casing running tool with link tilt did not yet exist at the time the Conoco contract was signed does not necessarily preclude a finding that the contract constituted an offer

for sale. For example, if the seller had conceived of the product and made the contract with the intent to commercialize the invention, and the purchaser did not "have reason to expect to receive" an already-existing product, the on-sale bar would apply even if the seller could theoretically have fulfilled its contractual burden with an already-existing product. *See Ferag AG v. Quipp, Inc.*, 45 F.3d 1562 (Fed. Cir. 1995).[16] However, there are numerous factual issues that prevent summary judgment of invalidity.

First, Tesco presents evidence that the language of the Conoco Contract calling for a "Casing Clamp / Drive Sub" referred to the already-existing Casing Clamp. (*See* Doc. No. 327, Tesco's Resp. to Mot. for Summary Judgment, at 10-12.) For example, Tesco offers testimony that Tesco and Conoco had previously test-drilled on a rig using the Casing Clamp. (*Id.*) If the contract specifically called for the prior Casing Clamp rather than the link tilt system, then it could not be considered an offer for sale under § 102(b).

Second, Tesco presents evidence that it did not enter into the Conoco Contract with the intention of commercializing the casing running tool with link tilt. (*See id.* at 12-15.) For example, meeting notes and testimony suggest that the location of the link tilt was not conceived of until June 2002, several months after the Conoco Contract was signed. (*Id.* at 13.) *See Sparton Corp. v. United States*, 399 F.3d 1321, 1325 (Fed. Cir. 2005) (finding fact that invention was not fully conceived at time of contract important in holding that on-sale bar did not apply); *see also Tec Air, Inc. v. Denso Mfg. Michigan Inc.*, 192 F.3d 1353, 1358-59 (Fed. Cir. 1999) (jury reasonably could have found that on-

---

[16] As Tesco points out, the Federal Circuit has rejected the "totality of the circumstances" inquiry applied at the time *Ferag* was decided. However, that court has continued to treat *Ferag* as good law for purposes of the on-sale bar inquiry. *See Baker Hughes, Inc. v. Davis-Lynch, Inc.*, 31 F. App'x 650, 656 (Fed. Cir. 2002) ("the on-sale bar inquiry is governed by our decision[] in *Ferag* . . ."). Regardless, the precedential status of *Ferag* is irrelevant because that case does not affect the outcome of this ruling.

sale bar did not apply where the patented product was not specified in the invention and seller presented evidence that it had not intended to use the patented product to fulfill contracts). Therefore, there is evidence that Tesco did not "inten[d] to be bound" to provide the new CDS. *See Linear Technology Corp.*, 275 F.3d at 1050.

Third, Frank's fails to prove that Conoco expected to receive the casing running tool with link tilt, and Tesco presents evidence to the contrary. For example, Frank's relies on a "non-binding understanding" between Tesco and Conoco from December 2001 specifying an "automated pipe handling system," but Tesco presents testimony that this did not refer to new system with link tilt. (*See* Doc. No. 327, at 15-16.) Furthermore, Tesco presents testimony from several witnesses suggesting that Conoco did not know that Tesco was going to use the link tilt system before the Alpha Rig was delivered in November 2002. (*Id.* at 15-18.) Although Conoco's expectations are not determinative of whether the contract was an offer for sale, the evidence that Conoco did not expect the rig to include the link tilt system weighs in favor of Tesco's position that it was not offering to sell or attempting to commercialize that system.

Therefore, summary judgment of invalidity based on the on-sale bar is denied.

### 5.  Inequitable Conduct

Tesco moves for partial summary judgment on the affirmative defenses that claim the patents-in-suit are invalid due to Tesco's inequitable conduct. (Doc. No. 281.)

### a.  Legal Standard

PTO Rule 56 requires of persons filing and prosecuting patent applications a duty of candor, good faith, and honesty, including a "duty to disclose all information known to be material to patentability." 37 C.F.R. § 1.56(a). "A breach of this duty constitutes

inequitable conduct." *Molins PLC v. Textron, Inc.*, 48 F.3d 1172, 1178 (Fed. Cir. 1995). "To prove that a patent is unenforceable due to inequitable conduct, the alleged infringer must provide clear and convincing evidence of (1) affirmative misrepresentations of a material fact, failure to disclose material information, or submission of false material information and (2) an intent to deceive." *Impax Laboratories, Inc. v. Aventis Pharmaceuticals Inc.*, 468 F.3d 1366, 1374 (Fed. Cir. 2006). With regard to the first prong, "information may be considered material if there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." *Leviton Mfg. Co., Inc. v. Universal Sec. Instruments, Inc.*, 606 F.3d 1353, 1358-59 (Fed. Cir. 2010) (internal citation omitted). "Under the 'reasonable examiner' standard, a misstatement or omission may be material even if disclosure of that misstatement or omission would not have rendered the invention unpatentable." *Digital Control, Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1318 (Fed. Cir. 2006). With regard to the second prong, "[i]ntent need not, and rarely can, be proven by direct evidence. It is most often proven by a showing of acts the natural consequences of which are presumably intended by the actor." *Merck & Co., Inc. v. Danbury Pharmacal, Inc.*, 873 F.2d 1418, 1422 (Fed. Cir. 1989) (internal citation omitted).

"If the materiality and intent requirements are met, the court must then determine whether the cited conduct amounts to inequitable conduct by balancing the levels of materiality and intent; a greater showing of one allows a lesser showing of the other." *Taltech Ltd. v. Esquel Enterprises Ltd.*, 604 F.3d 1324, 1328 (Fed. Cir. 2010); *see also Kingsdown Medical Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 876 (Fed. Cir. 1988) ("As an equitable issue, inequitable conduct is committed to the discretion of the

trial court.") (en banc in relevant part). The underlying elements of "materiality and intent to deceive[] are questions of fact." *Leviton*, 606 F.3d at 1368.

### b. Analysis

Frank's, NOV, and OES argue that Tesco engaged in inequitable conduct by failing to disclose to PTO 1) the Alpha Rig, the first rig used to fulfill the Conoco Contract; 2) the channel key and guide slot features in the April 2002 Tesco brochure; 3) information from this litigation in the reexamination proceeding, including deposition testimony and allegations of Tesco's inequitable conduct; 4) various prior art that contradicted what was found in the Background section of the patents-in-suit, particularly discloses a hydraulic rather than manual link arm; 5) photographs of an October 2002 test of the CDS at a Tesco facility in Houston; and 6) reexamination proceedings for a prior NOV patent[17]. (Doc. No. 337, 340.)

### i. Alpha Rig / Conoco Contract

Defendants contend that the Conoco Contract, and the Alpha Rig that Tesco built to fulfill that contract, are material to the on-sale bar. Tesco argues that they are completely irrelevant to the on-sale bar, and so are not even material for purposes of the inequitable conduct inquiry. The parties also dispute whether Defendants have sufficiently shown Tesco's intent to deceive by withholding this information.

As discussed in Section IV.D.4 above, material issues of fact remain regarding whether the Conoco Contract constituted a public offer for sale. As with Frank's Motion for Summary Judgment regarding the on-sale bar, those factual issues preclude summary judgment for Tesco regarding the inequitable conduct defense. Regardless of whether a reasonable examiner would find the patents-in-suit invalid based on the Conoco Contract,

---

[17] U.S. Patent No. 6,938,709 ('709 patent).

there is at the very least a factual dispute as to whether an examiner would find the contract important in making that determination.

Issues of material fact also exist with regard to the intent prong. Given that Tesco itself made the contract with Conoco and eventually developed the Alpha Rig with the new CDS, a reasonable inference could be drawn that Tesco intentionally withheld the information despite knowing its materiality. *See Paragon Podiatry Laboratory, Inc. v. KLM Laboratories, Inc.*, 984 F.2d 1182, 1189 (Fed. Cir. 1993) ("'smoking gun' evidence is not required in order to establish an intent to deceive"); *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1313-14 (Fed. Cir. 2008) ("An inference of intent to deceive is generally appropriate, however, when (1) highly material information is withheld; (2) the applicant knew of the information and knew or should have known of the materiality of the information; and (3) the applicant has not provided a credible explanation  for the withholding.") (internal citation omitted). Furthermore, a factual finding of a high level of materiality (such as a finding that the Conoco Contract constituted an offer for sale) would allow for a "lesser showing" of intent in the Court's equitable balancing analysis. *Taltech Ltd.*, 604 F.3d at 1328.

Thus, summary judgment is denied on the defense of inequitable conduct with respect to the Alpha Rig and the Conoco Contract.[18]

### ii.  Tesco's April 2002 Brochure

Frank's argues that Tesco engaged in inequitable conduct by failing to reveal an April 2002 Tesco brochure in the original patent prosecution. Specifically, Frank's

---

[18] In its response, Frank's moves to strike deposition testimony of Kyle Fontenot, a Conoco employee, on the ground that Tesco's lawyers asked leading questions even though Fontenot was not an adverse witness. (Doc. No. 340, at 19.) Because the Court in no way relies on Fontenot's testimony, it need not rule on its admissibility.

contends that the brochure depicts Tesco's Pioneer tool containing, among other features, a channel key and an anti-rotation device. Tesco argues that the brochure is not relevant, evidenced in part by the fact that an examiner noted that he had considered it as evidence in the reexamination. Further, Tesco argues that Frank's presents no evidence of intent to deceive and that the testimony of Tesco employees shows that there was no such intent.

Issues of material fact remain with regard to the April 2002 brochure. Contrary to Tesco's argument, the examiner's notation indicates only that he *considered* the brochure in the reexamination. That is irrelevant to the issue of materiality, because the materiality standard is much easier to meet than the standard for finding patent invalidity. Furthermore, to be material, the brochure need not potentially disclose *each* limitation of the patents-in-suit, as is required for invalidity based on anticipation under 35 U.S.C. § 102. Rather, it need only be potentially relevant under the 35 U.S.C. § 103 standard for obviousness.  Frank's presents testimony from Tommy Warren stating that the brochure depicts a tool with "an anti-rotation device" and a channel key. Thus, there is a material issue of fact as to whether the brochure was material.

Frank's has also made a sufficient showing with regard to intent to deceive. A reasonable inference could be drawn that Tesco knew of the materiality of its own brochure. Testimony from Tesco employees denying that the information was material is insufficient to erase the material issues of fact. *See Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1257 (Fed. Cir. 1997) ("facing a high level of materiality and clear proof that it knew or should have known of that materiality[,] . . . [a] mere denial of intent to mislead (which would defeat every effort to establish inequitable

conduct) will not suffice"). Material facts exist such that the Court could find that the equitable balance called for a finding of inequitable conduct.

Thus, summary judgment is denied on the inequitable conduct defense with regard to the April 2002 brochure.

### iii.  Information From This Litigation

Frank's contends that Tesco engaged in inequitable conduct by failing to disclose material from this litigation, specifically 1) Frank's allegations of inequitable conduct by Tesco; and 2) deposition testimony by Tommy Warren acknowledging that Tesco's April 2002 brochure discloses a channel key. Tesco argues that Warren's statement is immaterial because it is merely cumulative to the brochure itself, and that it had no duty to submit Frank's pleading of inequitable conduct because § 2014 of the Manual of Patent Examining Procedure ("MPEP") states that "issues of 'fraud,' 'inequitable conduct,' or 'violation of duty of disclosure' are not considered in reexamination."

Material issues of fact exist with regard to Tesco's failure to disclose Frank's pleading of inequitable conduct in its Third Amended Answer and Counterclaim. Tesco is correct that "issues of . . . 'inequitable conduct' are not considered in reexamination." MPEP § 2014. However, Frank's does not contend that the answer is material as evidence of inequitable conduct, but rather to direct the examiner's attention to the presence of a channel key and guide slot in the April 2002 Tesco brochure. Such a use could be material in a reexamination proceeding. Under MPEP § 2001.06(c), "pleadings" from ongoing litigation, including "allegation[s] of . . . 'inequitable conduct,' . . . must be brought to the attention of the Office." Therefore, a factual issue remains with regard to materiality of Frank's pleading of inequitable conduct.

Material issues of fact also exist with regard to materiality based on Warren's testimony. The Court is not convinced that Warren's admission that the April 2002 brochure depicts a channel key is merely cumulative. Frank's cites to testimony from Warren and Kevin Nikiforuk in which they acknowledge that the photograph in the brochure is not clear and that it is difficult to identify the channel key. There is at the very least a material issue of fact as to whether Warren's deposition testimony is material. *See Jackson v. VTech Telecommunications Ltd.*, 289 F. Supp. 2d 969, 984 (N.D. Ill. 2003) (finding deposition testimony material where it clarified the contents of prior art already before the examiner).

Frank's has also raised a sufficient factual issue regarding intent to avoid summary judgment. Tesco still has not disclosed these litigation materials, and it is clear that Tesco and its counsel are aware of them. Tesco's failure to disclose potential evidence of a channel key and guide slot being found in the April 2002 brochure, despite that issue being discussed at length in this litigation, could lead to an inference of intent if Tesco "knew, or should have known," that the information withheld was material. *See Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 68 F. Supp. 2d 508, 550-51 (D.N.J. 1999) (finding inequitable conduct where patentee withheld litigation materials even though it had disclosed prior art). At the very least, if there were a factual finding of a high level of materiality, the context could support a finding of sufficient intent to constitute inequitable conduct.

Therefore, summary judgment is denied on the inequitable conduct defense with regard to materials from this litigation.

### iv.   Powered Link Arms

NOV and OES contend that Tesco engaged in inequitable conduct by not disclosing the fact that powered (as opposed to manual) link arms existed in the prior art. Tesco argues that any references that show powered link arms would have been merely cumulative because U.S. Patent No. 6,527,047 to Pietras and U.S. Patent No. 4,625,796 to Boyadjieff. NOV and OES do not seem to dispute that the Pietras and Boyadjieff patents were before the examiner, nor that those patents disclose powered link arms. Instead, they argue that a January 2002 Tesco brochure should have been disclosed because it was "more material" than the prior patents.

The Court agrees with Tesco that summary judgment is appropriate on this issue. The sole argument for which NOV and OES provide a legal basis is the issue of whether the January 2002 brochure was improperly withheld. The Pietras and Boyadjieff patents disclosed powered link arms, however, so the brochure was merely cumulative and thus not material. *Leviton*, 606 F.3d at 1359. NOV's and OES's only evidence that the prior patents do not disclose powered link arms is that Tesco argues, in its motion for summary judgment that the patents are not anticipated, that the Boyadjieff patent fails to disclose a "pipe engaging apparatus." NOV and OES fail to provide any legal support for this, or any other argument regarding powered link arms or the background section of the patents-in-suit.

Therefore, summary judgment is granted on the inequitable conduct defense with regard to powered link arms.

### v.  October 2002 Test Photographs

NOV and OES contend that Tesco engaged in inequitable conduct by failing to disclose photographs depicting use of the CDS tool on October 11, 2002 at Tesco's West

Brittmoore Park facility in Houston. Tesco argues that the photographs are not prior art, that the tests were not public, and that even if they were public, such testing would not implicate the on-sale bar.

The Court finds that issues of material fact remain with regard to the October 2002 photographs, and so summary judgment is not appropriate. First, Tesco contends that even if the testing was public, it is immaterial because the Supreme Court has stated that "an inventor who seeks to perfect his discovery may conduct extensive testing without losing his right to obtain a patent for his invention—even if such testing occurs in the public eye." *Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 64 (1998). However, the experimental use exception involves a consideration of "the entire surrounding circumstances," including "[t]he length of the test period[,] . . . whether payment was made for the device, whether a user agreed to use secretly, whether records were kept of progress, whether persons other than the inventor conducted the asserted experiments, how many tests were conducted, [and] how long the testing period was in relationship to tests of other similar devices." *TP Laboratories, Inc. v. Professional Positioners, Inc.*, 724 F.2d 965, 971-72 (Fed. Cir. 1984). Thus, even if the experimental nature of the October 2002 use might prevent a finding of invalidity, whether the use was public would certainly be *important* to the on-sale bar inquiry, and thus material.

Although they lack direct proof that the October 2002 use of the CDS was public, NOV and OES have made a sufficient showing to raise a genuine issue of material fact with respect to that question. The modest evidence they do provide consists of 1) the fact that Tesco titled a submission for reexamination "E-mail communication re: Photographs

of Public Use of Prior Art System, October 11, 2002"[19]; 2) a Tesco internal memorandum stating, "Shell is confident enough from watching us in the Houston yard that the South Texas part of the project is not going to be required"; and 3) a Tesco newsletter to its customers stating, "Testing of the 13-3/8' drilling tools proved to be very difficult . . . . We had so many potential clients in attendance that we served lunch for the first three days of drilling." (*See* Doc. No. 337, NOV and OES's Response to Motion for Summary Judgment, at 21-22.) Although none of this evidence explicitly shows that members of the public were present at the October 2002 use of the CDS, a reasonable inference could be drawn from those pieces of evidence, together, that the use was public. In the face of Defendants' several pieces of circumstantial evidence, Tesco provides no evidence directly stating that the October 2002 use was only attended by Tesco personnel. Instead, Tesco relies solely on cites to testimony and a memorandum from Shell employee Brian Tarr. Those do not mention the October 2002 use of the CDS, but Tesco suggests that the lack of mention is evidence that Shell did not attend it. Tesco's evidence is insufficient to remove the dispute of material fact.

Thus, summary judgment is denied on the defense of inequitable conduct with respect to the October 2002 photographs.

### vi.  Reexamination Proceedings for NOV's '709 Patent

Finally, NOV and OES allege that Tesco engaged in inequitable conduct regarding reexamination proceedings for NOV's '709 patent[20], based on Tesco's claims in those proceedings that NOV's patent was anticipated, which NOV and OES claim

---

[19] The Court held in its August 5, 2010 Order denying NOV's Motion for Summary Judgment that that submission title was insufficient by itself to invalidate the patents-in-suit. (Doc. No. 317, at 40.)
[20] NOV and OES also mention NOV's U.S. Patent No. 6,527,493, but do not elaborate as to why that patent is relevant distinct from the '709 patent.

contradict Tesco's arguments regarding its own patents. Tesco argues that neither the '709 patent nor its reexamination proceedings are material to the patents-in-suit.

NOV and OES fail to show any issue of material fact that would prevent summary judgment on this claim. They do not seem to argue—and certainly do not provide evidence—that the '709 patent itself is material to the patents-in-suit. Nor do they articulate a legal basis for why Tesco's statements in the reexamination proceedings for that patent, or any discrepancy between what Tesco argued there and what it argued in its motion in this case, could constitute inequitable conduct.

Therefore, summary judgment is granted on the inequitable conduct defense with regard to reexamination proceedings for NOV's '709 patent.

### E.  Frank's Motion for Summary Judgment of No Willful Infringement

Frank's moves for summary judgment that it did not willfully infringe the patents-in-suit. (Doc. No. 275.)

#### 1.  Legal Standard

To prove willful infringement, a patentee must show by clear and convincing evidence that 1) the accused infringer "acted despite an objectively high likelihood that its actions constituted infringement of a valid patent"; and 2) this objectively-defined risk . . . was either known or so obvious that it should have been known to the accused infringer." *In re Seagate Technology, LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007). "Willful infringement is a question of fact." *Fuji Photo Film Co., Ltd. v. Jazz Photo Corp.*, 394 F.3d 1368, 1373 (Fed. Cir. 2005). Upon a finding of willful infringement, the patentee may be entitled to increased damages, 35 U.S.C. § 284, and attorney fees. 35 U.S.C. § 285.

## 2. Analysis

Frank's argues that it is entitled to summary judgment because 1) the rejection of many of Tesco's claims in the reexamination proceedings show as a matter of law that the objective prong if *Seagate* is not met; 2) the "channel key" claims are disclosed in Tesco's own prior art; and 3) Tesco cannot meet its burden on the subjective prong of *Seagate*. Tesco contends that, because the reexamination is not final, the Court should not consider the rejections to bar a finding of willful infringement. Furthermore, Tesco argues that conduct after the patents were issued is irrelevant to the objective prong. Tesco disputes the relevance of Frank's argument regarding the "channel key" claims. Finally, Tesco argues that it has sufficiently shown that the objective risk was either known or should have been known to Frank's.

The reexamination proceedings are sufficient evidence that the objective prong is not met so as to make summary judgment appropriate on all of the claims that were rejected in reexamination. Contrary to Tesco's argument, events that took place after the patents were issued can indeed be considered in the inquiry into the objective prong. *See, e.g.*, *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1337 (Fed. Cir. 2009) (objective prong could not be met because "the record developed in the infringement proceeding in this case, viewed objectively, indisputably shows that the question of equivalence was a close one").

The Federal Circuit has held that "the grant by the examiner of a request for reexamination is not probative of unpatentability." *Hoechst Celanese Corp. v. BP Chemicals Ltd.*, 78 F.3d 1575, 1584 (Fed. Cir. 1996). At least one court, however, has held that the mere issuance of a reexamination order is a factor weighing against a

finding of willful infringement. *Lucent Technologies, Inc. v. Gateway, Inc.*, 2007 WL 6955272, at *6-7 (S.D. Cal. Oct. 30, 2007). When reexamination has progressed further, and claims have been rejected by PTO examiners, there is, at the very least, "a colorable challenge" to the validity of the patents. *Pivonka v. Central Garden & Pet Co.*, 2008 WL 486049, at *2 (D. Colo. Feb. 19, 2008) (holding, based on preliminary PTO order that claims were unpatentable as obvious, that "plaintiffs cannot meet their burden of proving by clear and convincing evidence that the defendants acted despite an objectively high likelihood that their actions constituted infringement of a valid patent"); *see also Safoco, Inc. v. Cameron Intern. Corp.*, 2009 WL 2424108, at *20 (S.D. Tex. July 31, 2009) ("the *outcome* of a reexamination proceeding is far more persuasive, though again not necessarily dispositive, as to whether the defendant acted despite an objectively high likelihood that its actions constituted infringement of a valid patent, than the mere fact that a reexamination proceeding occurred") (emphasis in original).

In this case, regardless of whether the reexamination is described as "preliminary," "almost final," or anything else, it is undisputed that PTO examiners rejected all but three of Tesco's claims. The rejection of those claims by three PTO examiners, along with the lack of compelling contradictory evidence from Tesco, is sufficient to show that, as a matter of law, Tesco cannot show by clear and convincing evidence that there was an objectively high likelihood that Frank's actions constituted infringement of a valid patent. *See Seagate*, 497 F.3d at 1371. The Court acknowledges that, after the Actions Closing Prosecution, Tesco may appeal, or the examiner may reopen the case. (*See* Doc. No. 215-1, at 4-6.) However, even if the claims are eventually restored, the fact that the examiners rejected the claims demonstrates that a major issue

exists as to whether they are valid. Therefore, Tesco cannot prove the objective prong by clear and convincing evidence with regard to all claims except claims 18 and 43 of the '443 patent and claim 4 of the '324 patent.

On the other hand, material issues of fact exist with regard to the "channel key" claims, which were confirmed in reexamination. Frank's argument with regard to these claims relies on the likelihood that those claims are invalid based on Tesco's April 2002 brochure discloses the limitations of those claims. This stance is undercut by Warren's testimony and by evidence that the PTO considered the brochure and still confirmed the claims. (*See* Doc. No. 324, Tesco's Resp. to Mot. for Summary Judgment, at 10-12.)   At the very least, there is a factual dispute as to what the brochure discloses. *See* Section IV.B.1 above. Furthermore, Tesco presents sufficient evidence that Frank's knew or should have known of an objectively high likelihood of infringement to avoid summary judgment on the subjective prong, and Frank's submission of Mike Webre's testimony is not sufficient to prevent a dispute of material fact.

Therefore, summary judgment of no willful infringement is denied with respect to claims 18 and 43 of the '443 patent and claim 4 of the '324 patent and granted with respect to all other claims.

V.     CONCLUSION

Tesco's Motion to Strike Reexamination Files (Doc. No. 338) is **GRANTED IN PART AND DENIED IN PART**, Weatherford's Motion to Strike the Report and Testimony of Gary Wooley (Doc. No. 299) is **DENIED**, Frank's Motion to Strike the Testimony of Tommy Warren (Doc. No. 323) is **DISMISSED AS MOOT**, Defendants' Motions for Summary Judgment of Non-Infringement of the "Pivotal Connection"

Claims (Doc. Nos. 289, 294, 296) are **DENIED**, Defendants' Motions for Summary Judgment of Non-Infringement of the "Channel Key" and "Fitted for Anti-Rotation" Claims (Doc. Nos. 283, 291) are **GRANTED IN PART AND DENIED IN PART**, NOV's Motion for Summary Judgment of Invalidity Due to Obviousness (Doc. No. 300) is **DENIED**, Tesco's Motion for Summary Judgment on Defendants' Anticipation Defense (Doc. No. 279) is **DENIED**, NOV's Motion for Summary Judgment of Invalidity Due to Indefiniteness (Doc. No. 293) is **DENIED**, Frank's Motion for Summary Judgment of Invalidity Due to the On-Sale Bar (Doc. No. 284) is **DENIED**, Tesco's Motion for Summary Judgment on Defendants' Inequitable Conduct Defenses (Doc. No. 281) is **GRANTED IN PART AND DENIED IN PART**, and that Frank's Motion for Summary Judgment of No Willful Infringement (Doc. No. 275) is **GRANTED IN PART AND DENIED IN PART**. Frank's Motion to Strike the Testimony of Tommy Warren (Doc. No. 323) is **DISMISSED AS MOOT**. The Court further construes disputed claim terms as follows[21]:

| Term, Phrase, or Clause | Court's Construction |
|---|---|
| "**link arm mounted by a pivotal connection to move with the top drive**" | "Link arm mounted to a surface by a pivotal connection to move with the top drive, but not connected to any part of, or surface directly supported by, the top drive itself." |
| "**pivotally connectable**" | "Capable of being pivotally connected to the pipe engaging apparatus, but not connected to any support structure outside the scope of the patent. If the link arms are |

---

[21] These constructions supersede constructions of the same terms in the *Markman* Order. (Doc. No. 179.) Today's order does not disturb the Court's previous constructions of terms not construed today.

| Term, Phrase, or Clause | Court's Construction |
|---|---|
|  | connected to a surface intermediate the top drive and pipe engaging apparatus, which surface is directly supported by the top drive, then the link arms are not connected to the pipe engaging apparatus." |
| **"pivotally connected / pivotally mounted / pivotal connection"** | No construction needed, but with the following limitation: "If the link arms are connected to a surface intermediate the top drive and pipe engaging apparatus, which surface is directly supported by the top drive, then the link arms are not connected to the pipe engaging apparatus." |
| **"pipe engaging apparatus"** | "a structure or equipment including a main body with an upper end for drive connection directly or indirectly to a top drive, and a pipe gripping mechanism" |
| **"main body"** | "the main portion of the pipe engaging apparatus, which has an upper end for connection directly or indirectly to the top drive" |
| **"pipe gripping mechanism"** | "a mechanism in which pipe is gripped for rotational and axial movement" |

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 27th day of September, 2010.

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE