**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **TESCO CORPORATION,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| vs. | § | **CIVIL ACTION NO. H-08-2531** |
| | § | |
| **WEATHERFORD INTERNATIONAL,** | § | |
| **INC., NATIONAL OILWELL VARCO,** | § | |
| **L.P., OFFSHORE ENERGY SERVICES,** | § | |
| **INC., and FRANK'S CASING CREW &** | § | |
| **RENTAL TOOLS, INC.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

<u>**MEMORANDUM AND ORDER**</u>

Pending before the Court are the following motions:

**Filed by Plaintiff Tesco Corporation ("Tesco" or "Plaintiff"):**

- Motion for Entry of Judgment on the Verdict as a Matter of Law, or Alternatively, Motion for Summary Judgment (Doc. No. 711)

**Filed by Defendant Frank's Casing Crew & Rental Tools, Inc. ("Frank's"):**

- Sealed Motion for Attorney's Fees for Post-Trial Discovery and New Trial (if Granted) (Doc. No. 633);
- Post-Trial Motion for Summary Judgment on Obviousness Based Upon Tesco Prior Art Brochures (Doc. No. 713);
- Post-Trial Motion for Summary Judgment That Tesco's Asserted Patent Claims are Invalid Under the On-Sale Provision of 35 U.S.C. § 102(b) (Doc. No. 721)

**Filed by Defendants National Oilwell Varco, L.P. ("NOV") and Offshore Energy Services, Inc. ("OES"):**

- Motion for Summary Judgment of Patent Invalidity Pursuant to 35 U.S.C. § 102(b) re: Tesco's Offer for Sale to Conoco (Doc. No. 712);

- Motion for Summary Judgment of Patent Invalidity Pursuant to 35 U.S.C. § 102(b) (Prior Printed Publication) Re: Tesco's August 2002 "Vision" Brochure (Doc. No. 716);
- Motion for Summary Judgment of Patent Invalidity Pursuant to 35 U.S.C. § 103(a) Obviousness (Doc. No. 723)

This Memorandum and Order concerns itself only with the post-trial motion for summary judgment filed by Frank's (Doc. No. 721) and the motion for summary judgment filed jointly by NOV and OES (Doc. No. 712) on the question of the on-sale bar.[1]  The parties remaining post-trial motions will be addressed at a later date.  Upon considering the Motions, all responses thereto, and the applicable law, the Court finds that Frank's Post-Trial Motion for Summary Judgment That Tesco's Asserted Patent Claims are Invalid Under the On-Sale Provision of 35 U.S.C. § 102(b) (Doc. No. 721) and NOV and OES's Motion for Summary Judgment of Patent Invalidity Pursuant to 35 U.S.C. § 102(b) re: Tesco's Offer for Sale to Conoco (Doc. No. 712) must be **DENIED**.

## I. BACKGROUND

This proceeding was filed in 2008, and has been the subject of previous rulings of the Court. *E.g.,* Doc. No. 386.  The background set forth in earlier writings will not be repeated, except as necessary to provide context for the facts and law discussed herein.

Tesco owns U.S. Patent No. 7,140,443 ("the '443 patent") and U.S. Patent No. 7,377,324 ("the '324 patent").  The '324 patent, granted in May 2008, is a continuation of the '443 patent, granted in November 2006. The two patents describe a tool used on a drilling rig.  Drilling rigs

---

[1] The Court also requested supplemental briefing from the parties regarding an on sale bar argument that none of the parties had not originally raised.  (Doc. No. 787.)  Because of the great expense and delay that another trial would require, the Court found it appropriate to raise the issue sua sponte, in order to explore all possible arguments that would enable the parties and this Court to avoid another trial.  After reviewing the supplemental briefing, the Court does not believe the on-sale bar inquiry can be resolved on the theory it raised.  However, the Court does consider the arguments raised and the evidence presented in the supplemental briefing to the extent that it is helpful to resolving the original motions for summary judgment based on on-sale bar.

are used to bore and encase holes in the ground for the purpose of extracting oil.  The patents describe an apparatus and method for handling the sections of the pipe or pipe strings that are used for drilling or lining a well bore.  Stated summarily, the patent covers a "Case Drilling System with a link tilt" referred to by all parties as "CDS with link tilt."   More detailed descriptions of the device and its function can be found in the Court's earlier opinions.

Tesco brought suit against Weatherford International, Inc., NOV, OES, and Frank's for infringement of those patents.[2]  After re-examination of the patents with the United States Patent and Trademark Office ("PTO"), lengthy discovery and many pre-trial motions, the Court and the parties spent three weeks in jury trial.  The jury found that claims 27 and 55 of the '443 patent, and claim 14 of the '324 patent were valid.  The jury found that claims 13, 25 and 59 of the '443 patent and claims 1 and 12 of the '324 patent were not valid.

Plaintiff sought to have the Court enter judgment on the verdict.  Defendants sought judgment as a matter of law in their favor.  The Court did neither.  Rather, because of internal inconsistencies in the jury verdict, and because of concern – re-enforced during the trial – that Tesco had not produced all of the discovery that Defendants had properly requested, the Court authorized additional discovery.

The Court now turns to the post-trial motions for summary judgment filed by Frank's, NOV and OES on the question of the on-sale bar.  (Docs. Nos. 712, 721.)  Defendants base their argument that the patent claims are invalid under 35 U.S.C. § 102(b) on a contract between Tesco and Conoco ("Conoco Contract") in which Tesco agreed to provide three oil drilling rigs to Conoco.  The Conoco Contract was entered into on February 1, 2002, over nine months before the critical date, which all parties agree is November 8, 2002.  It is undisputed that the Conoco

---

[2] The Court will refer to the remaining defendants, NOV, OES, and Frank's, collectively as "Defendants."

Contract does not explicitly name the CDS with link tilt described in the patents-in-suit, and that the tool did not yet exist at the time of the contract.  However, the first rig that Tesco provided under the Conoco Contract (known as the Alpha Rig), in November 2002, contained the link tilt system.

## II.    APPLICABLE LAW

### A.  Legal Standard for Summary Judgment

A motion for summary judgment requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented.  *See* Fed. R. Civ. P. 56(c)(2).  "Summary judgment is appropriate when, drawing all justifiable inferences in the nonmovant's favor, there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law."  *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA, Inc.*, 617 F.3d 1296, 1302 (Fed. Cir. 2010). "[A] dispute about a material fact is genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The Court views all evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor.  *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000).  The Court may not make credibility determinations or weigh the evidence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  "The court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'"  *Id.* at 151.  Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence.  Fed. R. Civ. P. 56(e)(1); *see, e.g.*, *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir.

2008); *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir.1996) *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (noting that a nonmovant's burden is "not satisfied with 'some metaphysical doubt as to the material facts'") (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

### B.  On-Sale Bar

Defendants assert that they are entitled to summary judgment based on the invalidity of all of the claims at issue in this lawsuit.  Under 35 U.S.C. § 102(b),

> A person shall be entitled to a patent unless—
> . . .
> (b) the invention was . . . on sale in this country, more than one year prior to the date of the application for patent in the United States.

35 U.S.C. §§ 102(a)–(b).  "Section 102(b) encourages prompt disclosure of new inventions and in particular limits commercial exploitation of an invention prior to filing for a patent application."  *August Tech. Corp. v. Camtek, Ltd.* 655 F.3d 1278, 1288 (Fed. Cir. 2011) (citation omitted).

An alleged infringer asserting patent invalidity must overcome the presumption of validity with clear and convincing evidence.  *Microsoft Corp. v. i4i Ltd. Partnership*, -- U.S. --, 131 S. Ct. 2238, 2244–53 (2011).  Therefore, generally, courts may grant summary judgment only if the alleged infringer has presented "such clear and convincing evidence of invalidity so that no reasonable jury could find otherwise."  *Eli Lilly and Co. v. Barr Labs., Inc.*, 251 F.3d 955, 962 (Fed. Cir. 2001).  However, during trial, as a sanction against Tesco for discovery abuses, this Court shifted the burden and required Tesco to prove by a preponderance of the evidence that the patent claims were valid.  (Doc. No. 506 Supp. Jury Inst., at 17.)  Tesco continues to bear the burden, and this Court may grant summary judgment against Tesco unless

it can show, that there is a genuine issue of material fact as to whether the patent claims are valid under the applicable precedents as to the on-sale bar.

The on sale bar applies where two conditions are satisfied before the critical date: (1) the product is the subject of a commercial offer for sale, and (2) the invention is ready for patenting. *Pfaff v. Wells Electronics, Inc.*, 525 U.S. 55, 67 (1998).

### 1. Commercial Offer for Sale

"First, the product must be the subject of a commercial offer for sale." *Id.* To satisfy this prong, a court must find (1) that the alleged offer for sale rose to the level of a "definite" offer which, upon acceptance, would form a binding contract, and (2) that the subject of the offer met each of the limitations of the claims. *Scaltech, Inc. v. Retec/Tetra, LLC,* 269 F.3d 1321, 1328–31 (Fed. Cir. 2001). Despite these two requirements, the Federal Circuit has also repeatedly recognized the fact that the product did not yet exist at the time of an offer for sale does not necessarily preclude a finding that the patent is invalid because of an on-sale bar. A review of the Circuit's recent decisions is instructive.

For example, in *Ferag AG v. Quipp, Inc.*, in June of 1979, Ferag, Inc. and Bergen entered into an Equipment Sales Agreement, incorporating a prior partnership agreement among Ferag, Ferag, Inc. and Bergen, for a conveyer apparatus. 45 F.3d 1562, 1565 (Fed. Cir. 1995). The agreement set forth functional specifications the conveyer would meet, but made no reference to the subsequently patented conveyer system with gripper clamps. *Id.* at 1565, 1569. In fact, Ferag contended that it did not even begin work on the patented system until July of 1979. *Id.* at 1565. However, the claimed conveyer could be used to meet the functionality specifications in the contract, and by November of 1979, Ferag had unambiguously indicated in writing that it was planning on fulfilling the contract with the claimed conveyer system. *Id.* ("On November

23, 1979, Ferag sent Ferag, Inc. a document confirming a Ferag, Inc. order . . . of an inserting system destined for Bergen. Among other equipment, the order confirmation clearly specifies end product 'EP-1' and 'EP-2' conveyors, conceded by Ferag to include the EP-100 gripper clamps embodying the patent claims.")  The critical date in that case was January 15, 1980.  *Id.* at 1564–65.  The court found that the on-sale bar would apply to this contract even though the invention had not been conceived at the time of the offer because the purchaser did not "have reason to expect to receive" an already-existing product and the inventor had documented, prior to the critical date, that the contract would be fulfilled with the claimed invention prior to the critical date.  *Id.* at 1568–69.  Nonetheless, the Court made clear that the on-sale inquiry is an objective inquiry, noting that an offer specifically calling for the prior art would *not* constitute an on-sale bar even if the inventor ultimately decided to supply the claimed invention.  *Id.* at 1568–69 (discussing *Envirotech Corp. v. Westech Eng'g Inc.*, 904 F.2d 1571 (Fed. Cir. 1990) *overruled on other grounds by Pfaff*, 525 U.S. 55).

In *Robotic Vision Systems Inc. v. View Engineering, Inc.* ("*Robotic II*"), the Federal Circuit again indicated that the fact that a product does not exist at the time of an offer for sale does not forestall the possibility of an on-sale bar.  112 F.3d 1163, 1168 (Fed. Cir. 1997).  Robotic agreed to supply Intel with a full-tray scanning system in March of 1991, about three months before the critical date.  *Id.* at 1164.  At the time, the invention was still in development.  *Id.*  The court noted that, if "agreement[s] to develop and provide a device that had not yet been invented, developed, or completed were held to be a bar to patentability, then collaboration between inventors and customers would be greatly impeded."  *Id.* at 1168.  Thus, completion of an invention pursuant to an agreement between an inventor and purchaser would not automatically relate back to the date of the offer.  *Id.*  However, in the case before it, "completion

of the invention prior to the critical date, pursuant to an offer to sell that invention, would validate what had been theretofore an inchoate, but not yet established, bar" as of the date of completion. *Id. Robotic II* did not spell out the particular circumstances that made completion of the invention prior to the critical date sufficient to validate an "inchoate" bar. The Court cannot say for certain the circumstances that validated an "inchoate" bar; perhaps the agreement between Intel and Robotic specifically called for an as yet undeveloped full-tray scanning system that Robotic was clearly going to fulfill with its patented invention. However, as discussed in more detail below, the Court does not believe that *Robotic II* should stand for the proposition that the completion of an invention prior to the critical date will validate an "inchoate" bar in every case.

In *Sparton Corp. v. United States*, the Federal Circuit found it relevant that the patented technology had not even been conceived at the time of the alleged offer for sale. 399 F.3d 1321, 1325 (Fed. Cir. 2005). There, prior to the critical date, Sparton specifically contracted to sell the United States a sonobuoy with a multi-piece release plate. *Id.* at 1321. However, after the contract was entered into, Sparton developed an improved sonobuoy with a single piece release plate, and ultimately delivered that new technology to the United States. *Id.* The Court found the new technology was not barred because the contract was specifically for the older sonobuoy and because, in any event, there could be no offer for sale of an invention that had not yet been conceived. *Id.* at 1324. *Sparton*, while not directly applicable to cases where the offer does not specify precisely what technology will be provided, is nonetheless in tension with *Ferag* and *Robotic II*.

Finally, and most recently, in *August Technology*, the Federal Circuit stated that an offer for sale could invalidate a subsequent patent even if the claimed technology had not yet been

conceived at the time of the offer.  655 F.3d at 1289.  There, ICS contacted August Technology to develop a wafer inspection machine.  *Id.*  In late 1996, August Technology, "with a concept of what the machine would be," issued a purchase order to ICS, and ICS agreed to pay set percentages of the purchase price upon order, design review, and acceptance.  *Id.*  The critical date was in July of 1997.  *Id.* at 1288.  The court held that "if an offer for sale is extended and remains open, a subsequent conception will cause it to become an offer for sale of the invention as of the conception date."  *Id.* at 1289.  The case was remanded because there was a question of fact as to whether the patented technology was conceived of before or after the critical date and remanded.  *Id.* at 1290.

The Court provides this detailed accounting of Federal Circuit precedent because the governing law is not entirely clear.   For instance, the *Sparton* court's holding that a product cannot be offered for sale before it is even conceived is in tension with the Federal Circuit's previous holding finding an on-sale bar in *Ferag* despite the fact that fact that the invention there had not been conceived until after the offer.  *Compare Sparton*, 399 F.3d at 1324 *with Ferag*, 45 F.3d at 1568–69.  Furthermore, the Federal Circuit recently reiterated that an offer for sale may ultimately blossom into an on-sale bar even if at the time of the offer the invention had not been conceived, so long as it is conceived before the critical date.  *August Tech.*, 655 F.3d at 1289.  In this same opinion, it discussed *Sparton* and implied that its holding continues to be good law.  *Id.*

This Court finds that the best way to reconcile this line of precedent is to read *Sparton* narrowly.  *Sparton* simply provides that an offer for sale before an invention is conceived cannot, standing alone, amount to an on-sale bar irrespective of when the conception ultimately occurs.  Contrary to Tesco's suggestions (Doc. No. 736, at 14–15), *Sparton* cannot stand for the proposition that, if the invention was not conceived by the time of an offer, there can never be an

on-sale bar stemming from that original offer.  Rather, as the Federal Circuit's recent pronouncement in *August Technology* affirms, a subsequent conception combined with the original offer for sale, may constitute a bar if the conception date precedes the critical date. *August Tech.*, 655 F.3d at 1289.  However, contrary to Defendants' suggestions, a conception of the patented invention prior to the critical date is not *sufficient* to transform a previous offer into an on-sale bar.  (Doc. No. 712, at 11.)  Ultimately, the commercial offer must be "of the patented invention."  *Plumtree Software, Inc. v. Datamize, LLC*, 473 F.3d 1152, 1163 (Fed. Cir. 2006). Where an offer for sale does not specifically offer the patented invention for sale, this requires a finding of an "objectively manifested" attempt to commercialize the invention prior to the critical date.  *Ferag*, 45 F.3d at 1568.  The focus is not the "subjective, uncommunicated, and ultimate intention of the offeror."  *Id.* (*citing Envirotech*, 904 F.2d at 1575).  Just as subjective and ultimate intentions to supply the patented invention cannot override clear contract terms that call for the prior art, *see Envirotech*, 904 F.2d at 1575, they also cannot alone provide the requisite objective manifestation when the contract is ambiguous.  *See Ferag*, 43 F.3d at 1568 (emphasizing that the on-sale bar inquiry is "an objective test").[3]

---

[3] The Court's prior order addressing on-sale bar emphasized that Tesco must "inten[d] to be bound" to provide the patented invention.  (Doc. No. 381, at 48, 51.)  To the extent that the Court's prior opinion suggested that Tesco must "inten[d] to be bound" to provide the patented invention, the Court now retracts this characterization.  The Court now finds that language requiring a patentee to "inten[d] to be bound" is concerned with the requirement that there be a commercial offer for sale in the first place.  *See Linear Technology Corp. v. Micrel, Inc.*, 275 F.3d 1040, 1050–1052 (Fed. Cir. 2001).  There is no doubt that the Conoco Contract rises to the level of a commercial offer for sale.  Instead, the question is whether it is an offer for sale of the patented invention.  In the Federal Circuit cases discussed above, which involved commercial offers for sale that could be satisfied with either the prior art or the patented invention, the court has never required the patentee to intend to be bound to supply the new art after the contract was executed.  This is perfectly logical, as such a requirement would effectively mandate modification of contractual obligations before a contract that could be satisfied by prior art or a new invention could constitute an on-sale bar.  Tesco's intent is surely probative, but it need not intend to be bound.  Instead, what is needed is an objective manifestation of that intent that amounts to an attempt to commercialize its invention.  *See Ferag*, 43 F.3d at 1568.

The Federal Circuit has provided little guidance as to what constitutes the objectively manifested attempt to commercialize an invention in cases where the offer does not explicitly provide for the specific invention.  This Court is left to conclude, from reviewing the relevant precedent, that the determination of whether an objectively manifested attempt to commercialize an invention has occurred turns on a holistic review of the circumstances surrounding a particular offer.  While what the purchaser reasonably expects to receive is relevant to determining what is on sale, there is no requirement that the purchaser have actual knowledge of the invention to invoke the on-sale bar.  *Envirotech*, 904 F.2d at 1576 (citation omitted).  While the inventor's intent to provide the invention is not sufficient, communications of an unambiguous intent to provide the invention are surely relevant.  *Ferag*, 45 F.3d at 1565–1566, 1569 (relying on confirmation document that revealed inventor's clear intent to provide the patented invention in holding that patent was invalid because of an on-sale bar).

## 2.  Ready for Patenting

The second prong of the on-sale bar inquiry requires the invention to "be ready for patenting."  *Pfaff*, 525 U.S. at 67.  The "ready for patenting" condition may be satisfied "by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention."  *Id.* at 67–68.  Reduction to practice requires that an invention be "sufficiently tested to demonstrate that it will work for its intended purpose."  *Barmag Barmer Maschinenfabrik v. Murata Machinery, Ltd.*, 731 F.2d 831, 838 (Fed. Cir. 1984).  However, regardless of whether the invention has been reduced to practice before the critical date, it may still be found to be patent-ready if the inventor prepares a

description that would enable a person reasonably skilled in the art to replicate it.  *Pfaff*, 525 U.S. at 67–68.

These conditions need not be satisfied at the time of the offer for sale.  *Robotic Vision Sys., Inc. v. View Eng'g, Inc.*, 249 F.3d 1307, 1311 (Fed. Cir. 2001) ("*Robotic IV*").  However, if the invention is not patent ready at the time of the offer, for the purposes of the on-sale bar inquiry, there is no offer for sale until the invention is patent-ready.  *August Tech.*, 655 F.3d at 1289.  In other words, the ready for patenting prong can be satisfied after the offer for sale has occurred, so long as it is satisfied before the critical date.

## III.   ANALYSIS

The Court finds that Tesco has met its burden and shown that there is a genuine issue of material fact as to whether the on-sale bar invalidates its patents.

### A.  Commercial Offer for Sale

Defendants argue that the Conoco Contract constitutes an offer to sell the CDS with link tilt system because the Conoco Contract was not limited to the prior art and Tesco intended to provide the new system to Conoco under the Conoco Contract.  (*See* Doc. No. 721, at 27–33; Doc. No. 712, at 37–49.) Defendants point out that the Conoco Contract does not require a prior version of Tesco's products.  The Conoco Contract states, in paragraph 1.1, that Tesco will "compl[y] with the provisions and specifications of Exhibits A through E attached hereto." (Trial Ex. 461 at TESCOSD0016954, 1.1.)    Exhibit A lists the "equipment materials, and services" to be provided (*id.* at TESCOSD0016974), including a "Casing Clamp/ Drive Sub." (*Id.* at TESCOSD0016977.)   However, the Conoco Contract also provides that "[t]hese rigs shall meet or exceed the specifications referenced in paragraph 1.1 and shall have passed Tesco's

function test." (*Id.* at TESCOSD0016954, 1.3, 1.4.)  This clause, Defendants argue, means that the Conoco Contract could be satisfied with a "Casing Clamp" or an improved tool.

Defendants further argue that Tesco was not required to provide Conoco with the prior art because trial and post-trial evidence reveals that the term "Casing Clamp" is not limited to the prior art.  Defendants present a substantial amount of sworn testimony which indicates that both Conoco and Tesco employees occasionally used the term "Casing Clamp" to refer to the new technology as well as the prior art.  (Doc. No. 721, at 29–32; Doc No. 712, at 47–49.)

Tesco argues in response that the Conoco Contract was not an offer to sell the patented technology because the Conoco Contract specifically called for the prior art, and Tesco did not enter the Conoco Contract with the intent to commercialize the CDS with link tilt.   (Doc. No. 736, Tesco's Combined Response to Frank's Post-Trial Mot. for Summ. J. That Tesco's Asserted Patent Claims are Invalid Under the On-Sale Provision of 35 U.S.C. § 102(b) and NOV and OES's Mot. for Summary J. of Patent Invalidity Pursuant to 35 U.S.C. § 102(b) re: Tesco's Offer for Sale to Conoco, at 6–19.)

Tesco argues that the Conoco Contract did not trigger the on-sale bar because the "Casing Clamp," expressly called for in the Conoco Contract, refers specifically to a prior version of Tesco's casing system.  (Doc. No. 736, at 6–7.)  Tesco argues that the sheer fact that some individuals used the term "Casing Clamp" to refer to old and new technology cannot alter the plain terms of the contract.  (Doc. No. 736, at 21–23.)

The Court rejects Tesco's argument that the terms of the Conoco Contract specifically require the prior art.  First, the plain term of the Conoco Contract allow Tesco to exceed the specifications set out in Exhibit A, which include the Casing Clamp.  Tesco weakly complains that the use of the terms "meet or exceed" cannot prove that Tesco was required under the

contract to provide the new art.  (Doc. No. 766, Tesco's Combined Sur-Reply to Frank's Post-Trial Mot. for Summ. J. That Tesco's Asserted Patent Claims are Invalid Under the On-Sale Provision of 35 U.S.C. § 102(b) and NOV and OES's Mot. for Summary J. of Patent Invalidity Pursuant to 35 U.S.C. § 102(b) re: Tesco's Offer for Sale to Conoco, at 3–4.)  While true, this misses the point.  Because the Conoco Contract explicitly allows Tesco to provide technology that exceeds the specifications set out in Exhibit A, the real import of this language is that it shows that neither the prior art nor the new art was *required*.  Tesco cannot possibly claim otherwise; after all, providing the CDS with link tilt was surely not a breach of the Conoco Contract.  Therefore, cases like *Sparton* and *Envirotech*, which involved contracts specifically calling for the prior art, are not dispositive of this case.  *See Sparton*, 399 F.3d at 1321; *Envirotech*, 904 F.2d at 1573.

Furthermore, even absent the "meets or exceeds language, Defendants have proffered a substantial quantity of testimony from Conoco and Tesco employees indicating that the term "Casing Clamp" was used to refer to both new and old technology.  While this evidence is unnecessary to a finding that the contract does not specifically call for the prior art, it surely weighs in favor of such a finding.

However, to prevail, Defendants cannot simply show that the Conoco Contract is ambiguous.  Rather, for this Court to grant summary judgment, the facts must reveal an objectively manifested attempt on Tesco's part to use the Conoco Contract to commercialize the CDS with link tilt.  To this end, Defendants' evidence that, although the term "Casing Clamp" is ambiguous, as used in the Conoco Contract, it actually referred to the new technology Tesco was developing, is probative.  (Doc. No. 721, at 9–10, 28–32; Doc No. 712, at 40–44; Doc No. 753, Franks' Reply to Post-Trial Mot. for Summ. J., at 12.)   Specifically, Defendants present

testimony pertaining to pre- and post-contract discussions indicating that Conoco desired an "automated pipe handling system." (Fontenot Depo., at 86:10–18, 88:11–16.) Conoco employee Robert Strickler even testified that in "February of 2002, Conoco wanted a link tilt system for manipulating the pipe . . . [and] Tesco was to provide a link tilt system with its casing drive system." (Doc. No. 721, at 34–35 (citing Strickler Depo., at 67:16–68:1).)  Defendants argue that this evidence reveals both Tesco and Conoco's intent that the rig would include improved casing gripping technology. (Doc. No. 721, at 9–10, 28–32; Doc No. 712, at 40–47.)

In addition to trial and deposition testimony, Defendants also rely on several Power Point presentations that were produced only after the trial, and by Conoco, not Tesco. These include a May 7, 2002 Power Point that referred to a "new casing drive system" and reflected the original drive system and a new system that Tesco was developing, (Doc. No. 721, at 28; Doc. No. 712, at 45–46), a Power Point dated September 11, 2002 that contained photographs of the CDS with link tilt (Doc. No. 753, at 11; Exhibit D, Doc. No. 724), and another Power Point dated September 19, 2002 containing a rig graphic showing the CDS with link tilt as depicted in a brochure issued by Tesco in August 2002. (Doc. No. 753, at 11; Doc. No. 724–2, Exhibit G.)

Tesco argues that it did not enter into the Conoco Contract in an attempt to commercialize the CDS with link tilt because Tesco did not even conceive of the link tilt system that is the subject of the patent in this case until June 2002. (Doc. No. 736, at 21–23.)  Tesco presents concerns about the reliability of some of the deposition testimony cited by Defendants. In particular, Tesco cites to deposition testimony by Strickler that indicates he may not have understood or accurately recalled key aspects of the old casing clamp and how it compared to the CDS with link tilt. (Doc. No. 736, at 16 (citing Strickler Depo. at 73:2–74:9, 84:21–85:8); Doc.

No. 327, at 17–18.)[4]   Strickler appeared to believe that the rigs to be provided under the Conoco

Contract would include a link tilt system because he mistakenly believed that the predecessor rig,

Rig 4, which included the Casing Clamp also included link tilts.  (Doc. No. 327, at 17–18 (citing

Strickler Depo. at 73:2–74:9).)   Finally, Tesco puts forward testimony from Conoco employee

Kyle Fontenot indicating that Conoco was surprised to find that the Alpha rig included the CDS

with link tilt.  (Doc. No. 736, at 14–19.)[5]   This testimony cuts against Defendants' arguments

that Conoco expected to receive the CDS with link tilt under the Conoco Contract.

Defendants, in response, raise doubts about the reliability of Fontenot's testimony that he

was surprised that the Alpha Rig contained the CDS with link tilt.   In addition to the above-

referenced Power Points, which Defendants argue clearly informed Conoco that the rigs would

include the CDS with link tilt, Defendants also cite to an email by Fontenot sent on November 8,

2002 (the critical date).   In this email, Fonetenot asked his coauthor, Tesco's Tommy Warren,

whether a paper they were working on should be revised to reflect the casing drilling system on

the new rig.  (Doc. No. 757, NOV and OES's Reply in Support of Summ. J. of Patent Invalidity

---

[4] Actually, Tesco claims that Strickler testified that Conoco was expecting the Casing Clamp. (Doc. No. 736, at 16.)  The deposition excerpts Tesco cites in support of this claim, which Tesco neglected actually to provide to the Court until specifically requested to do so, contain no such testimony. (Strickler Depo., at 73:2–74:9, 84:21–85:8.)  The Court has reviewed this testimony and, as discussed above, it finds that the testimony is nonetheless relevant because it raises concerns about the reliability of Strickler's testimony.  However, the Court emphasizes that, to the extent this opinion relies on Strickler's testimony, it is not for the reasons Tesco cites it in its Response.

[5] Tesco also claims that a Conoco employee, Gary Hamilton, visited Tesco's Calgary yard for three days in order to observe the rig, and never once saw the CDS with link tilt.  (Doc. No. 736, at 28.)  Tesco presents this claim as further evidence that Conoco did not expect to receive the CDS with link tilt.  (Doc. No. 736, at 28.)  The deposition testimony Tesco cites in support of this claim indicates only that Hamilton could not recall if he saw the CDS with link tilt on his visit.  (Hamilton Depo., at 43:21–44:16.)  Thus, the Court ignores this purported evidence. Furthermore, Tesco again failed actually to provide the cited testimony to the Court; instead, the Court located the testimony in an Exhibit previously filed by Frank's.  (Doc. No. 285.)  Needless to say, Tesco's repeated failure actually to provide record evidence it relies on, and its mischaracterizations of the evidence in its briefing, are neither appropriate nor helpful to this Court.

Pursuant to 35 U.S.C. § 102(b) re: Tesco's Offer for Sale to Conoco, at 18–19; Doc. No. 721, Ex. Q.)  Defendants argue that this email, sent on the critical date, reveals a degree of knowledge of the CDS with link tilt that belies any claims that Fontenot was surprised by the tool.  (Doc. No. 721, at 33–34.)

Tesco's argument that it could not have intended to provide the CDS with link tilt under the Conoco Contract because it was not developed until June of 2002 is without merit.  *Ferag*, *Robotic II*, and *August Technology* all stand for the proposition that an invention conceived after the original offer for sale may still invalidate a patent if it is conceived prior to the critical date.  *Ferag*, 45 F.3d at 1568–69; *Robotic II*, 12 F.3d at 1168; *August Tech.*, 655 F.3d at 1289.  It is undisputed that the CDS with link tilt was conceived at least by June of 2002, five months before the critical date.

However, the fact that Tesco conceived of the CDS with link tilt before the critical date does not, in and of itself, convert the Conoco Contract into an offer for sale.  There must also be an objective manifestation of an attempt to commercialize its invention under the Conoco Contract.  The Court finds that, even after post-trial discovery, a genuine issue of material fact remains about whether there was such an objective manifestation.

The Court has no doubt that Defendants have presented more than enough evidence for a jury to find that Tesco had always intended to provide new casing drilling technology under the Conoco Contract, and that Tesco made objectively manifested attempts to commercialize the CDS with link tilt under the Conoco Contract.  Testimony from Conoco employees suggests that Conoco may have expected to receive an invention like the CDS with link tilt, and Tesco intended to provide it, from the very outset of contract negotiations.  (Fontenot Depo., at 86:10–18, 88:11–16); *Ferag*, 45 F.3d at 1568 (citation omitted) (noting that what the purchaser

reasonably expects to receive is relevant to determining what is on sale). Furthermore, even if a jury were to accept Tesco's argument that the images in the September Power Points were too small for the invention to be seen, and therefore could not have altered Conoco's expectations (Doc. No. 736, at 28), Tesco's decision to include these renderings nonetheless constitutes objective evidence of Tesco's intent; Conoco's actual knowledge of the invention, while relevant, is not required. *Ferag*, 45 F.3d at 1568 (citation omitted). Furthermore, as discussed above, Defendants have marshaled other evidence probative of Conoco's expectations.

Yet, the Court cannot say that there are no genuine issues of material fact as to whether Tesco made an objectively manifested attempt to commercialize the CDS with link tilt under the Conoco Contract. First, among Defendants' key pieces of evidence is Strickler's testimony that Conoco always expected to receive a casing drilling system with link tilts. Doc. No. 721, at 34–35; Doc. No. 712, at 42.) This testimony is based, however, on an incorrect understanding of Tesco's prior technology and is therefore suspect. Furthermore, Tesco presents evidence that Conoco was surprised to receive the CDS with link tilt. (Doc. No. 736, at 14–19; Fontenot Depo., at 24:3–7, 85:24–88:4.) If Defendants are right that Conoco desired and expected new technology all along, Fontenot's reaction does not make sense. Defendants invite this Court to find that this part of Fontenot's testimony "cannot be trusted." (Doc. No. 757, at 18.) The Court agrees that Fontenot's testimony is suspect, in light of the aforementioned November 8, 2002 email, which suggests that he was fully aware of the new rig system. However, just as this Court cannot ignore Strickler's testimony, it also cannot ignore Fontenot's; to do so would be to intrude on the province of the jury. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."). A jury must decide how

much weight to give Strickler's testimony in light of his apparently mistaken understanding of the prior technology.   A jury must decide whether Fontenot's testimony that he was surprised to receive the CDS with link tilt can be believed.

Accordingly, a jury could reasonably find that Strickler's testimony should be given little weight or that Fontenot's testimony that Conoco was surprised to receive the link tilt should be given credence.   The jury could conclude, on these bases, that there was no objective manifestation of intent to commercialize the CDS link tilt through the Conoco Contract.   Tesco has, therefore, met its burden of showing that a jury could reasonably find the patents at issue valid.   Therefore Frank's Post-Trial Motion for Summary Judgment That Tesco's Asserted Patent Claims are Invalid Under the On-Sale Provision of 35 U.S.C. § 102(b) and NOV and OES's Motion for Summary Judgment of Patent Invalidity Pursuant to 35 U.S.C. § 102(b) re: Tesco's Offer for Sale to Conoco must be denied.

### B.  Ready for Patenting

Defendants argue that the CDS with link tilt was patent-ready before the critical date. (Doc. No. 721, at 20–24; Doc. No. 712, at 51–56.)   In support of this argument, Defendants rely on the September 11, 2002 Power Point, which includes photographs of the CDS with link tilt, and an October 10, 2002 assembly diagram, which Defendants argue is similar to Figure 4 of the '443 patent in all relevant respects.

Tesco responds that the CDS with link tilt was not patent-ready prior to the critical date. (Doc. No. 736, at 29–32.)   Tesco notes that the photographs of the CDS with link tilt show the Device hanging from a crane, not "fully assembled" or "operational." (Doc. No. 736, at 31.) Furthermore, Tesco presents testimony that, when the CDS with link tilt was tested on October 11, 2002, it "didn't work well."  (Doc. No. 736, at 31–32; Trial Tr. 717:16–718:1.)  Tesco also

argues that the October 10, 2002 assembly drawings included several differences from the '443 patent embodiment.  (Doc. No. 736, at 30.)  Defendants point out that these differences all relate to the washers that stabilize the link tilt, and none of the stabilization claims is at issue in this suit.  (Doc. No. 753, at 14; Doc. No. 757, at 22–24.)

Defendants also present evidence that raises questions about whether the Alpha rig with the CDS with link tilt was actually delivered before the critical date.  (Doc. No. 721, at 34.)[6]  In particular, Frank's points to an email of a draft paper between Conoco's Fontenot and Tesco's Tommy Warren on November 6, 2002 that indicates the Alpha rig was "on location."  (Doc. No. 721, at 34.)

Tesco responds that the evidence presented by Frank's that the Alpha rig was delivered prior to the critical date is taken out of context.  (Doc. No. 736, at 39.)  It argues that the statements Frank's relies on were made when the authors knew the paper would be published well after the Alpha rig would have been on location, and thus should not be understood to suggest the rig was on location as of November 6, 2002.  (Doc. No. 736, at 39.)  NOV and OES point out that this explanation does not make sense in light of the full statement, which reads: "The first of the new Casing Drilling rigs is on location but has not spudded yet."  (Doc. No. 757, at 25; Doc No. 721, Ex. N.)  Furthermore, NOV and OES point out that the papers were going to be presented in March of 2003.  (Doc. No. 801, Defendants' Reply to Tesco's Response to Defendants' Supplemental Briefing, at 7.)

Relying on the September 2002 Power Points, Defendants argue that the CDS with link tilt was reduced to practice by at least September of 2002.  (Doc. No. 721, at 20–21, Doc. No.

---

[6] Because Frank's includes this evidence in its discussion of whether the CDS with link tilt was ready for patenting, the Court analyzes it here.  However, the Court notes that this evidence is also probative of whether there was a commercial offer for sale of the CDS with link tilt prior to the critical date.

712, at 53–54.)  However, Tesco proffers evidence that the invention still did not work well when it arrived on the Conoco lease at Lobo Field, which Tesco contends was on or after the critical date.  (Doc. No. 736, at 31–32, 39; Trial Tr. 717:16–718:1.)  Tesco relies on its own interrogatory responses and on a spreadsheet detailing when the fourteen loads carrying components of the Alpha rig arrived at Lobo Field as proof that the CDS with link tilt did not arrive before November 8, 2002.  (Doc. No. 736, at 31–32, 39; Doc. No. 799, Tesco Corporation's Response to NOV and OES's Supplemental Briefing, at 3, Ex. 13.)

The Court recognizes that neither Tesco's interrogatory responses nor the spreadsheet are competent summary judgment evidence.  Interrogatory responses may constitute competent summary judgment evidence if they satisfy the other requirements of Rule 56.  *See* 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2722 at 51–52 (1983).  Verified or sworn pleadings are competent summary judgment evidence; unverified answers to interrogatories and interrogatories not based on personal knowledge are not.  *See Fowler v. S. Bell Tel. & Tel. Co.*, 343 F.2d 150, 154 (5th Cir. 1965); *Brady v. Blue Cross and Blue Shield of Tex., Inc.*, 767 F. Supp. 131, 135 (N.D. Tex. 1991) ("The court has been unable to locate a case . . . in which unsworn, unverified interrogatory answers proffered by a nonmovant have been considered competent summary judgment evidence.").  Similarly, the spreadsheet relied on by Tesco is not competent summary judgment evidence because it is undated and unauthenticated.  (Doc. No. 801, at 4–5.)   Furthermore, NOV and OES report that, when this Court ordered electronic discovery, this spreadsheet could not be located on Tesco's servers, further casting doubt on its origin and admissibility.  (Doc. No. 801, at 4.)

Nor can the Court conclude, however, that the CDS with link tilt was delivered to Lobo Field before the critical date.  Defendants argue that the CDS with link tilt was reduced to

practice before the critical date because the Alpha rig was actually delivered to the Conoco lease before the critical date.  (Doc. No. 721, at 34.)  If Defendants are right that the Alpha rig was "on location" by November 6, 2002, then perhaps the CDS with link tilt was, in fact, reduced to practice before the critical date.   However, Tesco explains that the statements Defendants rely on were forward looking and not meant to reflect the state of events as of November 6, 2002. (Doc. No. 736, at 39.)  Although the Court is highly skeptical of this explanation in light of the fact that the paper was to be presented in March of 2003, whether Tesco's explanation is credible is ultimately a jury question.  The Court has not been presented with evidence indicating when this paper was to be finalized for publication.  There is some indication that Warren hoped to send the "final form" of the paper by "Monday," presumably the Monday of November 11, 2002, in order for it to be reviewed by Conoco's management.  (Doc. No. 795, Frank's Supp. Br. Re: On-Sale Questions Raised by Court Order of September 17, 2012, Ex. FF.)  If the paper was due to be finalized for publication shortly after these emails and drafts were exchanged, a jury could find that the statement was written with the expectation that the paper would be finalized sometime after the first rig was delivered but before it had spud its first well.

Furthermore, even if the CDS with link tilt was delivered before November 8, 2002, Tesco's Kevin Nikiforouk testified that, when the CDS with link tilt was tested upon arrival at Lobo Field, before the washers were added, "it really didn't work well."  (Trial Tr. 717:16–718:1.)   While it is true that there is no requirement that the invention be workable on a "commercial scale," *see In re Cygnus Telecommunications Technology, LLC, Patent Litigation*, 536 F.3d 1343, 1355 (Fed. Cir. 2008), reduction to practice does require that an invention be "sufficiently tested to demonstrate that it will work for its intended purpose." *Barmag*, 731 F.2d at 838.  Defendants do not provide countervailing evidence showing either that the testing of the

Alpha rig at Lobo Field did demonstrate that the CDS with link tilt would work for its intended purpose,[7] or that, after this testing but prior to the critical date, adjustments were made and further testing revealed that the CDS with link tilt would work for its intended purpose. The Court cannot conclude that the CDS with link tilt was reduced to practice before the critical date.

Finally, Defendants present evidence that the October 10, 2002 drawing is identical in all material respects to the figure in Tesco's patent. However, to prevail on the second patent-readiness test enunciated in *Pfaff*, Defendants must proffer evidence that the drawings were "sufficiently specific to enable a person skilled in the art to practice the invention." *Pfaff*, 525 U.S. at 67–68. The Court cannot conclude that, simply because the drawings are substantially identical to the patent figures, a person skilled in the art would be able to reduce the invention to practice. *Cf. Honeywell Int'l. Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1145 (Fed. Cir. 2004) (where pre-critical date drawings were substantially identical to patent figures, jury could nonetheless conclude that a person reasonably skilled in the art could not reduce the invention to practice from the drawings because "the details and the operation of the figures themselves are of little or no use in being able to discern how the system operates"). After all, the patent includes much more than figures. It is entirely conceivable that, even though the October 10, 2002 drawings are materially identical to the patent figures, a reasonable person skilled in the art would nonetheless need further explanation to reduce the invention to practice. No evidence is offered to show that a person reasonably skilled in the art could reduce the invention to practice based on the October 10, 2002 drawings.

The Court need not resolve these disputes. As discussed above, summary judgment is inappropriate because there is a material question of fact as to whether there was a commercial

---

[7] Although the claims regarding stabilization are no longer at issue in this case, the Court cannot conclude that improvements, such as adding washers, could not affect the overall workability of the CDS with link tilt.

offer for sale of the CDS with link tilt.  Nonetheless, the Court notes that there likely exist genuine issues of material fact that would preclude this Court from finding that the CDS with link tilt was patent-ready before the critical date.

## IV.  CONCLUSION

Frank's Post-Trial Motion for Summary Judgment That Tesco's Asserted Patent Claims are Invalid Under the On-Sale Provision of 35 U.S.C. § 102(b) (Doc. No. 721) and NOV and OES's Motion for Summary Judgment of Patent Invalidity Pursuant to 35 U.S.C. § 102(b) re: Tesco's Offer for Sale to Conoco (Doc. No. 712) are **DENIED**.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 19th day of October, 2012.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE