IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TESCO CORPORATION, | § | |
|     Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| WEATHERFORD INTERNATIONAL, | § | |
| INC.; NATIONAL OILWELL VARCO, | § | Civil Action No. H-08-2531 |
| L.P.; OFFSHORE ENERGY SERVICES, | § | |
| INC.; and FRANK'S CASING CREW AND | § | |
| RENTAL TOOLS, INC., | § | |
|     Defendants. | § | |

**<u>PLAINTIFF TESCO CORPORATION'S MOTION FOR SUMMARY JUDGMENT ON DEFENDANTS' CLAIMS OF EXCEPTIONAL CASE</u>**

BRACEWELL & GIULIANI LLP


*/s/ Glenn A. Ballard, Jr.*
Glenn A. Ballard, Jr.
Attorney-in-Charge
State Bar No. 01650200

John F. Luman III
State Bar No. 00794199
711 Louisiana Street, Suite 2300
Houston, Texas 77002-2770
Telephone:  (713) 223-2300
Telecopy:   (713) 221-1212

**ATTORNEYS FOR PLAINTIFF**

## TABLE OF CONTENTS

**Page(s)**

I.  INTRODUCTION ..................................................................................1

II. ARGUMENT .......................................................................................2

    A.  Defendants' Claims of Inequitable Conduct Have No Merit..................2

        (i)  The Legal Standard for Inequitable Conduct ...............................3

        (ii)  The Conoco Contract Is Not a Basis for Inequitable Conduct....................5

            a.  Materiality...................................................................5

            b.  Intent to Deceive ........................................................7

        (iii)  The January and April 2002 Brochures Are Not a Basis for Inequitable Conduct ...................................................................9

            a.  The January and April 2002 Brochures Are Not Material..............9

            b.  No Specific Intent to Deceive ......................................11

        (iv)  The August 2002 Brochure Is Not a Basis for Inequitable Conduct ........11

            a.  The Brochure Does Not Meet the But-For Materiality Standard ........................................................................11

                1.  Materiality—Anticipation...................................12

                2.  Materiality—Obviousness .................................14

             b.  Tesco Had No Specific Intent to Deceive......................18

        (v)  The Weatherford Settlement Is Not a Basis for Inequitable Conduct..............................................................................22

        (vi)  Frank's Fourth Amended Answer Is Not a Basis for Inequitable Conduct..............................................................................23

    B.  Defendants' Exceptional Case Claim Based on Alleged Litigation Misconduct Fails as a Matter of Law....................................................24

        (i)  Law on Litigation Misconduct..................................................26

         (ii)  Bubble Gum Incident................................................................27

         (iii)  Production of the August 2002 Brochure .................................31

(iv) Tommy Warren Emails...................................................................................37

(v) Karr and Orcherton Testimony ................................................................38

(vi) Trial Witnesses............................................................................................41

(vii) Distribution of the August 2002 Brochure.................................................42

III. CONCLUSION.......................................................................................................44

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*1st Media, LLC v. Electronic Arts, Inc., et al.,*
    694 F.3d 1367 (Fed. Cir. 2012), *cert. denied*..................................................................4

*Adams & Assoc., LLC v. Dell Computer Corp.,*
    519 Fed. Appx. 998 (Fed. Cir. 2013)............................................................34, 38, 43

*Applied Medical Resources Corp. v. United States Surgical Corp.,*
    147 F.3d 1374 (Fed. Cir. 1998)..................................................................12, 13

*Aptix Corp. v. Quickturn Design Sys., Inc.,*
    269 F.3d 1369 (Fed. Cir. 2001)..................................................................27

*Aria Diagnostics, Inc. v. Sequenom, Inc.,*
    726 F.3d 1296 (Fed. Cir. 2013)..................................................................6

*Astrazeneca Pharm. LP v. Teva Pharm. USA, Inc., et al.,*
    583 F.3d 766 (Fed. Cir. 2009)..................................................................8

*Chambers v. NASCO, Inc.,*
    501 U.S. 32 (1991)..................................................................26

*EZ Dock, Inc. v. Schafer Sys., Inc.,*
    276 F.3d 1347 (Fed. Cir. 2002)..................................................................7

*FDIC v. Calhoun,*
    34 F.3d 1291 (5th Cir. 1994) ..................................................................43

*Forrest Labs., Inc. v. Abbot Labs.,*
    339 F.3d 1324 (Fed. Cir. 2003)..................................................................26, 44

*General Electric Co. v. Mitsubishi Heavy Indus., Ltd.*
    --- F. Supp. 2d ---, 2013 WL 2338345 (N.D. Tex. May 28, 2013)............................8

*Highmark, Inc. v. Allcare Health Mgmt. Systems, Inc.,*
    687 F.3d 1300 (Fed. Cir. 2012)..................................................................27, 31

*In re Ceccarelli,*
    401 Fed. Appx. 553 (Fed. Cir. 2010)..................................................................7

*In re Omeprazole Patent Litigation,*
    258 F.Supp.2d 221 (S.D.N.Y. 2001)..................................................................12

*Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GmbH,*
    603 F.3d 943 (Fed. Cir. 2010)..................................................................26, 44

*Molins PLC v. Textron, Inc.*,
    48 F.3d 1172 (Fed. Cir. 1995).................................................................27

*Monolithic Power Sys., Inc. v. O2 Micro, Ltd.*,
    726 F.3d 1359 (Fed. Cir. 2013)...........................................................26, 31

*Network Signatures, Inc. v. State Farm Mut. Auto. Ins. Co.*,
    731 F.3d 1239 (Fed. Cir. 2013)................................................................4

*Power Mosfet Tech., LLC v. Siemens AG*,
    378 F.3d 1396 (Fed. Cir. 2004)...........................................................27, 34

*Qualcomm Inc. v. Broadcom Corp.*,
    548 F.3d 1004 (Fed. Cir. 2008)...............................................................26

*Sony Computer Entertainment America LLC et al. v. 1st Media LLC*,
    134 S.Ct. 418, Case No. 12-1086 (2013) ...............................................3, 4

*Tesco Corp. v. Nat'l Oilwell Varco, LP et al.*,
    Case No. 13-1155 at *2 (Fed. Cir. 2013) ................................................26

*Therasense, Inc. v. Becton, Dickinson & Co.*,
    649 F.3d 1276 (Fed. Cir. 2011).......................................................... passim

**STATUTES**

35 U.S.C. § 102(b) ......................................................................................12

**REGULATIONS**

37 C.F.R. § 1.56(c)-(d)................................................................................5

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TESCO CORPORATION, | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | |
| | § | |
| WEATHERFORD INTERNATIONAL, | § | |
| INC.; NATIONAL OILWELL VARCO, | § | Civil Action No. H-08-2531 |
| L.P.; OFFSHORE ENERGY SERVICES, | § | |
| INC.; and FRANK'S CASING CREW AND | § | |
| RENTAL TOOLS, INC., | § | |
| Defendants. | § | |

**PLAINTIFF TESCO CORPORATION'S MOTION FOR SUMMARY JUDGMENT
ON DEFENDANTS' CLAIMS OF EXCEPTIONAL CASE**

Tesco Corporation ("Tesco") submits this Motion for Summary Judgment on Defendants'

Claims of Exceptional Case (the "Motion") as follows:

## I.    INTRODUCTION

1.    In the three years since this case was tried to a jury, Defendants have taken all of

the discovery they have requested and could reasonably want.  There is nothing left to discover,

and the Court can rule on the remainder of this case as a matter of law.  All that remains is

Defendants' claim that they are entitled to their attorneys' fees as a sanction because this is an

exceptional case, a claim that is predicated on allegations of inequitable conduct and litigation

misconduct.  With respect to inequitable conduct, Defendants have fallen far short of the

exacting standard imposed by recent Federal Circuit case law as there has been no evidence of

the requisite intent to deceive the Patent and Trademark Office.  Defendants have similarly failed

to establish that they are entitled to sanctions for litigation misconduct.  All of their misconduct

allegations stem from events occurring prior to or during trial for which they already requested

and received sanctions.  It is time bring this case to a conclusion.

## II.    ARGUMENT

2.      Defendants have now conducted extensive post-trial discovery on all aspects of their inequitable conduct and litigation misconduct claims.  Defendants were given access to Tesco's computer system to search for documents, and Defendants have taken more than a dozen depositions post-trial.  In fact, Tesco has consented to many more depositions than the Court required of Tesco in the three (3) years since trial.[1]  Defendants have now taken more discovery in an effort to get their attorneys' fees than they took defending the case-in-chief.  The facts have now been established, however, and the Court can rule on the remaining claims as a matter of law.

### A.    Defendants' Claims of Inequitable Conduct Have No Merit

3.      As of the filing of their most recent live pleadings, Defendants have pled five (5) bases for their inequitable conduct claims.  Specifically, Defendants allege that inequitable conduct should be found due to the failure to disclose to the Patent and Trademark Office ("PTO") the following:

(1)    Tesco's contract with Conoco for the Alpha Rig;

(2)    January and April 2002 brochures;

(3)    August 2002 Brochure;

(4)    Tesco's Settlement Agreement with Weatherford; and

(5)    Frank's Fourth Amended Answer.[2]

---

[1] Specifically, in its Order dated July 29, 2013, the Court required Tesco to produce only Mr. Beierbach, Mr. Fontenot, Mr. Karr and Mr. Orcherton for depositions "on issues relevant to claims of litigation misconduct and inequitable conduct."  Dkt. No. 864 at p. 2.  In addition to those witnesses, Tesco has also produced for deposition Dick Heenan, Per Angman, Nigel Lakey, Cristi Harrington, Blair Watkins, and Eric Moellendick.

[2] Knowing that their allegations of inequitable conduct to date are insufficient under the case law, NOV has belatedly moved to add yet another ground for inequitable conduct based on Tesco's assertion that the tool was not ready for patenting until adjustments were made in the Lobo field after November 15, 2002.  NOV knew of this "new" argument both before and during trial as one co-inventor, Kevin

*See* Dkt Nos. 878 (Frank's Fifth Amended Answer and Counterclaim) and 877 (NOV's Second Amended Answer, incorporating Dkt. Nos. 141, 590-93, 609-11, 821, 831, and 839).  Discovery on these issues has been exhaustive, and Defendants have failed as a matter of law to meet the heavy burden necessary to prove by clear and convincing evidence that these alleged examples of inequitable conduct are material or that Tesco withheld them from the PTO with intent to deceive.  This is true for those involved in the patenting process who had a duty to disclose— Evert Beierbach, Kevin Nikiforuk, and Tommy Warren—as well other Tesco employees at the time of the patent applications.

### *(i)* *The Legal Standard for Inequitable Conduct*

4.      To prevail on a claim for inequitable conduct, Defendants must prove that Tesco acted with the specific intent to deceive the PTO by withholding material information. *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1290 (Fed. Cir. 2011).  In *Therasense*, the Federal Circuit heightened the requirements for finding materiality and intent to deceive.  This heightened standard governs and is not changing anytime soon as the United States Supreme Court this past October declined to review this standard requiring accused infringers (i) to show that the patent holders deliberately withheld material information from the PTO and (ii) that if this material information had been disclosed, it would have prevented the PTO from issuing the patent.  *See Sony Computer Entertainment America LLC et al. v. 1st Media LLC*, 134 S.Ct. 418, Case No. 12-1086 (2013).  In *Sony*, the Federal Circuit reversed the trial court's inequitable conduct finding and held that "it is not enough to argue carelessness, lack of

---

Nikiforuk, had already testified at trial that the tool worked, but "really didn't work well" without the adjustments made in Lobo field.  Trial Tr. at 717:16-718:1.  Thus, the testimony of the other co-inventor, Evert Beierbach, saying the same thing is not new news, and the Court should deny leave to assert this additional ground for inequitable conduct.  *See* Tesco's Response to NOV's Motion for Leave to Amend, filed contemporaneously with this Motion.  This alleged ground fails as a matter of law anyway and granting leave would be futile.  *Id.*

attention, poor docketing or cross referencing, or anything else that might be considered negligent or even grossly negligent." *1st Media, LLC v. Electronic Arts, Inc., et al.*, 694 F.3d 1367, 1374-75 (Fed. Cir. 2012), *cert. denied*. Sony appealed the Federal Circuit's decision, complaining that the Federal Circuit had created a "framework that is nearly impossible to meet," but the Supreme Court denied Sony's petition for writ of certiorari. *See Sony Computer Entertainment America LLC et al.*, 134 S.Ct. 418, Case No. 12-1086. *Therasense* is now the established law on inequitable conduct.

5.      To establish materiality, Defendants must show by clear and convincing proof that not only would the PTO have considered the prior art important to their examination of the patent application (this was the pre-*Therasense* materiality threshold), but also that "the PTO would not have allowed a claim had it been aware of the undisclosed prior art." *Therasense, Inc.*, 649 F.3d at 1291. In other words, the undisclosed prior art must be more than just relevant or important to the examiner; it must be art that invalidates the patent. This materiality requirement must be proven by clear and convincing evidence. *Network Signatures, Inc. v. State Farm Mut. Auto. Ins. Co.*, 731 F.3d 1239, 1243 n.2 (Fed. Cir. 2013) (rejecting argument that "'materiality' component of inequitable conduct need be shown by only a preponderance of the evidence").

6.      The second element—intent to deceive—was made intentionally difficult to establish by the Federal Circuit in *Therasense*. Indeed, "[p]roving that the applicant knew of a reference, should have known of its materiality, and decided not to submit it to the PTO <u>does not prove specific intent to deceive</u>." *Therasense*, 649 F.3d at 1290 (emphasis added). Unlike the law prior to *Therasense*, specific intent can no longer be inferred if a patent applicant should have known that withheld information could be material—the evidence must establish that the

applicant did know and deliberately withheld the reference in order to deceive the PTO.[3]  *Id.*  As set forth below, extensive discovery has proven that Tesco had no such intent.

### (ii) The Conoco Contract Is Not a Basis for Inequitable Conduct

7.     Defendants first allege that Tesco's February 2002 contract to build the Alpha Rig for use in the Lobo Field with Conoco is material and should have been disclosed to the PTO but was not in order to deceive the PTO.  The notion that clear and convincing evidence can possibly support this position can be easily rejected.

### a.     Materiality

8.     First, Defendants cannot establish that the Conoco contract is but-for material—i.e., that the PTO would not have allowed the patents had it been aware of the Conoco contract. In other words, under *Therasense* Defendants are required to prove by clear and convincing evidence that the Conoco contract invalidates the patents.  *See Therasense*, 649 F.3d at 1291.

9.     In the Court's October 19, 2012 order denying Defendants' motion for summary judgment on the on-sale bar (Dkt. No. 805), the Court determined that Defendants had not met their clear and convincing burden because they had not provided sufficient evidence showing that the invention was ready for patenting by the critical date, a requirement for the on-sale bar. *See* Dkt. No. 805 at 22-23.  Specifically, the Court noted that Tesco provided evidence—not controverted by Defendants—that the invention "really didn't work very well" upon its arrival at Conoco's well site, and therefore the invention was not established to have been "sufficiently tested to demonstrate that it will work for its intended purpose."  *Id.* (citing Trial Tr. attached as Exhibit 4 at 717:16-718:1).[4]

---

[3] An "applicant" is anyone substantively involved in the patenting process.  *See* 37 C.F.R. § 1.56(c)-(d).  The applicant does not necessarily include every employee of a company.
[4] Indeed, at least NOV has now confirmed there is no on-sale bar defense, as they cite additional testimony from the other inventor, Mr. Beierbach, which is essentially the same testimony that the Court

10.     Since that time Defendants have taken additional discovery in an effort to meet their burden, but subsequent discovery has only reinforced the fact that the invention was not yet ready for patenting.  Co-inventor Evert Beierbach was deposed on October 23, 2013.  He testified that the invention was to be used by Tesco at the Conoco well site "if it worked."  *See* Beierbach 10/23/13 deposition attached as Exhibit 1 at 95:11-19.   Another Tesco former employee, Per Angman, was deposed October 24, 2013 and described Tesco's use of its new tool with Conoco as "an experiment."  *See* Angman Depo., attached as Exhibit 3, at 124:4-17.  In fact, Tesco brought the old Casing Clamp tool to the Lobo Field as a backup in case the new tool did not work. *See*  Ex. 1 at 89:23-90:4.  Once the tool was on-site, Tesco learned that it did not work as well as it would have liked, because it could not "stab" the pipe consistently without washers being added to stabilize the link arms.  *Id*. at 140-42.[5]  This problem was fixed in the field after the critical date, and the inventor did not think the tool was ready for patenting prior to fixing this problem.  *Id*. at 192:6-193:23.   This evidence is not controverted, and it establishes that Defendants cannot meet their materiality burden as a matter of law.

11.     Defendants argue that regardless of the uncontroverted evidence of the state of the invention as of the critical date, the Conoco contract still constitutes an on-sale bar because, they contend, it is a commercial sale of the invention prior to the critical date.  Indeed, the parties have long disputed whether the contract with Conoco—executed before the invention was even

---

relied upon in denying the on-sale bar summary judgment in the first place.  *See* NOV's Motion for Leave to Amend its Counterclaims to Tesco's Third Amended Complaint (Dkt. No. 887) at pp. 4-5.  Thus, in its desperation to show inequitable conduct, NOV has given up on one theory (on-sale bar) in order to try another theory that does not work either.  *See* Tesco's Response to NOV's Motion for Leave, filed contemporaneously with this Motion, at pp. 3-5.

[5] Now NOV inaccurately argues that (i) Tesco did not disclose the washers used for stabilization in its patent, even though Tesco did make this disclosure in Figure 4 and in Columns 6-8 of the Specifications of the patents-in-suit, and (ii) Tesco had to put the washer requirement in every claim, which Tesco did not have to do as a matter of law.  *Aria Diagnostics, Inc. v. Sequenom, Inc.*, 726 F.3d 1296, 1301 (Fed. Cir. 2013).

conceived—can possibly be an on-sale bar.[6]  Without reiterating all of those arguments, the invention does not satisfy the "ready for patenting" prong of the on-sale bar test for the reasons set forth above.  Additionally, the fact that experimentation was required in the field invokes the "experimental use" exception to the on-sale bar, and this exception applies regardless of whether the Conoco contract is prior to the critical date.  *See In re Ceccarelli*, 401 Fed. Appx. 553, 554 (Fed. Cir. 2010)(applying experimental use exception where invoice was generated prior to critical date); *EZ Dock, Inc. v. Schafer Sys., Inc.*, 276 F.3d 1347, 1352-53 (Fed. Cir. 2002)(finding experimental use exception applies in commercial sale).

12.     For these reasons, the Conoco contract cannot be material as a matter of law.  The uncontroverted testimony of the experimental use of an unperfected invention precludes any finding by clear and convincing evidence that the Conoco contract was material under the standard set forth in *Therasense*.

### b.     Intent to Deceive

13.     Not only can Defendants not prove that the Conoco contract is material, but there is no evidence—let alone clear and convincing evidence—that anyone at Tesco made the deliberate decision to withhold information about the Conoco contract in an effort to deceive the PTO.  As mentioned above, Defendants' burden here is a high one.  Even if Defendants provide evidence that individuals at Tesco had knowledge of a reference, that they should have known it was material, and that they decided not to submit it to the PTO, this is still not enough without

---

[6] It is not disputed that prior to the Alpha Rig, Tesco had been using the casing clamp in the Lobo Field.  *See* SPE Paper, attached as Exhibit 2, at A0428.  The Conoco contract, executed in February of 2002, prior to the date the new invention was conceived, specifically calls for the "casing clamp."  *See* a copy of the Conoco contract, attached Exhibit 50 at COP00024.  This alone defeats the notion that the Conoco contract is clear and convincing evidence of an on-sale bar.  Defendants' argument that the parties sometimes called the CDS with link tilt a casing clamp after it was invented in June of 2002 makes no difference, as the parties certainly knew what a casing clamp was at the time of contracting for it and could not have confused it with something that did not yet exist.

evidence that Tesco specifically intended to deceive the PTO.  *General Electric Co. v. Mitsubishi Heavy Indus., Ltd*. --- F. Supp. 2d ---, 2013 WL 2338345 at *4-5 (N.D. Tex. May 28, 2013)(citing *Therasense*, 649 F.3d at 1290).  A patentee does not even "have to offer any good faith explanation for his conduct unless and until an accused infringer has met his burden to prove an intent to deceive by clear and convincing evidence."  *Id*.  The requirement of proving a deliberate intent to deceive "creates a hurdle [that] is unlikely to be jumped in all but the rarest cases."  *Id*. (finding no inequitable conduct for patent on wind turbine technology despite GE failing to provide the PTO with any art relating to the entire wind turbine industry).

14.     Here, the Court can determine at the summary judgment stage that Defendants have not met the "intent to deceive" requirement with respect to the Conoco  contract.  *See Astrazeneca Pharm. LP v. Teva Pharm. USA, Inc., et al.*, 583 F.3d 766, 776-77 (Fed. Cir. 2009) (affirming district court's grant of summary judgment of no inequitable conduct).  Defendants have deposed everyone involved (in some cases multiple times) and there is no testimony and no document within the voluminous record that even suggests an intent to deceive the PTO.  Mr. Beierbach testified that he did not knowingly fail to disclose anything material to the PTO.  *See* Ex. 1 at 194:7-14.  Mr. Angman and Mr. Warren both testified that they were not aware of anyone at Tesco intentionally withholding anything from the PTO.  *See* Ex. 3 at 102:22-103:1; *see also* Trial Tr. attached as Ex. 4 at 2331:23-2332:3.

15.     There is no evidence at all suggesting that any Tesco employee thought the Conoco contract was material and made the deliberate decision to withhold it from the PTO in an effort to deceive the PTO.  Whether the Conoco contract is even material at all is a hotly contested issue that has been briefed exhaustively by the parties and opined on by the Court at length.  To suggest that Tesco determined years ago during prosecution that it was material is a

stretch without evidentiary support, and then to further suggest Tesco made the deliberate decision to withhold this information from the PTO is an even thinner theory. Defendants have done all of the discovery possible, and they have failed to even approach meeting their burden to demonstrate an intent to deceive the PTO with respect to the Conoco contract. The Court can and should grant summary judgment finding no inequitable conduct with respect to the Conoco contract.

(iii) <u>**The January and April 2002 Brochures Are Not a Basis for Inequitable Conduct**</u>

16.    Defendants also continue to assert the January and April 2002 brochures as a basis for inequitable conduct. *See* Dkt. No. 878, at 9; Dkt No. 877 at 4. This assertion is wrong as a matter of law because the PTO has reviewed these documents and found them to be immaterial, and also because there is no evidence of deceptive intent.

a.    **The January and April 2002 Brochures Are Not Material**

17.    Defendants cannot establish by clear and convincing evidence that the January and April 2002 brochures are material because there is no evidence in the record that demonstrates that the PTO would not have allowed the patents-in-suit to issue had it been aware of those brochures.   Note that the April 2002 brochure contains all of the same photographs/renderings as the January 2002 brochure. *See* January 2002 brochure and April 2002 brochure, attached as Exhibits 5 and 6. The evidence establishes conclusively that that the PTO did not find the brochures to be anything close to material.   ***Tesco submitted the April 2002 brochure to the PTO during reexamination proceedings, and the examiner considered the brochure and did not find it to be relevant to patentability***. *See* November 24, 2009 Information Disclosure Statement, attached as Exhibit 7, at 2, May 4, 2010 PTO Decision Dismissing Petition, attached as Exhibit 8, at 4.   The examiner did not find these brochures

"material" under *Therasense*.  Ex. 8, at 4 ("The record indicates that the art submitted by the patent owner on November 24, 2009, was considered, and no rejection based on that art was made.").  Moreover, Frank's likewise submitted the April 2002 brochure to the PTO and was able to provide whatever analysis of the document Frank's believed would be helpful.  Frank's got the following response:

> Finally, with regard to the Tesco brochure, Requester [Frank's] contends that the brochure shows the channel key and guide structure that was not shown in prior references. However, in reviewing the document, there is no description of such structure and the examiner cannot identify with any degree of certainty the parts in the photographs that would indicate such a key and guide. Therefore, as no new technical teaching/feature is taught by the Tesco brochure, it does not raise a new question of patentability with regard to claims 1-70 of the '443 patent.

*See* Office Communication dated November 19, 2010, attached hereto as Exhibit 9.  The examiner thought so little of the relevance of these brochures that they were not cited as relevant prior art even though they were submitted.  *See* Ex. 8 at p. 4.[7]

18.    This finding was confirmed by the Patent Trial and Appeal Board ("PTAB"), that found each and every original claim of the patents-in-suit valid.  On November 27, 2012, a three-member panel of judges on the PTAB unanimously reversed all of the patent examiner's rejections of Claims 1-3 and 5-34 of the '324 Patent and unanimously reversed the patent examiner's rejections over prior art of Claims 1-17, 19-25, 27-37, 39-42, 51-59, and 61-70 of the '443 Patent.  *See* the decisions of the PTAB, attached hereto as Exhibits 10 and 11.

19.    As *Therasense* clearly states, "prior art is but-for material if the PTO would not have allowed a claim had it been aware of the undisclosed prior art."  *Therasense*, 649 F.3d at 1291.  Because the brochures ***were actually submitted to and considered by the PTO***, there is no need to guess about how the PTO views their materiality.  The examiner and the PTAB

---

[7] This finding is not surprising given the fact that these brochures depict link arms attached to the top drive, not to the casing running tool.  *See* Exs. 5 and 6.  Nothing in the brochures suggests moving the link arms to the casing running tool.

determined these disclosed references to be immaterial.  As a matter of law, these brochures are not material and cannot be the basis of a claim for inequitable conduct.

### b.    No Specific Intent to Deceive

20.    Although the materiality issue is conclusive, it is also clear that Defendants cannot show intent to deceive with respect to the January and April 2002 brochures for the obvious and undisputed reason that the brochures were disclosed to and considered by the examiner.  *See* Exs. 7 and 8.   This alone should end the discussion.

21.    Moreover, Defendants cannot show any evidence of a specific intent by Tesco to deceive the PTO with respect to the January and April 2002 brochures.  There is no testimony from any fact witness indicating they thought these brochures were relevant or material to the patents-in-suit.  One of the inventors, Beierbach, specifically testified that he did not believe these references to be "material at all" to his invention.  *See* Ex. 1 at 232:2-13; *see also* January 13, 2010 Beierbach deposition, attached as Exhibit 12, at 139:10-17)("I didn't think it was – didn't think it was material or relevant.").  Defendants cannot prove by clear and convincing evidence that Tesco believed the January and April 2002 brochures were material and made a deliberate decision to withhold them.  *See Therasense*, 649 F.3d at 1290.

### (iv)    *The August 2002 Brochure Is Not a Basis for Inequitable Conduct*

22.    Defendants also argue that the August 2002 brochure is a basis for inequitable conduct.  Again, however, after years of voluminous discovery Defendants have failed as a matter of law to establish materiality or deceptive intent.

### a.    The Brochure Does Not Meet the But-For Materiality Standard

23.    The August 2002 brochure (attached as Exhibit 13) is not material—i.e., it is not invalidating prior art by clear and convincing evidence—under 35 U.S.C. § 102(b) (anticipation)

or §103 (obviousness).

### 1.    Materiality—Anticipation

24.    With respect to anticipation under § 102(b), "[a] person is entitled to a patent unless-- (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."  35 U.S.C. § 102(b).  The party seeking to invalidate a patent must prove by clear and convincing evidence that the allegedly invalidating printed publication contains "each and every element of [the] claimed invention."  *Applied Medical Resources Corp. v. United States Surgical Corp.,* 147 F.3d 1374, 1378 (Fed. Cir. 1998).

25.    To be deemed a "printed publication," Defendants must show that persons interested and of ordinary skill in art can recognize and comprehend therefrom the essentials of the claimed invention without need of further research or experimentation.  *In re Omeprazole Patent Litigation*, 258 F.Supp.2d 221, 227 (S.D.N.Y. 2001).  Unless this condition prevails, the publication is inadequate as a statutory bar to patentability under section 102(b).  *Id*.

26.    The critical issue is therefore whether the August 2002 brochure enables one of ordinary skill in the art to practice the invention without the need for further research and experimentation.  *Id*.  The jury has already made this determination.  Even after the Court reversed the burden and put it on Tesco, the jury found that Tesco proved by a preponderance of the evidence the brochure "could not have enabled a person of ordinary skill in the art to make and use the claimed invention."  *See* Verdict, attached as Exhibit 14.

27.    This finding is well supported by the record both before and after trial.  As Dr. Gary Wooley testified at trial, the rendering in this brochure is woefully insufficient to enable one of ordinary skill in the art given that the purported disclosure of the invention is so small and

illegible.  *See* Trial Tr., attached as Exhibit 4, at 1798:1-5; 1796:9-11.  The image is re-produced in its actual size below:



Dr. Wooley said it would be "impossible" to make the invention from this image.  *Id*.  In a deposition taken after trial, the inventor Beierbach testified that his invention was "a long ways" from the rendering.  *See* Ex. 1 at 239:16-240:17.  Moreover, other witnesses have testified since trial that the tiny rendering in the mast does not show other aspects of the invention, such as the anti-rotation device.  *See* Ex. 3 at 115:5-8.  Again, each and every element of the invention must be shown in the prior art publication, and here it cannot be disputed that the August brochure fails to show each and every element of the invention as required by law.  *Applied Medical Resources Corp.,* 147 F.3d 1374, 1378 (Fed. Cir. 1998).

28.     Defendants simply cannot overcome the fact that even if one could see what the tiny image in the mast shows, which no one other than NOV lawyers saw before trial, the image does not show each and every aspect of the invention in one prior art publication.  Thus, as a matter of law, Defendants cannot establish that the brochure is an anticipatory reference by clear and convincing evidence.  Nothing in the record supports such a position, and a materiality

finding based on anticipation would require the Court to ignore the jury's finding and take the long leap from Tesco having affirmatively proven its position by a preponderance of the evidence all the way to the Defendants having satisfied the exact opposite position by clear and convincing evidence.   Thus, the Court can grant summary judgment that the August 2002 brochure is immaterial as a Section 102 anticipatory reference.

## 2. Materiality—Obviousness

29.   The August 2002 brochure is also not material as a Section 103 obviousness reference, and certainly not by clear and convincing evidence.   At trial, Mr. Nikiforuk was unable to determine where the link arms were attached until he saw an enlarged, zoomed-in image, and even then he found it "very difficult to follow."  *See* Trial Tr. attached as Ex. 4 at 776:25-777:7.   The deponents who testified in post-trial discovery confirmed that the rendering is too small and unclear to adequately disclose anything about the invention.   Nigel Lakey, a former Tesco employee with no stake in this dispute, testified that he could not determine what the link arms are attached to.  *See* Lakey deposition, attached as Exhibit 15, at 49:1-18.   Another former employee with no stake in this dispute, Richard Heenan, testified similarly, stating that "It's still going to be pretty small and pretty vague.   So to say – can someone who wasn't involved look at this and say that that's a Casing Drive System, I would say no."  *See* Heenan deposition, attached as Exhibit 16, at 49:7-23.   Former employee Per Angman, upon being shown a magnified, blown-up version of the rendering was asked if he could see that the link arms were not connected to the top drive, and he responded "I don't know that you can say that. They're – they're connected to a yellow blob."  *See* Angman deposition, attached as Exhibit 3 at 87:10-88:18.

30.     The actual animators who created the brochure—who also have no stake in this fight—testified similarly.  Marion Harris testified that he could not identify the invention in the brochure as follows:

> Q:     Now, if you look back to this August 2002 brochure, Exhibit 4008, we got a little illustration or a photograph with a Casing Drive System.  You can see it in the rig right there (indicating).  And it looks like the picture shown in Exhibit 6003, these photographs of the Casing Drive System; right?
>
> ***
>
> Q:     You see the little tool in the mask [sic mast] there?
>
> A:     You're asking me to identify that as being this tool here?
>
> Q:     Yes.
>
> A:     I cannot – I cannot say "yes" to that.
>
> Q:     How come?
>
> A:     **Well, it's not a very good photograph or rendering of that, specifically.**

Harris Depo., attached as Exhibit 17, at 91:16-92:6.  Bill White also testified that he could not see the CDS with link tilt in the rendering:

> Q:     (BY MR. BOWICK) And looking at these pictures, those – those arms, those yellow arms, are attached to a little yellow ring or donut at the top of the casing drive tool?
>
> ***
>
> A:     You know, I cannot make that out in these illustrations.

White Depo., attached as Exhibit 18, at 53:11-17.  Indeed, even with the benefit of a blow-up of the rendering and with NOV's counsel pointing to the invention, Mr. White could not find the CDS with link tilt because the rendering is just too blurry:

> Q:     (BY MR. BOWICK) Does Exhibit 6016 appear to be a blow-up of this area of TESCO's August 22nd, 2002, brochure?

A: Uh-huh.

***

A: Yes.

Q: (BY MR. BOWICK) And do those arms appear to be connected in the same place shown in the photograph of Exhibit 5159, Page 1022?

***

Q: (BY MR. BOWICK) Right here.

A: 1022?  Well, it looks different to me.  You know, there's a vertical that is – that impedes the view of this.  And it looks like these arms are much longer in the photograph than they are here, and I honestly can't tell that this – what seems to be a hydraulic fixture below these arms, I cannot tell if that's on this illustration.

Q: You're talking about the red cylinder that's connected to the upper end of the arms?

A: No.  I'm talking about – let me show you.  I'm talking about this hydraulic fixture right here (indicating).

Q: Sure.

A: I can't tell if that's in this illustration or not.

Q: Okay.  See the little red right there behind that, on the left side of the beam (indicating)?

A: Yes.  I can see – I can definitely see there's a little splotch of red there.

Q: And you can see that there's like – what appears to be a parallel arm (indicating) under this longer arm?

A: I can't tell.  I'm sorry.  I'm just – it's just too blurry.

*Id*. at 60:11-61:19.  Finally, Lawrence Olez, an employee of the company that made the brochure, explained that it is difficult to see any of the details in the rendering in the August 2002 brochure:

Q: Right.  It's very difficult to see what's in the original illustration that's in the brochure; right?

A: Right.

Q:    Or any details of it; right?

\*\*\*

A:    Right.

Olez Depo., attached as Exhibit 19, at 129:12-130:10.

31.    Of all the witnesses, not one was able to identify the invention without first seeing it blown up. Conoco's Kyle Fontenot was shown Exhibit 6063, an enlarged rendering, and only then did he identify the tool. *See* Fontenot deposition, attached as Exhibit 20, at 112:22-113:11; *see also* deposition exhibit 6063, attached hereto as Exhibit 21. Mr. Fontenot later made clear, however, that he would not have even paid attention to the link arms in the small rendering had he been shown the brochure without also having the blown-up version:

Q:    And if you look at this picture without the blown-up picture that Mr. Raley showed you simultaneously, it's very hard to see where the links are in this image, is it not, sir?

A:    I think given -- it's hard to put myself – if I was looking at this picture before we -- all this happened, I don't think I would even bother to look at where those link tilt arms were going at the time. You know, if you're asking me now as of today, can I tell where they go? I'd say they probably go to the – to the casing drive sub.

Q:    Okay. But if you were looking at it then, you wouldn't even notice that?

A:    I would have not paid any attention to where that went.

*Id.* at 212:11-213:4 (objections omitted).

32.    Both inventors had to be shown blown-up versions of the brochure before they could identify any aspect of their invention in it. Specifically, Defendants used a blow-up during trial in order to lead Mr. Nikiforuk into a tentative identification of his invention (Trial Tr. attached as Ex. 4 at 773:25-779:2), and they did the same thing after trial with Beierbach (*see* Ex. 1 at 97:23-131:10; *see also* blown up deposition exhibits, attached as Ex. 50-55). After each of the Primarc employees testified that they could not see the invention in its actual size in the

August 2002 brochure, Defendants changed their strategy and used blow ups of the brochure and invention with subsequent witnesses after trial before asking any of them if they could see the invention, including Dick Heenan, Per Angman, Nigel Lakey, and Cristi Harrington.[8] Defendants did so because they just could not risk showing additional witnesses the rendering of the tool in the mast in its normal size and resolution and have them say they could not see it. Since the Primarc depositions, the only witness not first shown a blow up of the rendering of the tool, Jim Orcherton, could not see the tool.  *See* Orcherton Depo., attached as Exhibit 48, at 28:14-29:8.  Only after Defendants came back with their blow ups could he see it.

33.    Defendants cannot plausibly contend that this rendering sufficiently describes the novelty of the invention, and certainly not clearly and convincingly as required by *Therasense*. If it did, they would not have found it necessary to show an enlarged version of the rendering side-by-side with the original in order to try and get the witness to identify the tiny image in the mast of the brochure.  Mr. Fontenot did so only after being shown the blown-up version, and this identification was qualified by his admission that he would have not paid any attention to where the link arms were attached.  All of the discovery has been taken, and Defendants cannot prove by clear and convincing evidence that the brochure is material under *Therasense*.

### b.    Tesco Had No Specific Intent to Deceive

34.    There is absolutely no evidence in the record that Tesco had any specific intent to deceive the PTO with respect to the August 2002 brochure.  Tommy Warren could not recall ever seeing the brochure, except for possibly the laser eye on the front page.  *See* Ex. 4 Trial Tr., at 2403:6-9.  He also testified that at the time, he never thought the brochure reflected or displayed Mr. Nikiforuk's invention. Trial Tr. at 2403:17-24.

---

[8] Cristi Harrington testified that when she was first shown the August 2002 brochure, she thought the link arms were hanging from the top drive in the rendering.  Harrington Depo., attached as Exhibit 49, at 66:18-23.

35.    The Tesco witnesses who have been deposed on this issue post-trial unanimously

testified that they were unaware that the invention was in the brochure.  Mr. Beierbach testified:

Q:    Did you ever see the CDS with link tilt in the August brochure back in the 2002/2003 time frame?

A:    Not that I'm aware of. I can't say that I did in that time frame.

Q:    Did you ever know it was in there back in that time frame?

A:    No.

***

Q:    Did you ever knowingly hide any prior part from the patent office in connection with those two patents?

A:    Absolutely not.

Q:    Did you ever knowingly fail to disclose to the patent office anything you deemed material to your invention?

A:    No.

*See* Ex. 1 at 187:11-19; 194:7-14 (objections omitted).  Nigel Lakey testified:

Q:    Yeah. Did you ever see or recogni[z]e a CDS with link tilt in the vision brochure back in April -- August of 2002?

A:    No.

*See* Ex. 15 at 57:5-8.  Richard Heenan testified:

Q:    Did you ever see the CDS with link tilt in the August brochure back in 2002/'03 time frame?

A:    I certainly don't remember that at all.

*See* Ex. 16 at 106:14-16.  Finally, Per Angman testified:

Q:    Okay. Did you ever see the CDS with link tilt in the August brochure back in the 2002/2003 time frame?

A:    No.

Q:    Okay. Did you know it was in there?

A:    No.

-19-

*See* Ex. 3 at 103:8-13.  Finally, Mr. Orcherton testified he could not remember having seen the CDS with link tilt in the August brochure back in 2002.  *See* Ex. 48 at 36:15-21.  In like manner, Don Karr could not see the CDS with link tilt in the mast when he first saw it in 2010, and instead thought the links were on the grabber box, which is part of the top drive.  *See* Karr Depo., attached as Exhibit 47, at 106:12-23.  It was only after seeing a high resolution version of the August brochure that he thought the CDS with link tilt was in there (Ex. 47 at 16:23-18:1), but he then equivocated on that testimony saying "it could be," but he "wasn't a hundred percent sure what it was in there" (*Id.* at 17:21-23) and "it might look like it's there." *Id.* at 18:21-19:4.  In other words, he could not be sure, which is what Tesco's counsel told the Court.  *See* Aug. 2, 2011 Hearing. Tr, attached as Ex. 45, at 92:11-14.[9]

36.    It is not entirely surprising that Tesco employees were unaware of the details of the rendering.  As Per Angman explained, the renderings produced by the company that made the brochure, Primarc, are often far different than the engineering drawings supplied by Tesco.  *Id.* at 71:9-72:10; 74:2-75:19.  Given that Tesco understood that PriMarc typically made changes to the engineering drawings provided by Tesco, and given the very small and unclear nature of the rendering, it is not surprising whatsoever that Tesco employees were not aware that the August 2002 brochure contained a rendering showing link arms attached below the top drive.  Indeed, Don Karr, upon being shown a blow-up version of what Primarc had prepared, testified it was "very poorly done."  Ex. 47 at 63:24-64:7.

---

[9] Indeed, Karr's testimony confirmed what Tesco's counsel told the Court both in trial and over the years since trial about what Karr saw in the brochure.  He first said he could not see the invention and thought the link arms were on the top drive (Ex. 47 at 106:12-23), and then after seeing a high-resolution image he thought it was in there and was surprised (*Id.* at 15:7-24, 20:7-15, 108:1-9), but even at that point he could not be sure (*Id.* at 17:16-18:1).  This testimony covers everything that Tesco said to the Court over the years about what the witness saw in the brochure and even the witness confirmed that he could not remember exactly what was said.  *Id.* at 54:23-55:3, 105:10-24.

37.     Moreover, many drawings would have been sent to the illustrators, and Tesco could not be sure which ones the illustrators would ultimately chose to use.  Ex. 3 at 104:23-105:24; Ex. 16 at 107:13-108:10.  The primary illustrator at Primarc testified that he did not remember even talking to anyone at Tesco.  Ex. 19 at 22:3-4, 96:15-97:6.  Accordingly, while it seems likely that among the many drawings Tesco sent over there were drawings showing the link arms moved down, Tesco was never told what Primarc ended up using and nobody at Tesco reports realizing that an image with link arms on the tool had been used back in 2002.  This is also not surprising given the actual size of the image that ended up in the brochure.

38.     Not only was the rendering so small and unclear that Defendants' counsel used an enlarged version (created post-trial) throughout the depositions rather than solely using the actual brochure, but Frank's own corporate representative, Mr. Webre, had the August 2002 brochure in his office for years and never once thought it was relevant to the issues in this case.  In fact, Frank's corporate representative was also an expert witness and was presented as a person of ordinary skill in the art, yet he never reported seeing the CDS with link tilt in the color brochure he had in his possession, nor did it enable him to make the tool.  *See* Ex. 4, Trial Tr., at 904:24-905:21.  If Frank's own employee with the most knowledge of this case does not even believe the brochure to be material, Defendants can hardly complain when Tesco's employees thought the same.[10]

39.     After years of discovery, there is no evidence in the record that Tesco believed the August 2002 brochure to be material and made a deliberate decision to withhold it.  *See*

---

[10] Tesco propounded document requests to Frank's asking for production of "all documents related to or referring to Tesco, including but not limited to notes, memorandum and letters" and to NOV and OES asking for "all documents related to Tesco and/or Tesco's Products, including but not limited to notes, memorandums and letters."  Yet, Frank's never produced the color brochure it clearly had, nor did the rest of the Defendants.  *See* Ex. 35 at RFP Nos. 2.  Frank's and the other Defendants also frequently asked for color copies of brochures produced in black-and-white (attached as Exhibit 39), but never asked for a color copy of the August 2002 brochure even though it was clearly dated August 22, 2002.

*Therasense, Inc.*, 649 F.3d at 1290.  Even if the Court believes that all of the Tesco personnel involved in the patent prosecution plus non-patent personnel had the brochure, knew or should have known it was material, and decided not to disclose it, this is still not enough because there is no evidence whatsoever that Tesco had intent to deceive the PTO.  *See id*. at 1290-91.  The evidence demonstrates the opposite, and the Court should therefore dismiss Defendants' inequitable conduct claim with respect to the August 2002 brochure.

40.     Finally, and perhaps most telling, Defendants have never initiated a reexamination based on the August 2002 brochure.  Even if the years that NOV and Frank's had the August brochure before trial are discounted, they have had it for at least the three years since trial.  The initial reexamination initiated by Weatherford has been over for at least a year, yet these Defendants have never asked for another reexamination in connection with the August brochure. The reason is clear:

> The August brochure has not and would not invalidate the patents-in-suit at the PTO.

Thus, the August brochure cannot support a claim for inequitable conduct as a matter of law.

### *(v)*     *The Weatherford Settlement Is Not a Basis for Inequitable Conduct*

41.     Frank's alleges that Tesco intended to deceive the PTO during the reexaminations by not fully disclosing the terms of Tesco's settlement agreement with Weatherford.  *See* Frank's Fifth Amended Answer, Dkt. No. 877 at 4 , attached as Exhibit 878, at 16-17.  In an effort to terminate the re-exam, Tesco gave the PTO notice of the settlement and subsequent dismissal of Weatherford's litigation claims by providing the PTO a copy of Tesco's 8-K SEC filing (the settlement agreement is confidential).  *Id*.  Frank's alleges that the actual settlement agreement, but not the 8-K, contains an acknowledgement that the reexaminations "are pending and active," and that Tesco committed inequitable conduct by not disclosing to the

PTO this acknowledgement, which reads:

> The Parties represent and warrant that as of the Effective Date they are not aware of any reason the patents licensed under this Agreement cannot be enforced, other than actions of the U.S. Patent & Trademark Office *in the pending reexaminations for such patents*.

*See* Settlement Agreement, attached as Exhibit 24, at ¶ 7.3 (emphasis added).

42.     Bluntly put, Frank's argument makes no sense.   Frank's accuses Tesco of inequitable conduct for not telling the PTO that the reexaminations are active and pending in connection with Tesco's request to the PTO to terminate those very same reexaminations.  Tesco does not need to inform the PTO that the PTO has an active reexamination—*of course* the PTO knows the reexaminations are active.  If they were not active why would Tesco be requesting they be terminated?  Frank's nonsensical argument should be dismissed as a matter of law.

### *(vi)     Frank's Fourth Amended Answer Is Not a Basis for Inequitable Conduct*

43.     Frank's contends that Tesco committed inequitable conduct in the reexamination because Tesco submitted Frank's <u>Third</u> Amended Counterclaim to the PTO on July 6, 2011 but did not submit Frank's <u>Fourth</u> Amended Counterclaim.  *See* Ex. 25 at 17-18.  This claim fails as a matter of law because at the time of Tesco's disclosure to the PTO, the Third Amended Counterclaim was Frank's live pleading.  As of July 6, 2011 (the date of Tesco's disclosure), Frank's motion for leave to amend its counterclaim had not been granted.  *See* April 2, 2013 Hearing Transcript, attached as Exhibit 26, at 31-32. Tesco thus submitted the live pleading to the PTO.

44.     Frank's, however, complains that its Fourth Amended Counterclaim was attached to its motion for leave, and this amended pleading contained new charges of inequitable conduct related to the August 2002 brochure as well as the Weatherford settlement.  *See* Ex. 25 at 18. Not disclosing this unfiled pleading is not inequitable conduct.  The fact that Frank's included

allegations of inequitable conduct is irrelevant. The PTO is not charged with determining inequitable conduct and such allegations are irrelevant to the PTO. *See* M.P.E.P. § 2010, attached hereto as Exhibit 61. The underlying prior art at issue—the August 2002 brochure—had already been disclosed to the PTO. *See* Exhibit 13. Thus, Frank's Fourth Amended Answer was, at best, cumulative of what was already before the PTO, and no inequitable conduct can be found on this basis as a matter of law.

*     *     *

45.     As shown above, Defendants are not close to satisfying their burden to prove inequitable conduct. For all of their allegations, the art involved is, at best, of questionable materiality. *Therasense* requires more—it requires clear and convincing evidence that the art is invalidating, and Defendants cannot meet this burden. Even if they could, there is no evidence of any kind that Tesco intentionally withheld information in an effort to deceive the PTO. All of the possible discovery has been taken, and every deponent has consistently explained that nothing believed to be material was withheld. Without any contrary evidence or testimony of precisely what the law requires, Defendants cannot satisfy their burden as a matter of law. *See Therasense, Inc.*, 649 F.3d at 1290.

**B.      Defendants' Exceptional Case Claim Based on Alleged Litigation Misconduct Fails as a Matter of Law**

46.     Defendants raise several issues that they claim constitute litigation misconduct in an effort to convince the Court to further sanction Tesco by requiring Tesco to pay their attorney's fees. None of the issues raised by Defendants warrants such a sanction. All of the alleged conduct occurred prior to or during trial, and the Court already sanctioned Tesco by reversing the burden of proof, a sanction that Defendants conceded was sufficient. *See* Trial Tr. at 2511:1-14.

47.     The overwhelming majority of Defendants' allegations stem from the August 2002 brochure.  The Court will recall that Defendants used the brochure effectively at trial, so much so that they enthusiastically opted for in-trial sanctions against Tesco while repeatedly rejecting a mistrial that would have allowed them to take discovery on the brochure before going to the jury.  When the jury returned a verdict favoring Tesco, Defendants began a crusade of discovery aimed not at learning anything new or relevant to the issues that had been litigated, but instead solely to recover fees.  Indeed, the Court ultimately found Tesco's patents invalid based on ***pre-trial*** evidence and trial testimony.  *See* Dkt. No. 821 at p. 16.  The situation has gotten out of hand, with Defendants taking more and more discovery, and generating more and more fees, all in an effort to recover those fees from Tesco.  The parties have lost sight of the actual litigation.  By way of example, Defendants requested (and were denied) over $220,000 in fees for drafting a total of twenty-eight (28) pages of briefing in connection with Tesco's appeal, incorrectly claiming the appeal was frivolous.  The Federal Circuit rejected this claim for sanctions, and stated unequivocally that "Tesco's arguments in support of jurisdiction were not frivolous."  *Tesco Corp. v. Nat'l Oilwell Varco, LP et al.*, Case No. 13-1155 at *2 (Fed. Cir. 2013), attached as Exhibit 56.

48.     A year ago, the Court's December 6, 2012 order made clear that no additional sanctions are warranted.  The Court found that Tesco's patents were obvious-to-try based on evidence and arguments that existed prior to trial, noting that Defendants failed to sufficiently raise this issue pre-trial.  *See* Dkt. No. 821 at pp. 13-14.  Thus, all of the additional discovery and expense incurred by Defendants was irrelevant and unnecessary.  Moreover, after all of the issues were known, the Court in its December 6, 2012 order ruled that "[b]ecause the Court reaches its decision in this case based on pre-trial evidence and trial testimony, it concludes that

an award of fees is not appropriate."  *See* Dkt. No. 821 at 16.  There is no cause to revisit this issue, as discussed below.

(i)       <u>Law on Litigation Misconduct</u>

49.     Litigation misconduct is normally decided in motion practice.  *See e.g., Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersysteme GmbH*, 603 F.3d 943, 952-54 (Fed. Cir. 2010); *Forrest Labs., Inc. v. Abbot Labs.*, 339 F.3d 1324, 1327-28 (Fed. Cir. 2003).  The Federal Circuit and the Supreme Court have "emphasized that a court's inherent powers" to award fees "must be exercised with restraint and discretion."  *Medtronic Navigation, Inc. v. BrainLAB*, 603 F.3d 943, 966 (Fed. Cir. 2010)(quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991)).

50.     Litigation misconduct has been found in egregious situations.  *See Monolithic Power Sys., Inc. v. O2 Micro, Ltd.*, 726 F.3d 1359 (Fed. Cir. 2013)(inventor added false date to schematics to misrepresent conception date); *Qualcomm Inc. v. Broadcom Corp*., 548 F.3d 1004 (Fed. Cir. 2008)(patentee falsely testified that it was not involved in standard setting organization; produced 200,000 pages of emails post-trial demonstrating participation; patentee knowingly attempted to conceal evidence); *Aptix Corp. v. Quickturn Design Sys., Inc.*, 269 F.3d 1369 (Fed. Cir. 2001)(inventor added handwritten notes to ten-year old notebooks after lawsuit filed and claimed notes were original); *Molins PLC v. Textron, Inc*., 48 F.3d 1172 (Fed. Cir. 1995)(patentee selectively destroyed relevant documents).

51.     Even if litigation misconduct is found, a "finding of exceptionality based on litigation misconduct, however, usually does not support a full award of attorneys' fees."  *Highmark, Inc. v. Allcare Health Mgmt. Systems, Inc*., 687 F.3d 1300, 1316 (Fed. Cir. 2012).  The fee award must relate to the extent of the misconduct.  *Id*.  Finally, courts also tend not to

-26-

grant a litigation misconduct claim where the party asserting the claim has also behaved poorly. *See, e.g., Power Mosfet Tech., LLC v. Siemens AG*, 378 F.3d 1396, 1415 (Fed. Cir. 2004).

### (ii)   *Bubble Gum Incident*

52.   Defendants continue to assert that the "bubble gum" incident is litigation misconduct, but this theory has been completely debunked by all of the evidence.  As the Court recalls, a marking plate containing Tesco's patent numbers and patent numbers from patents licensed to Tesco by Frank's was affixed to one of Tesco's tools.  Defendants assert that the marking plate was an attempt by Tesco to trick them into thinking that Tesco marked its products prior to this lawsuit being filed in an effort to get pre-suit damages.  *See* NOV's Second Amended Answer, Ex. 27, at ¶14; NOV's Request for a Bench Trial on Counterclaims, Dkt. No. 839, attached as Exhibit 28, at 6-8.  This is wrong on many levels, and Defendants surely know it.

53.   First, the marking plate at issue contained patent numbers belonging to defendant Frank's that were the subject of an unrelated litigation settled ***after*** this case was filed:



-27-

Tesco did not settle its other lawsuit with Frank's until May 29, 2009 – nine months *after* the current lawsuit was filed. *See* Settlement Agreement, attached as Exhibit 24A. The 2009 Settlement Agreement with Frank's required for the first time that Tesco mark its products with Frank's patent numbers 6,309,002 and 6,431,626. *Id.* at ¶ 2.2. Thus, Tesco manufactured a marking plate that contained both these patent numbers along with Tesco's patent numbers (7,140,443 and 7,377,324). Because the marking plate was obviously created after the settlement with Frank's, which was after this lawsuit had been filed, Tesco could not have been trying to fool anyone. Indeed, NOV knew at the time that the plates were created in connection with the Frank's settlement. *See* NOV's Motion for Summary Judgment, Dkt. No. 202, attached as Exhibit 27 at 3.[11]

54. Second, recent discovery taken by Defendants (other than Frank's) on this issue has confirmed the obvious—the plates were created after this suit was filed and the plate was hastily attached to Tesco's tool by an employee who had nothing to do with this lawsuit. Indeed, NOV has insisted on taking depositions with respect to the bubble gum incident even though the Court's order did not call for any such depositions. Dkt. No. 864. Tesco has given NOV two depositions in this area and has produced documents that clearly show the marking plates were created and put on for the settlement with Frank's, but NOV still will not accept reality.

55. Blair Watkins, an operations manager at Tesco, testified that an Engineering Change Notice was generated instructing the operations employees to create plates with Frank's patent numbers "as per Frank's settlement." *See* Engineering Change Notice, attached as Exhibit 30; *see also* Blair Watkins Deposition, attached as Exhibit 31, at 59:15-60:21. Mr. Watkins

---

[11] Perhaps most telling is the fact that Frank's has attended all post-trial depositions except for those relating to the "bubble gum" incident, and Frank's did not include any questions related to this incident in its post-trial interrogatories. Frank's knows that the marking occurred pursuant to its settlement with Tesco and it has refused to be a part of NOV's unending pursuit of their theory that Tesco was trying to fool the Defendants into thinking Tesco marked even though it never pled marking.

believed the decision to use bubble gum was a "split" decision by his subordinate, and he was embarrassed by his subordinate's actions. *See id*. at 32:25-33:3; 63:18-64:4; 70:24-71:3.

56.     Not satisfied with Mr. Watkins' testimony, or the contemporaneous documents supporting it, NOV then took the deposition of Eric Moellendick.  He testified there were numerous plates on a colleague's desk, that the colleague called him and asked for them to be put on the tools, that he was unaware of Tesco ever taking steps to mark until after the settlement with Frank's, that the plates for the Frank's settlement were ordered long before November 2009, and that the Engineering Change Notice required the marking "as per Frank's settlement."  *See* Eric Moellendick Deposition, attached as Exhibit 32, at 15:21-17:3, 59:9-13, 59:19-60:6, 60:23-61:2, 62:14-63:8.   This witness could not understand NOV's purported need to take more depositions as he testified the issue seemed very "clear."  *See id*. at 67:10-21, 68:3-6.  He also had no answer for why Tesco would take the plates with Frank's patent numbers on them from a 2009 settlement and use them to try and claim that Tesco marked before filing suit in 2008.  *Id*. at 64:20-24.

57.     Third, Tesco never alleged or pled that it marked, and therefore Tesco could not have been trying to use the marking plate (which was conspicuously created after the litigation was filed) to fool Defendants into thinking Tesco marked prior to the litigation.  None of Tesco's pleadings claimed that Tesco marked or that Tesco had provided constructive notice of its patents to Defendants via marking.  *See* Dkt. No. 1 at 3; Dkt. No. 63 at 4; Dkt. No. 64 at 4-5; Dkt. No. 79 at 4-5.  Tesco also made this clear in discovery.  In April 2009—well ***before*** the bubble gum incident—Tesco was given multiple opportunities to assert that it marked in response to interrogatories.  When asked to identify "all parties to whom Tesco has provided notice of [ ] the existence of…the Patents-in-Suit," Tesco did not claim marking or constructive

notice in its answer but instead stated that it sued Defendants and otherwise "has not provided notice to any other party about infringing the patents-in-suit."  Ex. 33 (Tesco Corp.'s Objs. and Answers to Def. Weatherford's First Set of Interrogs. (Apr. 29, 2009)), at 16.  When asked to provide the basis for its willful infringement claim, Tesco would certainly have stated it marked if Tesco was actually making a marking claim.  Yet, again, Tesco did not assert that it marked. *See id.* at 17.  This was known to at least two Defendants— prior to the "bubble gum" incident Weatherford and current defendant OES affirmatively pled that Tesco did not mark.  *See* Dkt. Nos. 70 and 73.  Thus, Tesco never alleged marking and the "bubble gum" incident was not relevant to anything in the case.

58.    Moreover, the only party still pursuing the "bubble gum" theory, NOV, has known since before trial that Tesco marked only for the settlement with Frank's and never marked before that settlement.  Specifically, Defendants took Matthew Brown's deposition back on January 14, 2010, and this witness testified unequivocally that the marking plates were done for the Frank's settlement in a different case and not to claim marking in this case.  *See* Ex. 41 at 83:25-84:3-13,  85:8-14,  89:19-90:1,  93:12-20.    Thus, NOV did not need to take the two depositions it took after trial on the bubble gum incident, let alone additional depositions that it will likely claim it needs.  This exercise in generating attorneys' fees to recover attorneys' fees must stop.

59.    Finally, the "bubble gum" incident does not warrant any sanction because Defendants did not incur any additional expense due to the incident.  Any fee award must relate to the extent of the misconduct.  *Highmark,* 687 F.3d at 1316.  Moreover, the award is designed to compensate a party "for the extra legal effort to counteract the misconduct."  *Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd*., 726 F.3d 1359, 1369 (Fed. Cir. 2013).  Prior to trial, no

extra legal effort was required to "counteract" the bubble gum incident.  Tesco had never pled

marking and continued to disavow any marking claim through trial.  The "bubble gum" issue

was completely irrelevant, as the Court rightly noted.  The only extra expenses Defendants have

incurred because of the "bubble gum" incident are the costs associated with doing post-trial

discovery on it.  In other words, Defendants are doing post-trial discovery on the "bubble gum"

incident solely to recover the fees they are creating by doing that same discovery.  This is

nonsensical and should be denied.[12]

### (iii)   *Production of the August 2002 Brochure*

60.     Defendants also assert that Tesco withheld the August 2002 brochure prior to

trial, and this warrants a litigation misconduct finding.  *See* NOV's Second Amended Answer,

Ex. 27, at ¶ 14; NOV's Request for a Bench Trial on Counterclaims, Dkt. No. 839, attached as

Exhibit 28, at pp. 10-12.  This position should be rejected for numerous reasons: (i) Tesco did

produce a black and white copy of the brochure, (ii) Defendants already had a color copy well

before trial, (iii) Defendants could have requested a better copy if they had wanted to, and did so

on other occasions (*see* Exhibit 39), and (iv) Tesco has already been given a sanction for this

conduct that was deemed appropriate by Defendants.

61.     First, Tesco produced the brochure in question in black-and-white as kept in its

computer records on June 1, 2009, more than a year before trial.  *See* black-and-white version of

brochure, attached as Exhibit 34.  Tesco *and Defendants* produced numerous documents in

---

[12] Nor has NOV given up on its pursuit of this specious claim.  NOV has sent a recent email saying the bubble gum incident "was, at a minimum, an effort to defraud Franks" even if NOV has no claim, and asking for two more depositions.  *See* email exchange between counsel, attached as Exhibit 62. Tesco responded by pointing out that "[a]t worst, Tesco was trying to comply with its settlement obligations with Frank's and one of its employees chose to go about it the wrong way."  Further, Frank's has never claimed it was defrauded.  Finally, the two additional bubble gum depositions that NOV now wants to take are the only two depositions requested by Defendants that Tesco has not provided.  Tesco has indicated a willingness to do even these depositions, as it wants to give Defendants everything they are requested no matter how unnecessary it is at this point, but they are certainly not needed.  *Id.*

black-and-white, many of which were distorted to some degree from being copied and scanned multiple times. Examples of such documents produced by Defendants include Exhibits 36 (NOV0006044), 37 (NOV3668-3690), and 38 (FCCW000272). Due to this common practice, the parties would ask for color copies if needed, and Defendants asked for color copies on numerous occasions. *See* emails dated July 23, 2009; September 16, 2009, and October 1, 2009, all of which are attached as Exhibit 39. Defendants discussed copies with witnesses of Tesco that were shrunken to less than their normal size through copying rather than something intentional, and these copies were only pages away from the brochure in question, yet Defendants never asked for better copies. *See* Exhibit 580 to Deposition of Tommy Warren taken on April 22, 2010, attached hereto as Exhibit 57. (The portions of the deposition of Warren wherein he was questioned about Exhibit 580 are attached as Exhibit 58). Thus, Tesco produced this brochure consistent with how ***all parties*** produced documents in the case.

62. Second, both NOV and Frank's already had a color copy of the brochure in their possession during the entirety of the litigation, which may be why at least NOV did not request a color copy from Tesco. Defendant NOV's counsel had the brochure in color from a previous litigation and included it on NOV's exhibit list three weeks before trial. *See* NOV's Trial Exhibit List, attached as Exhibit 40, at 1. Moreover, NOV's counsel was using documents from that prior litigation during depositions in this case prior to trial, so NOV cannot claim it did not search and review the production from that case. *See* Deposition of Matt Brown, attached hereto as Exhibit 41, at 201:8-202:16. Similarly, Defendant Frank's corporate representative had a color copy of the brochure in his possession since before the litigation was ever even filed. *See* Ex. 4, Tr. of Trial, Nov. 1, 2010 at 904-905. Given that both Frank's and NOV ***already had color copies the entire time***, Tesco should not be sanctioned further for this issue.

63.     This is especially true as Defendants cannot show Tesco intentionally distorted the brochure so that the image could not be seen, and such a suggestion has always been preposterous anyway.  If the copy of the brochure produced from the binder it came from is compared with the binder itself, all of the brochures in that binder are hole punched (so the hole punches cannot be intentional), and in copying anything it will conform to the pages it is copied upon thereby explaining away any allegation that it was purposefully shrunken.  *See* Ex. 57. Finally, why would Tesco purposefully do anything to the copy of the August brochure if none of its employees report knowing that the CDS with link tilt was in there anyway?  It should also have been quite obvious to the Court that counsel for Tesco never knew about the allegation that the CDS with link tilt was in the August brochure until the fourth day of trial.  Not knowing its significance would have made it difficult for counsel to knowingly try to cover it up.

64.     Third, Tesco was already sanctioned for its alleged improper production of the brochure when the Court reversed the burden of proof on validity of the patents following the close of evidence at trial.  The Court stated that such a sanction was appropriate and would be the only sanction.  *See* Trial Tr., Ex. 4, at 2511.  Defendants agreed that this sanction was appropriate, and in fact this is the precise sanction that NOV requested.  *See id*; *see also* NOV Motion for Sanctions, Dkt. No. 439, attached hereto as Exhibit 42 at 7.  Defendants apparently believed this sanction was sufficient to rectify the supposed harm done to them because they ***repeatedly*** refused a mistrial.  *See, e.g*., Trial Tr. , Ex. 4, at 872 ("MR. RALEY:  "I'm not asking for a mistrial and I am opposed to it.").  Given that Tesco has been punished already, there is no justification for further sanction, and the Federal Circuit recently affirmed a district court's denial of a litigation misconduct claim for spoliation of evidence where the court had already given an adverse inference sanction.  *See Adams & Assoc., LLC v. Dell Computer Corp*., 519

Fed. Appx. 998, 1007-1008 (Fed. Cir. 2013).  The Federal Circuit held that "it was reasonable for the district court to decide against imposing two different penalties for the same conduct." *Id*.  For the same reason, no further sanction is warranted here.

65.  Fourth, no sanction of Tesco should be found in light of Defendants' flawed behavior in connection with the brochure.  *See, e.g., Power Mosfet Tech., LLC v. Siemens AG*, 378 F.3d 1396, 1415 (Fed. Cir. 2004)(affirming denial of litigation misconduct claim because of the moving party's bad conduct).  Here, not only did Frank's primary witness have the document all along,[13] but NOV did too.  (Trial Tr. at 786:21-787:6).  NOV has also repeatedly changed its story as to when it first located the August 2002 brochure.  When initially asked by the Court about the files from the previous case where the color version was located, Mr. Bowick stated:

> MR. BOWICK:  We didn't really even look at these files until after the Court denied our second motion to compel.  I started looking to see if I could find….

Trial Tr., Ex. 4, at 849:22-24.  This cannot be true.  NOV filed its second motion to compel in *May* 2010 (Dkt. No. 251), yet NOV used files from the previous case in depositions in *January* and *April* 2010.  *See* January 14, 2010 deposition of Matt Brown at 200-202 (discussing use of document from previous case) and deposition exhibit 480 from April 7, 2010 deposition of Ryan Miller, collectively attached as Exhibit. 44.  In the January deposition of Matt Brown, NOV's counsel explained on the record that he had multiple documents from the prior case that he wanted to use, and the documents were dated around the same date as the August 2002 brochure.  *Id*. at 201:23-202:16.  Thus, NOV was reviewing these files in detail and searching for documents dated in August 2002 well in advance of when Mr. Bowick represented to the Court.  Presumably worried about the ramifications of admitting to having found the brochure in May

---

[13] Again, Frank's failed to find and produce the brochure despite Tesco sending a document request seeking "all documents relating to or referring to Tesco."  *See* Tesco's First Request for Production to Frank's, attached as Exhibit 43, at 7.

2010 (five months before trial),  Mr. Raley cut off Mr. Bowick and stated immediately after the quote above:

> MR. RALEY:  Well, actually, it was recently.  If we're going to be honest with the Court, it was really within the last, you know, week or so before trial that -- I don't know, Bobby has these a-ha moments; and I don't know where they come from; but he just thought "Maybe I'll look in this other file and see what I can find." And he went, "Holy cow. Look at this."
>
> ***
>
> And actually, your Honor, he brought it to me the night before Mr. Nikiforuk's cross examination and I decided to use it.

Trial Tr., Ex. 4, at 849:25-850:6; 852:25-853:1.  This too cannot be true.  The brochure was not found "a week or so before trial"; it was on NOV's exhibit list *three weeks* before trial.  *See* Exhibit list dated October 4, 2010, attached as Exhibit 40, at 1.  Tesco pointed out this discrepancy in a later hearing, and the Court later asked why NOV did not request more discovery at that point, when there would have been time to do so before trial.  Specifically, The Court stated:

> Yeah, but he's – the argument I heard from plaintiff was that defendant, although late to the news, did have the news of this brochure two weeks in advance of trial. . . . I mean, if that is the case, then I could have given additional discovery at that time.

*See* Aug. 2, 2011 Hearing. Tr., attached as Ex. 45, at 17:6-12.  In response, NOV's counsel finally admitted discovering the brochure three weeks before trial but oddly stated that it was not until the middle of trial that they realized what it was and decided to use it.  *Id*. at 17:13-18:9.  In a later hearing, NOV's story changed again when they admitted to recognizing the importance of the brochure when they "found" it prior to trial:

> [W]e dug through these old boxes and we found this thing shortly before trial. And we looked at it and we went 'Holy cow.  Here it is.  We can see the link arms attached to the pipe engagement apparatus."

*See* Feb. 3, 2012 Hearing Tr., attached as Exhibit 46, at 20:25-21:3.  In short, NOV has been far less than forthright with the Court regarding when it first start reviewing the files from the previous case, when it first located the brochure, and when it realized the importance of the brochure.  It seems very likely that NOV had the brochure and knew exactly what it was weeks, if not months, before trial.[14]  If anyone's statements regarding the brochure had an effect on the trial, it was those of NOV since they are the only ones who clearly knew what was in the brochure before trial, yet they chose to go forward with the trial and to complete it without taking the mistrial offered by the Court.  Unlike NOV, Tesco is not suggesting NOV's statements to the Court are sanctionable.  Instead, NOV has simply waived its right to complain about the fees they incurred in a trial that they chose to complete.

66.    NOV's own questionable behavior goes further, however.  NOV has repeatedly alleged that during trial Tesco had the other inventor, Mr. Beierbach, in the courthouse but sent him home in order to avoid having him testify about the brochure.  *See* Trial Tr., Ex. 4, at 1573:17-22; August 2, 2011 Hearing Tr., Ex. 45, at 92:18-21; February 3, 2012 Hearing Tr., Ex. 46 at 24:9-11.  In fact, NOV's rhetoric on this issue has been anything but professional to the point of repeatedly referring to Tesco's witnesses as scattering "roaches" at least four times.  *See* Trial Tr., Ex. 4, at 1573:21-22; Ex. 45, at 92:18-21; Dkt. No. 588 at 5 n.3; Dkt. No. 685 at 7. Tesco has explained that Mr. Beierbach was not present in Houston on the Monday in question as he had already returned to his home in Canada.  *See* Trial Tr., Ex. 4, at 1574:10-21.  In response, NOV's counsel has represented to this Court that he personally saw Mr. Beierbach at

---

[14] It is also noteworthy that the black-and-white version contains a clearly-legible printing date of "8/22/2002" on the last page, which was during the critical time period NOV was focused on in connection with its motions to compel.  *See* Ex. 34.  It is hard to understand how NOV was so focused on this time period, including the invoices showing the printing of a brochure in August, and yet they never asked for a better copy of this brochure.  This is inexplicable unless, of course, they already had a color copy.

the courthouse on that Monday.  *See* Trial Tr., Ex. 4, at 1573:17-19 ("And, your Honor, I took

the depositions of Mr. Beierbach.  He was here in the courthouse on Monday…."); *see also*

February 3, 2012 Hearing Tr., Ex. 46, at 24:9-14.  This has now been proven to be untrue.  Mr.

Beierbach confirmed in his recent deposition that he was not at the courthouse that day.  *See* Ex.

1 at 161:13-24.  He has also testified that he had a sick relative that caused him, at least in part,

to leave as Tesco has said many times.  *Id*. at 162:10-13.  He could have come back, but there

was no need as Mr. Nikiforuk had already testified about the August brochure and thereafter

Tesco never challenged that testimony.   Further, Defendants have now had the chance to

continue to depose Mr. Beierbach and his testimony has not helped them or shown any reason

why Tesco would have "hidden" him.   Accordingly, NOV's repeated attempts to turn Mr.

Beierbach's departure into something nefarious fail along with all of their other attempts to

denigrate Tesco.  While listening to NOV's repeated accusations, the Court should also carefully

examine NOV's own conduct and consider the source of all these attacks on Tesco and its

counsel.

67.     In short, Defendants had the brochure all along, used it at trial exactly how they

wanted to, and rejected the opportunity to declare a mistrial to conduct further discovery.

Because the Court has already sanctioned Tesco for this conduct, it should not do so again.

### (iv)     *Tommy Warren Emails*

68.     Defendants next allege that Tesco committed litigation misconduct in connection

with the late production of emails from Tommy Warren.  *See* NOV's Second Amended Answer,

Dkt. No. 877, Ex. 27, at ¶14; NOV's Request for a Bench Trial on Counterclaims, Dkt. No. 839,

attached as Exhibit 28, at pp. 13-14.  No litigation misconduct finding is warranted as a matter of

law on this issue for several reasons.  First, there is no evidence of any intentional misconduct

and Tesco produced the documents as soon as Mr. Warren found them.  In addition, Tesco

offered to allow Defendants to depose Mr. Warren during trial in order to ask about the new documents.  *See* Trial Tr., Ex. 4 at 1572:11-21.  Defendants never accepted Tesco's offer.[15]

69.    Further, Tesco has already been punished for this alleged misconduct.  Rather than have a mistrial after learning of the emails, Defendants requested and received a reversal of the burden of proof.  They agreed this was a sufficient sanction.  *See* Ex. 4 at 2511.  There is no need for Tesco to be punished twice.  *See Adams & Assoc., LLC*, 519 Fed. Appx. at 1007-1008.

### (v)    *Karr and Orcherton Testimony*

70.    Defendants contend that Tesco misrepresented to the Court the content of testimony of potential witnesses regarding the August 2002 brochure.  *See* NOV's Second Amended Answer, Ex. 27, at ¶14; NOV's Request for a Bench Trial on Counterclaims, Dkt. No. 839, attached as Exhibit 28, at pp. 14-16.  Specifically, Defendants allege that Tesco misrepresented what two witnesses—former Tesco employees Don Karr and Jim Orcherton—would testify to regarding the brochure.  *Id*.  The Court should not find any litigation misconduct for multiple reasons.

71.    Tesco tried to be accurate in reporting to the Court what these witnesses were initially telling Tesco, and their depositions confirm as much subject to the vagaries of memory.  During trial when the issues regarding the August 2002 brochure came to light, Tesco contacted Karr and Orcherton and asked them about the brochure.  *See* Ex. 47 at 53:17-54:4.  Due to the

---

[15] The drafts of the article exchanged between Mr. Warren and Mr. Fontenot of Conoco never mentioned the CDS with link tilt, Mr. Fontenot does not report seeing any pictures in the drafts before the critical date of November 8, 2002.  *See* Exhibit 59.  Moreover, when pictures were inserted into the draft, they were pictures of link arms on the top drive and not the tool.  Ex. 19 at 93:25-94:15; 95:6-25.  Tesco never played Mr. Fontenot's deposition during trial as Defendants did not have the chance to depose him on the emails with Mr. Warren before trial, but they have since deposed him about these emails and he reconfirmed that no one told him about the CDS with link tilt until it showed up in the Lobo field.  *See* Ex. 20 at 192:4-6.

small size and lack of clarity of the rendering, Karr initially believed that it did not depict the invention.  Ex. 47 at 106:12-23.

72.     Specifically, Karr's testimony confirmed his initial belief that the invention was not in the brochure, because the first time he saw it he thought the link arms were on the grabber box, which is part of the top drive.  *See id*.  Orcherton could not remember what he had said to counsel about initially not being able to see the CDS with link tilt in the brochure, but he proved what he had said four years ago by again testifying he could not see the CDS with link tilt in the August brochure even during his deposition in 2013.  *See* Ex. 48 at 28:14-29:8.  It was only after Defendants showed him blowups of the rendering in the August brochure that he said he could see it in his deposition.  This is exactly what happened when Tesco's counsel first talked to Orcherton in 2010.  He initially could not see the CDS with link tilt in the brochure in its normal size and resolution, but then later saw it after being shown a high resolution image.

73.     Tesco also tried to be accurate in later reporting to the Court what they remembered Karr and Orcherton saying after they received a high resolution picture of the rendering during trial some years before.  Indeed, Karr testified that it was not until later, when he reviewed an enlarged version of the rendering, that Karr determined that it may be the invention.  He said he thought it was the invention, but he could not be sure as he also said, "it could be," but he "wasn't a hundred percent sure what it was in there" and "it might look like it's there."  *See* Ex. 47 at 17:21-23, 18:21-19:4.  Over the years, defense counsel have given Tesco's counsel a hard time over his reports to the Court of what Karr actually said, but it turns out that the reports of Tesco's counsel in this regard were very close to the testimony Karr actually gave at his deposition.[16]  Orcherton again could not remember what he said to counsel but his

---

[16] Compare Karr's testimony that he "thought the CDS with link tilt was in the brochure, although [he] had not been able to see it before without the high resolution image, and [he] expressed surprise,"

testimony at the deposition confirmed his not initially seeing the CDS and then seeing it after it was blown up.  Because they had no independent recollection or personal knowledge of how the image made its way into the brochure, Tesco did not bring these former employees down from Calgary to testify.

74.     Defendants cannot possibly complain about Tesco's decision not to call these witnesses at trial because Defendants specifically requested that the Court not allow Tesco to call any witnesses about the brochure.  NOV requested, as a sanction, that  "no other witnesses should be allowed to testify regarding this document." *See* NOV Motion for Sanctions, Ex. 42, at 7.  Moreover, if Defendants wanted to pursue the testimony of Karr and Orcherton, they could have taken up the Court's offer of declaring a mistrial rather than rejecting it.

75.     Finally, the allegations about Mr. Karr and Mr. Orcherton made absolutely no difference to the trial and did not cost Defendants any attorneys' fees other than those they voluntarily spent in their zeal to attack Tesco's counsel.  Indeed, Tesco's counsel shared what he was learning from Mr. Karr and Mr. Orcherton only with the Court, and never with the jury so that information is irrelevant to any trial misconduct claim in any event.  There was nothing to correct, because Tesco never offered any evidence to the jury that Nikiforuk's invention was not in the brochure after Nikiforuk testified that the rendering looked like his invention.[17]  Nor did

---

and Karr's testimony, again after looking at the high resolution image, that it "could be," but he "wasn't a hundred percent sure it was in there" and it "might look like its in there" (Ex. 47 at 17:21-23, 18:21-19:4) with counsel's statement at an August 2, 2011 hearing stating that he remembered Karr saying after viewing the high resolution image "we are not sure … [i]t may be" the tool and counsel's statement on November 7, 2012 saying, "it was not until I got a high resolution image to send up there and they said 'oh, that is it,' and they were surprised by that."

[17]     In its final argument, after noting that the image was a computer rendering, as opposed to a photograph of an actual tool, Tesco did argue that the tool did not actually exist in the brochure like the photograph images of other tools.  This statement was made in the context of arguing that no one could buy the tool at that time, and the rendering could not instruct a person of ordinary skill in the art how to make the tool, and after telling the jury "I'm not going to tell you what you see in there because you're going to see what you're going to see." Trial Tr. at 2723:8-2724:3.  Indeed, defense counsel knew exactly the context of this statement during trial, which is why they did not contemporaneously object.

the Court or opposing counsel rely on what Tesco had initially said about what it was finding with respect to the August brochure.  Those findings were just that—preliminary.

76.     Defendants will no doubt now come back to the Court and point out that Tesco's counsel was not right on other details they reported to the Court, like Karr being the animator and Orcherton and Karr being involved in the brochure, but they are the only names Tesco's counsel had during trial.  According to Karr's deposition, he was telling Tesco's counsel at time that "probably 95 percent of the photographs in that brochure [were mine]" and that he thought Orcherton had "prepared the graphics" for the brochure.  *See* Ex. 48 at 32:5-11, 35:4-14.  These statements clearly support why Tesco told the Court those two were involved in the brochure during trial.  In addition, Tesco's counsel clearly did not know about Primarc during trial or that the Primarc animators actually did the rendering.   After continued questions throughout the deposition, Mr. Karr finally concluded that he never told Tesco's counsel about Primarc (Ex. 47, at 125:25-126:3).   Tesco's counsel has previously made it clear to the Court and opposing counsel that it did not find out about Primarc until June, 2011.  *See* a letter from Tesco's counsel to NOV's counsel, dated June 17, 2011, attached as Exhibit 23; *see also* the statement of Tesco's counsel to the Court on the subject on August 2, 2011, Ex. 45 at 10:14-20.  An email about Primarc was sent to Tesco people during trial, but those people were uninvolved in the trial and in any case never informed Tesco's counsel.  *Id.*

(vi)     ***Trial Witnesses***

77.     Defendants allege that in addition to Karr and Orcherton, Tesco withheld information regarding other witnesses who had knowledge of the August 2002 brochure.  *See* NOV's Second Amended Answer, Ex. 27, at ¶14; NOV's Request for a Bench Trial on Counterclaims, Dkt. No. 839, attached as Exhibit 28, at pp. 17-18.  Specifically, Defendants

complain about Tesco not disclosing the identities of PriMarc, the marketing company who made the brochure, and the creator of the brochure, Larry Olez.  *Id*.

78.     As before, however, this is not a basis for a finding of litigation misconduct. Again, nobody on Tesco's trial team knew of Primarc during trial.  Defendants also requested that no additional witnesses be called to discuss the brochure (*see* Trial Tr., Ex. 4 at 864:15-23), and Defendants were satisfied with how they used the brochure and the reversal of the burden of proof—so much so that they declined a mistrial.  *See id*. at 872:17-20.  Because Tesco was already sanctioned for this conduct in the precise way Defendants requested, additional sanctions are not necessary.

79.     Moreover, Defendants' request for sanctions related to Mr. Olez should be juxtaposed with NOV's conduct during his post-trial deposition.  At the start of the deposition, Mr. Olez testified that he had provided documents to NOV's counsel.  *See* Olez deposition, attached as Exhibit 19, at 10:5-9.  When counsel for Tesco asked counsel for NOV why copies of these documents had not been provided to Tesco, NOV's counsel stated that NOV had received them late the night before.  *Id*. at 10:8-9.  When Tesco's counsel later asked the witness, Mr. Olez testified that he had provided documents to NOV's counsel "three or four weeks ago."  *Id*. at 105:19-25.  The fact that NOV received these documents without providing copies to Tesco, and then misrepresented when such documents were received, again undercuts any notion that NOV should be entitled to sanctions against Tesco.

### (vii)     *Distribution of the August 2002 Brochure*

80.     Defendants claim Tesco committed litigation misconduct by failing to stipulate that the August 2002 brochure had been distributed prior to the critical date.  *See* NOV's Second Amended Answer, Ex. 27, at ¶14; NOV's Request for a Bench Trial on Counterclaims, Dkt. No. 839, attached as Exhibit 28, at pp. 19-20.

81.     Tesco stipulated at trial that the brochure had been distributed and that Tesco would not contest that it had been distributed before the critical date.  *See* Tr. of Trial, Ex. 4, at 2211-2212.  The Court even agreed that due to Tesco's concession, the date of distribution was not a disputed issue and instructed the jury that the brochure was prior art.  *Id*. at 2617:17-23.  Based on Tesco's stipulation and agreement not to contest the distribution date, along with the Court's instruction to the jury, Defendants were not required to expend any resources whatsoever to do anything further regarding distribution of the brochure.  This is not even an issue, and certainly not any basis for a finding of litigation misconduct.

82.     Tesco has already been punished for any alleged misconduct through trial and no post-trial misconduct is alleged.  There is no need for Tesco to be punished twice.  *See Adams & Assoc., LLC*, 519 Fed. Appx. at 1007-08.

*     *     *

83.     A litigation misconduct finding is reserved for the most extreme cases and should be "sparingly applied."  *FDIC v. Calhoun*, 34 F.3d 1291, 1297 (5th Cir. 1994).  As set forth above, none of the alleged litigation misconduct justifies a finding of exceptional case, just as the Court indicated in its December 6, 2012 order.  The fact that Defendants have spent more time doing post-trial discovery (and taken an equal number of fact witness depositions post-trial as were taken pre-trial) demonstrates that this has become an exercise to generate fees simply to then argue for the recovery those same fees.  Indeed, Frank's, who attended only six depositions before trial, has attended every deposition since trial (except for the bubble gum depositions which Frank's knows are irrelevant as Frank's settlement with Tesco required it to mark).  NOV has had two or more attorneys at every deposition except one, and has insisted on far more depositions than the Court ordered.  Even OES, who is indemnified by NOV, has sent two attorneys to every deposition post-trial with the exception of the last two in Calgary, where only

Mr. Bushman attended.  Both Mr. Bushman and his associate attended the first depositions in

Calgary.  The Court can and should decide the inequitable conduct and trial misconduct claims

on this motion.[18]  Inequitable conduct cannot be proven as a matter of law because there is no

evidence of any deliberate intent to deceive the PTO (*Therasense*, 649 F.3d at 1290-91), and the

existence of litigation misconduct, if any, is left to the Court's discretion and is normally decided

in motion practice.  *See e.g., Medtronic Navigation, Inc. v. BrainLAB Medizinische*

*Computersysteme GmbH*, 603 F.3d 943, 952-54 (Fed. Cir. 2010); *Forrest Labs., Inc. v. Abbot*

*Labs.*, 339 F.3d 1324, 1327-28 (Fed. Cir. 2003).

## III.    CONCLUSION

84.    For the reasons set forth above, Tesco respectfully request the Court dismiss

Defendants' claims for exceptional case.

Respectfully submitted,

BRACEWELL & GIULIANI LLP

By: _____ */s/ Glenn A. Ballard, Jr.* _____
   Glenn A. Ballard, Jr.
   Attorney-in-Charge
   State Bar No. 01650200
   John F. Luman III
   State Bar No. 00794199


711 Louisiana Street, Suite 2300
Houston, Texas 77002-2770
Telephone:  (713) 223-2300
Telecopy:   (713) 221-1212

**ATTORNEYS FOR PLAINTIFF**

---

[18] Since the remaining claims are equitable in nature, the Court will decide these issues, not a jury. A bench trial is unnecessary, as the Court can decide the remaining claims as a matter of law.  Even if the case were tried, the Court would simply be reviewing trial transcripts and deposition testimony as most of the live witnesses are outside the Court's jurisdiction.   No reason exists to prolong this process or generate more fees to recover fees, and the Court should decide this case on this motion.

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing document has been forwarded to all counsel of record via the Court's electronic filing system pursuant to the Federal Rules of Civil Procedure on the 23rd day of December, 2013.

_/s/ Glenn A. Ballard, Jr._

Glenn A. Ballard, Jr.

#4399951