<pre>
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF TEXAS
 2                        HOUSTON DIVISION

 3   TESCO CORPORATION,          *     4:08-CV-002531
           PLAINTIFF,            *     HOUSTON, TEXAS
 4                               *
     VS.                         *
 5                               *
     WEATHERFORD INTERNATIONAL,  *
 6   INC., ET AL                 *     March 10, 2014
           DEFENDANTS.           *     10:45 a.m.

 7

 8

 9
                        TRANSCRIPT OF MOTION HEARING
10          BEFORE THE HONORABLE KEITH P. ELLISON
                     UNITED STATES DISTRICT JUDGE
11

12   **APPEARANCES:**

13   FOR THE PLAINTIFFS:

14       Glenn A. Ballard, Jr.
         John f. Luman, III
15       **BRACEWELL & GIULIANI, LLP**
         711 Louisiana
16       Suite 2300
         Houston, Texas  77002
17
         - and -
18
         David J. Beck
19       Michelle E. Gray
         **BECK REDDEN**
20       1221 McKinney Street
         Suite 4500
21       Houston, Texas  77010

22

23

24

25
</pre>

1  **APPEARANCES - CONTINUED:**

2  FOR THE DEFENDANT NATIONAL OILWELL VARCO, LP

3      John Wesley Raley
       Bradford T. Laney
4      Robert M. Bowick, Jr.
       **RALEY & BOWICK, LLP**
5      1800 Augusta Drive, Suite 300
       Houston, Texas  77057

6

7  FOR THE DEFENDANT OFFSHORE ENERGY SERVICES, INC.:

8      C. James Bushman
       Erin Werner
9      **BUSHMAN & ASSOCIATES, P.C.**
       1001 West Loop South
10     Suite 810
       Houston, Texas  77027

11

12 FOR THE DEFENDANT FRANK'S CASING CREW AND RENTAL TOOLS, INC.:

13     Lester L. Hewitt
       **ATTORNEY AT LAW**
14     5773 Woodway Drive
       Houston, Texas

15
       - and -
16
       Sarah J. Ring
17     **AKIN GUMP, LLP**
       1111 Louisiana Street
18     44th Floor
       Houston, Texas  77002

19

20

21

22

23

24

25

**P R O C E E D I N G S**

1

2          THE COURT:  Okay.  Let's turn to Tesco.

3  We'll take appearance of counsel, beginning with Plaintiff.

4          MR. BALLARD:  Thank you, Your Honor.  Glen Ballard,

5  John Luman, and David Beck for Tesco.  And I think you know

6  everybody else.

7          MR. RALEY:  John Raley, Bobby Bowick, and Brad Laney

8  for NOV.

9          MR. BALLARD:  And Michelle Gray, Your Honor, for

10 Tesco.

11          MR. HEWITT:  Lester Hewitt and Sarah Rain for

12 Frank's.

13          MR. BUSHMAN:  Jim Bushman and Erin Werner for OES,

14 Your Honor.

15          THE COURT:  Welcome to all of you.

16          Okay.  I've already said I'm not going to reexamine

17 further my ruling on obviousness.  I also have concluded that

18 there was not inequitable conduct before the PTO.

19          What I'm struggling with is this testimony from

20 Mr. Beierbach -- for the court reporter, B-E-I-R-B-A-C-H.

21          And I'm not sure exactly where the parties are

22 on this issue.  I had understood Defendants to say at the

23 last hearing that if Mr. Beierbach's testimony does mean that

24 the washers were critical or essential, then, that suggests

25 the case should have been filed.  In the papers that I

1   received from Defendants, however, you don't seem to be

2   making that argument.  So I need some help as to where

3   Defendants are on this position right now, on this issue.

4           MR. HEWITT:  Your Honor, before Mr. Ballard speaks,

5   may I just get a clarification.  Did you already say you have

6   already ruled or decided there's no inequitable conduct --

7           THE COURT:  Yes.

8           MR. HEWITT:  -- with respect to Mr. Beierbach's

9   testimony.

10          THE COURT:  Well, with respect to what happened

11  before the PTO.  We're going to talk today about where

12  litigation is going to go.

13          MR. HEWITT:  Now, when you say before the PTO, are

14  you referring to this essential feature issue or all the

15  issues?

16          THE COURT:  I'm talking about all the issues.

17          MR. RALEY:  Your Honor, I have some slides.  I'll

18  just hand them up to the Court if that's all right.

19              And if the Court would have it, I would like to

20  sort of address the inequitable conduct that relates to this

21  Beierbach testimony as well.

22              You asked to be heard -- for us to talk about

23  this testimony to Beierbach in October of 2013.  This was the

24  first time they presented this argument that this invention

25  wouldn't work without these washers, and they hammered it

```
 1  home.
 2              The Court has already granted the Defendants'
 3  leave to amend the pleadings --
 4              THE COURT:  Yes.
 5              MR. RALEY:  -- to add this washer issue to their
 6  inequitable conduct claims.  It has to be pled with
 7  specificity.  And the Court said -- I'm on page 2 here --
 8  that the allegations described serious misconduct, which we
 9  agree.
10              Now, if you go to Page 3 of the slide, Your
11  Honor, what Tesco has done here is they have boxed themselves
12  in with no way out.
13              THE COURT:  But can you give me an answer to the
14  question I asked?
15              MR. RALEY:  Yes, sir.
16              THE COURT:  I mean, are you saying that because
17  washers were critical or essential, thus, the case shouldn't
18  have been filed and thus that's the misconduct?  Or are you
19  saying something different than that?
20              MR. RALEY:  It's both, Your Honor.  You could flip a
21  coin this morning -- and I don't know which -- if it's heads
22  or tails, Tesco is going to take two different positions.  I
23  don't know.
24              This morning they're saying, in the filing they
25  filed, they said it was ready for patenting before --
```

1          THE COURT:  Yes, they do.

2          MR. RALEY:  Before when they deposed Mr. Beierbach,

3    they led him by the nose that this thing would work, that it

4    was critical, that it was essential, et cetera.  Now their

5    argument is, Beierbach didn't say the words "essential" or

6    "critical" or "necessary."  I can't help that Mr. Ballard

7    can't ask his own client a nonleading question.  That's not

8    my problem, okay.

9          Ballard asked those specific questions,

10   "essential," "critical"; and he said, "Yes, yes, yes."

11         THE COURT:  I've read over that testimony.  What it

12   sounds like to me, is what he was saying was that

13   occasionally the equipment would work and occasionally it

14   wouldn't.  I think that's what he meant when he said it would

15   not work as well.  And not every time would it work.  And

16   there's a --

17         MR. RALEY:  Well, we can -- I've got the testimony.

18         THE COURT:  Just a second.  Just a second.

19         Gary King, in his testimony, he was asked:  So,

20   if you didn't have the washers, would this tool operate

21   effectively?

22         His answer was:  It would still operate, yes.

23   You'd just have to make sure everybody is out of the way

24   because it might go sideways a touch.

25         So I think it might not have been a patentable

1    invention if it only worked some of the time.

2                    But how do you interpret his remarks?

3            MR. RALEY:  Well, pretrial, Your Honor, they took

4    the position that this patent didn't require washers.

5            THE COURT:  I know that.  I know that.

6            MR. RALEY:  And Gary King testified along those

7    lines, saying, "Yeah, it still worked some of the time

8    without washers."

9                    We tried to see if there was a viable defense

10   pretrial.  And they said, "No, it worked okay.  It worked

11   better with washers, but it still worked."  They took the

12   position and they said this thing was tested in mid October

13   and it was commercialized with the Alpha rig delivery.

14                   Post-trial -- now that we know about the

15   communications with Conoco, now that we know about the August

16   brochure and other disclosures -- they want to take that all

17   back and say, it wasn't ready for patenting until after

18   delivery when they added the washers.

19                   I agree.  They're like a fish; they're just

20   flopping.  They're taking two positions on this.

21           THE COURT:  Well, I know what they're going to say.

22   Tesco is going to say that those statements can be reconciled

23   because the washers were not absolutely sine qua non; that

24   the machine would work, just not as well.  What I think it

25   means, it's just not as regularly.  It would work sometime,

1   but not work others.

2            I mean, I think that's going to be the way --

3   that's going to be the reconciliation that is offered.

4            MR. RALEY:  This issue -- the Court recognized last

5   week -- came up in response to our summary judgment,

6   post-trial summary judgment of on-sale bar.

7            THE COURT:  Right.  I agree.

8            MR. RALEY:  And to skirt that, they said, "Oh, no,

9   it wasn't ready for patenting."  And the Court said there was

10  a fact issue on that.  They raised this is not ready for

11  patenting due to the washers.

12           THE COURT:  Right.

13           MR. RALEY:  Pretrial they didn't assert it's ready

14  for patenting because we didn't have the evidence on Conoco,

15  we didn't have the brochures.

16           Now, King says it worked some of the time.

17  He's not an inventor.  Mr. Beierbach is a co-inventor.

18           And I've got it laid out in this PowerPoint.

19  I've marked it up.  He says over and over again, this thing

20  would not work without washers.

21           THE COURT:  Okay.  If you want to go forward with

22  your PowerPoint.  I didn't mean to get you off the track.

23           MR. RALEY:  Well, Your Honor, the point is -- I

24  don't need to go back through the testimony.  We might go

25  through some highlights of it.

1          On Page 3 here, they box themselves in here
2  because, if the inventor believed that this invention
3  wouldn't work without washers, he has the duty to tell the
4  Patent Office that.  The Patent Office doesn't give patents
5  on things that are inoperable.
6          THE COURT:  How about on things that work some of
7  the time?
8          MR. RALEY:  If it worked for its intended purpose,
9  yes.  The law is not clear.  Does it say it has to work 50
10 percent of the time or 60 percent of the time or 90 percent
11 of the time?  There's no magical number there or hurdle to
12 get over.
13          But when a co-inventor comes in and provides
14 his testimony, which obviously his lawyers coached him and
15 wanted him to say this.
16          THE COURT:  Yeah.  I think that's right.
17          MR. RALEY:  And he says it won't work.  I will go
18 through it in a second.  He says over and over again it won't
19 work.  I mean, he says it won't work -- I can count the
20 ways -- 11 different times, it won't work.  And it's not the
21 device.  The Patent Office doesn't care about the device
22 delivered in Lobo field.  The patent examiners care about the
23 claims.  It's the claimed invention.
24          In the Supreme Court Pfaff decision, they talk
25 about ready for patenting.  It's the claimed invention.  They

1  don't care about the device.  The Patent Office doesn't care
2  if you make a device or don't make a device.  They care
3  about -- they examine the patent claims, which defines the
4  metes and bounds of what the intention is and will that
5  claimed invention work for its intended purpose.
6          And what Mr. Ballard has done here, is he even
7  had Mr. Beierbach go through the three claims that the jury
8  didn't find were invalid; Claim 50, Claim 37 of the '443,
9  Claim 55, and then Claim 14 of the '324 patent.
10          And he says, "Show me where in that claim we
11  know that it requires this stabilization, these washers."
12          And Beierbach testified, basically trying to
13  limit those claims to washers.  I believe that's litigation
14  misconduct, of course.  Because Markman -- I guess, it's been
15  five years ago -- they said it doesn't require washers.  Now,
16  they have the inventor --
17          THE COURT:  Yeah.  I'm troubled by that, too.  I'm
18  troubled by that.
19          MR. RALEY:  -- say it required washers.  So they're
20  trying to get over the on-sale bar and get over these prior
21  art issues to argue that these things require washers.
22          If Mr. Beierbach is telling the truth, he
23  didn't tell that to the Patent Office and he had a duty as an
24  inventor.
25          THE COURT:  He seemed to be very explicit, though,

1   that he thought he had been absolutely forthcoming with the
2   PTO.  I mean, his testimony on that was pretty clear, too, I
3   thought.
4            MR. RALEY:  Well, let's just go through it here.
5   I'm on page 4 here.  We have pictures of the patent there.
6            THE COURT:  I'm having a hard time finding the
7   numbers on the page.
8            THE RALEY:  I didn't put the numbers on that.
9            THE COURT:  Please tell me what the headline is.
10           MR. RALEY:  "Beierbach testimony, direct
11   examination."
12           THE COURT:  Okay.  I got it.
13           MR. RALEY:  He's asked on direct where in Figure 4
14   of the patent he has these stabilization systems.  And he
15   refers to 129, which is the washers.  And he also refers to
16   141, 143, 142, A and B.  Those are the bumpers.
17               None of the defendants' tools have any of those
18   parts --
19           THE COURT:  I know that.
20           MR. RALEY:  -- or pieces.
21           THE COURT:  And that's why I'm troubled.
22           MR. RALEY:  So he's talking about here's the
23   stabilization that we added.
24               You go to the next page, which is Beierbach
25   testimony page 248, line 25, Mr. Ballard asking:  Would your

1  invention work as designed to pick up pipe with the link
2  tilts and actually stab it in the hole.
3            Mr. Beierbach's answer is:  It would not.
4  Sorry, it would not consistently stab without these pieces.
5            He takes him further than that.  That -- that
6  right there, Your Honor, is where it's not consistent, but he
7  keeps going.
8            You get down here to page 249, line 18 through
9  22, he says:  Is it necessary to your invention?
10           What's the invention?  It's the claims.  The
11 metes and bounds.
12           Mr. Beierbach says:  Absolutely.
13      THE COURT:  Okay.  What page is that on now?
14      MR. RALEY:  I'm on the same page.  It's Beierbach
15 testimony page 249, lines 18 through 22.  Left-hand column.
16      THE COURT:  Yeah.  I got it.  I got it.
17      MR. RALEY:  Over on the bottom -- to the right, on
18 the bottom, page 254, lines 13 through 16, he says:  Does
19 that picture show the stabilization system that you had to
20 add to the tool later to make it work?
21           No.  It wasn't invented then.
22           Mr. Ballard keeps hammering home, make it work,
23 make it work.  Not make it work consistently or make it work
24 some of the time.
25      THE COURT:  But what I'm referring to is, if you go

 1   back to line 23, it says -- in the question I think
 2   Mr. Ballard, in fact, they were critical because it couldn't
 3   work without it.
 4              And the answer is:  Not consistently.
 5              I think that is -- I think that is what he's
 6   saying, all things in.  I think he's saying not consistently.
 7              MR. RALEY:  He starts off, if you go in the order
 8   here, saying that.  But then he takes that away and says it
 9   won't work.  He's sort of dips his toe in and says "not
10   consistently."  But then his attorney leads him down further
11   and says -- clears all doubt about consistently and says it
12   won't work.
13              THE COURT:  Okay.  Let's carry on then.
14              MR. RALEY:  Keep going.
15              Okay.  Next page 258, line 7 through 11,
16   question:  Is that why you later added the stabilization
17   system that you added?
18              Yes.
19              Question:  To make the tool work?
20              Yes.
21              And he asked him:  And where is the
22   stabilization system depicted?
23              That's lines 12 through 13.  You really don't
24   get the answer until down at lines 23 through 24 where he
25   refers to the doughnut, to the washers.

1           THE COURT:  Yeah, I got it.

2           MR. RALEY:  Turn over to the right-hand column,

3  page 259, lines 1 through 6, question:  "Were those all

4  added" -- talking about "those" being the washers or

5  doughnuts -- "added to the CDS with link tilt that you

6  actually patented?"

7                   Answer:  Yes.

8                   Question:  Were those all added to make the

9  tool work?

10                  Yes.  Answer, yes.

11                  Turn the page.  You get into when they

12  delivered this tool in November of 2002.  Mr. Ballard asked

13  him on page 262, lines 3 -- beginning line 3:  When you got

14  it out to the location in Lobo field in the middle of

15  November, it was still a work in progress; right?

16                  Answer:  Yes.  In my opinion.

17                  Question:  And it wasn't complete before you

18  added the part that actually made it work out in the Lobo

19  field sometime November 16, 17, 18?

20                  Answer:  Not to the state that was patented.

21                  He's saying this thing requires washers, Your

22  Honor, because it doesn't work.

23          THE COURT:  Well, what -- help me with this, Mr.

24  Ballard.  Why is this issue coming up now?  I know I'm the

25  person to blame for having authorized post-trial discovery,

1   which in retrospect I think was a good idea.  But why is this

2   issue coming up now?

3        MR. RALEY:  Your Honor, we were surprised by this

4   testimony.

5        THE COURT:  Okay.  All right.

6        MR. RALEY:  This is their weasel out of the on-sale

7   bar.  They raised it as a last-ditch effort to get -- I don't

8   know why they're changing the story.  Pretrial, they had one

9   story.  Post-trial, it's different.

10        Either way, here's the inventor.  This inventor

11   was here to testify during trial.  They sent him back to

12   Canada.

13        THE COURT:  Well, hadn't you kind of invited that,

14   though?  You just wanted more testimony after Mr. Nikiforuk?

15        MR. RALEY:  We didn't invite that, Your Honor.  When

16   Mr. Ballard came in here and said he got to the bottom of it

17   and he's got a whole list of witnesses in Canada he's going

18   to fly down here to testify because he's talked to them --

19   he's got the bottom of it, and they said unequivocally this

20   is not the invention, that was a lie, Your Honor.

21        THE COURT:  Well, but -- but am I totally wrong

22   that, at some point, some defendant wanted the testimony

23   limited to Mr. Nikiforuk and not bring additional witnesses

24   to induce testimony that would vitiate Mr. Nikiforuk's

25   testimony?

1        MR. RALEY:  Your Honor, we did not want Mr. Ballard
2   to bring a list of who knows how many witnesses to come down
3   here and say it was not the invention.

4        THE COURT:  Okay.  That's what I remember.

5        MR. RALEY:  And he told us he would.  He told us he
6   had a list of them.

7               With post-trial discovery, we found out that's
8   not true.  The people that he said he talked to who were
9   going to testify unequivocally it wasn't the invention, we
10  deposed them two months ago.  They said they told Mr. Luman
11  that it was the invention.  Mr. Ballard has already told the
12  Court that.

13              He said, yeah.  After we sent them the high
14  definition, the glossy Court Exhibit 1, they said it was the
15  invention.  That was about day 8 or 9 of trial.  Did he ever
16  correct it?

17              I mean, if they had told us -- if they had come
18  in here and said, "Your Honor, I just talked to Mr. Nikiforuk
19  or -- I'm sorry -- Mr. Karr in Washington and they said,
20  "Yeah, we sent them the good, high-definition Court
21  Exhibit 1," and they said, "Yeah, it looks like it's the
22  invention," we would have demanded that they bring him down
23  here.

24              But I'm not going to demand the witness come up
25  here and say that's not the invention when they haven't been

1  identified before.  They were misrepresented that they were
2  the ones --
3          THE COURT:  I'm not faulting your decision.  I'm
4  trying to remember the sequence of events.
5          MR. RALEY:  And I just don't think I can be at
6  fault --
7          THE COURT:  I'm not faulting you.  I'm not.  I'm
8  not.
9              But I am -- it seems -- it's such an O'Henry
10 ending, and this case has been going on for five years.  It's
11 such an O' Henry ending to find out this basic issue of the
12 washers.
13         MR. RALEY:  Well, Your Honor, we were surprised in
14 October when Mr. Beierbach testified.  And I think it is
15 litigation misconduct, because they're trying to change the
16 testimony.  They're trying to limit these claims.
17             If that's their position, if they're going to
18 live by the sword, they've got to die by it.  I mean, they
19 had this guy testify that it requires washers; that the parts
20 did not work without stabilization.  I mean, you can flip
21 through this.  It just keeps going on and on.
22             Mr. Ballard even had him limit the claims.  He
23 went through the three claims that the jury verdict did not
24 find were invalid, and he asked him where those are.
25             If you turn a couple more pages, the heading is

1   Claim 27 of the '443 patent.

2                   THE COURT:  Okay.  I'm with you.

3                   MR. RALEY:  He has them look at those three claims

4   and asked him where in those claims the stabilization is,

5   where the washers are.

6                       They are trying to get the inventor to say that

7   the claims require washers.  I don't think he realized that

8   it kills their whole case because NOV and Frank's don't have

9   washers.

10                  THE COURT:  I know that.  I know that.

11                  MR. RALEY:  And we didn't want these witnesses to

12  come forward when they were still concealing the documents or

13  PriMarc and who actually created the brochures and what

14  documents were around.  When Mr. Ballard represents to the

15  Court why we didn't want more witnesses, we didn't have all

16  the evidence.  All we heard was his representations about

17  what they were going to say.

18                  THE COURT:  Yeah.

19                  MR. RALEY:  And we found out that what he said they

20  were going to say isn't even true, which is further

21  misconduct.  But we're here to talk about what Mr. Beierbach

22  said.

23                      I will leave this with you.  We have already

24  briefed all this, Your Honor.

25                  THE COURT:  Yes.  I know you have.

1      MR. RALEY:  And if they're going to -- I mean, my

2  point here is, on Page 3 of this thing, they boxed themselves

3  in.  If these patents don't require washers as Tesco

4  advocated and as this Court interpreted them, then their

5  patent is invalid -- is inoperable, because you have the

6  inventor who says it won't work without washers.

7      He started off -- he's dipping his toe in

8  saying some of the time.  Then later he nailed it home,

9  saying, "It's essential, it's critical, it won't work.  He

10 doesn't of any other way to make it work without those

11 washers."  We have laid out all that testimony.

12     It's also -- if they don't require washers,

13 they -- it's litigation misconduct.  Because you can't have

14 the inventor trying to skirt the defense of on-sale bar,

15 trying to make up this affirmative defense under Pfaff and

16 change their story.

17     THE COURT:  Spell Pfaff for the court reporter.

18     MR. RALEY:  P-F-A-F-F versus Wells.

19     THE COURT:  Do you have the spelling of Nikiforuk,

20 Dorothy?

21     MR. RALEY:  I don't know, maybe they want to throw

22 away the lawsuit against the defendants, try to save their

23 patents against future litigation.  I don't know what their

24 motivation was here with Mr. Beierbach and his testimony.

25     THE COURT:  Well, I'm concerned.  Obviously, I'm

1    concerned about it.

2         MR. RALEY:  And if these things require washers,

3    Your Honor, they should have never brought this suit.

4              If they require washers, they should have told

5    the Patent Office that.  If this inventor believed that they

6    required them to make it work and that they were critical,

7    essential, necessary, they should have told the Patent Office

8    that.

9              And if this inventor believed that these

10   independent claims -- Claims 37, 55 of the '443 and Claim 14

11   of the '324 -- required washers, they should have told the

12   Court that when they filed this lawsuit.

13        THE COURT:  I got you.  I understand.  I understand

14   what you're saying.

15        MR. RALEY:  Thank you, Your Honor.

16        THE COURT:  Thank you.

17              Yes, sir, Mr. Hewitt.

18        MR. HEWITT:  Your Honor, I'm not going to add much

19   more to what Mr. Ballard said, but I do believe that what

20   Tesco did is they admitted to an interpretation of the three

21   remaining claims as including the washers.  And that's what

22   they asked, and that's what they obtained, and that's

23   different from this Court's claim construction, but that's

24   now their assertion.  And if that is indeed their assertion,

25   then, that should become an admission and those claims should

1  be held to be noninfringed.

2           I understand that the Court is trying to
3  rationalize what was said over a period -- over a deposition
4  and other positions.  And you're right, and Mr. Ballard is
5  right, this did stem out of the on-sale issue.

6           But as Mr. Ballard said, they took it to an
7  extreme and then, in the process, in essence, they admitted
8  that all the claims do have the washers in them and that
9  leads, at least, to noninfringement.

10          And as Mr. Ballard -- I agree with him with
11 respect to the inequitable conduct.

12          The litigation misconduct, on the other hand,
13 if they're now saying, "None of that is true, we just overled
14 him in the process," that's another example of litigation
15 misconduct.

16          THE COURT:  The reason I don't think that
17 inequitable conduct in front of the PTO is implicated, I
18 don't think we have a similar statement from anyone that
19 shows that those who filed the papers with the PTO and those
20 who processed them knew that the washer was such an integral
21 part.  That's what I think was missing, why it can't be
22 inequitable conduct.  I may be wrong about that.  I'm open to
23 being corrected.

24          MR. HEWITT:  May I point, Your Honor --

25          THE COURT:  Yes.

1          MR. HEWITT:  The record will show that Mr. Beierbach

2   did read the patent application.  The record will show that

3   Mr. Beierbach was very concerned about filing a patent

4   application because he was aware that there were some

5   potential on-sale bars.

6          THE COURT:  Yeah.

7          MR. HEWITT:  And so he was -- he was attuned to

8   that.  He admitted in his deposition several times that he

9   had -- he knew absolutely that he had a duty to disclose to

10  the Patent Office.

11         THE COURT:  Yeah, he was very clear on that.

12         MR. HEWITT:  And in spite of all that, nothing was

13  said to the Patent Office about the washers.  And he's the

14  one who claims to have invented them.  Now he claims that it

15  didn't work without it.  So, yes, he was involved in the

16  prosecution.

17         THE COURT:  But he didn't read the application, is

18  that what you told me to start with?

19         MR. HEWITT:  I did.  And in addition to that, what

20  we were going to show at the bench trial was that, under

21  their privileged log, he also received papers in the time

22  period when they were amending the claims and responding to

23  the office action.  So he was involved in several different

24  points in time with respect to the prosecution.  He had --

25         THE COURT:  But none of that adds up to Beierbach or

1  anyone else on Tesco's side knowing that what they submitted
2  was -- was incomplete or false.
3        MR. HEWITT:  When they read the application and they
4  saw that the application describes three different potential
5  ways that the link arms could be modified, but never said
6  that they had to be modified, never said in the patent
7  application one of them has to be done, left everything to
8  the patent attorney -- excuse me -- the Patent Office to
9  understand that it was all optional, you don't have to claim
10  things in every claim that are optional.  But you do have to
11  claim -- claim things, elements, that are not optional.
12        THE COURT:  That would be the language was --
13        MR. HEWITT:  I'm sorry.  Just to finish.
14        THE COURT:  Carry on.  Carry on.
15        MR. HEWITT:  Mr. Beierbach in reading the
16  application had the personal knowledge that he added the
17  washers to make it work and that use of the washers was not
18  optional.  And he should have told the attorneys that,
19  because as the application read and as the examiner would
20  understand it, all that was optional.  None of it needed to
21  be included in the claims.
22        THE COURT:  As long as the use was "can."
23        MR. HEWITT:  "Can" is optional.  "Must" is
24  necessary.  "Must" is essential.  "Can" is optional language.
25              Now -- so I'm going to close on that.  I do

1  have one other point that I've been in shock about.  I want
2  to be sure that I understand you.  Has the Court ruled that
3  there is no inequitable conduct on all the other counts.
4  　　　　THE COURT:  Well, that's the way I see the evidence
5  before me.  Are you not satisfied with that.
6  　　　　MR. HEWITT:  Well, let me say this, Your Honor.
7  　　　　THE COURT:  And what I'm considering is fairly
8  major.  If there's inequitable con -- if there's
9  inappropriate conduct in the litigation phase, I mean that
10  leads to dramatic results.
11  　　　　MR. HEWITT:  Well, I don't disagree with that.  But
12  if there's inequitable conduct, then, it also should be ruled
13  upon.
14  　　　　THE COURT:  I mean hasn't the Federal Circuit set
15  the bar extremely high for inequitable conduct?  It seems to
16  me it's a very high bar for inequitable conduct before the
17  Patent Office.  And for better or worse, the litigation
18  misconduct seems to be judicial discretion.
19  　　　　MR. HEWITT:  Your Honor, Tesco moved at the
20  beginning of the trial that we have a bench trial on
21  inequitable conduct and litigation misconduct.  What has
22  changed since then is the Therasense case came out.
23  　　　　THE COURT:  Spell that for the court reporter.
24  　　　　MR. HEWITT:  -- T-h-e-r-a-s-e-n-c-e case came out,
25  and it did tighten the standards as they say.

1       THE COURT:  Yeah, it did.

2       MR. HEWITT:  But we believe that there is sufficient

3  testimony for the Court to find that this single and only

4  reasonable inference on intent is met -- intent to deceive

5  the Patent Office, especially with respect to the two

6  brochures, the April brochure and the August brochure.

7       THE COURT:  But don't we have a finding from the PTO

8  that the April brochure was immaterial?

9       MR. HEWITT:  No.  No, sir, you don't.  We talked

10 about that last time.

11      THE COURT:  Okay.

12      MR. HEWITT:  But let me just say this:  The April

13 brochure was cited to the Patent Office by Tesco, but it was

14 never explained.  It just was submitted.

15          The feature in issue on -- which is the basis

16 for inequitable conduct, is that in the photographs, in the

17 Tesco brochure, the antirotation feature is shown.

18          The Patent Office, both in the original

19 prosecution where nothing was submitted -- and so that stands

20 alone as a basis for inequitable conduct, nothing was

21 submitted then.  But in the -- even in the reexamination when

22 they submitted the April brochure, they didn't explain that

23 the antirotation was shown in the pictures.

24          The patent examiner -- and the best example of

25 that that Tesco keeps citing, which I -- I continue to cite

because I believe it supports our case is that when Frank's

filed a quick ex parte examination during the trial, the

patent examiner -- same patent examiner examining the Tesco

reexamination, that patent examiner refused to grant a

reexamination.  Because he said, on the April brochure,

there's nothing described in the text and I can't tell

anything from the photographs.

He's the examiner that signed off on those --

the April brochure in the reexamination, and he can't

understand the photographs.  So Tesco failed to tell the

Patent Office that the antirotation was shown in the

photographs; that the antirotation was part of the Appleton

tool long before -- before Tesco even bought it.  And they

didn't tell the Patent Office that.  So it was not before the

Patent Office.

THE COURT:  Okay.  All right.

MR. HEWITT:  So I just want to be clear.  I

understand you're looking for judicial efficiency.

THE COURT:  No.  That's one of many goals.

MR. HEWITT:  Yes.

THE COURT:  I mean, I get paid to do this job.  I

want to do the right thing, even if it's not efficient.

MR. HEWITT:  And here's -- from Frank's point of

view, we've had -- we have filed motions for summary

judgment, before and after Therasense.  The one after

Therasense, as I recall, was just never ruled on, which is
fine.  I actually said, "We're going to have a bench trial.
We'll take care of it then anyway."

So here we are.  So the only vehicle currently
before this Court is Tesco's motion for exceptional case; and
that includes their motion for summary judgment, to which we
filed a response.  And I don't think the Court could grant
summary judgment.  I think I commented on that last time,
that you would not grant summary judgment.

So here we are, Frank's and NOV, without any
vehicle to bring all that proof to you and marshal it for you
with respect to inequitable conduct.  Now, that is a big
burden to the Court and I recognize it.

THE COURT:  Let's move off that point.

MR. HEWITT:  Right.

THE COURT:  It's just my job.  But I just -- we
understand each another.  I think the bar is so high and I
think the showing of intent is so rigorous.

MR. HEWITT:  All right.

THE COURT:  You would agree that recklessness is not
enough; right?

MR. HEWITT:  Yes.  I agree with that.

Now, Your Honor, should we -- should the Court
consider trying the bench trial into two phases, first
litigation misconduct and then, if necessary, inequitable

1    conduct.

2         THE COURT:  Well, that would be pretty duplicative,

3    wouldn't it?

4         MR. HEWITT:  There is some overlap, but not

5    necessarily a great deal.

6         THE COURT:  Well, that's the last question we're

7    going to consider, what kind of trial format we're going to

8    have.

9              I'm trying to understand better what I think is

10   a new, surprising, and looming issue, which is this issue of

11   the stabilization were required and the washers that were

12   implicated.  That's where my thinking is right now.

13        MR. HEWITT:  I appreciate that.  I think Mr. Bowick

14   covered it well.  I think the point I added just shows that

15   if Tesco takes the position as an admission that its

16   claims -- the only claims found valid include the washers,

17   then, there's no infringement.  And we're entitled to a

18   judgment of noninfringement, at least, whether the Court

19   considers inequitable conduct or litigation misconduct.

20        THE COURT:  Okay.

21        MR. BOWICK:  Your Honor, I don't want to argue.  I

22   just want to add one point for clarification.

23        THE COURT:  Yes, sir.

24        MR. BOWICK:  We have looked over the deposition

25   videotape cuts, which are almost completely post-trial

1  depositions --

2          THE COURT:  Yes.

3          MR. BOWICK:  -- and we believe that the evidence for

4  the two issues before the Court, litigation misconduct and

5  inequitable conduct, overlaps significantly.  And we foresee

6  that that evidence could be shown to the Court, and then

7  there could be arguments one and then the other on the two

8  things.

9          THE COURT:  Okay.

10          MR. BOWICK:  But it's not like there's some evidence

11  for one and some for the other.  That's all I wanted to say.

12          THE COURT:  Mr. Bushman, anything from you, sir?

13          MR. BUSHMAN:  I have nothing to add to what

14  Mr. Bowick and Mr. Hewitt said.

15          THE COURT:  Okay.  Thank you.

16              Mr. Ballard, do you want to speak?

17          MR. BALLARD:  Sure.  Just briefly.  I think the

18  Court has the issue well in hand and the record is before the

19  Court and it's all on video.  We're not aware of any new

20  things that are going to come in at any trial.

21              And just to start with Mr. Hewitt's point, you

22  asked him if the April brochure had been found to be

23  nonmaterial and, of course, it was by the Patent Office.  It

24  was presented three different times by three different

25  parties to the Patent Office, and it was rejected twice as

immaterial, Your Honor.  So I think it's very clear in the record that that is not a material piece of prior art.

And then addressing the last point, Your Honor, it appears that both parties are now content with the record on Mr. Beierbach's testimony, and the Court can rule on that record.

Tesco said March 3, 2014 it was content with the record in Docket 970, and I know they filed a brief saying it thought it was dispositive for them in Docket 978. Of course, it is not dispositive for them.  And, in fact, there are no cases that rule the way they're asking this Court to rule, which is that an inventor can invalidate the patent with his testimony post-issuance; that you would have to make new law to make that ruling.

But beyond that, Judge, I think you have read the testimony -- and you read it the same way we read it and the same way that Frank's reads it, quite frankly -- and, that is, that if Mr. Beierbach testified, looking at everything, that the tool will not work well without the washers, but he did not testify that it will not work at all.

THE COURT:  But would it be patentable if we have a machine that -- that works only some of the time?

MR. BALLARD:  Yes, sir.  And as Mr. Bowick just admitted, you can have a patent on a machine that works only some of the time.  He said 60 percent, 90 percent, it doesn't

1    matter, Judge.  As long as it worked some of the time, it is

2    patentable.  And, in this case, there was no prior art for

3    Tesco to get around with link arms on the tool.

4             So this is not like a prosecution history

5    estoppel case, which is the one they're citing to you where

6    the patentee tries to narrow the claim to get around prior

7    art and then broadens it later.

8             Instead, in this case, it's very clear that

9    there's no prior art to get around and this was a patentable

10   invention with the broad claims that Tesco put in.  And

11   beyond that, Judge, Frank's says in Document 902 that

12   Mr. Beierbach testified the tool will not work well without

13   washers.  That's fine.  That's fine, Judge.

14            And, in fact, this is not a new issue that has

15   just come up, which the Court has said is troubling.  This

16   issue came up before trial, at trial, and after trial.

17            THE COURT:  And what are we defining as "the issue"?

18            MR. BALLARD:  Well, the issue is how the tool will

19   work without washers.  And, in fact, Mr. King was asked that

20   same question before the case, was -- and, actually, the day

21   before they took Beierbach's testimony.  So they could have

22   covered all this in Beierbach's deposition before trial.

23            And what Mr. King said is:  So you don't have

24   to have washers to operate the tool effectively.  He said

25   that very clearly.  He said it would still operate, yes.  You

1   just have to get out of the way a little bit.

2          THE COURT:  Okay.  Well, then, if the washers -- I

3   mean, that doesn't sound even safe to me, you have to get out

4   of the way.  I'm sure the PTO wouldn't allow a patent on a

5   machine that was unsafe.

6          MR. BALLARD:  No, sir.  I mean, he is saying you

7   would have to get out of the way a little bit.  He is not

8   saying it is unsafe.  And he goes on and says it would work

9   without washers for its intended purposes, very clear about

10  that.

11         Mr. Nikiforuk said the same thing at trial --

12         THE COURT:  Slowly.

13         MR. BALLARD:  Sure.  It really didn't work well

14  without washers, he said the same thing.  Mr. Beierbach said

15  the same thing afterward.

16         THE COURT:  Then do we need to reexamine the August

17  brochure as to whether that -- that it was prior art, then?

18         MR. BALLARD:  No, sir.  I think you have disposed of

19  the August brochure and the post-trial record has disposed of

20  the August brochure.  You have just overruled our motion for

21  rehearing that -- holding the patents invalid for obvious to

22  try.  That ruling does not depend on any way, shape, or form

23  on the April brochure -- I'm sorry -- the August brochure.

24  And, in fact, you say, in granting that summary judgment,

25  that you should base your testimony only on pretrial and

1    trial testimony; and that you specifically exclude the August

2    brochure from any consideration.  So, therefore, we think

3    it's moot at this point.

4              In addition, it's certainly not invaliding on

5    this record.  We have had 11 people testify post-trial, and

6    no one said Tesco saw it before trial or indeed back in the

7    relevant time frame.  So it's certainly not invaliding this

8    trial.  So, no, we don't need to reexamine that.

9              THE COURT:  I'm sorry.  I'm not sure I understand

10   the import of Tesco didn't see it before trial.

11             MR. BALLARD:  Well, Tesco and anybody else

12   because --

13             THE COURT:  Oh, didn't see the invention.  I got

14   you.  All right.

15             MR. BALLARD:  Didn't see the invention in it.

16   Because, you know, that's the whole point, is it's not

17   obvious, it's not enabling if nobody could see the tiny

18   rendering in there.  And post-trial testimony has borne that

19   out --

20             THE COURT:  Okay.  I got it.

21             MR. BALLARD:  -- nobody saw it.  And so it can't be

22   invalidating on this record, Judge.  And I think you've said

23   it's moot anyway because of the way you've disposed of the

24   case.

25             And so all we have at the end of the day now is

1   this one issue that the Court has identified in its Order of
2   2/27/14 -- that's Docket 965 -- and that is the allegations
3   relating to Beierbach and whether they require an evidentiary
4   hearing.  And we don't think they do.

5              And the reason is, he said essentially the same
6   thing before as after, which is the tool will not work well,
7   but he doesn't say the tool will not work at all.  He says
8   often you can't stab it.  He says it would not work properly.
9   He says it does not stab consistently.  But they never got
10  him to say -- and neither did I, Your Honor -- that it would
11  not work at all.  And beyond that, we could have no specific
12  intent to deceive the Patent Office because the specification
13  says -- talks about washers.

14             THE COURT:  The reason I'm troubled by this
15  testimony or, at least, a reason is that Tesco's counsel
16  clearly wanted him to say these things.  But what was the
17  intent of leading him through all that?

18             MR. BALLARD:  Well, Your Honor, it was just further
19  evidence that the tool was not ready for patenting.  That was
20  all.  And we were pursuing that before trial and after trial.
21  And it's clear, I think, that the tool was not ready for
22  patenting.  And so that's the only reason for that, Judge.

23             And my question --

24             THE COURT:  Well, it is not -- why wasn't it ready
25  for patenting, if you could have proceeded without washers

1 and had a patent work some of the time?  Why wasn't it ready?

2        MR. BALLARD:  Well, Your Honor, first of all, you

3 could have claims that are -- some claims that are ready for

4 patenting and other claims that are not ready for patenting.

5 And, in fact, that's the EZ Dock case.

6             And -- and, specifically here, the claims

7 without the washers could have been ready for patenting

8 beforehand, but we were continuing to refine the tool in the

9 field and the experimentation exception to the on-sale bar

10 applies to that under the EZ Dock case.

11        THE COURT:  Okay.

12        MR. BALLARD:  And so you could have some claims that

13 are ready for patenting before and some claims that are not.

14 And the claims without the washers were not ready after the

15 patent.  So -- and the EZ Dock says that, under those

16 circumstances, on-sale bar doesn't apply.  And these guys

17 really aren't even arguing on-sale bar anymore.  I mean, that

18 ship has sailed.  So --

19        THE COURT:  Well, I think the reason they're not is

20 because of Mr. Beierbach's testimony.

21        MR. BALLARD:  Right.  And Mr. Beierbach's testimony,

22 as I pointed out, does not invalidate the patent.  There is

23 no case that they can cite to you where an inventor's

24 testimony, after a patent issues, invalidates a patent.  And

25 that --

1        THE COURT:  Well, I'm not so concerned about
2    invalidating the patent.  I'm just focusing on whether these
3    were proper defendants to pursue, given that the washers were
4    necessary and these guys didn't have washers.  That's...
5        MR. BALLARD:  Well, actually, Your Honor, yes, they
6    were proper defendants to sue because they infringed the
7    patent.  They found a way to operate the tool without
8    washers, just as we found a way to operate the tool without
9    washers.  And so, as a consequence, they infringed the patent
10   and the jury properly found that.
11       THE COURT:  But didn't you drop all the claims
12   against defendants after my -- all that related to washers
13   after the Markman ruling?
14       MR. BALLARD:  Yes.  We talked about washers during
15   the Markman, and you said that the washers had to be in the
16   claim.  And I'll let John Luman talk about that.
17       MR. LUMAN:  Your Honor, when we were doing the
18   Markman hearing, there was some dependent claims that had
19   stabilization for link arms.  And they were -- the debate was
20   whether those were means plus function claims.  And you found
21   that they were means plus function claims, and that those
22   claims had to have washers in them.  Those were dependent
23   claims.
24            So broad claims were the independent claims,
25   and then there was the dependent claims.  And so when you

1    ruled that they had to have washers in it, we sort of sized

2    it all up and said, okay, we have to eliminate some claims

3    anyway, because we had a broad-based number of claims that we

4    were asserting at the time.  And we did.  In fact, we dropped

5    a bunch of claims before trial, which is done all the time.

6    There's nothing --

7              THE COURT:  No.  I know that happens.

8              MR. BALLARD:  And so, as a consequence, Your Honor,

9    at bottom, you have got Mr. Beierbach testifying to something

10   very similar to what everybody testified before.  They could

11   have taken Mr. Beierbach's deposition on that very issue,

12   because it was raised with Mr. King the day before they took

13   Mr. Beierbach's deposition pretrial.

14              Mr. Beierbach, at the end of the day, if you

15   read all his testimony, doesn't say anything very much

16   different than the other individuals had said, which is the

17   tool will work, just not as well.  And that does not

18   invalidate the patent under any law that they've cited to

19   you.

20              THE COURT:  Okay.

21              MR. BALLARD:  And I think you can decide that on the

22   record.

23              THE COURT:  Okay.  Thank you very much.

24              MR. RALEY:  I'm not going to argue the patent

25   issues, but I wanted to correct something Mr. Ballard said

1   very briefly.  And I want to object to it, for the record,

2   because he said it over and over and he said it in briefing.

3            He said that the Court has disposed of the

4   issue of the August brochure.  Let me share with the Court

5   the words of Document 821, which is the Court's memorandum

6   and Order of December 6, 2012.

7            The Court says, on page 8:  "Defendants also

8   provide evidence that the only inventive concept of Tesco's

9   CDS with link tilt was the relocation of the link arms from

10  the top drive to the casing drive."

11           And I believe, in other documents, the Court

12  had found that that was indeed the only innovative concept.

13           Footnote 2 is very important:  "Defendants

14  argued vigorously that the August brochure which Plaintiff

15  failed to produce in original form prior to trial, revealed

16  this innovation."

17           The footnote goes on to say:  The Court reaches

18  its decision that the relocation of the link arms was obvious

19  to try, even absent the August brochure.  Accordingly, the

20  Court need not evaluate whether the August brochure did, in

21  fact, reveal the relocation of the link arms."

22           So what happened was the Court selected one of

23  multiple grounds to grant summary judgment for the

24  defendants.  That does not mean that the other grounds are

25  not material.  That does not mean that Tesco gets to decide

1    what they are going to produce before trial because some day

2    they predict the Court's not going to rule on this issue,

3    they're going to rule on some other issue.  That doesn't give

4    them the right to come to court and misrepresent

5    conversations they've had about the brochure with their own

6    people and say, "Well, that doesn't matter because we didn't

7    say that to the jury.  We just said it to the Court."

8              I want to make it very clear that when we have

9    the litigation misconduct bench trial, we're going to be

10   addressing this issue --

11             THE COURT:  You disagree that there's -- we don't

12   need a trial?

13             MR. RALEY:  I strongly disagree that we don't need a

14   trial.  We want to present to the Court the evidence and --

15   and --

16             THE COURT:  Well, the part that's most troubling to

17   me, though, is Mr. Beierbach's testimony.  What more do we

18   need from him?

19             MR. RALEY:  Well, when -- and I want Mr. Bowick to

20   respond to the patent questions that were raised, because he

21   can do so better than me.  But I think that there's a value

22   always, as a trial lawyer, in the Court observing the

23   deposition --

24             THE COURT:  Demeanor testimony.

25             MR. RALEY:  -- the demeanor in testimony in

1    assessing the credibility of the witnesses.  And we'll be

2    better able to address the arguments --

3              THE COURT:  It seems to me the record is about as

4    good as Defendant can ever expect it to be.

5              MR. RALEY:  Well, it's like so many other things,

6    Your Honor.  It's just a mush, because it depends on what day

7    it is.  If it's Tuesday, then Tesco is going to take the

8    position that it was not ready for patenting.  On Wednesday,

9    they'll have a different position depending on what they have

10   to encounter in the lawsuit.  I want to let Mr. Bowick

11   respond to that.

12              I just want to object.  And I hope that Tesco

13   never again says that the other grounds were -- are mooted

14   because the Court selected one of them.  Thank you.

15              MR. BOWICK:  And, Your Honor, we haven't had an

16   opportunity to lay out the whole case on litigation

17   misconduct.  They moved for summary judgment, and we

18   responded.

19              THE COURT:  Yeah.  I understand, I understand where

20   we are right now.

21              MR. RALEY:  He wants to know about the washers.

22              MR. BOWICK:  Okay.  And that's what I'm going to

23   focus on.

24              Now, if I heard Mr. Ballard say that the

25   invention wasn't ready for patenting when they delivered this

1    tool.  He said it again.  They maintain this.

2              Now, "ready for patenting" is one of the two

3    prongs with the Pfaff Supreme Court decision.  What matters

4    is the claimed invention.  You can't say these claims over

5    here weren't ready for patenting, because Tesco dropped those

6    claims, Your Honor.  This Court is not going to make rulings

7    on claims they're not asserting.  They're saying, oh, the

8    washers claims weren't ready for patenting.

9              They're suing my client for patent

10   infringement.  They're maintaining now eight or nine claims,

11   and they're saying those claims weren't ready for patenting

12   because they didn't have washers.  They're still saying it.

13             If they'll just take it back and go back and

14   say, no, it was ready for patenting in mid October, we

15   wouldn't be having this fight.  But they are still doggedly

16   maintaining that the claims before this Court, the claims

17   that they're suing my client for, were not ready for

18   patenting without washers.  Mr. Ballard just said it.

19             THE COURT:  Well, but what he said is that you can

20   patent an invention that works only some of the time.

21             MR. BOWICK:  I generally agree with that notion.

22   But if it worked some of the time without washers, then, it

23   was ready for patenting.  They can't say it's not ready for

24   patenting without the washers.

25             THE COURT:  Well, then we get to the experimental

1  use, which I think that case -- that issue arose late in the

2  case, too, didn't it?

3  MR. BOWICK:  They didn't raise this experimental use

4  till post-trial, I believe.  They said that this thing --

5  their interrogatories answer says they had tested it by mid

6  October.  It was first commercialized, and they decided to

7  deliver it with the --

8  THE COURT:  So you say there's no middle ground.

9  Either it was ready for patenting in October without the

10  washers or -- in which case we have a prior art or on-sale

11  bar?  Or it was not ready for -- or it was not ready for

12  patenting without the washers, in which case you shouldn't

13  have been sued?

14  MR. BOWICK:  Correct, Your Honor.  They can't

15  have -- Pfaff says it's the claimed invention.  That's what

16  the Court is ruling on.  It's not the preferred embodiment.

17  It's not the device they delivered.  It's the patent claims.

18  This Court doesn't want to make rulings on washer claims.

19  Those have been dismissed.  They're no longer asserting those

20  against us.

21  THE COURT:  I understand that.

22  MR. BOWICK:  It's the claims that they're suing us

23  for that matter.  And Mr. Ballard is still maintaining those

24  were not ready for patenting until washers were added.  They

25  can't slice this baby up.  It's the claims that have to be

1    ready for patenting -- that's what PFAFF says.  And they're

2    saying -- they're still maintaining today that the claims

3    that they're asserting were not ready without washers.

4            THE COURT:  Okay.

5            MR. BOWICK:  If they required washers, they never

6    should have brought this suit.  If they required washers, the

7    inventor should have told the Patent Office that.  If they

8    required washers, they should have brought this suit and they

9    certainly should have told this Court in Markman that none of

10   the claims require washers.

11           THE COURT:  Okay.  Thank you.

12               Mr. Hewitt.

13           MR. HEWITT:  First of all, with respect to Frank's

14   position, in the on-sale, let me be clear, what we said was

15   that the asserted claims were ready for patenting.  The issue

16   of the washers came up and -- but none of the asserted claims

17   have the washers in them.  All of those claims were dropped.

18               So my view of the law is those asserted claims

19   should have been found ready for patenting as well as

20   on-sale.  That's always been our position.  We filed a

21   motion --

22           THE COURT:  Without the washers?

23           MR. HEWITT:  Yes.

24           THE COURT:  Okay.

25           MR. HEWITT:  In other words, the claims asserted

1    don't have the washers; but washers apply to the -- to those

2    claims where the washers are in them.  Tesco knows that.

3                So they come back with Beierbach and say, oh,

4    well, isn't it true, Mr. Beierbach, the washers are really in

5    these three claims?  And they only chose the three, because

6    those are the three that had been held -- the jury had not

7    found invalid.

8                In fact, the washers are not in any of those

9    claims and that prototype should have been found ready for

10   patenting and on sale and as prior art.  And it would be

11   prior art to the version with the washers.  And the question

12   would then be:  Would it have been obvious to add the washers

13   to that design relating to those claims that have washers.

14               Claims just ended up being thrown together,

15   Your Honor.  And that was wrong.  That was error.  And, of

16   course, the Court had, in our opinion, with due respect,

17   other errors with respect to the on-sale and their legal

18   tests.  We filed a motion for reconsideration.  That was not

19   addressed by the Court.

20               So we stand here today in still water on that

21   issue.  It's not because we don't want to insert it.  It's

22   not because we have given it up, as Mr. Ballard says.  And,

23   frankly, if we take it up on appeal, you bet we're going to

24   appeal every bit of that, because those claims are ready for

25   patenting.  Those asserted claims based upon --

1        THE COURT:  As of what date.

2        MR. HEWITT:  -- the first prototype.

3        THE COURT:  As of what date were they ready?

4        MR. HEWITT:  They were ready for patenting when the

5   rig was delivered.  And, actually, they were ready for

6   patenting when the unit, as manufactured, was sent into the

7   United States on November 1st.  And that's why it was an on

8   sale.  Even before it got to the Lobo field, it was in the

9   United States on its way to the Lobo field.  Whether or not

10  it got to the Lobo field --

11       THE COURT:  You said you would have me disregard

12  altogether the experimental use?

13       MR. HEWITT:  Let's talk about experimental use for a

14  moment.  That's a new claim be their --

15       THE COURT:  Yeah.  I'm surprised by that.

16       MR. HEWITT:  Well, that's a new claim.  They threw

17  that up in Per Agnman and asked him in a leading question --

18       THE COURT:  And where is that?

19       MR. HEWITT:  Per Angman, A-N-G-M-A-N.

20       THE COURT:  Oh, somebody's name.  I see.

21       MR. HEWITT:  They threw that into a question in Per

22  Angman's deposition when it came out, this use is

23  experimental.  That was experimental use.

24           Okay.  So now we have an experimental use and

25  they're bringing up the EZ Dock case.

1          But as we said in our briefing, in
2    experiment -- to prove an experimental use, you've got to
3    show that the fact that it was going to be experimental has
4    to be communicated to the customer.

5          THE COURT:  Yeah.  Yeah.  I know that.

6          MR. HEWITT:  And there's no evidence that that was
7    ever done.  And so it's just a concocted version to try to
8    avoid the ready for patenting again.  And as Mrs. Rain told
9    you last time, part of it is they're trying to avoid the
10   inequitable conduct on sale this year.  Because Mr. -- the
11   testimony will show Mr. Beierbach was concerned about that,
12   concerned about the on sale.  And that's why he wanted them
13   to file the application.  But they filed it too late with
14   respect to the on sale.  And he should have told the Patent
15   Office about it.

16         THE COURT:  Okay.  So as soon as the -- as soon as
17   the device came into this country, then, it was on sale?

18         MR. HEWITT:  I am saying -- we don't have to prove
19   that it was delivered.  We don't --

20         THE COURT:  I'm looking for the magic date.

21         MR. HEWITT:  First of all, the law doesn't require
22   the product be manufactured.  But the magic date is, for
23   certain, when the CDS with link tilt as part of the alpha rig
24   was imported into the United States on November 1.

25         THE COURT:  Okay.  November 1.  All right.

1          MR. HEWITT:  And we have and have submitted that

2     evidence before --

3          THE COURT:  Yeah, I know that.

4          MR. HEWITT:  -- on its way --

5          THE COURT:  I thought it might have changed.

6          MR. HEWITT:  -- on its way to the Lobo field.

7               Now, what Beierbach did say that was new from

8     the prior testimony was, well, it didn't work for its

9     intended purpose.  The others said, well, it worked for its

10    intended purpose -- you know, like Mr. King -- if you stay

11    out of the way.  But Tesco relied upon that statement and

12    Mr. Nikiforuk's statement.  Yeah, it worked for its intended

13    purpose.

14              But Beierbach said, no, it didn't work for its

15    intended purpose.  That's all about this ready for patenting

16    and that's all about trying to avoid the inequitable conduct

17    issue of it.

18              Let me turn to --

19         THE COURT:  Well, do you think Mr. Beierbach's

20    testimony was truthful or perjurious?

21         MR. HEWITT:  I think Mr. Beierbach was put up to

22    every question he answered, and every question was suggested

23    by the attorneys.

24         THE COURT:  But was his testimony then false, or was

25    it true and we had a misapprehension as to what the state of

1  the patent was?

2        MR. HEWITT:  I don't believe Mr. Beierbach ever

3  previously testified with respect to the intended purpose

4  issue -- that it worked for the intended purpose.  I think

5  that came up only in his deposition in 2013.

6        THE COURT:  But do you believe it was truthful?

7        MR. HEWITT:  That's a hard question for me to

8  answer.  I have some doubts.

9            Let me turn to the August brochure for a

10  moment, please.

11        THE COURT:  Okay.

12        MR. HEWITT:  As has been said, the August brochure

13  was not considered in your finding of summary judgment.  With

14  due respect, I believe it should have.

15        THE COURT:  I understand.

16        MR. HEWITT:  But even further, I urge the Court to

17  look at it again, because -- and I'll give you the exact

18  hearing, but I believe it's the June 4 hearing, pages 37 and

19  38.  I can't swear to it right now, but we have preparing so

20  I know I looked at it recently -- Mr. Ballard admitted.  You

21  asked him and he said, "The invention is shown in the

22  brochure."  That's a statement of testimony.  That's an

23  admission of Tesco.  "The invention shown is the brochure."

24            You don't need any other argument.  You don't

25  need to look anywhere else.  You don't need to look at all

1    these questions about is it blown up or not blown up or at

2    high resolution.  Tesco admitted the invention shown in the

3    patent, and this Court should reconsider invalidity on that

4    basis.

5              THE COURT:  Because of prior art or on sale or both?

6              MR. HEWITT:  Because -- not the on sale.  I think

7    the Court should consider inequitable conduct, but not

8    validity.  The ruling stands.  As I said, we believe there is

9    error, but the ruling stands.

10             THE COURT:  I understand.  I understand.  You're

11   certainly entitled to disagree.

12             MR. HEWITT:  Okay.  Now, with respect to the

13   noninfringement issue, let me just say that Tesco started

14   with suing some ungoshly number of claims -- 20, 30, 40.  I

15   don't even remember the number.

16             And as happens after a Markman where the court

17   makes decisions that limit the claims, this Court limited

18   terms relating to stabilization, any rotation to require

19   something like washers.  Tesco dropped those claims, now

20   leaving only claims that don't include the washers.

21             What Tesco did, through Mr. Beierbach, was try

22   to get the washers back into those three claims because they

23   knew they needed them.  That -- Your Honor, I do believe

24   that's litigation misconduct.

25             THE COURT:  And the penalty for that should be what?

1           MR. HEWITT:  I'm sorry?

2           THE COURT:  The penalty for that should be what?

3           MR. HEWITT:  When you add up the entire pattern of

4   actions and conduct that will be shown at the trial, you're

5   going to see that the trial was totally destroyed by a lack

6   of candor during the trial, by the late production of the

7   August brochure, by documents produced later that should have

8   been produced before trial that would have had an effect on

9   some of the invalidity issues, like the on-sale issue.

10          We took discovery in this case without getting

11  all the information.  We took depositions of Beierbach and

12  all of them without having the August brochure or any of that

13  information.

14          Then we get a jury verdict where Mr. Ballard

15  says, well, I never argued that the August brochure -- that

16  the invention was or was not in the August brochure.  What

17  you're going to see next week is that Mr. Ballard already

18  knew that Mr. Karr said the invention is in there, even

19  though he elicited testimony from his expert that he couldn't

20  see it in there, he already knew it was in there.

21          And so he came to the closing with the idea

22  that he wasn't going to say it's not in there, because

23  somebody had told him it was.  But you will see -- and we

24  will show you the -- that over the course of the closing and

25  the statements that he made were all directed to the point

1    that the invention is not in there.

2            THE COURT:  Okay.

3            MR. HEWITT:  And that's part of the litigation

4    misconduct.  And the trial was destroyed, so the pretrial was

5    destroyed.  The trial was destroyed, and we have had this

6    endless amount of work afterward to get to the point we are

7    today and that's attorney's fees.

8            THE COURT:  Okay.  Mr. Bushman.

9            MR. BUSHMAN:  Thank you, Your Honor.

10               Mr. Ballard wants to just dismiss the August

11   brochure.  The fact of the matter is -- and there's all this

12   talk about high resolution, blown up, exploded, et cetera,

13   et cetera.

14               The high resolution is the original brochure as

15   it was distributed.  It wasn't blown up.  It wasn't

16   magnified.  It wasn't pixilated to make it clear.  It was the

17   original brochure.  And Mr. Karr, when he saw that version,

18   said immediately, "Yeah, that's the invention."  They knew

19   that in the middle of the trial.  They didn't tell the Court.

20               Would the instruction to the jury had been

21   different, Your Honor, if the Court had had to say, oh, the

22   brochure does show the link arms attached to the piping

23   gauging apparatus?  I think they would have been.  And I

24   think the failure to tell the Court that is litigation

25   misconduct of the highest order.

1          THE COURT:  Okay.  This is what I'm going to do.  I
2     am going to take a break till 12:45.  If you think you've
3     said everything you want to say, you don't need to come back.
4     If you have more to say -- we're at a real fulcrum in the
5     case, I think.  So I don't want to proceed hastily.  Thank
6     you very much.

7          (Recess.)

8          THE COURT:  Okay.  I'll give you all a chance for
9     anything else that has occurred to you over the lunch break.

10          But first, I had an inquiry for the defendants.
11     I see we better not start yet.

12          MR. RALEY:  Apologies, Your Honor.

13          THE COURT:  That's all right.

14          I will give everybody a chance to say whatever
15     needs to be said.  But I wanted to ask the Defendants, you
16     obviously feel very strongly about your case.  Was there some
17     reason you didn't file a cross-motion for summary judgment or
18     motion for attorney's fees or anything like that.

19          MR. HEWITT:  Well, Your Honor, I filed a motion for
20     attorney's fees, but under Rule 37.  And the Court did not
21     rule on it.  I filed two motions for summary judgment based
22     upon inequitable conduct, but I always viewed --

23          THE COURT:  When was that?  When was that.

24          MR. HEWITT:  Oh, sometime ago.  I've always viewed
25     this as being a different category because this is not a

1  summary judgment.

2        THE COURT:  Well, that's the ultimate question I'm

3  reaching for.  We could have a -- I think this -- we've

4  already dealt, in many respects, with the August brochure.  I

5  know that you feel like additional sanctions are warranted,

6  but my focus really is the -- Mr. Beierbach's testimony,

7  which does concern me.

8        But I just wonder, if we have a trial that goes

9  on for a week or two, are we going to know anything more than

10 we know right now?  We have the issue of whether the washers

11 were a necessary component of the invention, whether -- how

12 that intersects with the question of on-sale bar or prior art

13 and what exactly Mr. Beierbach was saying, what have other

14 people said about the washers.  We already have that in the

15 record.  What more are we going to learn from a trial.

16       MR. HEWITT:  Your Honor, are you asking only about

17 that issue?

18       THE COURT:  Yes.  Right now, I am.  Right now, I'm

19 asking about only this issue.

20       MR. HEWITT:  I do agree with Mr. Raley that hearing

21 the evidence is always better than just reading it.  So, in

22 that sense, we have not had.  You have heard arguments, I

23 think, sometimes --

24       THE COURT:  What I'm worried about is Mr. Beierbach

25 is not going to say the same thing and...

1      MR. HEWITT:  Oh, he's not going to testify.

2      MR. RALEY:  We'll play the tape for you, Your Honor,

3  and then we'll speak to it.

4      THE COURT:  But I can play the tape.  I can get the

5  tape played without having a trial.

6      MR. RALEY:  I understand that.

7          My point, we've had several hearings.  And, for

8  my money, I think having a trial -- and I don't think it will

9  take even a week -- would be much more dispositive of the

10  issues in this case than having hearings to talk about it.

11      THE COURT:  Well, how many witnesses will you call?

12      MS. RAIN:  Excuse me?

13      THE COURT:  How many witnesses will you call?

14      MS. RAIN:  Well, there are 14 depositions that we've

15  cut.  We're going to cut them some more.  But rather than do

16  as Tesco did pretrial and designate all witnesses, we have

17  actually cut significantly precisely to the things going to

18  litigation misconduct, which I submit overlaps greatly with

19  the inequitable conduct evidence.  We will play those for the

20  Court, and the Court will be able to assess the witness --

21      THE COURT:  Here again, I can do that without having

22  a trial; right?

23      MR. RALEY:  Yes.  But here's the thing, if we were

24  going -- if we weren't going to have a trial, then we would

25  all want to brief what these witnesses said and then we'd

1  have hearings about our briefs.  And we really think we can

2  just knock it all out if we can do it.

3          THE COURT:  Well, what more are you going to do at a

4  trial?  Opening statement and closing argument?  I mean, if

5  your deposition testimony is going to be played for me, I can

6  do that without convening a trial.

7          MR. RALEY:  I understand that, Your Honor.  But

8  here's the thing -- and if you'd just permit me to speak very

9  freely on this issue.

10          THE COURT:  Yes.

11          MR. RALEY:  We have a situation -- and you asked why

12  we didn't file motion for sanctions is because we have a

13  counterclaim for litigation misconduct, which is what we're

14  going for.

15          THE COURT:  Okay.

16          MR. RALEY:  But as the Court itself has noted,

17  before this case was filed, Tesco had a duty to investigate

18  the case, to talk to the inventor, to -- to talk to its

19  client, when was this first thing first offered for sale,

20  when was it disclosed.

21              And now, long post-trial, we're finding all

22  these things that make this case something that should never

23  have been filed in the first place.  And it's really

24  important, I submit, for us to have a chance to lay that out

25  for the Court.

1     This case was, through no fault of the Court,

2    rushed to trial while Tesco was saying over and over,

3    "There's no more documents to produce.  Believe me, we've

4    looked."  And that just simply wasn't true.  We now know that

5    that was a false statement to the Court.

6          And we now know that, during trial, they

7    were -- Tesco was e-mailing PriMarc, the people who actually

8    prepared the brochure, and never told the Court about the

9    existence of PriMarc or what PriMarc new, instead represented

10    falsely to the Court that they had gotten to the bottom of it

11    and they talked to these Karr and Orchardson people who were

12    ready to testify unequivocally that the invention was not in

13    the brochure.  We now know that they never talked to one of

14    those people, and the other one told them that the invention

15    was in the brochure.

16          So it's not disputed that the only inventive

17    step is moving the link arms down.  It's not disputed that

18    the prior art before the brochure reveals all of the inven --

19    all of the invention, link arms, top drive, elevator, pipe

20    and gauge apparatus, all disclosed before.  So the only

21    missing ingredient was the moving of the link arms downs,

22    which is revealed in the brochure, which Tesco now, three

23    years after trial admits, even though we now know they knew

24    that during trial because they were told that by Mr. Karr.

25          Tesco, two years after trial, finally admitted

1  that it was distributed at the SPE conference, even though

2  they knew that during trial and were having e-mails with

3  PriMarc about the fact that this was expedited to be

4  prepared, so it can be distributed at the SPE conference.

5        We just want a chance, Your Honor -- and I

6  submit that we're entitled to a chance -- to lay out the

7  evidence for the Court, rather than coming back and

8  continuing to make these arguments.  We'll do it with all the

9  passion we can, because we believe what we're -- and I don't

10 apologize for my passion.  But we'll try to be as factual as

11 we can.

12        But if we can have a chance to lay out the

13 evidence for the Court in a bench trial, as we believe we're

14 entitled to -- because it is a counterclaim and because this

15 Court's order was that this issue would be handled in a

16 separate trial after the principal trial -- then, I think

17 that we would have a chance to get to -- the Court to the

18 endgame here, which we really haven't been able to do with

19 all these arguments and all this briefing.

20        And, in fairness, we aren't the source of a lot

21 of this briefing.  Tesco has filed for motions for summary

22 judgment on all of these issues and we have had to respond to

23 all of them.  And we have had back and forth briefs until,

24 I'm sure, that the Court is heavily burdened by all of this

25 briefing.

1       We request a chance to have a trial where the
2  Court can see the witnesses, hear them, assess them; and then
3  attorneys can comment on their perspective on the evidence to
4  the Court.  And then we'll be done, and the Court can decide
5  what it wants to do and then we go forward.  That's my
6  earnest plea and request for the Court.

7       THE COURT:  Okay.  Thank you.

8       MR. BECK:  Your Honor.  Your Honor, David Beck for
9  Tesco.  As Your Honor knows, I have been in this case a very
10  short period of time.  We'll do whatever the Court -- we'll
11  do whatever is most helpful to you in terms of resolving
12  these issues and bringing it to a close.

13       It seems to me, however, that if we're talking
14  about video depositions, at the end of the day, we're not
15  going to know any more at the end of a bench trial than the
16  Court probably already knows.  If the Court wants to look at
17  video depositions in the courtroom while we sit here, we'll
18  be here.  But it seems to me to be a waste of the Court's
19  time and is not as efficient as the Court might like if --
20  you can watch it in chambers whenever you want.  You'll get
21  to see the witness and judge for yourself whether or not
22  these people are telling the truth or not telling the truth
23  or, as the Court said this morning, it's a little bit of
24  each.

25       And as far as them laying out their case, I

1  mean, I've only been here two hearings and people keep saying
2  the same things over and over again to Your Honor.  So if
3  they're concerned about laying out a roadmap, the Court can
4  deal with that very simply and just simply say, file a
5  post-hearing, post-trial brief or some kind of a brief that
6  lays out your whole theory and then the Court consider it
7  based upon its schedule.
8          But it seems to me that if all we're talking
9  about is going through the motions and not learning anything
10 more than you already know, it's an absolute waste of time.
11         THE COURT:  Okay.  Thank you.
12         I mean, on this -- on the Beierbach deposition,
13 I think at the end of any kind of hearing, whether it's a
14 trial or further argument, I'm going to be where I am now.  I
15 find Mr. Beierbach's testimony troubling, because I don't
16 think it was clear throughout the case that the washers were
17 such an important part.
18         But Tesco's position is going to be the same.
19 It's going to be that the invention worked without the
20 washers.  It didn't work as well, but it did work; that the
21 period of time in question with Conoco was a period of time
22 of experimental use.
23         And Mr. Fontenot, I think says just enough --
24 just barely enough to make me think that there is something
25 to the experimental use doctrine use.  I'm sorry it wasn't

1    raised a long time ago, but it's been raised now.

2            And I think we're going to be in the same

3    position.  We're going to say -- Tesco is going to say the

4    August brochure is not the invention because it doesn't have

5    the washers; that finding the washers was important during

6    the experimental use period; and that the patent that was

7    filed, which said washers can be used as part of

8    stabilization, was accurate.  It didn't need to use "must"

9    language; "can" language was sufficient.  And I don't think

10   I'm going to be able to advance the ball one bit by hearing

11   the depositions.

12           But tell me where I'm wrong on that.

13   MR. BOWICK:  Your Honor, I think there's been some

14   confusion about this ready for patent.

15   THE COURT:  About what now?

16   MR. BOWICK:  This ready for patenting defense.  Here

17   is where we're at.  Let's make it real easy.  If you have an

18   invention, it's just three components, A, B and C, and those

19   components are assembled, sitting there on the rig in October

20   of 2002 and you're testing them and they work okay.  And you

21   file a patent and one of your claims is A, B and C, you have

22   a dependent claim that is A, B and C, plus D.  That D didn't

23   come along until after you delivered that rig in early

24   November and it wasn't working as well, you can't claim that

25   what happened in October, A, B and C, which you have claimed

1    and sued people on isn't ready for patenting without D.

2            THE COURT:  Even if you have this experimental use

3    doctrine invoked?

4            MR. BOWICK:  They didn't invoke the experimental use

5    doctrine.  If the thing that was experimental was adding the

6    D to make it work, then the claim should be limited to D, all

7    the claims.

8            THE COURT:  But I thought -- I thought -- I mean one

9    of the tests for experimental use is whether the client

10   thinks it's experimental, and I think Mr. Fontenot says

11   enough to get them past that.

12           MR. BOWICK:  Well, I think we look to what Tesco

13   said in its answers to interrogatories, pretrial.  And it

14   says it was tested and deemed ready for commercialization in

15   October 15th.  That's done.  This new thing with the washers

16   is post-trial.

17           THE COURT:  So we're back to the on-sale bar we had

18   even before the trial; right?  Is that where we are?

19           MR. BOWICK:  That's where we are, Your Honor.  They

20   can't say that the claimed invention that they're suing us

21   for wasn't ready for patenting until they added these washers

22   to it.  That's the only change they did once they delivered

23   it, is added the washers.

24                   We don't have washers.  You can't use the ready

25   for patenting to overcome earlier activities that didn't have

washers.  They say it worked part of the time, not so well,
but it still worked without washers.  Then it was ready for
patenting without washers.  It was ready for patenting in mid
October.

THE COURT:  Okay.  So on-sale bar is your primary
argument?

MR. BOWICK:  Well, it's not my primary argument.
I'm just saying, they can't have it both ways.  They can't
skirt that and say it wasn't ready for patenting until the
added washers, when washers had nothing to do with a single
claim in this lawsuit.

And if washers are a claim, then this case
should have never been brought, because we don't have them.
The inventor knows that.  Tesco's lawyers know we don't have
washers.

And if they're going to maintain that it wasn't
ready for patenting until they added washers, then, it just
shows how frivolous this whole case and these arguments are.

And if the brochure -- second court just
said -- doesn't show washers on it and that's the key to
their invention, then, they shouldn't have brought this suit,
because they knew about the brochure didn't have washers.
They knew NOV didn't have washers.  They knew Frank's didn't
have washers.

THE COURT:  So the brochure is prior art?

1          MR. BOWICK:  It is.  And they've admitted that.

2          THE COURT:  Okay.

3          MR. BOWICK:  Thank you, Your Honor.

4          MR. HEWITT:  Your Honor, I'm not going to say

5     anything about that issue.  It's been argued by everybody.

6               I just want to be sure I understand, with

7     respect to an inequitable conduct, there are other counts,

8     four to five of them, and we do want to be heard on them.

9     And the way we were thinking about doing it, to try to make

10    it as efficient as possible, is for NOV to go first on the

11    litigation misconduct and play whatever designations it's

12    going to play, plus its other evidence.

13              And then we, for Frank's, will pick up and we

14    won't repeat any of the designations that are the same as

15    NOV's; and we'll add what evidence there is on the issue --

16    like the August brochure, where there's an overlap.  We'll

17    add that for the inequitable conduct to try to avoid as much

18    wasted time as possible to streamline it.  That won't work in

19    everything, but it will work in some.  And we'll get an

20    entire record, if the Court is willing to do that.

21         THE COURT:  What is your best argument on

22    inequitable conduct?  Is it the brochure?

23         MR. HEWITT:  I think that the best argument is the

24    April brochure.

25         THE COURT:  Well, I just have a hard -- I know you

1  all disagree.  But I have a hard time getting around what the

2  PTO, what the examiner said about that.

3         MR. HEWITT:  The examiner didn't say anything about

4  it.  The examiner of the patent didn't say anything about it,

5  except he couldn't see it.

6         THE COURT:  Couldn't he have asked for clarification

7  if he thought it was important?

8         MR. HEWITT:  He just denied it.  That's what they

9  do.  He denied the reexamination, and he went on down the

10 road.

11         But that -- that examiner was -- same examiner,

12 Kaufman, but he was looking at it in the Frank's

13 reexamination, not in this reexamination.

14         But the point is that what it showed was

15 supposedly -- well, the brochure was given to the Patent

16 Office a couple of times, in the reexamination, not original

17 prosecution.  It was given to the Patent Office but it wasn't

18 ever explained.  So what was in the pictures were never

19 explained to the patent examiner who was examining it.

20         THE COURT:  Yeah.  Okay.

21         MR. HEWITT:  And he didn't understand that.  So

22 Tesco knew that.  Tesco knew what was in the photographs.

23 Tesco knew that the claims that had been allowed -- that many

24 of them had been allowed had the antirotation feature, just

25 like this Court said in -- and you found in finding the

1  patent to be invalid; that Tesco did not dispute that it was
2  known in the art to have a pipe engaging apparatus; that it
3  was known in the art to have link arms coming from the top
4  drive; and it was known in the art to have antirotation.
5  Except that feature, the antirotation wasn't known --
6            THE COURT:  Okay.
7            MR. HEWITT:  -- to the Patent Office.
8            THE COURT:  Okay.
9            MR. HEWITT:  And if they think it was known to the
10  Patent Office, other than submitting a brochure without
11  confidence, then let's hear it.
12            THE COURT:  Okay.  Thank you.
13            MR. BOWICK:  Your Honor, we have a different --
14  Frank's has a different opinion than we do.
15            NOV believes that the August brochure is
16  probably the strongest grounds for inequitable conduct.  So I
17  want to make sure the record is clear.
18            MR. RALEY:  Tell him our cuts are five hours at the
19  most, total for everything.
20            MR. BOWICK:  Your Honor, the cuts we have from the
21  videos, I believe, is about five hours.  So we're talking
22  about a two-day presentation for trial.
23            THE COURT:  Okay.  Thank you very much.
24            Anybody from Tesco want to speak?
25            MS. RAIN:  Your Honor, if I could, I would like --

1          THE COURT:  Yes, Ms. Rain.

2          MR. RAIN:  -- to make a few quick statements.

3          THE COURT:  Yeah.  Why don't you come up here.

4          MS. RAIN:  You have asked the question about why

5     this washers issue is coming up now a couple of times.

6          THE COURT:  Yes.

7          MS. RAIN:  And, if I could, I would just like to

8     explain how I saw it come up.  As you know, the Court ruled

9     on on-sale bar --

10          THE COURT:  Yes.

11          MS. RAIN:  -- but the Defendants still had an

12     inequitable conduct argument with respect to on-sale.  So the

13     Defendants went up to depose Mr. Beierbach in October of 2013

14     and we showed him an e-mail that he had written right before

15     the patent application was filed.  Mr. Beierbach had written

16     an e-mail to some folks at Tesco and said, "Look, guys, we

17     are commercially using this invention.  We need to get this

18     patent application on file and, in fact, we may even have to

19     direct our claims more narrowly to an automated elevator

20     since we're already commercially using it."

21          THE COURT:  Date of that?

22          MS. RAIN:  Right prior to them filing the patent

23     application.  So this would have been in September 2003,

24     okay.

25          So then they filed the patent application in

November of 2003, but they do not make their claims to
this -- they don't narrow their claims to this automated
elevator that they're saying.  So, in October 2013, when we
go up to depose Beierbach, we said, "What were you concerned
about in this e-mail?"  And he admits that he was concerned
about the on-sale bar.  He admits that he knew that there was
a requirement to get a patent application on file within a
year after they were commercially using it.

   THE COURT:  Okay.  But you're saying his e-mail was
a month before they filed?

   MS. RAIN:  Right.

   THE COURT:  So they're within the one-year period;
right?  I'm missing something here.

   MS. RAIN:  Okay.  So you get one year to file your
patent application, right?

   THE COURT:  Right.  Right.

   MS. RAIN:  And so they had already started using it
in November of 2002.

   THE COURT:  Okay.  Well, again, what's the evidence
for that?

   MS. RAIN:  Well, I mean it's undisputed that it
was -- that it was -- began -- that the tool was used in
November of 2002.

   THE COURT:  Okay.

   MS. RAIN:  I don't think --

1        THE COURT:  Pardon me.  I think that's right.

2        MS. RAIN:  Yeah.  So, you know, they're getting

3   ready to file in November 2003 and saying, "Look, we're

4   already commercially using this," okay, because that was

5   almost a year ago; right?

6        THE COURT:  More than a year ago, if you say --

7   November 2003, he's saying it's already commercially -- it's

8   already commercially available.

9        MS. RAIN:  Yes.  September, October, November,

10  sometime in that range.  I don't have the exact date on the

11  e-mail right now.

12       THE COURT:  But isn't he still --

13       MS. RAIN:  But it doesn't really matter.

14       THE COURT:  But isn't he still in the one-year

15  period?

16       MS. RAIN:  So he's saying, "Look, we've already

17  commercially used this.  We need to get it on file" --

18       THE COURT:  Yeah.

19       MS. RAIN:  -- okay?  And so -- and so when he was

20  asked in his deposition about it, he says he was concerned

21  about the on-sale bar when he wrote this e-mail and he was

22  concerned that they needed to file narrower claims, and he

23  knew that they needed to get it on file within one year after

24  using it, okay?

25              This -- this did not look good for Tesco, okay?

1    So Tesco came back and tried to establish nonmateriality with

2    respect to the on-sale bar portion of this inequitable

3    conduct evidence.  Because Beierbach is over here saying,

4    "Oh, we're already commercially using it.  We need to get

5    this patent application on file," and he admitted that he was

6    concerned about the on-sale bar, okay, when he wrote this

7    e-mail.

8                    And so Ballard cross-examines him and says,

9    well, these -- the washers weren't in place and these washers

10   were essential to the invention and --

11                THE COURT:  Yeah.  I got that.  I got that.

12                MS. RAIN:  And so that's where Ballard was going

13   with that.  This very bad evidence on inequitable conduct,

14   the on-sale bar portion came out from Beierbach.  And Ballard

15   comes back and says, "Well, it wasn't ready for patenting,"

16   is where he's going with the essential elements.

17                THE COURT:  I think you just explained to me what

18   I've been thinking.  I mean, that is the dilemma.  I have

19   great respect for you, so I'm afraid I'm not picking up your

20   point.

21                    I understand exactly the horns of the dilemma.

22   Was it commercially available?  If it was, was the whole

23   invention there?  I mean, that's what we've been talking

24   about all morning, isn't it?

25                MS. RAIN:  Uh-huh.

1    THE COURT:  So what does this e-mail add to it?

2    MS. RAIN:  So basically this e-mail had never been

3 put in front of Beierbach, and it establishes intent.

4 Beierbach knew about the on -- okay, because we're working

5 with inequitable conduct, on-sale inequitable conduct.

6    THE COURT:  Okay.  You're trying to provide the

7 intent part of the inequitable conduct?

8    MS. RAIN:  Right.  So defendants are up there trying

9 to establish that Beierbach had intent.  He knew that they

10 were commercially using it.  He knew that that was an issue

11 and that they needed to get their patent application before

12 it was within that one-year time date.  And so we had, what

13 we thought, established intent right there.

14     And so Ballard comes back and goes to the

15 materiality portion of it.  And he says, okay, well, you

16 know, we -- you know, these elements are essential and,

17 therefore, you don't have the materiality portion of

18 inequitable conduct because there's no ready for patenting.

19 There's a lot of levels to this.

20    THE COURT:  Yeah, I understand.

21    MS. RAIN:  So you've got inequitable conduct and,

22 within that, the on sale.  Within on sale, you've got

23 materiality and intent.  And so defendants got some good

24 testimony on intent, and Ballard came back and tried to get

25 to the materiality portion of inequitable conduct by

1  establishing it wasn't ready for patenting.

2        THE COURT:  Yeah.

3        MS. RAIN:  Does that make sense?

4        THE COURT:  Yeah.  I understand what you're saying.

5        MS. RAIN:  Okay.  And one other point I just wanted

6  to make is that today Mr. Ballard said that it was not ready

7  for patenting, after you brought up the issue about bringing

8  up on-sale bar again.  But they filed a brief this morning on

9  page 2, and it clearly suggests that it was ready for

10  patenting.  So, I mean, he says -- and it clearly works --

11       THE COURT:  I have that in front of me.  Let's talk

12  about that.  Where on page 2?

13       MS. RAIN:  On page 2, the very last sentence.

14       THE COURT:  "By contrast, Tesco had a tool without

15  washers or bumpers.  If Frank's argues work in the yard...

16       MS. RAIN:  And then he says, "And it clearly worked

17  for several days in the field before refinements were made."

18  And if you look at the footnote, it points to all of

19  this element -- or all of this evidence that establishes the

20  tool worked in the yard prior to the washers being there.

21       THE COURT:  Okay.  What's your primary argument?

22  On-sale bar?

23       MS. RAIN:  On sale bar.

24       THE COURT:  Not the fact that the washers should

25  have been part of the patent?

1          MS. RAIN:  Well, I mean, they can't have it both

2  ways.

3          THE COURT:  I understand.  Your primary argument is

4  on-sale bar?

5          MS. RAIN:  I mean, I have to say that both are my

6  argument.  They -- they -- you know, they're flipping a coin.

7  Just like Bobby Bowick said, they're flipping a coin.  You

8  know either it's ready for patenting or it's not.  They can't

9  have it both ways.  And either way they have it, it's either

10  on sale or they've committed litigation misconduct.

11          THE COURT:  Okay.  All right.  Okay.

12              Mr. Bushman, yes, sir.

13          MR. BUSHMAN:  Just briefly, Your Honor, OES adopts

14  both positions, NOV's Frank's, as to inequitable conduct.

15              But in a submission that they filed today,

16  here's what they're saying that the Patent Office said about

17  the brochure.  I'm talking about the April brochure.

18          THE COURT:  Yes.

19          MR. BUSHMAN:  "Finally, with regard to the Tesco

20  brochure requester, Frank's, contends that the brochure shows

21  the channel key and guide structure that was not shown in

22  prior references.  However, in reviewing the documents,

23  there's no description of such structure and the Examiner

24  cannot identify with any degree of certainty the parts in the

25  photographs that would indicate such a key and guide.

1   Therefore, as no new technical teaching/feature is taught by

2   the Tesco brochure, it does not raise a new question of

3   patentability with regard to Claims 1-7 --

4          THE COURT:  You're going way too fast.  Did not

5   raise a question...

6          MR. BUSHMAN:  ...of patentability with regard to

7   Claims 1-70 of the '443 patent.

8               What the examiner is saying, number one, I

9   can't see anything.  Number two, there's nothing in there

10  that describes anything.  He's not saying one way or the

11  another whether it's material.  He simply doesn't know.

12              Tesco knew, but the examiner didn't.  And they

13  didn't go out of their way to point out, "Yeah, it does show

14  a channel key.  Yeah, it does show a guide.  It may not be

15  described, but it's in there."

16         THE COURT:  Okay.

17         MR. BUSHMAN:  Thank you, Your Honor.

18         THE COURT:  Okay.  If anybody wants to submit

19  deposition experts to me, they may, within the next 48 hours.

20  I'll be in contact with you if I do plan to proceed with the

21  trial on Monday.  For now, you can assume I do not, however.

22  Thank you very much.

23         MR. BECK:  Thank you, Your Honor.

24         (Off the record.)

25

1          I certify that the foregoing is a correct

2    transcript from the record of proceedings in the

3    above-entitled cause, to the best of my ability.

4

5

6    *Dorothy A. Rull*

7    _____          4-18-2014

8    Dorothy A. Rull                        Date
     Official Court Reporter

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25