**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| TESCO CORPORATION, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-08-2531 |
| | § | |
| WEATHERFORD INTERNATIONAL, | § | |
| INC., NATIONAL OILWELL VARCO, | § | |
| L.P., OFFSHORE ENERGY SERVICES, | § | |
| INC., and FRANK'S CASING CREW & | § | |
| RENTAL TOOLS, INC., | § | |
| | § | |
| *Defendants*. | § | |

## MEMORANDUM AND ORDER

Pending before the Court are Plaintiff Tesco Corp.'s ("Tesco") Motion for Summary Judgment (Doc. No. 890), Defendant National Oilwell Varco, L.P.'s ("NOV") Fifth Motion to Compel (Doc. No. 973), NOV's Motion for Finding of Exceptional Case under 35 U.S.C. § 285 (Doc. No. 987), Defendant Frank's International, LLC ("Frank's") Motion for Judgment of Exceptional Case upon Inequitable Conduct under 35 U.S.C. § 285 (Doc. No. 993), NOV's Motion to Unseal a Pre-Trial Conference Transcript (Doc. No. 1005), Frank's Motion for Judgment of Patent Invalidity under the On-Sale Provision of 35 U.S.C. § 102(b) (Doc. No. 1009), Frank's Motion for Judgment of Patent Invalidity under 35 U.S.C. § 102(b) (Anticipation) (Doc. No. 1010), and Tesco's Motion to Strike Frank's Motion for Judgment of Patent Invalidity under the On-Sale Provision of 35 U.S.C. § 102(b) and Frank's Motion for Judgment of Patent Invalidity under 35 U.S.C. § 102(b) (Anticipation) (Doc. No. 1017).

The post-trial discovery conducted in this case surrounding allegations of inequitable conduct and litigation misconduct on the part of Tesco has revealed that Tesco's counsel

1

affirmatively misrepresented to the Court during trial the statements of key witnesses regarding important evidence disclosed only during trial. Accordingly, in an effort to safeguard the integrity of the Court and these proceedings, the Court utilizes its inherent authority to **DISMISS** the case **WITH PREJUDICE**. As a result, the Court **TERMINATES AS MOOT** all of the pending motions.

## I.     BACKGROUND

This case was filed in 2008, and has been the subject of previous rulings of the Court. (*See* Doc. Nos. 386, 805, 821). The background set forth in earlier writings will not be repeated, except as necessary to provide context for the facts and law discussed herein.

Tesco owns U.S. Patent No. 7,140,443 ("the '443 patent") and U.S. Patent No. 7,377,324 ("the '324 patent"). The '324 patent, granted in May 2008, is a continuation of the '443 patent, granted in November 2006. The two patents describe a tool used on a drilling rig. Drilling rigs are used to bore and encase holes in the ground for the purpose of extracting oil. The patents describe an apparatus and method for handling the sections of the pipe or pipe strings that are used for drilling or lining a well bore. Stated summarily, the patent covers a "Case Drilling System with a link tilt" referred to by all parties as "CDS with link tilt." More detailed descriptions of the device and its function can be found in the Court's earlier opinions.

Tesco brought suit against Weatherford International, Inc., NOV, OES, and Frank's for infringement of those patents.  After re-examination of the patents with the United States Patent and Trademark Office ("PTO"), lengthy discovery and many pre-trial motions, the Court and the parties spent three weeks in jury trial. The jury found that claims 27 and 55 of the '443 patent, and claim 14 of the '324 patent were valid. The jury found that claims 13, 25 and 59 of the '443 patent, and claims 1 and 12 of the '324 patent were not valid.

Tesco sought to have the Court enter judgment on the verdict. Defendants sought judgment as a matter of law in their favor. The Court did neither. Rather, because of internal inconsistencies in the jury verdict, and because of concern – re-enforced during the trial in no small part because of the events discussed herein – that Tesco had not produced all of the discovery that Defendants had properly requested, the Court authorized limited additional discovery.

After engaging in limited post-trial discovery, the parties filed numerous post-trial motions. Following several extensive hearings, the Court denied Defendants' motions for summary judgment under the on-sale bar provision, 35 U.S.C. § 102(b), (Doc. No. 805), and granted their motions for summary judgment under the obviousness provision, 35 U.S.C. § 103(a), (Doc. No. 821). The Court also denied Tesco's motion for entry of judgment on the verdict, and NOV and OES's motion for summary judgment based on anticipation under 35 U.S.C. § 102(b). (Doc. No. 808). Tesco appealed this Court's decision granting summary judgment as to obviousness, and Frank's counter-appealed. The Federal Circuit dismissed Tesco's appeal as premature. *See* Order (Doc. No. 49), *Tesco Corp. v. National Oilwell Varco, LP*, No. 13-1155 (Fed. Cir. Oct. 3, 2013) (unpublished). The Court then allowed the parties again to conduct limited discovery, this time on the question of whether Tesco's conduct warranted a finding of exceptional case under 35 U.S.C. § 285. They then engaged in extensive briefing of that issue, producing the pending motions, and the Court conducted equally extensive hearings on them. The decision that follows arises from the Court's consideration of all the evidence presented therein.

## II.     LEGAL STANDARD

This Court possesses certain implied powers to "'manage [its] own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) (quoting *Link v. Wabash R. Co.*, 370 U.S. 626, 630-31 (1962)). One of these implied powers is the "ability to fashion an appropriate sanction"—such as involuntary dismissal of a lawsuit or the imposition of attorney's fees—"for conduct which abuses the judicial process." *Id.* at 44-45. Pursuant to such inherent authority, the Court, in its discretion, may dismiss an action, though such a dismissal is "a particularly severe sanction." *Id.* at 45 (citing *Roadway Exp., Inc. v. Piper*, 447 U.S. 752, 765 (1980)). In addition, the Court "may assess attorney's fees when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'" *Id.* at 45-46 (quoting *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 258-59 (1975)). However, the Supreme Court has warned that "[b]ecause of their very potency, inherent powers must be exercised with restraint and discretion." *Id.* (citing *Roadway Express*, 447 U.S., at 764).

In light of *Chambers*, the Federal Circuit has determined that "when statutes or rules provide an adequate sanction for bad faith, a trial court should ordinarily rely on those express authorities for sanctions." *Amsted Indus. Inc. v. Buckeye Steel Castings Co.*, 23 F.3d 374, 379 (Fed. Cir. 1994) (citing *Chambers*, 501 U.S. at 50). "But," the Supreme Court explained, and the Federal Circuit affirmed, "if in the informed discretion of the court, neither the statute nor the rules are up to the task, the court may safely rely on its inherent power." *Chambers*, 501 U.S. at 50; *see id.* In *Amsted*, the Federal Circuit clarified when a court may invoke its inherent powers to sanction in place of the sanctions offered by 35 U.S.C. § 285. It found that the district court had abused its discretion in awarding the full amount of expert witness fees because, though the

conduct of the party facing sanctions "justif[ied] an award of attorney fees and enhanced damages under section 285, [it] did not amount to a fraud on the court or an abuse of the judicial process." *Amsted*, 23 F.3d at 379. The Federal Circuit admonished that a district court "should resort to its inherent power only where the rules or statutes do not reach the 'acts which degrade the judicial system.'" *Id.* (quoting *Chambers*, 501 U.S. at 41-42).

## III.    RELEVANT STATEMENTS

### A. Tesco's Representations to the Court

On October 28, 2010, Day Four of the trial in this case, Tesco called to the stand Kevin Nikiforuk, co-inventor of the CDS with link tilt. Much to the surprise of all present, Mr. Nikiforuk testified that a marketing brochure developed by Tesco in August 2002 ("the August 2002 brochure"), well before the November 8, 2002 on-sale bar critical date, displayed his invention. Trial Tr. at 777:22-779:3. This testimony could easily have been the fulcrum in the trial, leading to a prompt dismissal of all of Tesco's claims.

Whether the brochure in question had been produced to the Defendants in discovery is hotly contested. Tesco claims that it produced a black-and-white copy in 2009, while Defendants argue that Tesco never produced the color version of the brochure. If the August 2002 brochure indeed showed the CDS with link tilt invention prior to the on-sale bar's critical date, then the patent would be invalid. *See* 35 U.S.C. § 102(a)(1). Accordingly, the importance of Mr. Nikiforuk's declaration is impossible to overstate.

The next day, Friday, October 29, 2010, Tesco asked the Court for time, through the weekend, to "find out what this rendering is, where it came from . . . ." Trial Tr. at 871:24-872:5. When trial resumed the following Monday, November 1, 2010, Glen A. Ballard, Jr., Tesco's counsel, reported to the Court that:

> As I told the Court, I would get to the bottom of this August brochure issue . . . over the weekend. We did so. We found the animator who actually did the rendering in question. The animator is Don Carr [sic]. He says unequivocally that this is not the invention in the brochure. . . . He says – he says the date is in August of 2002 but the rendering is *not* of the invention; that, in fact, the rendering is of link arms just above the grabber box on the top drive.

Trial. Tr. at 895-897. Mr. Ballard went on:

> I think the issue has been put to bed. It's not the image. I can call Don Carr [sic] to tell you that. We also talked to a guy last night, Jim Orcherton, who was also an individual who worked on the rendering. . . . He also confirms that it's not the tool. And so we could call both of them. . . . These guys can come in – I think Mr. Orcherton may be able to be here as early as Wednesday but surely Thursday, and Mr. Carr can be here by Friday. I think this trial will still be going by then, unfortunately; and so as a consequence, I think we can get them on if this is still an issue.

Trial Tr. at 898-900. Importantly, Mr. Ballard claimed:

> The animators that actually did the brochure and that actually did the rendering are prepared to swear and testify that this is not Mr. Nikiforuk's invention; and in fact, there is no doubt it's not Mr. Nikiforuk's invention.

Trial Tr. at 907. Mr. Ballard later reaffirmed this representation in even stronger terms:

> [T]hat is what he's [Don Karr] going to say; and he's going to say unequivocally that this is not it. And so is Mr. Orcherton who also worked on the rendering. Two individuals, same rendering, both will say that.

Trial Tr. at 923.

### B.  Don Karr's Deposition Testimony

In a post-trial deposition, Don Karr testified as follows:

> Q: One question: Have you ever – have you ever told anybody associated with Tesco or Tesco themselves that you were the creator of the brochure graphics or animation?
>
> A: Which one are we talking about?
>
> Q. The one for the [August 2002] brochure.
>
> A. No, because I was not involved in the brochure.

6

Karr Depo. at 12:22-13:4.

> Q: If someone claimed in court claimed that you were the one who created the image, that would not be truthful --
>
> A. That's --
>
> Q. -- correct?
>
> A. -- right.
>
> Q. Is that correct?
>
> A. Correct.

Karr Depo. at 12:12-19.

> Q. All right. Did you inform Tesco at that time you were not the one who created the image? Did you tell them one way or another whether you --
>
> A. No, I did -- I -- my only input to this brochure was the photographs. Someone in Houston created this -- this image.
>
> Q. Did you tell Tesco that in November of 2010?
>
> A. Yes.
>
> Q. Who did you tell that to?
>
> A. It would have been John.
>
> Q. Luman?
>
> A. Yes.

Karr Depo at 20:16-21:3.

> Q. Would it surprise you that they told the Court that they've gotten to the bottom of it, and that you and Mr. Orcherton did the brochure, and they never mentioned PriMarc?
>
> A. There is no way I did that brochure.
>
> Q. So that would be a false statement; correct?
>
> A. Totally.

7

Karr Depo. at 36:3-7.

> Q: I'm reading from the transcript of proceedings in court November 1st, 2010. Mr. Ballard, quote: "As I've told the Court, I would get to the bottom of this August brochure, 4008, over the weekend. We did so. We found the animator who actually did the rendering in question. The animator is Don Karr." Unquote. That's not a truthful statement is it, sir?
>
> A. I don't have the ability – it's – no, it's not true in any way, shape, or form.

Karr Depo 42:13-43:2.

> Q: Did you have a discussion with Mr. Luman about who prepared this graphic, the one in the centerfold?
>
> A: He had asked me if I had, and I said no. I had nothing to do with it.

Karr Depo. at 55:4-8.

> Q . . . You said a minute ago that when the first image was sent to you, you thought it might be a scan and it wasn't clear to you, correct?
>
> A. That's correct.
>
> Q: So you did not say one way or another at that time whether the CDS with link tilt was in the image. You just said you couldn't tell – correct?
>
> A: I –
>
> Q. – correct?
>
> A: That's right.

Karr Depo. at 18:8-13.

### IV. ANALYSIS

Defendants uniformly argue that these statements show that Tesco affirmatively and knowingly misrepresented that Mr. Karr was the "animator" who "actually did" the rendering in the August 2002 brochure and that Mr. Karr had stated "unequivocally" that the rendering in the August 2002 brochure did *not* depict the CDS with link tilt.

Despite this deposition testimony, Tesco claims that it accurately reported to the Court what Mr. Karr had told it. In support, Tesco claims that Mr. Karr at first stated that the invention depicted in the August 2002 brochure was not the CDS with link tilt, which is consistent, it argues, with its representations to the Court:

> Q. I'm going to read to you something that was said in this Tesco interrogatory answer. And again, this relates to the first version that was sent to you. Quote: "Specifically Mr. Karr said initially that the subject rendering in Exhibit 4008, the subject rendering, depicted link arms on the grabber box, which is part of the top drive." End quote. Did you tell Mr. Luman that?
>
> A. That's what it looked like to me. Yes.

Karr Depo. at 106:12-23. However, what Tesco does not report is that Mr. Karr continued as follows:

> Q. So even though it was unclear and even though you just said you couldn't tell where it was connected to the grabber box?
>
> A. Well, I know what a top drive looks like, and because it wasn't totally clear, I *made the assumption* that that's what it was.
>
> Q. And did you tell Mr. Luman that that was an assumption because it wasn't clear?
>
> A. I said I didn't -- he wanted a definitive answer, and *I said I could not give him one because I could not see it*.

Karr Depo. at 106:24-107:10 (emphasis added). And, just *before* the testimony quoted by Tesco, Mr. Karr stated:

> Q. . . . Were you asked by Mr. Luman with respect to that first illustration that you received, the first copy of the brochure, whether or not the link tilt was attached to the pipe engaging apparatus or to the top drive?
>
> A. I was asked, yep, if I saw it there or if it was there: and *my comment was is the image was so poor and it was disguised behind the mast that I – I actually couldn't tell*.
>
> Q. You couldn't tell where the link arm was attached at all?

9

    A. No.

Karr. Depo. at 105:25-106:11. The Court strains to understand how such equivocal answers to John Luman, another of Tesco's counsel, could be represented to the Court as an "unequivocal" statement that the image did not depict the CDS with link tilt. Tesco also attempts to minimize its misrepresentations by arguing that Mr. Karr told it that "probably 95 percent of the photographs in that brochure [were mine]." Karr Depo. at 32:5-11. Tesco claims that this "clearly support[s] why Tesco told the Court [that Mr. Karr was] involved in the brochure during trial." Tesco MSJ at 41. But, Tesco did not simply report to the Court that Mr. Karr was "involved" – it assured the Court that it had contacted "the animator who actually did the rendering in question. The animator is Don Carr [sic]." Trial. Tr. at 895-897. Finally, Tesco argues that any misrepresentations it might have made to the Court did not make a difference because it never made them in front of the jury and Defendants rejected the mistrial offered by the Court.

    The Court is not persuaded by Tesco's arguments. Defendants have produced testimonial evidence clearly and directly contrary to the representations Tesco made to the Court during trial. That Tesco may have backpedaled from these statements over time, *after trial had finished*, does not relieve it of its responsibility for its misrepresentations to the Court at what all present recognized was an absolutely critical point in the trial. Although Tesco testified in nearly directly opposite terms, Mr. Karr could not, in fact, "unequivocally" state that the CDS with link tilt was not in the rendering. Nor did he ever tell counsel that he was the "animator" who "actually did" the rendering. The testimony reveals that this is not a simple case of innocent mischaracterization. Mr. Karr said one thing, and counsel told the Court that he said something else. Such willfulness compels a finding of bad faith. If the actual statements made by Mr. Karr and Mr. Orcherton at this critical inflection point had been reported to the Court, the Defendants'

10

trial strategy would have been entirely different. More significantly, the Court would, in all probability, have entered judgment for the Defendants forthwith.

Further, the Court is deeply concerned about Tesco's attitude towards its misrepresentations to the Court. Counsel owes the Court a duty of complete candor at all times, regardless of whether the jury is in the courtroom, or opposing counsel rejects other sanctions. Moreover, any sanctions opposing counsel rejected have nothing to do with Tesco's misrepresentations *to the Court*. As the trial transcript makes abundantly clear, the Court offered a mistrial as a way to cure any prejudice to Defendants from the new evidence. Post-trial disclosures show that the Defendants were denied access to critical information they needed in deciding whether to accept a mistrial.

Beyond the effect on Defendants, the Court has an independent obligation to safeguard its own integrity and those of the proceedings before it. It is impossible to know exactly what the result would have been had Tesco been forthright with the Court. Nevertheless, it cannot be understated how critical this brochure has been in this case. The Court well recognized at the time of Mr. Nikiforuk's testimony that the brochure might very well be case dispositive. Trial Tr. 871:11-23. So did the parties. Tesco's advantage-seeking misrepresentations sought nothing other than to minimize the importance of Mr. Nikiforuk's testimony and the significance of the rendering in the August 2002 brochure at a critical point at which the Court and the parties were trying to find the best way forward following the disclosure of such important evidence and Mr. Nikiforuk's surprising testimony. Such misrepresentations irrevocably poisoned these proceedings, and could not have been calculated to assist the Court in the administration of justice, but only to win an advantage. Accordingly, the Court reluctantly concludes that Tesco's

representations amount to an abuse of the judicial system; they are most certainly "'acts which degrade the judicial system.'" *Amsted*, 23 F.3d at 379 (quoting *Chambers*, 501 U.S. at 41-42).

Lesser sanctions will not suffice here. While the Court still may award attorney's fees as a sanction in addition to this dismissal, an award of attorney's fees alone is insufficient to deter such conduct. As the First Circuit has explained in a case which similarly dealt with a matter at the heart of judicial integrity,

> the sanction was obviously severe and lesser sanctions were available. . . . His deceits were substantial, deliberate, and went to the heart of the case. *And since not everyone will be caught, the penalty needs to be severe enough to deter.*

*Hull v. Municipality of San Juan*, 356 F.3d 98, 102 (1st Cir. 2004). Just as with witnesses testifying truthfully under oath, the proper administration of justice depends upon counsel being completely forthright with the Court. As the court recognized in *Hull*, not every lawyer who lies to a court will be caught, so when such deliberate and advantage-seeking untruthful conduct is uncovered, the penalty must be severe enough to act as a deterrent. Awarding attorney's fees – even if they were to be paid by Tesco's counsel alone – is insufficient. Such serious misrepresentations cannot be excused as simply the cost of doing business. Attorney's fees also may be appropriate, but such an affront to this Court, to the other parties, and to judicial integrity can only be answered with dismissal.

## V. CONCLUSION

The Court reaches its decision with great reluctance. The Court is entirely confident that the conduct that it finds so troubling is entirely out of character for the attorneys. However, the conduct is serious and has had significant and costly ramifications to the Court and Defendants.

For the reasons stated above, the case is **DISMISSED WITH PREJUDICE** pursuant to the Court's inherent authority. All pending motions are **TERMINATED AS MOOT**. The Court

will entertain motions for attorney's fees based on this ruling. Those parties seeking attorney's fees should file their motions within sixty days of this Order. In keeping with the Southern District of Texas's Local Rules, any Responses will be due twenty-one days following that date and any Replies will be due ten days later.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the twenty-fifth day of August, 2014.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE